## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

A.M., a minor by and through, Iesha
Mitchell, Guardian and Next Friend;
A.B., a minor by and through, Kea N
Bennett, Guardian and Next Friend;
A.L., a minor by and through, Christine
Anderson, Guardian and Next Friend;
A.R., a minor by and through, Ronald D
Roseburgh, Guardian and Next Friend;
A.F., a minor by and through, Stonesha
A Williams, Guardian and Next Friend;
A.M., a minor by and through, Ramona
Surray, Guardian and Next Friend; A.J.,
a minor by and through, Antwon
Johnson, Guardian and Next Friend;
A.G., a minor by and through, Andrea L
Gunn, Guardian and Next Friend; A.W.,
a minor by and through, Olisha Hill,
Guardian and Next Friend; A.E., a minor
by and through, Chakeemala L Jones,
Guardian and Next Friend; A.T., a minor
by and through, Constance Woods-tyler,
Guardian and Next Friend; A.B., a minor
by and through, Earnest Bates, Guardian
and Next Friend; A.A., a minor by and
through, Betty Washington, Guardian
and Next Friend; A.B., a minor by and
through, Earnest Bates, Guardian and
Next Friend; A.B., a minor by and
through, Carmela Patton, Guardian and
Next Friend; A.W., a minor by and
through, Khanita M Hudson, Guardian
and Next Friend; A.T., a minor by and
through, Donesia M Tucker, Guardian
and Next Friend; A.J., a minor by and
through, Antwon Johnson, Guardian and
Next Friend; A.L., a minor by and

Case No.:

Hon.

through, Tiffany L Brown, Guardian and Next Friend; A.M., a minor by and through, Cathy M Murray, Guardian and Next Friend; A.B., a minor by and through, Mary Burton, Guardian and Next Friend; A.M., a minor by and through, Mary Burton, Guardian and Next Friend; A.J., a minor by and through, Mary Burton, Guardian and Next Friend; A.J., a minor by and through, Mary Burton, Guardian and Next Friend; A.W., a minor by and through, Shanta Y Watkins, Guardian and Next Friend; A.H., a minor by and through, Hashim D Mccoy, Guardian and Next Friend; A.T., a minor by and through, Tanisha L Neal, Guardian and Next Friend; A.F., a minor by and through, Rodney M Ford, Guardian and Next Friend; A.L., a minor by and through, Nichelle N Johnson, Guardian and Next Friend; A.H., a minor by and through, Larry T Hooks, Guardian and Next Friend; A.D., a minor by and through, Lakiesha A Bland, Guardian and Next Friend; A.L., a minor by and through, Nichelle N Johnson, Guardian and Next Friend; A.M., a minor by and through, Cheyann M Mcgee, Guardian and Next Friend; A.T., a minor by and through, Sonya D Cooper, Guardian and Next Friend; A.P., a minor by and through, Kabrina James, Guardian and Next Friend; A.T., a minor by and through, Priscilla A Taylor, Guardian and Next Friend; A.H., a minor by and through, Tasha Coleman, Guardian and Next Friend; A.H., a minor by and through, Corvell L Hardnett, Guardian and Next Friend; A.H., a minor by and

through, Kayla Jones, Guardian and
Next Friend; A.M., a minor by and
through, Terrell Moore, Guardian and
Next Friend; A.L., a minor by and
through, Heather Miller, Guardian and
Next Friend; A.B., a minor by and
through, Kevin Bethea, Guardian and
Next Friend; A.W., a minor by and
through, Olisha Hill, Guardian and Next
Friend; A.M., a minor by and through,
Cathy M Murray, Guardian and Next
Friend; A.G., a minor by and through,
Angela Gunn, Guardian and Next
Friend; B.L., a minor by and through,
Antonea Brown, Guardian and Next
Friend; B.J., a minor by and through,
Jasmine Jones, Guardian and Next
Friend; B.B., a minor by and through,
Vernetta Childs, Guardian and Next
Friend; B.M., a minor by and through,
Lashaun E Wilson, Guardian and Next
Friend; B.L., a minor by and through,
Lakeumiss C Jones, Guardian and Next
Friend; B.H., a minor by and through,
Diamond Davis, Guardian and Next
Friend; B.H., a minor by and through,
Corvell L Hardnett, Guardian and Next
Friend; B.N., a minor by and through,
Emanuel S Norman, Guardian and Next
Friend; C.B., a minor by and through,
Catherine J Brown, Guardian and Next
Friend; C.J., a minor by and through,
Sara E Zavoral, Guardian and Next
Friend; C.J., a minor by and through,
Laura L Ruby, Guardian and Next
Friend; C.B., a minor by and through,
Jasmine Jones, Guardian and Next
Friend; C.M., a minor by and through,
Tamika N Miller, Guardian and Next
Friend; C.M., a minor by and through,

3

Jahneen K Copeland, Guardian and Next Friend; C.A., a minor by and through, Rebecca Campbell, Guardian and Next Friend; C.A., a minor by and through, Keisha Kimble, Guardian and Next Friend; C.P., a minor by and through, Shawniqua F Bailey, Guardian and Next Friend; C.B., a minor by and through, Jasmine Boxx, Guardian and Next Friend; C.M., a minor by and through, Tamico Mosley, Guardian and Next Friend; C.W., a minor by and through, Sharieka L Bell, Guardian and Next Friend; C.M., a minor by and through, Therita Micken, Guardian and Next Friend; C.H., a minor by and through, Corvell L Hardnett, Guardian and Next Friend; C.T., a minor by and through, Sonya D Cooper, Guardian and Next Friend; C.M., a minor by and through, Moneshaniea Mckinney, Guardian and Next Friend; D.H., a minor by and through, Michelle Palmer, Guardian and Next Friend; D.H., a minor by and through, Michelle Palmer, Guardian and Next Friend; D.W., a minor by and through, Demetrius L White, Guardian and Next Friend; D.B., a minor by and through, Shanta Y Watkins, Guardian and Next Friend; D.C., a minor by and through, Latasha Wynn, Guardian and Next Friend; D.C., a minor by and through, Malik D Ellis, Guardian and Next Friend; D.C., a minor by and through, Isabel De Los Santos, Guardian and Next Friend; D.I., a minor by and through, Kayla Jones, Guardian and Next Friend; D.L., a minor by and through, Christine Anderson, Guardian and Next Friend; D.P., a minor by and

4

through, Jennifer Campbell, Guardian and Next Friend; D.L., a minor by and through, Christine Anderson, Guardian and Next Friend; D.E., a minor by and through, Margaret R Mcclinton, Guardian and Next Friend; D.R., a minor by and through, Katrina R Randolph, Guardian and Next Friend; D.C., a minor by and through, Vernetta Childs, Guardian and Next Friend; D.T., a minor by and through, Priscilla A Taylor, Guardian and Next Friend; D.L., a minor by and through, Antonea Brown, Guardian and Next Friend; D.M., a minor by and through, Jenikia Mcgee, Guardian and Next Friend; D.L., a minor by and through, Antonea Brown, Guardian and Next Friend; D.W., a minor by and through, Brenda L Washington, Guardian and Next Friend; D.S., a minor by and through, Andrea Smith, Guardian and Next Friend; D.H., a minor by and through, Michelle Palmer, Guardian and Next Friend; D.T., a minor by and through, Schenella A Taylor, Guardian and Next Friend; D.J., a minor by and through, Yolanda Porter, Guardian and Next Friend; D.A., a minor by and through, Deborah Carrillo, Guardian and Next Friend; D.C., a minor by and through, Latasha Wynn, Guardian and Next Friend; D.C., a minor by and through, Latasha Wynn, Guardian and Next Friend; D.S., a minor by and through, Andrea S Smith, Guardian and Next Friend; D.C., a minor by and through, China C Collins, Guardian and Next Friend; D.K., a minor by and through, Katherine L Smith, Guardian and Next Friend; D.J., a minor

by and through, Yolanda Porter,
Guardian and Next Friend; D.N., a minor
by and through, Tasha Coleman,
Guardian and Next Friend; D.B., a minor
by and through, Jasmine Jones, Guardian
and Next Friend; D.G., a minor by and
through, Tenisa Moore, Guardian and
Next Friend; D.D., a minor by and
through, Kevin Bethea, Guardian and
Next Friend; D.B., a minor by and
through, Catherine J Brown, Guardian
and Next Friend; D.C., a minor by and
through, Latasha Wynn, Guardian and
Next Friend; D.K., a minor by and
through, Katherine L Smith, Guardian
and Next Friend; D.D., a minor by and
through, Conswayla Williams, Guardian
and Next Friend; D.W., a minor by and
through, Brittany Ford, Guardian and
Next Friend; D.H., a minor by and
through, Connie Horton, Guardian and
Next Friend; D.S., a minor by and
through, Jamie Miller, Guardian and
Next Friend; D.W., a minor by and
through, Demetrius L White, Guardian
and Next Friend; E.A., a minor by and
through, Verna Mcgruder, Guardian and
Next Friend; E.W., a minor by and
through, Lakeumiss C Jones, Guardian
and Next Friend; E.H., a minor by and
through, Corvell L Hardnett, Guardian
and Next Friend; E.H., a minor by and
through, Kayla Jones, Guardian and
Next Friend; E.N., a minor by and
through, Emanuel S Norman, Guardian
and Next Friend; E.N., a minor by and
through, Nichelle N Johnson, Guardian
and Next Friend; G.G., a minor by and
through, Tamika S Gray, Guardian and
Next Friend; I.J., a minor by and through,

6

Katina Plump-Dillard, Guardian and Next Friend; I.H., a minor by and through, Charmaine Collins, Guardian and Next Friend; I.D., a minor by and through, Taushenia Daniels, Guardian and Next Friend; I.D., a minor by and through, Mikshell Turner, Guardian and Next Friend; I.D., a minor by and through, Mikshell Turner, Guardian and Next Friend; I.B., a minor by and through, Brittney D Robertson, Guardian and Next Friend; J.K., a minor by and through, Rashia Kelly, Guardian and Next Friend; J.S., a minor by and through, Keoma Mathis, Guardian and Next Friend; J.B., a minor by and through, Natalya Hill, Guardian and Next Friend; J.k., a minor by and through, Rashia Kelly, Guardian and Next Friend; J.W., a minor by and through, Conswayla Williams, Guardian and Next Friend; J.A., a minor by and through, Sharieka L Bell, Guardian and Next Friend; J.S., a minor by and through, Jennifer L Zandarski, Guardian and Next Friend; J.B., a minor by and through, China C Collins, Guardian and Next Friend; J.D., a minor by and through, Jessica L Williams, Guardian and Next Friend; J.L., a minor by and through, Jenikia Mcgee, Guardian and Next Friend; J.B., a minor by and through, Tiffany L Brown, Guardian and Next Friend; J.D., a minor by and through, Jessica L Williams, Guardian and Next Friend; J.J., a minor by and through, Eunisha I Jones, Guardian and Next Friend; J.K., a minor by and through, Keoma Mathis, Guardian and Next Friend; J.G., a minor by and

through, Phyllis J Rodriquez, Guardian and Next Friend; J.M., a minor by and through, Jenikia Mcgee, Guardian and Next Friend; J.B., a minor by and through, Starkesha L Morris, Guardian and Next Friend; J.S., a minor by and through, Tamico Mosley, Guardian and Next Friend; J.E., a minor by and through, Margaret R Mcclinton, Guardian and Next Friend; J.M., a minor by and through, Starkesha L Morris, Guardian and Next Friend; J.R., a minor by and through, Kenarda L Rouse, Guardian and Next Friend; J.L., a minor by and through, Luciana Kuykendoll, Guardian and Next Friend; J.B., a minor by and through, Tanisha L Neal, Guardian and Next Friend; J.M., a minor by and through, Sharmaine Mcclinton, Guardian and Next Friend; J.M., a minor by and through, Jamie Miller, Guardian and Next Friend; J.L., a minor by and through, Rashia Kelly, Guardian and Next Friend; J.M., a minor by and through, Sharmaine Mcclinton, Guardian and Next Friend; J.H., a minor by and through, Kendra D Cooper, Guardian and Next Friend; J.K., a minor by and through, Joeanner L Williams, Guardian and Next Friend; J.H., a minor by and through, Kendra D Cooper, Guardian and Next Friend; J.W., a minor by and through, Tenisa Moore, Guardian and Next Friend; J.M., a minor by and through, Starkesha L Morris, Guardian and Next Friend; J.B., a minor by and through, Starkesha L Morris, Guardian and Next Friend; J.M., a minor by and through, Kevin Bethea, Guardian and Next Friend; J.R., a minor by and

through, Ronald D Roseburgh, Guardian and Next Friend; J.G., a minor by and through, Vastoria Morrow, Guardian and Next Friend; J.J., a minor by and through, Eunisha I Jones, Guardian and Next Friend; J.Y., a minor by and through, Sabrina N Yates, Guardian and Next Friend; J.W., a minor by and through, Alicia L Warren, Guardian and Next Friend; J.W., a minor by and through, Brenda L Washington, Guardian and Next Friend; J.C., a minor by and through, Malik D Ellis, Guardian and Next Friend; J.P., a minor by and through, Lakiesha A Bland, Guardian and Next Friend; J.W., a minor by and through, Brittany Ford, Guardian and Next Friend; J.T., a minor by and through, Mikshell Turner, Guardian and Next Friend; J.B., a minor by and through, Charmaine Collins, Guardian and Next Friend; J.J., a minor by and through, Keirra Nicole Jones, Guardian and Next Friend; J.J., a minor by and through, Keirra Nicole Jones, Guardian and Next Friend; J.G., a minor by and through, Sabrina K Gacnik, Guardian and Next Friend; J.S., a minor by and through, Jennifer Campbell, Guardian and Next Friend; J.J., a minor by and through, Leticia L Jones, Guardian and Next Friend; J.H., a minor by and through, Victoria Robinson, Guardian and Next Friend; J.T., a minor by and through, Nicole Tanner, Guardian and Next Friend; J.M., a minor by and through, Tamico Mosley, Guardian and Next Friend; J.C., a minor by and through, Keoma Mathis, Guardian and Next Friend; J.C., a minor by and

9

through, Alecia Howard, Guardian and
Next Friend; J.M., a minor by and
through, Jenikia Mcgee, Guardian and
Next Friend; J.K., a minor by and
through, Crystal K Krause, Guardian and
Next Friend; J.M., a minor by and
through, Tenisa Moore, Guardian and
Next Friend; J.M., a minor by and
through, Therita Micken, Guardian and
Next Friend; J.D., a minor by and
through, Mikshell Turner, Guardian and
Next Friend; J.R., a minor by and
through, Charity Reed, Guardian and
Next Friend; J.R., a minor by and
through, Isabel De Los Santos, Guardian
and Next Friend; J.W., a minor by and
through, Tiffany Campbell, Guardian
and Next Friend; J.W., a minor by and
through, Tiffany Campbell, Guardian
and Next Friend; J.M., a minor by and
through, Tenisa Moore, Guardian and
Next Friend; K.B., a minor by and
through, Dennee Brown, Guardian and
Next Friend; K.P., a minor by and
through, Tyler C Vaughn, Guardian and
Next Friend; K.J., a minor by and
through, Terrell Moore, Guardian and
Next Friend; K.K., a minor by and
through, Joeanner L Williams, Guardian
and Next Friend; K.J., a minor by and
through, Kabrina James, Guardian and
Next Friend; K.C., a minor by and
through, Denise D Hill, Guardian and
Next Friend; K.B., a minor by and
through, Lashaun E Wilson, Guardian
and Next Friend; K.K., a minor by and
through, Keisha Kimble, Guardian and
Next Friend; K.P., a minor by and
through, Shawniqua F Bailey, Guardian
and Next Friend; K.R., a minor by and

through, Jasmine Jones, Guardian and
Next Friend; K.W., a minor by and
through, Kenyada Williams, Guardian
and Next Friend; K.M., a minor by and
through, Dominique Alexander,
Guardian and Next Friend; K.D., a minor
by and through, Kenneth N Delaney,
Guardian and Next Friend; K.M., a
minor by and through, Kenyetta A
Brown, Guardian and Next Friend; K.P.,
a minor by and through, Dashawn D
Perry, Guardian and Next Friend; K.W.,
a minor by and through, Eddie B Erby,
Guardian and Next Friend; K.H., a minor
by and through, Lawanda L Morrow,
Guardian and Next Friend; K.C., a minor
by and through, Denise D Hill, Guardian
and Next Friend; K.D., a minor by and
through, Kenneth N Delaney, Guardian
and Next Friend; K.D., a minor by and
through, Kenneth Delaney, Guardian and
Next Friend; K.F., a minor by and
through, Tyler C Vaughn, Guardian and
Next Friend; K.V., a minor by and
through, Tyler C Vaughn, Guardian and
Next Friend; K.J., a minor by and
through, Jennifer Campbell, Guardian
and Next Friend; K.N., a minor by and
through, Tawana M Nash, Guardian and
Next Friend; K.Y., a minor by and
through, Sabrina N Yates, Guardian and
Next Friend; K.M., a minor by and
through, Dale J Montemayor, Guardian
and Next Friend; K.S., a minor by and
through, Destiny M Willis, Guardian and
Next Friend; K.T., a minor by and
through, Schenella A Taylor, Guardian
and Next Friend; K.V., a minor by and
through, Teaquila M Jones, Guardian
and Next Friend; K.W., a minor by and

through, Victoria Robinson, Guardian and Next Friend; K.C., a minor by and through, Kabrina James, Guardian and Next Friend; K.M., a minor by and through, Adrienne Cox, Guardian and Next Friend; K.P., a minor by and through, Shawniqua F Bailey, Guardian and Next Friend; K.K., a minor by and through, Kyra Strange, Guardian and Next Friend; K.L., a minor by and through, Kyra Strange, Guardian and Next Friend; L.M., a minor by and through, Chrystal Moore, Guardian and Next Friend; L.W., a minor by and through, Ladona K Napier, Guardian and Next Friend; L.F., a minor by and through, Leon Fox, Guardian and Next Friend; L.P., a minor by and through, Kanesha Phillips, Guardian and Next Friend; L.F., a minor by and through, Leon Fox, Guardian and Next Friend; L.S., a minor by and through, Margaret R Mcclinton, Guardian and Next Friend; L.H., a minor by and through, Kendra D Cooper, Guardian and Next Friend; L.W., a minor by and through, Victoria Robinson, Guardian and Next Friend; L.G., a minor by and through, Vastoria Morrow, Guardian and Next Friend; L.C., a minor by and through, Shiyuanna N Campbell, Guardian and Next Friend; L.C., a minor by and through, Shiyuanna N Campbell, Guardian and Next Friend; L.W., a minor by and through, Rickytria Walker, Guardian and Next Friend; L.M., a minor by and through, Moneshaniea Mckinney, Guardian and Next Friend; L.T., a minor by and through, Arianne Tobin, Guardian and Next Friend; L.T., a minor by and

through, Arianne Tobin, Guardian and Next Friend; L.F., a minor by and through, Leon Fox, Guardian and Next Friend; L.F., a minor by and through, Leon Fox, Guardian and Next Friend; L.F., a minor by and through, Leon Fox, Guardian and Next Friend; L.T., a minor by and through, Sonya D Cooper, Guardian and Next Friend; L.H., a minor by and through, Olisha Hill, Guardian and Next Friend; L.P., a minor by and through, Kanesha Phillips, Guardian and Next Friend; L.S., a minor by and through, Jennifer Campbell, Guardian and Next Friend; L.H., a minor by and through, Larry T Hooks, Guardian and Next Friend; L.B., a minor by and through, Jasmine K Broadway, Guardian and Next Friend; L.M., a minor by and through, Heather Miller, Guardian and Next Friend; L.L., a minor by and through, Dennee Brown, Guardian and Next Friend; L.M., a minor by and through, Walter Sanders, Guardian and Next Friend; L.T., a minor by and through, Arianne Tobin, Guardian and Next Friend; L.N., a minor by and through, Terri Nelson, Guardian and Next Friend; M.B., a minor by and through, Jasmine Boxx, Guardian and Next Friend; M.M., a minor by and through, Ramona Surray, Guardian and Next Friend; M.C., a minor by and through, Shimika K Colvin, Guardian and Next Friend; M.S., a minor by and through, Teaquila M Jones, Guardian and Next Friend; M.L., a minor by and through, Christine Anderson, Guardian and Next Friend; M.P., a minor by and through, Ramona Surray, Guardian and

13

Next Friend; M.J., a minor by and through, Alecia Howard, Guardian and Next Friend; M.R., a minor by and through, Sharmaine Mcclinton, Guardian and Next Friend; M.J., a minor by and through, Conswayla Williams, Guardian and Next Friend; M.A., a minor by and through, Deborah Carrillo, Guardian and Next Friend; M.G., a minor by and through, Shiyuanna N Campbell, Guardian and Next Friend; M.P., a minor by and through, Ramona Surray, Guardian and Next Friend; M.W., a minor by and through, Ladona K Napier, Guardian and Next Friend; M.S., a minor by and through, Margaret R Mcclinton, Guardian and Next Friend; M.N., a minor by and through, Terri Nelson, Guardian and Next Friend; M.P., a minor by and through, Ramona Surray, Guardian and Next Friend; M.S., a minor by and through, Keirra Nicole Jones, Guardian and Next Friend; M.C., a minor by and through, Malik D Ellis, Guardian and Next Friend; M.D., a minor by and through, Melvin Davis, Guardian and Next Friend; M.D., a minor by and through, Tamia Walker, Guardian and Next Friend; M.P., a minor by and through, Ramona Surray, Guardian and Next Friend; M.J., a minor by and through, Conswayla Williams, Guardian and Next Friend; M.J., a minor by and through, Nyiesha James, Guardian and Next Friend; M.M., a minor by and through, Phyllis J Rodriquez, Guardian and Next Friend; M.G., a minor by and through, Tamika S Gray, Guardian and Next Friend; M.L., a minor by and through, Twanquella I Johnson,

14

Guardian and Next Friend; M.H., a
minor by and through, Lawanda L
Morrow, Guardian and Next Friend;
N.H., a minor by and through, Kendra D
Cooper, Guardian and Next Friend;
N.W., a minor by and through, Ladona K
Napier, Guardian and Next Friend; N.J.,
a minor by and through, Sara E Zavoral,
Guardian and Next Friend; N.M., a
minor by and through, Adrienne Cox,
Guardian and Next Friend; N.R., a minor
by and through, Quatila D Robertson,
Guardian and Next Friend; N.M., a
minor by and through, Brian Mckinney,
Guardian and Next Friend; N.D., a minor
by and through, Conswayla Williams,
Guardian and Next Friend; N.R., a minor
by and through, Quatila D Robertson,
Guardian and Next Friend; N.H., a minor
by and through, Lawanda L Morrow,
Guardian and Next Friend; N.K., a minor
by and through, Katherine Kavanaugh,
Guardian and Next Friend; N.J., a minor
by and through, Nyiesha James,
Guardian and Next Friend; P.S., a minor
by and through, Andrea L Gunn,
Guardian and Next Friend; P.O., a minor
by and through, Phillip Ogden, Guardian
and Next Friend; P.G., a minor by and
through, Andrea L Gunn, Guardian and
Next Friend; P.S., a minor by and
through, Jessica L Williams, Guardian
and Next Friend; Q.R., a minor by and
through, Laura L Ruby, Guardian and
Next Friend; R.K., a minor by and
through, Rashia Kelly, Guardian and
Next Friend; R.S., a minor by and
through, Denise D Hill, Guardian and
Next Friend; R.B., a minor by and
through, Linda Doss, Guardian and Next

Friend; R.C., a minor by and through, Shidahsa T Ware, Guardian and Next Friend; R.L., a minor by and through, Rashia Kelly, Guardian and Next Friend; R.R., a minor by and through, Shimika K Colvin, Guardian and Next Friend; R.B., a minor by and through, Jasmine Boxx, Guardian and Next Friend; R.F., a minor by and through, Rodney M Ford, Guardian and Next Friend; R.G., a minor by and through, Cheyann M Mcgee, Guardian and Next Friend; R.R., a minor by and through, Quatila D Robertson, Guardian and Next Friend; R.B., a minor by and through, Linda Doss, Guardian and Next Friend; R.B., a minor by and through, China C Collins, Guardian and Next Friend; S.T., a minor by and through, Nicole Tanner, Guardian and Next Friend; S.T., a minor by and through, Nicole Tanner, Guardian and Next Friend; S.H., a minor by and through, Danielle Carter, Guardian and Next Friend; S.A., a minor by and through, Porsche Bowman, Guardian and Next Friend; S.R., a minor by and through, Tiffany L Brown, Guardian and Next Friend; S.E., a minor by and through, Chakeemala L Jones, Guardian and Next Friend; S.T., a minor by and through, Nicole Tanner, Guardian and Next Friend; S.M., a minor by and through, Moneshaniea Mckinney, Guardian and Next Friend; S.M., a minor by and through, Hashim D Mccoy, Guardian and Next Friend; S.N., a minor by and through, Tawana M Nash, Guardian and Next Friend; S.B., a minor by and through, China C Collins, Guardian and Next Friend; S.T., a minor

by and through, Schenella A Taylor, Guardian and Next Friend; S.W., a minor by and through, Brittany Ford, Guardian and Next Friend; S.B., a minor by and through, Kea N Bennett, Guardian and Next Friend; S.K., a minor by and through, Katherine L Smith, Guardian and Next Friend; S.J., a minor by and through, Lakeumiss C Jones, Guardian and Next Friend; S.B., a minor by and through, Charlene Dortch, Guardian and Next Friend; S.G., a minor by and through, Nicole Tanner, Guardian and Next Friend; S.T., a minor by and through, Sonya D Cooper, Guardian and Next Friend; T.L., a minor by and through, Twanquella I Johnson, Guardian and Next Friend; T.L., a minor by and through, Twanquella I Johnson, Guardian and Next Friend; T.B., a minor by and through, Samantha Byrd, Guardian and Next Friend; T.W., a minor by and through, Teresa Walker, Guardian and Next Friend; T.H., a minor by and through, Larry T Hooks, Guardian and Next Friend; T.N., a minor by and through, Tanisha L Neal, Guardian and Next Friend; T.H., a minor by and through, Tasha Coleman, Guardian and Next Friend; T.N., a minor by and through, Tanisha L Neal, Guardian and Next Friend; T.F., a minor by and through, Michelle Floyd, Guardian and Next Friend; T.L., a minor by and through, Twanquella I Johnson, Guardian and Next Friend; T.T., a minor by and through, Priscilla A Taylor, Guardian and Next Friend; T.W., a minor by and through, Taushenia Daniels, Guardian and Next Friend; T.J., a minor

17

by and through, Lakeumiss C Jones, Guardian and Next Friend; T.B., a minor by and through, Samantha Byrd, Guardian and Next Friend; T.B., a minor by and through, Samantha Byrd, Guardian and Next Friend; T.M., a minor by and through, Terrell Moore, Guardian and Next Friend; T.H., a minor by and through, Dontae L Henderson, Guardian and Next Friend; T.M., a minor by and through, Larry T Hooks, Guardian and Next Friend; T.T., a minor by and through, Donesia M Tucker, Guardian and Next Friend; T.A., a minor by and through, Rebecca Campbell, Guardian and Next Friend; T.H., a minor by and through, Hashim D Mccoy, Guardian and Next Friend; T.W., a minor by and through, Teresa Walker, Guardian and Next Friend; T.T., a minor by and through, Schenella A Taylor, Guardian and Next Friend; T.R., a minor by and through, Melvin Davis, Guardian and Next Friend; T.J., a minor by and through, Falicia C Osler, Guardian and Next Friend; T.C., a minor by and through, Vernetta Childs, Guardian and Next Friend; T.J., a minor by and through, Chakeemala L Jones, Guardian and Next Friend; T.T., a minor by and through, Schenella A Taylor, Guardian and Next Friend; V.J., a minor by and through, Chakeemala L Jones, Guardian and Next Friend; W.B., a minor by and through, Kevin Bethea, Guardian and Next Friend; W.L., a minor by and through, Cadija Roseman, Guardian and Next Friend; W.B., a minor by and through, Kevin Bethea, Guardian and Next Friend; W.H., a minor by and

through, Tamika N Miller, Guardian and Next Friend; W.R., a minor by and through, Kenarda L Rouse, Guardian and Next Friend; Z.S., a minor by and through, Dontae L Henderson, Guardian and Next Friend; Z.V., a minor by and through, Tyler C Vaughn, Guardian and Next Friend; Z.B., a minor by and through, Raekkya Taylor, Guardian and Next Friend; Z.B., a minor by and through, Ronald D Roseburgh, Guardian and Next Friend; Z.G., a minor by and through, Vastoria Morrow, Guardian and Next Friend; Z.J., a minor by and through, Ashley T Jefferson, Guardian and Next Friend;

*Plaintiffs,*

v.

The City of Benton Harbor; Marcus Muhammad; Michael O'Malley; Darwin Watson; Liesl Clark; Eric Oswald; Ernest Sarkipato; Brandon Onan; Elhorn Engineering Company d/b/a Elhorn Company; F&V Operations and Resource Management, Inc.; and John Does 1–40.

*Defendants.*

19

## **COMPLAINT AND JURY TRIAL DEMAND**

Plaintiffs, individually or by and through their respective Guardians and Next Friends, who all were minors at the time of initial exposure and the majority of whom are still minors ("Plaintiffs"), file this Original Complaint and Jury Trial Demand against Defendants the City of Benton Harbor, Michigan; Marcus Muhammad, Michael O'Malley; Darwin Watson; Liesl Clark; Eric Oswald; Ernest Sarkipato; Brandon Onan; Elhorn Engineering Company d/b/a Elhorn Company; F&V Operations and Resource Management, Inc., and John Does 1-40.

Plaintiffs, who at all material times were minors that resided in and/or otherwise consumed the water in Benton Harbor, were poisoned by lead released into Benton Harbor's drinking water as a result of Defendants' conduct, which was conscience-shocking and deliberately indifferent. Plaintiffs assert claims for personal injuries resulting from Defendants' deprivation of Plaintiffs' rights to bodily integrity and to be free from state created danger, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs also assert personal injury claims resulting from Government Defendants' gross negligence. Finally, Plaintiffs assert personal injury claims against Elhorn Engineering Company, F&V Operations and Resource Management, Inc., and John Does 1 – 40 for professional and simple negligence in exacerbating and prolonging

the catastrophic and wholly preventable public health crisis, which poisoned the children of Benton Harbor for years.

## **INTRODUCTION**

1.    In October 2018, testing results revealed that the City of Benton Harbor's public water supply was contaminated with lead, which is a developmental neurotoxin.

2.    Lead can leach into a water supply when lead pipes and fixtures are corroded.

3.    Lead is poisonous, and poses the greatest danger to children.

4.    Exposure to lead causes severe health problems and development disorders.

5.    Communities like the City of Benton Harbor ("Benton Harbor" or the "City") are particularly vulnerable to lead poisoning in the water supply because of aging public water systems.

6.    Benton Harbor has a public water system that is over 100 years old and is substantially comprised of lead pipes and fixtures.

7.    With the utilization of proper corrosion control, lead poisoning is entirely preventable in poor and aging cities.

8.    When properly implemented, corrosion control (which is a term used to describe the treatment of water to make it less corrosive as it flows through pipes

made of various metals), toxic metals, like lead, are prevented from leaching into the water supply.

9.      Until October 2018, when testing revealed elevated lead levels in its water supply, Benton Harbor failed to implement proper corrosion control to protect its water supply and its residents, including Plaintiffs.

10.     When the crisis began, officials from the City and the Michigan Department of Environment, Great Lakes, and Energy ("EGLE") went to great efforts to minimize and cover up the urgency of the situation.

11.     On or about October 24, 2018, EGLE officials issued a misleading and dubious public advisory to residents of the City related to lead, which did not discourage residents, let alone outright prohibit them from drinking from the public water supply.

12.     In fact, they encouraged residents to drink cold tap water.

13.     The City's Mayor told the public that the situation did not constitute an emergency, and that the advisory was for no significant purpose other than to provide the public with information.

14.     Meanwhile, the City's Drinking Water Superintendent purposefully misled water users by publicly claiming the City was providing clean water to the tap, and that residents could safely consume it.

15.    The City Manager also misled the public when he publicly and falsely stated that their public water system did not contain lead pipes.

16.    At every turn, Defendants downplayed the existence of a community-wide emergency, and falsely emphasized that if there was any problem with the water supply, it was individualized to homes with lead plumbing—not systemic.

17.    While the State and City Defendants were engaged in a misleading public campaign about the water supply, they and the non-governmental Defendants were privately botching the treatment response.

18.    Defendant Elhorn proposed dangerous corrosion control treatments, which the EGLE approved, and which the City implemented.

19.    The implementation of the (improper and ineffective) corrosion control treatment came without a corrosion control study, oversight, or testing.

20.    EGLE leadership ignored warnings from their own employees about what was required to fix the water crisis.

21.    The City's Water Superintendent continued to mislead the public, representing that the City's corrosion control treatments were working.

22.    In fact, the treatments were haphazardly chosen and did not work.

23.    As a result, for at least three years Benton Harbor residents and water users drank and used water contaminated with high levels of lead.

24.     Defendants' decisions, actions, and inaction deprived Plaintiffs of their constitutional right to be free from harm caused to their bodies by their government, and caused them permanent injuries.

25.     Plaintiffs bring this action against these Defendants for damages they suffered as a result of Defendants' reckless conduct, which caused their lead poisoning and which was entirely preventable.

26.     Plaintiffs are all children or were children when they were exposed to and consumed toxic, lead-tainted water.

27.     Because of Defendants' conduct, Plaintiffs now suffer from devastating, lifelong, irreversible impairments and health problems.

28.     Plaintiffs' injuries are a direct and proximate result of Defendants' conduct.

29.     The effects of lead poisoning on a child are well known and heartbreakingly permanent: Plaintiffs have and will forever suffer cognitive deficits; Plaintiffs will have a reduced earning capacity compared to Plaintiffs' peers; and Plaintiffs will feel shame throughout their lives as each of them struggles to keep up with classmates, family members, and ultimately coworkers.

30.     As more particularly set forth herein, Plaintiffs maintain, among other things, that Defendants caused Benton Harbor's public health crisis to occur, continue, worsen, and persist for a longer period of time.

31.   Defendants also exacerbated the crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct.

32.   Defendants' misconduct has produced a significant effect, long lasting and permanent, upon rights, including Plaintiffs' health, safety, peace, comfort, and convenience.

33.   Plaintiffs' substantive due process rights, including the fundamental right to bodily integrity, were violated.

34.   Plaintiffs' substantive due process rights, including the fundamental right to not have the state create, inflict and/or exacerbate dangers through the culpable actions of public officials, were violated.

35.   Plaintiffs' therefore seek compensatory damages, and all other available remedies to redress the injuries caused by Defendants.

## JURISDICTION

36.   This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking compensatory damages and punitive damages against Defendants for, among other claims, violations of Plaintiffs' rights, privileges, and immunities secured by the United States Constitution, including the Fourteenth Amendment and federal law.

37.   This Court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claims, pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the

United States Constitution and laws of the United States; 28 U.S.C. §§ 1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases.

38.     This Court may exercise supplemental jurisdiction over Plaintiffs' professional negligence, simple negligence, and gross negligence claims pursuant to 28 U.S.C. § 1367(a), because they are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy pursuant to Article III of the United States Constitution.

39.     This case does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise pursuant to 42 U.S.C. § 1983.

40.     This Court has personal jurisdiction over Defendant the City of Benton Harbor because it is a Michigan municipality and because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan.

41.     Mich. Comp. Laws 600.6440 exempt actions against State agencies from the jurisdiction of the Michigan Court of Claims where the claimant has an adequate remedy in the federal courts.

42.     This Court may exercise personal jurisdiction over Defendant Mayor Marcus Muhammad ("Muhammad") because he is a citizen and resident of the State of Michigan and the acts and omissions giving rise to Plaintiffs' claims took place

in the State of Michigan. Exercising personal jurisdiction over Defendant Muhammad comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Defendant Muhammad's substantial contacts with Michigan.

43.     This Court may exercise personal jurisdiction over Defendant Michael O'Malley ("O'Malley"), former Drinking Water Superintendent for the City, because he is a citizen and resident of the State of Michigan and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan. Exercising personal jurisdiction over Defendant O'Malley comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Defendant O'Malley's substantial contacts with Michigan.

44.     This Court may exercise personal jurisdiction over Defendant Darwin Watson ("Watson"), the former City Manager for Benton Harbor, because he is a citizen and resident of the State of Michigan and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan. Exercising personal jurisdiction over Defendant Watson comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Defendant Watson's substantial contacts with Michigan.

45.     This Court may exercise personal jurisdiction over Defendant Liesl Clark ("Clark"), Director of EGLE, because she is a citizen and resident of the State

of Michigan and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan. Exercising personal jurisdiction over Defendant Clark comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Defendant Clark's substantial contacts with Michigan.

46.     This Court may exercise personal jurisdiction over Defendant Brandon Onan ("Onan"), Lead and Copper Unit Supervisor for EGLE, because he is a citizen and resident of the State of Michigan and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan. Exercising personal jurisdiction over Defendant Onan comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Defendant Onan's substantial contacts with Michigan.

47.     This Court may exercise personal jurisdiction over Defendant Ernest Sarkipato ("Sarkipato"), Surface Water Treatment Specialist for EGLE, because he is a citizen and resident of the State of Michigan and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan. Exercising personal jurisdiction over Defendant Sarkipato comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Defendant Sarkipato's substantial contacts with Michigan.

28

48.    This Court may exercise personal jurisdiction over Defendant Eric Oswald ("Oswald"), Director of EGLE Drinking Water and Environmental Health Division, because he is a citizen and resident of the State of Michigan and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan. Exercising personal jurisdiction over Defendant Oswald comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Defendant Oswald's substantial contacts with Michigan.

49.    The Court has personal jurisdiction over Defendant Elhorn Engineering Company, d/b/a/ Elhorn Company ("Elhorn"), pursuant to MCL §§ 600.705 and 600.715, as it is a Michigan corporation with its principal place of business located at 889 Eden Road, Mason, Michigan 48854.

50.    The Court has personal jurisdiction over Defendant F&V Operations & Resource Management, Inc., pursuant to MCL §§ 600.705 and 600.715, as it is a Michigan corporation with its principal place of business located at 2960 Lucerne Drive S.E., Grand Rapids, Michigan.

51.    The Court has personal jurisdiction over Defendants Elhorn and F&V, pursuant to MCL §§ 600.705 and 600.715, as they have personally availed themselves of the benefits and protections of the State of Michigan, have conducted business and committed torts in Michigan, by themselves and their agents and/or alter egos, which caused Plaintiffs to suffer severe personal injuries and

29

Constitutional violations in Michigan. Exercising personal jurisdiction over these Defendants comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to each Defendant's substantial contacts with Michigan.

52.     This Court may exercise personal jurisdiction over Defendants John Does 1 through 40 because they are, upon information and belief, citizens and residents of the State of Michigan, which subjects them to general personal jurisdiction, and/or because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Michigan. The John Doe Defendants are thus subject to specific personal jurisdiction under Michigan's long-arm statute because their conduct as alleged in this Complaint constitutes the transaction of business in Michigan as well as the commission of a tort in Michigan. Additionally, exercising personal jurisdiction over them comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to their substantial contacts with Michigan.

53.     Venue is proper under 28 U.S.C. § 1391 because many of the Defendants reside or are located in Benton Harbor, Michigan and because a substantial part of the events or omissions giving rise to the claim occurred in Benton Harbor, Michigan. This Court has personal jurisdiction over all Defendants

because a Michigan state court would have personal jurisdiction under MCL 600.701 and MCL 600.705.

## **PARTIES**

54.     Plaintiffs, throughout the relevant time period, were residents and/or water users of Benton Harbor, Michigan and citizens of the State of Michigan.

55.     Plaintiffs have suffered and continue to suffer personal injuries as a result of their exposure to and ingestion of water from the Benton Harbor Public Water System.

56.     As a result of exposure to and ingestion of harmful contaminated water, including lead tainted water, from the Benton Harbor Public Water System, Plaintiffs have suffered and continue to suffer the violation of their rights, privileges, and immunities secured by the Constitution of the United States as well as federal and state law.

57.     As a result of Defendants' actions, Plaintiffs suffered injuries including but not necessarily limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation and mortification, medical expenses, lost wages, brain injuries and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions).

58.    Defendant City of Benton Harbor is a municipal corporation which owns and/or operates the Benton Harbor Public Water System. Defendant City exists by virtue of the laws of the state of Michigan.  The Benton Harbor Public Water System is a Public Water System regulated by State and Federal Law and the City's ownership and/or operation of the Benton Harbor Public Water System makes the City a "supplier of water" within the meaning of Section 1401(5) of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f(5) and 40 C.F.R. § 141.2, and thus, subject to the requirements of Part B of the SDWA at 42 U.S.C. § 300f(5) and the National Primary Drinking Water Regulations ("NPDWRs") at 40 C.F.R. Part 141 among other federal and state laws and regulations.

59.    The City's policies, customs, and practices, created, increased, prolonged, concealed and conspired to conceal, the public health crisis caused by toxic, lead tainted, and otherwise dangerous drinking water and in doing so, the City was deliberately indifferent to the risk of harm to all those using the Benton Harbor Public Water System, and to Plaintiffs who are or were at all material times minors, in particular.  The City's policies, customs, and/or practices caused Plaintiffs' to unknowingly ingest contaminated water, both injuring Plaintiffs, and depriving them of the rights, privileges, and immunities, secured by the Constitution of the United States as well as state and federal law.

60.    Defendant Marcus Muhammad is the current Mayor of Benton Harbor and was mayor at all times relevant to this complaint. The Mayor of Benton Harbor is responsible for the management of city government, as well as for the health and welfare of its citizens and residents. Defendant Muhammad is sued in his individual and official capacities for the injuries he caused Plaintiffs resulting from his deliberate indifference, and his deprivation of Plaintiffs' constitutional and civil rights. Defendant Muhammad is an employee and/or official of Defendant City, with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

61.    Defendant Michael O'Malley was the Drinking Water Superintendent for the Benton Harbor Public Water System at all relevant times. Defendant O'Malley is sued in his individual and official capacities for the injuries he caused Plaintiffs resulting from his deprivation of Plaintiffs' constitutional and civil rights, and was deliberately indifferent to the suffering and injuries of Plaintiffs when he made decisions and statements that concealed and prolonged the public health crisis. Defendant O'Malley was an employee and/or official of Defendant City with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

62.    Defendant Darwin Watson was a City Manager for Defendant City. Defendant Watson is sued in his individual and official capacities for the injuries he

caused Plaintiffs resulting from his deprivation of Plaintiffs' constitutional and civil rights, and was deliberately indifferent to the suffering and injuries of Plaintiffs when he made decisions and statements that concealed and prolonged the current public health crisis. Defendant Watson was an employee and/or official of Defendant City with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

63.     Defendant Elhorn rendered specialized engineering services to the City and EGLE immediately after a determination was first made that there were lead action level exceedances. Defendant City and EGLE contracted with Defendant Elhorn, multiple times, in an effort to implement corrosion control treatments and to conduct corrosion control studies. Based on federal and state regulatory requirements and professional standards, Defendant Elhorn knowingly delivered substandard, and insufficient services and advice to Defendant City and EGLE.

64.     Defendant F&V rendered services to Defendant City two years after a determination was first made that there were lead action level exceedances. Subsequent to Defendant City firing Water Superintendent Defendant O'Malley, Defendant City contracted with Defendant F&V to operate and maintain the Benton Harbor Water Treatment Plant, in an effort to outsource and fulfill those duties Defendant O'Malley failed to execute. Defendant F&V faced sharp criticism from the EPA and EGLE following a joint inspection of the water treatment plant.

34

Defendant F&V delivered substandard and insufficient services to the City and was a substantial factor in the perpetuation of the water crisis. Defendant F&V contributed to the issuance of an Administrative Consent Order from the EPA to Defendant City.

65.    At all relevant times, EGLE had and continues to have primary responsibility for the implementation and enforcement of Benton Harbor's Public Water System, as well as for implementing state and federal drinking water regulations.

66.    At all relevant times, EGLE had, and continues to have, primary responsibility of ensuring that Michigan's state protocols, laws, and rules, are consistent with the SDWA, the Lead and Copper Rule ("LCR"), and all EPA guidance in the State of Michigan.

67.    At all relevant times, EGLE was, and continues to be, overseen by the United States EPA, which retains responsibility to ensure implementation of the SDWA by states with primacy, like the State of Michigan.

68.    Defendants Liesl Clark, Eric Oswald, Ernest Sarkipato, and Brandon Onan ("Defendant EGLE Employees") created and implements EGLE's policies, customs, and practices which prolonged the public health crisis caused by toxic, lead tainted drinking water. In doing so, Defendant EGLE Employees were deliberately

indifferent to the risk of harm to all those using the Benton Harbor Public Water System, and to Plaintiffs in particular.

69.    Defendant City's policies, customs, and/or practices caused Plaintiffs to unknowingly ingest contaminated water, both injuring Plaintiffs, and depriving them of the rights, privileges, and immunities, secured by the Constitution of the United States as well as state and federal law.

70.    Defendant Liesl Clark is the Director of EGLE. Clark is sued in her individual capacity for the injuries she caused Plaintiffs resulting from her deprivation of Plaintiffs' constitutional and civil rights. Defendant Clark was deliberately indifferent to the suffering and injuries to Plaintiffs when she made decisions and statements that concealed and prolonged the current public health crisis. Defendant Clark was an employee and/or official of EGLE with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

71.    Defendant Eric Oswald is the Director of EGLE's Drinking Water and Environmental Health Division. Defendant Oswald is sued in his individual capacity for the injuries he caused Plaintiffs resulting from his deprivation of Plaintiffs' constitutional and civil rights. Defendant Oswald was deliberately indifferent to the suffering and injuries to Plaintiffs when he made decisions and statements that concealed and prolonged the current public health crisis. Defendant Oswald was an

employee and/or official of EGLE with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

72.     Defendant Brandon Onan is the Lead and Copper Unit Supervisor for EGLE. Defendant Onan is sued in his individual capacity for the injuries he caused Plaintiffs resulting from his deprivation of Plaintiffs' constitutional and civil rights. He was deliberately indifferent to Plaintiffs' suffering and injuries when he made decisions and statements that concealed and prolonged the current public health crisis. Defendant Onan was an employee and/or official of EGLE with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

73.     Defendant Ernest Sarkipato is the Surface Water Treatment Specialist for EGLE. Defendant Sarkipato is sued in his individual capacity for the injuries he caused Plaintiffs resulting from his deprivation of Plaintiffs' constitutional and civil rights. He was deliberately indifferent to Plaintiffs' suffering and injuries when he made decisions and statements that concealed and prolonged the current public health crisis. Defendant Oswald was an employee and/or official of EGLE with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

74.     Defendants John Does 1 – 40 are agents, employees, and/or contractors of Defendants whose real names and identities are presently unknown and who, acting under color of state law, violated Plaintiffs' rights privileges and immunities secured by the Constitution of the United States.  Upon information and belief, the John Does 1 through 40 took conscience-shocking actions and acted with deliberate indifference for Plaintiffs' safety in the face of a known risk of lead poisoning.

75.     John Does 1 – 40 are sued in their individual capacities for, *inter alia*, conducting unlawful water testing methods, which produced artificially low lead testing results and were in contravention of Michigan state law as well as the U.S. Environmental Protection Agency's clear, pre-existing guidance as to proper testing methodology; failing to report lead in the City's distribution system; failing to report or submitting false and/or altered data about lead measurements in water and blood samples to the Federal government and/or to residents, including Plaintiffs; and/or advising, offering, and/or designing ineffective and improper corrosion control treatments.

76.     These acts and omissions were a deliberate result of an effort by Defendants John Does 1 – 40 to conceal and understate the scope and gravity of the threat of lead poisoning in Benton Harbor's water and to cast the State of Michigan and Benton Harbor in a positive light by decreasing the frequency of Action Level Exceedances ("ALEs").

77.     Defendants were, at all relevant times, acting under color of state law when they violated Plaintiffs' rights, privileges, and immunities secured by the Constitution of the United States as well as federal and state law.

78.     As more particularly set forth herein, Plaintiffs maintain, among other things, that Defendants caused Benton Harbor's public health crisis to occur, continue, worsen, and persist.

79.     Defendants also exacerbated the crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct.

80.     Defendants' misconduct produced a significant effect, long lasting and permanent, upon Plaintiffs' health, safety, peace, comfort and convenience and violated Plaintiffs' rights, privileges, and immunities secured by the Constitution of the United States as well as federal and state law, including the fundamental right to bodily integrity and the right to be free from state created dangers, inflicted and/or exacerbated by the culpable actions of public officials, agents, employees, and contractors.

**STATEMENT OF FACTS**

I.    **History of Benton Harbor's Aging Public Water System**

81.    Roughly 10,000 people live in Benton Harbor — a small city adjacent to Lake Michigan.

82.    In the last thirty years, Benton Harbor's population declined by almost 25 percent.

83.    This mass exodus of people and opportunity created segregation, inequity, disinvestment, and concentrated poverty.

84.    In March 2010, Michigan's Governor declared a state of financial emergency over Benton Harbor.

85.    As a result, an emergency manager was appointed by the Governor to act for and on behalf of the City.

86.    The emergency manager slashed the City's budget and reduced the City's staff from 109 to 50 employees.

87.    The water plant suffered greatly from these cuts.

88.    EGLE admitted these cuts caused significant deficiencies at/within Benton Harbor's water treatment plant.[1]

---

[1]    Louise Wrege, *State to require Benton Harbor water plant changes*, Herald Palladium, Jan. 23, 2019, available at: https://www.heraldpalladium.com/news/local/state-to-require-benton-harbor-water-plant-changes/article_a40742e8-1d6b-5e7f-b301-5513d81df9d2.html.

89.    In 2016, the State of Michigan determined that "the financial conditions within the city [were] corrected in a sustainable fashion."[2] However, EGLE noted in 2018 that Benton Harbor lacked necessary financial conditions to satisfy SDWA requirements.

90.    Today, Benton Harbor's residents reflect communities traditionally underserved, overlooked, and ignored.

91.    The majority of the population is Black or Latino, and less than half of residents live above the federal poverty line.

92.    Additionally, Benton Harbor lacks access to and funding for civic improvements often available to more affluent communities.

93.    Many of the financial solutions to the water crisis involve loans, which place the burden of repayment on revenue from residential water bills that increase with each loan taken by the City.

94.    Thus, the price to fix Benton Harbor's crumbling and historically neglected public water system falls on the "poorest of the poor."[3]

---

[2]    Letter from Nick Khouri to Marcus Muhammad, (July 1, 2016), attached as Exhibit 1 and incorporated as if stated fully herein.

[3]    Louise Wrege, *Benton Harbor seeking $13 million in grants to address infrastructure*, Herald Palladium, June 23, 2021, available at: https://www.heraldpalladium.com/communities/benton_harbor/benton-harbor-seeking-13-million-in-grants-to-address-infrastructure/article_c1da563f-f197-5968-9fcb-0b301f34dc44.html.

41

95.     Benton Harbor's public water system is over one hundred years old, and the earliest State record of the City's public water distribution system is from 1914.[4]

96.     The water system contains 347,645 feet (65.8 miles) of service pipes, through 2-inch to 20-inch water mains, and an estimated 5,877 service lines distributing water to residents.

97.     Many of the City-owned public water system distribution pipes and service lines contain full lead and lead jointed pipes.

98.     Michigan's laws require that the City maintain an inventory of service line materials from their distribution system.

99.     To date, the City has not developed a finished inventory of its system materials.

100.    These laws also required Benton Harbor to submit a preliminary materials inventory to EGLE by January 1, 2020.

101.    The City's Preliminary Distribution System Materials Inventory (which was incomplete) revealed a shocking amount of lead lines in Benton Harbor's public water system.[5]

---

[4]     Michigan Department of Environment, Great Lakes, and Energy, Michigan Service Line Materials Estimates Preliminary Distribution System Materials Inventories, (last updated Dec. 2020), attached as Exhibit 2 and incorporated as if state fully herein.

[5]     *Id.*

102.   Only 2% of the service lines are wholly without lead.

103.   51% of the City's service lines contain some form of lead or galvanized lines previously connected to lead, or are of unknown materials but likely contain lead.

104.   The City cannot account for the other half of the system, wherein 47% of the materials in lines are unknown. These materials should be assumed to contain lead until proven otherwise.[6]

105.   Benton Harbor draws its water from the surface of Lake Michigan.

106.   The Benton Harbor Water Treatment Plant filters and treats the water before distributing to homes and buildings through the public water system's many lead pipes.

107.   All water has corrosive properties.

108.   If not properly treated, water can corrode pipes and cause lead to leach from those pipes into the drinking water.

109.   It is imperative to treat and monitor source water to maintain an appropriate chemical balance before water ever comes in contact with lead pipes.

---

[6]    Michael Regan, *Petition for Emergency Action under the Safe Drinking Water Act, 42 U.S.C. § 300i and 42 U.S.C. § 300j-1(b), to Abate the Imminent and Substantial Endangerment to Benton Harbor, Michigan Residents from Lead Contamination in Drinking Water*, submitted to the United States Environmental Protection Agency on Sept. 9, 2021, available at: https://www.glelc.org/news/2021/9/9/petition-emergency-action-epa-to-address-benton-harbor-lead-contaminated-water.

110.   The Benton Harbor Water Treatment Plant is located outside of the City itself, at 601 Ridgeway, St. Joseph, Michigan, and treats up to 16 million gallons of water per day.

111.   Water treatment at the plant starts with raw Lake Michigan water, conveyed through low lift pumps from an intake structure, located 5,000 feet from the plant in Lake Michigan.

112.   This system was originally designed to distribute water to Benton Harbor and two other municipalities—Benton Township and St. Joseph Charter Township.[7]

113.   These municipalities disconnected from the Benton Harbor water system, in 2011 and 2013 respectively.

114.   The departure of these two municipalities from the Benton Harbor Public Water System eliminated half of the system's customers.

115.   Today, the City of Benton Harbor distribution system still consists of large mains, which were previously necessary to receive, treat, and distribute water

---

[7]      The City of St. Joseph sits just to the south of Benton Harbor and shares roughly the same population size. 84% of its residents are White and the median individual income is over $40,000. Benton Township spans the north of Benton Harbor's boundaries with a population around 15,000. 44% of residents are White and the township's median household income is $32,000. Both cities present a stark difference to Benton Harbor's lack of access to clean water, population demographics, and median individual income of $16,000.

for three municipalities, but which are no longer necessary for the volume of water needed by Benton Harbor alone.

116.   As a result, the City's drinking water is often left sitting in the distribution system for longer than is advisable.

## II.   Well-Established Laws and Science of Public Water Systems

117.   Congress enacted the Safe Drinking Water Act ("SDWA") in 1974 to ensure the quality of drinking water across the country and authorized the Environmental Protection Agency ("EPA") to set national standards for drinking water to protect against health effects from exposure to naturally occurring and man-made contaminants.

118.   The EPA works with states through their Primacy Agencies as well as with municipalities to monitor and enforce prevention methods, treatments, monitoring, and regulations of these contaminants.

119.   A state's Primacy Agency regulates other agencies and municipalities by enforcing federal and state regulations.

120.   In Michigan, the Primacy Agency is EGLE.

121.   One contaminant that the EPA, the Primacy Agencies, and the municipalities are each charged with carefully monitoring, treating, and preventing under the SDWA is lead.

122.   Lead, a developmental neurotoxin, is particularly poisonous for children—so much so that in 1991 the EPA implemented regulations tailored specifically to minimize and eliminate lead from the public water supply. These regulations are referred to as the Lead and Copper Rule ("LCR") and the National Primary Drinking Water Regulations ("NPDWR").

123.   On top of the EPA's regulations, the State of Michigan implemented its own Safe Drinking Water Act ("SDWA"), Act 399 of 1979, to "protect the public health; to provide for supervision and control over public water supplies;" and "to prescribe the powers and duties of [EGLE,]" among other things.[8]

124.   Following the Flint Water Crisis, the State of Michigan took additional steps to regulate lead in public drinking water.

125.   To that end, in 2018, legislators amended Michigan's SDWA to include additional testing requirements for lead samples.

126.   The 2018 revisions to the Michigan SDWA also assigned responsibility for replacing lead service lines to the water supplier – in this case, the City of Benton Harbor.

127.   The law requires the water supplier to replace on average 5 percent (5%) of the system's lead service lines every year for the next 20 years, and that

---

[8]     MCL § 325.1001, *et seq*. (emphasis added).

"[t]he water supplier must use revenue it collects from customers to pay for lead line removal."[9]

128.   Under these laws and regulations, municipalities are also required to test their water for lead and copper every three years—or triennially.

129.   If there is an action level exceedance for lead or copper within a triennial testing period, additional regulatory requirements are triggered for municipalities and Primacy Agencies.

130.   For lead, the action level is exceeded when results are 15 parts per billion ("ppb") or more, in 10 percent (10%) of the sampling sites ("the 90th percentile").

131.   When the lead action level is exceeded, municipalities and Primacy Agencies are required to meet additional requirements, including: increased testing frequency from every three years to every six months, distribution of public education materials, delivery of consumer notices of lead results, and correcting of corrosion problems through the performance of a corrosion control study and implementation of the study no later than six months after the initial action level exceedance.

---

[9]     Michigan.gov, Mi Lead Safe, (last visited Mar. 28, 2022), accessible at: https://www.michigan.gov/mileadsafe/0,9490,7-392-92852_93738---,00.html#:~:text=With%20the%20changes%20added%20to.

132.   Typically, lead does not enter a public water system from source water or from a drinking water treatment plant.[10] Rather, lead leaches into drinking water when water corrodes older pipes made of lead or lead solder connections, like the ones in Benton Harbor's 100-year-old public water system.

133.   To prevent lead from leaching out of older pipes, it is imperative for municipalities and regulatory authorities to monitor and treat chemical imbalances in water prior to distributing it through a public water system.

134.   Treating chemical imbalances in water to prevent or minimize corrosion of lead pipes is known as corrosion control treatment.

135.   A water system must implement corrosion control treatment if the 15 ppb lead action level is exceeded in the 90th percentile of testing.

136.   The EPA provides guidance for preliminary identification of corrosion control treatments. The guidance identifies a range of potential treatments.[11]

137.   One potential corrosion control treatment is to use an orthophosphate, on its own.

---

[10]    The Environmental Protection Agency, "Understanding the Lead and Copper Rule," (Oct. 9, 2019), attached as Exhibit 3 and incorporated as if fully stated herein.

[11]    U.S. EPA, Optimal Corrosion Control Treatment Evaluation Technical Recommendations for Primacy Agencies and Public Water Systems, at 53, Mar. 2016, available at:
https://www.epa.gov/sites/production/files/2016-03/documents/occtmarch2016.pdf

138.   Another is to use a blend of orthophosphate and polyphosphate—or "phosphate blend."

139.   Water treatment specialists can change the ratio and dosage of a phosphate blend depending on the unique needs present in the water system.

140.   In a successful treatment, the orthophosphate alone, or the phosphate blend creates protective scales that coat the system pipes and prevent lead from leaching into drinking water.

141.   However, polyphosphates in a phosphate blend require a great deal of monitoring.

142.   Because of this, the EPA indicates "special considerations" must be taken into account when blended phosphates are introduced to a public water system and that "[b]lended phosphates should be used with caution," because the polyphosphates may lead to poor corrosion control.[12]

143.   For these reasons, the EPA recommends state agencies require a demonstration study and increased monitoring to ensure a chosen corrosion control technique is effective.[13]

---

[12]     U.S. EPA, Optimal Corrosion Control Treatment Evaluation Technical Recommendations for Primacy Agencies and Public Water Systems, at 48 (Mar. 2016), available at:
https://www.epa.gov/sites/production/files/2016-03/documents/occtmarch2016.pdf
[13]     *Id.* at 43.

144.   It is well established and understood that the science surrounding public water systems and their operations is delicate, and therefore heavily regulated.

145.   Further, legislators made every effort in writing these federal and state regulations to prevent tragedies like the public water crisis happening now in Benton Harbor.

146.   Yet at every turn, EGLE and City officials, along with their contractors, dodged the law and misled the public about the true extent of the Benton Harbor water crisis and the dangers of lead.

### III.   Coverup of Toxic Water in Benton Harbor's Public Water System

147.   It is highly likely that Benton Harbor residents and water users consumed lead in their water for years prior to October 2018.[14]

148.   In fact, EGLE gave the City $284,000 in grants to start replacing lead and galvanized steel water service lines in May 2018 – months before the first action level exceedance.

149.   This indicates that EGLE and the City knew that, at a minimum, portions of the public water system contained lead.

---

[14]   Kelly House, *In Benton Harbor, residents' complaints of lead-tainted water carry echoes*, Great Lakes Now (Oct. 11, 2021) available at: https://www.greatlakesnow.org/2021/10/benton-harbor-residents-complaints-lead-tainted-water/.

150.   Further, EGLE Director of Drinking Water and Environmental Health Defendant Oswald said that it is impossible to know for sure when lead first leached into Benton Harbor's drinking water, citing systemic issues.[15]

151.   Prior to the first action level exceedance, EGLE completed a Sanitary Survey of the Benton Harbor water treatment plant in October 2018.

152.   EGLE Surface Water Treatment Specialist and Engineer, Defendant Sarkipato, mailed a letter to Benton Harbor's Mayor, Defendant Muhammad, after the survey's completion.[16]

153.   Defendant Sarkipato falsely and deceptively understated the dangerous issues associated with the water system, by stating that the City made significant efforts to "maintain and improve the historically neglected water system."

154.   But ultimately, Defendant Sarkipato identified $124 million in replacement value for the water system and its distribution pipe network and said that this "represents a significant challenge for the City."

155.   Defendant Sarkipato went on to say that "[p]roper care and maintenance of the system is necessary to protect the health of all customers[,]" thereby admitting that he understood the threat looming over Benton Harbor residents and water users, including Plaintiffs.

---

[15]   *Id.*

[16]   City of Benton Harbor, Administrative Consent Order, (Mar. 8, 2019), attached as Exhibit 4 and incorporated as if fully stated herein.

156. Defendant Sarkipato made note of several significant deficiencies that hindered the City of Benton Harbor from coming into compliance with the SDWA.

157. EGLE admitted that the State's emergency manager and subsequent budget cuts caused many of the problems identified in the Sanitary Survey results, while maintaining publicly that these issues had nothing to do with the lead water crisis.

158. Behind the scenes, EGLE used this letter and the survey results to secure an Administrative Consent Order regarding the City.

159. Meanwhile, the City's Mayor, Defendant Muhammad, was irate with the State's response.

160. Defendant Muhammad told state legislators: "I was cross-eyed because on one hand you had a state official to deplete the water labor [during the state of financial emergency] and then another [state] official coming back saying you need to increase it."[17]

161. Ultimately, despite his being "cross-eyed" about what he seemed to believe was the state's inconsistent communications, Defendant Muhammad ignored EGLE's letter and took no action to bring the City into compliance with the SDWA.

---

[17] John Flesher and David Eggert, *'I have not time for this': Emails show officials sniping amid Benton Harbor lead crisis,* Associated Press, Nov. 8, 2021, available at: https://www.freep.com/story/news/local/michigan/2021/11/08/emails-benton-harbor-lead-crisis/6347539001/.

## A. Initial Lead Action Level Exceedance and Response in 2018

162.    The City of Benton Harbor first exceeded the federally mandated lead action level in October 2018, following the mandated 2016 – 2018 triennial testing period. The 90th percentile of sampling sites returned a presence of lead in the water at an average of 22 ppb—well in exceedance of the 15 ppb action level.

163.    On October 24, 2018, EGLE issued a state advisory for lead on the City of Benton Harbor, which severely downplayed the urgency of the water crisis.[18]

164.    The advisory did not warn or instruct residents against drinking the water.

165.    In fact, it asked residents and water users to consider using cold tap water for drinking and cooking.

166.    The state advisory misleadingly shifted blame for the lead in the public water system to private residential plumbing, by referencing the possibility that corrective actions might be "necessary to reduce corrosion in household plumbing."

167. Benton    Harbor'    City    Manager,    Defendant    Watson,    advised homeowners that they were responsible for replacing water lines from the sidewalk to the house.

---

[18]    Louise Wrege, *Too much lead in Benton Harbor water*, Herald Palladium, Oct. 24, 2018, available at:
https://www.heraldpalladium.com/news/local/too-much-lead-in-benton-harbor-water/article_b5a94742-8edc-5574-8859-4e62159fa907.html#tncms-source=login.

168.   While this may be true, The City of Benton Harbor has always been responsible for drinking water and the treatment of source water—as made clear by long established federal and state regulations.

169.   Assertions that the lead problem is/was only present in isolated, individual plumbing systems is intentionally misleading and false. The City's public water system itself contained lead service and distributions lines, installed decades ago.

170.   Defendants knew well that older homes—like the ones in Benton Harbor—very likely contain(ed) lead plumbing, and that the 100-year-old public water system had lead components.

171.   Defendants were aware of the potential for the crisis based on nothing more than the fact that individual households contained lead pipes, fixtures, service lines, joints, and the like, and that proper corrosion controls were not being utilized in the public water system.

172.   Instead, they blamed the crisis on individual homeowners and their plumbing.

173.   On October 25, 2018—a day after EGLE issued the state advisory for lead—the City of Benton Harbor held a press conference at which City officials publicly downplayed the severity of lead in the water.[19]

174.   During the press conference, Benton Harbor Mayor, Defendant Muhammad, stated: "Although we want to send out a notice and make this announcement, it's not being … delivered as a high alert, emergency 911, panic frenzy. This is FYI, and you can work with our city staff to find out ways to get tested."[20]

175.   City Manager, Defendant Watson, outright lied when he publicly stated that the City had no lead lines (despite his intimate knowledge of the May 2018 EGLE grant the City received to replace lead lines).

176.   The county medical director, Dr. Rick Johansen, incorrectly and misleadingly emphasized that this was not a system-wide crisis but isolated to individual plumbing.

177.   The City also announced free lead testing kits for the public and launched a hotline.

---

[19]    Louise Wrege, *High lead levels not an emergency – yet*, Herald Palladium, Oct. 25, 2018, available at: https://www.heraldpalladium.com/news/local/high-lead-levels-not-an-emergency--yet/article_f52a3331-12cf-5718-8cb2-5364feea52d0.html.

[20]    *Id.*

178.   To be sure, in October 2018, there was a significant presence of lead in the public water system.

179.   Because of the significant presence of lead in the public water system, EGLE and the Defendant City were required to conduct lead testing every six months, issue public advisories, distribute public education materials, deliver consumer notices of lead and copper results, and correct the problems by way of a corrosion control study and implementation of optimal corrosion control treatment, no later than May 2019.

180.   Defendants EGLE and the City of Benton Harbor utterly failed to properly fulfill these requirements.

181.   EGLE and the Defendant City failed to issue a public advisory with the proper urgency necessary to inform the public. There was no clarification or education about the dangers of lead or who is most vulnerable to exposure.

182.   Consumer notices of lead and copper results were never properly delivered to Benton Harbor residents and water users as required by law.

183.   Defendants' failure to properly provide this information prevented residents from making fully informed decisions about consuming and otherwise utilizing water – not only in their homes – but also in their children's schools, daycares, and all of the places where families spend time within the City of Benton Harbor.

184.   Additionally, well before the October 2018 exceedance/violations, the City knew or should have known that the public water distribution system and most of the homes and other structures on the water distribution system contained lead plumbing.

185.   At the time of the exceedance/violations, the Defendant City was not using any form of corrosion control. Nor did the Defendant City even have a plan to implement any form of corrosion control.

186.   The Defendant City was unable to start treating the water with any form of corrosion control until, at the earliest, four months after the exceedance/violations.

187.   The Defendant City, which knew of the imminent threat present in the public water system, affirmatively and deliberately chose not to provide corrosion control treatment.

188.   After the exceedance/violations, the Defendant City involved and relied on EGLE, and EGLE's recommended consultant, Defendant Elhorn, for input on corrosion control.

189.   This association caused even greater problems with the public water system, and contributed to the continuance and systemic poisoning of Plaintiffs.

## B. Initial Response and the First Sixth Month Monitoring Period: November 2018 to June 2019

190.   In the Fall of 2018, the Defendant City started to do additional water testing.

191.   By November 23, 2018, 159 additional homes returned test results.[21]

192.   17% of those homes were above the action level exceedance for lead.

193.   Another 24% of those homes showed lead in the water from 5 ppb to 14 ppb, which is above the state's voluntary action level.

194.   At or around this time period, City Manager, Defendant Watson, backtracked his prior statement about lead in the City's lines, for the first time indicating that the City would hire contractors to investigate the source of the lead.[22]

195.   The stated intent regarding the contractors was for the Defendant City to use May 2018 EGLE grant money to perform a general inventory of the Defendant City's water service lines to determine how many lines were lead or galvanized steel.[23] This was the same grant that City Drinking Water Superintendent, Defendant

---

[21]      Wrege, *supra* n.1.

[22]      Louise Wrege, *BH homes test positive for high lead levels*, Herald Palladium, Nov. 23, 2018, available at: https://www.heraldpalladium.com/news/local/bh-homes-test-positive-for-high-lead-levels/article_dcce88fa-73e8-53e9-a5b1-b488a3983cc1.html.

[23]      Louise Wrege, *Benton Harbor and St. Joseph get DEQ grant to replace water lines*, Herald Palladium, May 11, 2018, available at: https://www.heraldpalladium.com/news/local/benton-harbor-and-st-joseph-get-deq-grants-to-replace-lead-water-lines/article_ca857311-f3fb-5bc1-8747-d973c51da4b4.html.

O'Malley, indicated months earlier the City planned to use to replace lead lines in private homes.

196.   At or about this time, Benton Harbor Mayor, Defendant Muhammad, claimed the City would have enough money to replace 40% of service lines after mapping and a determination of where the lead lines were was completed.[24]

197.   There is no indication of how Defendant Muhammad came to this figure – especially considering that EGLE informed him in October 2018 that the City would incur $124 million in replacement costs for the whole system, the May 2018 grant was only $284,000, and the fact that Benton Harbor had been under emergency financial management.

198.   In early January 2019, a Benton Harbor resident notified EGLE that she spoke with City Drinking Water Superintendent Defendant O'Malley and was alarmed by what he told her.[25]

199.   The resident stated she received a letter from the Defendant City, which indicated the water was safe to drink after a "first flush."

---

[24]   Wrege, *supra* n.1.

[25]   Email from Ernest Sarkipato to EGLE Staff, Re: Benton Harbor Follow Up Call (Jan. 9, 2019), attached as Exhibit 5 and incorporated as if fully stated herein.

200.   The resident spoke directly with Defendant O'Malley, who incorrectly informed her that the City was, at that time, delivering "clean water right to the tap and [she] should have no problem drinking it."

201.   The same resident contacted a non-profit organization, Fresh Water Future ("FWF") in an effort to assist with what she believed might be a problem with her drinking water, which prompted FWF to reach out directly to Defendant O'Malley and EGLE.

202.   FWF reported to EGLE that Defendant O'Malley informed it that the Defendant City was not providing filters or bottled water to anyone—not even to people living in homes that tested above the lead action level limit.

203.   These conversations sparked internal discussion via email between EGLE employees and the county health department.

204.   During the exchange of emails, one county health officer indicated she was under the impression that the Defendant City was providing bottled water to its residents.

205.   She indicated she was "quite troubled" by this exchange.[26]

206.   While the Defendant City publicly stated that it was providing free bottled water to people living in homes with high levels of lead, such was actually not occurring.

---

[26]   *Id.*

60

207.   Also in January 2019, EGLE started working with Defendant Elhorn and the Defendant City to begin the process of determining how and what to implement in terms of corrosion control.[27]

208.   By the end of January 2019, Defendant O'Malley submitted a permit application to EGLE for "corrosion protection" based on Defendant Elhorn's consultation, despite no one conducting a proper corrosion control study.[28]

209.   The permit application includes Defendant Elhorn's recommendation for *Carus 8600* as corrosion control, and makes clear that *Carus 8600* is a phosphate blend.

210.   *Carus 8600* is a generic blend, which Defendant Elhorn, EGLE, and the Defendant City never attempted to determine or tailor to the unique conditions present in the public water system.

211.   In February 2019, EGLE engineers emailed EGLE Surface Water Treatment Specialist, Defendant Sarkipato, to warn that the proposal was unlike other corrosion control proposals previously made and implemented for

---

[27]    EGLE, Regulatory Status Update, (Jan. 23, 2019), attached as Exhibit 6 and incorporated as if fully stated herein.

[28]    Permit Application for Water Supply Systems, Received Jan. 24, 2019, attached as Exhibit 7 and incorporated as if fully stated herein.

communities with known lead service lines and lead action level exceedances, such as Benton Harbor.[29]

212.   EGLE was also concerned that the calculations within the permit application were incorrect, and that the application did not actually provide any information as to how Defendant Elhorn planned to create/provide optimal corrosion control.

213.   Despite these detailed and valid concerns, EGLE approved Defendant O'Malley's wholly insufficient permit application at the end of February 2019.[30]

214.   On March 8, 2019—almost five months into the crisis—Benton Harbor Mayor Defendant Muhammad signed an Administrative Consent Order ("ACO")[31] with EGLE and EGLE's Director of Drinking Water and Environmental Health Division Defendant Oswald, which required Benton Harbor to either: (1) submit a proposal for optimal corrosion control treatment; or (2) submit a corrosion control study by the end of April 2019.[32]

---

[29]   Email from Ernest Sarkipato to Brian Thurston, (Feb. 21, 2019), attached as Exhibit 8 and incorporated as if fully stated herein.
[30]   Email from Ernest Sarkipato to Brandon Onan, (Feb. 25, 2019), attached as Exhibit 9 and incorporated as if fully stated herein.
[31]   An Administrative Consent Order is a tool EGLE uses to bring entities into compliance with regulations.
[32]   Letter from Ernest Sarkipato to Mayor Muhammad, (March 8, 2019), attached as Exhibit 10 and incorporated as if fully stated herein.

215.   The City did not submit either document to EGLE before the end of April 2019.

216.   Instead, the City sent EGLE a wholly insufficient, one page document, drafted by Defendant Elhorn, in response to what was required by the ACO.[33]

217.   The document outlined Defendant Elhorn's plan for a study to be conducted in the coming months.

218.   The plan failed to comply with federal and state regulations.

219.   Both federal and state regulations require public water systems to perform a corrosion control study, which evaluates the efficacy of multiple treatments and doses, not just one.

220.   Defendant Elhorn's plan analyzed just the *Carus 8600* phosphate blend at a single dose, completely ignoring other viable corrosion control treatments and doses.

221.   On March 27, 2019, the Defendant City implemented the *Carus 8600* phosphate blend as outlined in Defendant O'Malley's permit application under the approval, direction, and guidance of EGLE and Defendant Elhorn.[34]

---

[33]     Benton Harbor Corrosion Treatment Plan, Elhorn Co., (Apr. 23, 2019) attached as Exhibit 11 and incorporated as if fully stated herein.
[34]     Email from Mike O'Malley, Benton Harbor Water Superintendent, to EGLE Staff, (Mar. 27, 2019), attached as Exhibit 12 and incorporated as if fully stated herein.

222.   As noted earlier at ¶¶136-144, the EPA strongly urges water suppliers to take special considerations when introducing blended phosphates to the public water system since polyphosphates (in the blend) can actually extend exposure to lead.

223.   Additionally, the EPA suggests using demonstration studies and increased monitoring to ensure that any particular corrosion control is effective and not harmful.

224.   Defendant Elhorn, Defendant EGLE Employees, and the Defendant City never made any particular considerations for phosphate blends.

225.   Defendant Elhorn, Defendant EGLE Employees, and the Defendant City wholly failed to conduct the appropriate studies to ensure that the treatment was effective and not harmful.

226.   Defendant Elhorn, EGLE, and the Defendant City wholly failed  to increase its monitoring to ensure that the treatment was effective and not harmful.

227.   Indeed, the Defendant City started feeding *Carus 8600* into the water system per EGLE's approval and Defendant Elhorn's advice, despite the lack of testing or monitoring, and in spite of warnings from EGLE engineers.

228.   Meanwhile, City Drinking Water Superintendent, Defendant O'Malley, was obscuring Defendant City's lead testing.

229.   Defendant O'Malley refused to disclose the addresses of the testing sites to EGLE.

230.   Further, Defendant O'Malley requested that EGLE reduce the number of sites sampled for lead contamination.

231.   EGLE denied the request.

232.   At the conclusion of the first six-month monitoring period triggered by the October 2018 action lead level exceedance, the Defendant City's public water system continued to exceed lead action levels.

233.   Results returned the presence of lead at 27 ppb in the 90th percentile of sampled sites with the highest sample result showing 59 ppb. The October 2018 result was 22 ppb.

234.   Thus, after months of feeding an untested, unmonitored, phosphate blend into the public water supply, the presence of lead in the public drinking water actually increased.

**C. Second Six Month Monitoring Period: July to December 2019**

235.   On July 28, 2019, after the 27 ppb results from the first six-month monitoring period ending in June 2019, the Defendant City sent a new public advisory regarding lead.[35]

---

[35]    Louise Wrege, *Public advisory issued for lead in BH drinking water*, Herald          Palladium,          July          28,          2019,          available          at:

65

236.   Defendant O'Malley publicly discussed corrosion control and promised that it would coat the water pipes to keep lead from leaching into the drinking water.

237.   Defendant O'Malley stated: "It will literally seal up the inside walls of the pipes all the way from the water pipes to the faucet." He further stated, however, that such had just not happened yet.

238.   There is no indication that Defendant EGLE Employees, the Defendant City, or Defendant Elhorn changed course in any way whatsoever from their flawed plan to treat the water, throughout the next Monitoring Period (July to December 2019).

239.   There was no change of behavior, advice, or plan despite the increase of lead in the system at the conclusion of the first six-month monitoring period (January to June 2019).

240.   For another six months, the Defendant City, Defendant EGLE Employees, and Defendant Elhorn continued feeding the generic, untested *Carus 8600* phosphate blend into Benton Harbor's public water supply with no testing or phosphate blend specific monitoring.

241.   In November 2019, a concerned organization named the Great Lakes Environmental Law Center ("GLELC") expressed serious concerns in writing to

https://www.heraldpalladium.com/news/local/public-advisory-issued-for-lead-in-bh-drinking-water/article_0cf1cd79-b045-5c69-a1e4-05d54fe6a779.html.

EGLE's Director of Drinking Water and Environmental Health Division, Defendant Oswald, over the lead concentration levels in Benton Harbor's drinking water.[36]

242.   Specifically, GLELC voiced concerns about the untested generic *Carus 8600* phosphate blend. GLELC also questioned whether Defendants Elhorn and ELGE had complied with EPA guidance, and indicated that Defendant Elhorn's plan, which was EGLE-approved, was insufficient and noncompliant with both the federal and state LCRs.

243.   Defendant Oswald responded to GLELC's letter, indicating that everything was safe as to the water being treated and distributed by the Defendant City, and that the use of the generic *Carus 8600* phosphate blend had been approved by EGLE.

244.   Defendant Oswald further indicated, dishonestly and publicly, that the results of internal studies indicated the inhibitor was effectively reducing corrosion rates.

---

[36]   Letter from Nick Leonard, GLELC Executive Director to Eric Oswald, EGLE Drink Water and Environmental Health Division, (Nov. 6, 2019), attached as Exhibit 13 and incorporated as if fully stated herein.

245. Also in November 2019, Defendant City officials dishonestly and publicly stated that inroads were being made regarding eliminating lead from the water.[37]

246. City Drinking Water Superintendent, Defendant O'Malley, dishonestly explained to members of the City's Safety and Recreation Committee that the *Carus 8600* treatment was working ahead of schedule.

247. At this point, Defendant O'Malley had only tested seven of the required 60 houses he was mandated to test pursuant to the SDWA and LCR.

248. Regardless, Defendant O'Malley told the Committee that "[I]t appears … the corrosion control treatment system we installed … is having an impact sooner than [we expected]."

249. The truth was, at the end of the second six-month monitoring period, lead levels were even higher than prior to implementing the *Carus 8600*.

**D. Third Six Month Monitoring Period: January to June 2020**

250. Since the Defendant City exceeded the lead action level again, in the second six-month monitoring period, the Defendant City sent another public advisory to residents about lead in their water on January 22, 2020.

---

[37] Louise Wrege, *Official: BH making inroads with lead in water*, Herald Palladium, Nov. 14, 2019, available at: https://www.heraldpalladium.com/news/local/official-bh-making-inroads-with-lead-in-water/article_c0ae841d-9116-5ab8-9712-7e60ed18e3df.html.

251.   In January of 2020, City Drinking Water Superintendent, Defendant O'Malley, again publicly discussed corrosion control, but backed off his previous assertions about being ahead of schedule.

252.   This time, Defendant O'Malley publicly stated that the corrosion control had not yet kicked in. This time, he stated publicly that it could take up to 18 months for the treatment to sufficiently coat the pipes, and that the City would continue to test for lead until such time as the corrosion control was working.

253.   By mid-February 2020, EGLE prepared a letter to the Benton Harbor City Manager, Ellis Mitchell, indicating the *Carus 8600* phosphate blend was not reducing the amount of lead in the water fast enough.[38]

254.   Before it was sent, EGLE circulated the letter internally, and two specialists for the agency, Bob London and Brian Thurston, raised concerns about the instructions EGLE was giving to the City in the letter.[39]

255.   London and Thurston warned that the letter's language could steer the City toward the continued use of a phosphate-based corrosion inhibitor, instead of investigating a range of options as required by the federal and state LCRs.

---

[38]     Letter from Brandon Onan, EGLE Supervisor of Lead and Copper Unit, to Ellis Mitchell, Benton Harbor City Manager, 1, (Feb. 13, 2020), attached as Exhibit 14 and incorporated as if fully stated herein.

[39]     Email from Bob London, EGLE Surface Water Treatment Specialist, to EGLE Staff, (Feb. 3, 2020), attached as Exhibit 15 and incorporated as if fully stated herein.

256.   Ultimately, London and Thurston warned against EGLE biasing the City's corrosion control study. London and Thurston suggested that EGLE mandate full and complete compliance with the federal and state regulations.

257.   In response, EGLE Lead and Copper Unit Supervisor, Defendant Onan, told London and Thurston that he was "not comfortable entertaining the idea of pH/alkalinity adjustments" or other forms of corrosion control as mandated by the federal and state LCRs.

258.   Defendant Onan sent the letter to Mr. Mitchell, despite the concerns raised internally at EGLE about its content.

259.   Onan's letter demanded the Defendant City modify its corrosion control by changing the treatment rate by the end of February 2020.

260.   EGLE did not perform a corrosion control study prior to demanding the modification to the way Benton Harbor's public water system was treated for corrosion.

261.   As it had done in 2019, Defendant EGLE Employees required the Defendant City to contract with a third-party consultant to implement the required changes.

262.   As it did in 2019, the Defendant City contracted with Defendant Elhorn without a formal request for proposal process.

263.   Defendant EGLE Employees instructed the Defendant City that it must submit a corrosion control study proposal in compliance with the LCR, in an effort to determine what optimal corrosion control treatment would be appropriate for the Benton Harbor public water system.

264.   Defendant EGLE Employees set a deadline of September 30, 2020, for the Defendant City to comply with its demands.

265.   On May 19, 2020, Benton Harbor Water Superintendent, Defendant O'Malley, submitted a response to EGLE's demands.

266.   Defendant O'Malley dishonestly maintained that the City properly completed EGLE's original requirements, pursuant to the March 2019 ACO.[40] Specifically, O'Malley falsely claimed that Defendant Elhorn's single page document, which proposed a plan for a corrosion control, fulfilled the ACO's requirement of a completed corrosion control study.

267.   As previously stated herein, the Defendant City's submission did not sufficiently fulfill the ACO requirements with regard to undertaking a corrosion control study.[41]

---

[40]   Letter from Mike O'Malley, Benton Harbor Drinking Water Superintendent, to EGLE Staff, (Feb. 6, 2020), attached as Exhibit 16 and incorporated as if fully stated herein.

[41]   *See supra* ¶¶214-220.

268.   To address the EGLE's 2020 requirements under the Amended ACO, Defendant O'Malley explained that the Defendant City was prepared to hire Defendant Elhorn, again.

269.   The Defendant City provided the Defendant EGLE Employees with another one-page letter from Defendant Elhorn, as the EGLE Employees required.

270.   The letter, which was supposed to contain a detailed proposal for a corrosion control study – a foundational part of determining the optimal corrosion control, contained virtually no information of substance.

271.   The letter provided even less detail than Defendant Elhorn's first proposed corrosion control study plan of 2019.

272.   Defendant EGLE Employees responded in writing that Defendant Elhorn's newest proposed study was insufficient because it was "not detailed," and noted a number of concerns regarding the proposal.[42]

273.   Defendant EGLE Employees demanded the City revise the proposal and provide a fully detailed corrosion control study plan.

274.   Defendant EGLE Employees also indicated the daily supervision proposed in the letter would not be feasible under the current managerial capacity of the Defendant City's water operations staff.

---

[42]   Letter from Ernie Sarkipato, EGLE Surface Water Treatment Specialist, to Mike O'Malley, Benton Harbor Drinking Water Superintendent, (June 17, 2020), attached as Exhibit 17 and incorporated as if fully stated herein.

275.    Additionally, Defendant EGLE Employees pointed out that the Defendant City still needed to increase the treatment rate and blend ratio as directed in EGLE's letter from mid-February 2020.[43]

276.    Despite the back and forth between the Defendant City and EGLE, the response to the water crisis remained unchanged since March 2018, when the Defendant City first callously implemented the *Carus 8600* phosphate blend.

277.    At the conclusion of the third monitoring period, testing results showed lead at 23 ppb, with the highest sample testing at 440 ppb.

278.    More than a year after the City introduced the *Carus 8600* phosphate blend into the public water supply, the presence of lead remained in excess of lead action levels.

**E. Fourth Six Month Monitoring Period: July to December 2020**

279.    Following the conclusion of the third six-month monitoring period, the Defendant City issued another public advisory concerning the high lead levels.[44]

280.    At this point, the Defendant City started to encourage its residents to drink bottled water or to use water filters.

---

[43]    Email from Ernest Sarkipato, EGLE Surface Water Treatment Specialist, to Ellis Mitchell, Benton Harbor City Manager (Apr. 17, 2020), attached as Exhibit 18 and incorporated as if fully stated herein.

[44]    Louise Wrege, *Some Benton Harbor homes still recording high lead levels*, Herald Palladium, July 22, 2020, available at:

281.   If residents lacked access to either, the Defendant City advised them that they could continue to drink and use the tap water, so long as they first flushed the pipes for a few minutes.

282.   Pre-flushing water that has stagnated for longer than six hours in lead pipes reduces the immediate amount of lead in the water, but it does not eliminate it completely. Depending on how damaged the water pipes are from corrosion, the amount of lead in the water can remain above dangerous levels even after pre-flushing.

283.   On July 28, 2020, the Defendant City submitted its third proposal for a corrosion control study.[45]

284.   Defendant Elhorn prepared the proposal for the Defendant City as it had the previous two.

285.   Once again,, the third proposal recommended the *Carus 8600* polyphosphate blend as the corrosion inhibitor.

286.   The third proposal also included daily monitoring and oversight, which the Defendant City lacked the financial and managerial capacity to implement.

---

https://www.heraldpalladium.com/communities/benton_harbor/some-benton-harbor-homes-still-recording-high-lead-levels/article_736fb88d-49e3-5f24-95ea-09031eb85e0f.html.
[45]     City of Benton Harbor Corrosion Study Plan (July 28, 2020), attached as Exhibit 18 and incorporated as if fully stated herein.

287.   Despite the inclusion of daily monitoring and oversight in the third proposal, the Defendant City in-fact made no changes to its water operations staff, nor did it take any other measures to provide for the oversight and additional daily tasks called for by Defendant Elhorn in its third proposal.

288.   Once again, Defendant EGLE Employees permitted the Defendant City to implement Elhorn's third proposal.

289.   In November 2020, EGLE revoked Benton Harbor Drinking Water Superintendent Defendant O'Malley's license. The City placed O'Malley on administrative leave and later terminated his employment.

290.   In or around November 2020, the Defendant City contracted with an engineering firm, Defendant F&V Operations ("F&V"), to take over the day-to-day operation of the Benton Harbor Water Treatment Plant (in Defendant O'Malley's place).

291.   At the conclusion of the fourth monitoring period, testing results returned an elevated presence of lead at 24 ppb, with the highest sample testing at 240 ppb.

292.   Nearly two years after the City's introduction of *Carus 8600* into the public water supply, the presence of lead remained well in excess of lead action levels.

## F. Fifth Six Month Monitoring Period: January to June 2021

293.  The City issued yet another public advisory for lead following the fourth six-month monitoring period. The public was still being advised that it was okay to drink tap water after pre-flushing—a practice that can and often does leave dangerous levels of lead in water.

294.  On May 18, 2021, the City issued boil water notices to Benton Harbor residents and water users.

295.  Boiling water that contains lead makes the lead more concentrated, not less, and thus more dangerous. It exacerbates lead toxicity because the water boils off and evaporates, while the lead does not.

296.  Early in 2021, more than two years after the initial determination of a lead exceedance, a formal request for proposals ("RFP") process began specifically for a corrosion control, with the hope of determining the optimal corrosion control for Benton Harbor's public water system.

297.  On March 24, 2021, David Koch, a Project Director with the engineering firm Black & Veatch, communicated significant concerns to EGLE regarding the City's upcoming formal RFP related to the corrosion control study.[46]

---

[46] Email from David Koch, Black & Veatch, to Ernest Sarkipato, EGLE Surface Water Treatment Specialist (Mar. 24, 2021), attached as Exhibit 19 and incorporated as if fully stated herein.

298.   Koch advised that the federal LCR requires a corrosion control study for systems with lead service lines, like Benton Harbor, to include pipe loop testing with harvested lead service lines, which would be the most effective method to determine what the optimal corrosion control would be.

299.   Koch also noted that the $50,000 budget provided for in the RFP would be far too low to cover the cost of the necessary testing.

300.   The Defendant City refused to increase its budget, despite Koch's warnings, and issued its formal RFP on April 19, 2021.

301.   The Defendant City received proposals from Cornwell Engineering, Metro Consulting Associates, and Black & Veatch.[47]

302.   On June 28, 2021, a selection team consisting of two members from EGLE, one member from F&V Operations (the firm running Benton Harbor's Drinking Water Treatment Plant), and one member from the engineering firm Abonmarche, recommended that the Defendant City select the Cornwell proposal.[48]

303.   Also in June 2021, the Defendant City began applying for millions of dollars in state grants and loans to improve the City's water system.[49]

---

[47]   Email from Jason Marquardt, Abonmarche on behalf of Benton Harbor, to Benton Harbor and EGLE Staff, (May 13, 2021), attached as Exhibit 20 and incorporated as if fully stated herein.

[48]   Letter from Jason Marquardt, Abonmarche, to Ellis Mitchell, Benton Harbor City Manager, (Jun. 28, 2021), attached as Exhibit 21 and incorporated as if fully stated herein.

[49]   Wrege, *supra* n.3.

304.   In order to pay the loans back, the average monthly water rate would have to be increased.

305.   City Commissioner, MaryAlice Adams, stated publicly that the Defendant City was taking on too much debt, such that the EPA and Congress needed to step in and protect the "poorest of the poor" from incurring the costs of the Defendant City's very expensive solutions.

306.   At the conclusion of this fifth monitoring period, testing results returned an elevated presence of lead at 24 ppb, with the highest sample testing at 889 ppb, again exceeding the lead action level.

307.   Nearing three years of Defendants' inadequate response, the presence of lead in the public drinking water remained well in excess of lead action levels.

**G. Sixth Six Month Monitoring Period: July to December 2021**

308.   On September 2, 2021, EGLE created a PowerPoint presentation intended to highlight for the EPA the progress that had been made with regard to Benton Harbor's water supply, treatment and distribution.

309.   A few weeks later, representatives from the EPA visited Benton Harbor, at which time EPA inspectors toured the Defendant City's water treatment plant and public water system, which was being operated by Defendant F&V.

310.   Defendant F&V employees were unable to answer simple questions posed by EPA inspectors.

311.   Inspectors asked Defendant F&V employees to demonstrate certain tasks and testing necessary for running the plant, but the employees were unable to do so.

312.   At the conclusion of its inspection, the EPA inspectors found that several vital pieces of equipment that had been out of service for many years.

313.   The EPA inspectors also uncovered a myriad of unsanitary, defectively designed, and otherwise hazardous conditions at the plant.

314.   Following the visit, the EPA requested that Defendant City provide a copy of the contract between Defendant City and Defendant F&V, which outlined F&V's contracted for services.

315.   The Defendant City refused to provide one.

316.   In all, the EPA's report was scathing, not just for the Defendant City and its contractors, but for EGLE and its agents well, who clearly failed to adequately oversee the Defendant City's compliance with the rules and regulations that govern water treatment.

317.   It was also clear that the excessive lead levels dating back to 2018 remained unresolved.

318.   On September 10, 2021, a number of concerned organizations submitted a petition to the EPA regarding Benton Harbor's lead levels.

319.   On September 23, 2021, Benton Harbor received $10 million from the state, through the American Rescue Plan, for the purpose of removing lead pipes.

320.   On September 25, EGLE and the Defendant City finally began distributing free bottled water and filters to all Benton Harbor residents.

321.   The EGLE and the Defendant City, however, continually mismanaged programs created to distribute bottled water and water filters, causing residents to contend with long wait lines, insufficient supplies of bottled water, and incorrectly installed water filters.[50]

322.   By October 22, 2021—almost three years to the day since the initial lead level exceedance—the Benton Harbor water crisis took center stage in state legislative hearings.[51]

323.  Michigan's House Oversight Committee convened with a single objective: to determine why Benton Harbor's water crisis was not highlighted sooner.

---

[50]   Garret Ellison, *Michigan officials blame locals for empty Benton Harbor water site*, MLive (Oct. 22, 2021), available at https://www.mlive.com/public-interest/2021/10/michigan-officials-blame-locals-for-empty-benton-harbor-water-site.html.

[51]   Louise Wrege, *Benton Harbor water crisis takes center stage in Lansing*, Herald Palladium, Oct. 22, 2021, available at: https://www.heraldpalladium.com/communities/benton_harbor/benton-harbor-water-crisis-takes-center-stage-in-lansing/article_cf2ac22b-99bc-5e6c-bec1-1c7edc52584a.html.

324.   The Committee spoke with officials from EGLE, Benton Harbor, and certain private contractors.

325.   The Director of EGLE, Defendant Liesl Clark, dodged questions about the quality of Benton Harbor's water four times.

326.   It was not until a state legislator pressed her on the issue for a fifth time that she finally answered honestly.

327.   The legislator stated and asked: "It's a normal question. Is the water in Benton Harbor safe to drink or not?"

328.   "No, it's not. People should be drinking bottled water," Clark finally answered.

329.   As previously described herein, the Defendant City and Defendant EGLE Employees were delinquent in providing bottled water to Benton Harbor residents, and when they finally did, they failed miserably.

330.   On November 2, 2021, the EPA filed a Unilateral Administrative Order against the City (the "Order").

331.   The Order required the City to distribute educational materials to residents, when they received their water bills, as well as to organizations serving populations most vulnerable to lead poisoning, such as daycares and schools.

332.   The Order also required the Defendant City to implement monitoring devices throughout the water system, which are crucial to ensure that corrosion control is working effectively.

333.   In the most recent testing results, Benton Harbor's lead levels remain out of compliance with federal and state laws and regulations.

334.   Testing results returned an elevated presence of lead at 15 ppb with the highest sample testing at 48 ppb.

335.   After three years of Defendants' inadequate response, the presence of lead in the public drinking water remains in excess of lead action levels, leaving Benton Harbor residents and water users without public water they can safely consume.

## V.   Lead's Devasting Health Effects and Other Personal Injuries Caused by Benton Harbor's Water Crisis

336.   Lead is a toxic metal that causes severe health consequences.

337.   It is well known and widely understood in the public health community that "[t]here is no known safe blood lead concentration[.]"[52]

338.   According to the World Health Organization (WHO), "even blood lead concentrations as low as 5 μg/dL may be associated with decreased intelligence in

---

[52]     EPA, "Basic Information About Lead in Drinking Water," https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water, (last visited March 31, 2022).

children, [behavioral] difficulties and learning problems. As lead exposure increases, the range and severity of symptoms and effects also increase."[53]

339.   Under the federal SDWA, the EPA's maximum contaminant level goal ("MCLG") for lead is zero.

340.   The EPA has set this level based on the best available science, which shows there is no safe level of lead.

341.   The fact that there is no safe level of lead underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods.[54]

342.   The inverse of the EPA's statement is equally true: any action to create, increase, or prolong lead exposures can have serious, often irreversible, impacts on lives and livelihoods.

343.   Lead's catastrophic effects are indisputable. According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and [behavioral] effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. In children, low levels of exposure have been

---

[53]   World Health Organization "Lead Poisoning Fact Sheet" https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health   (last visited March 31, 2022).

[54]   EPA, "Basic Information About Lead in Drinking Water," https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water, (last visited March 31, 2022).

linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

344.   According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible."[55]

345.   The behavioral effects of lead poisoning in children cannot be overstated. Increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors, and arrests—including arrests involving violent offenses.

346.   Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

347.   The effects of lead exposure are long lasting. The EPA has explained: "Lead can accumulate in our bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal calcium and is used to help from the bones of the fetus. This is particularly true if a woman does

---

[55]   *See* World Health Organization, *supra* n.54.

not have enough dietary calcium. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

348.  Lead is also harmful to adults. The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)."

349.  The costs associated with lead poisoning are real and substantial. It has been estimated that each case of childhood lead poisoning leads to $5.9 million in medical care costs over the course of appropriate treatment.[56]

350.  The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning (typically chelation therapy), as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

351.  Given the long-lasting risks of lead exposure and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

---

[56]  Leonardo Trasande & Yinghua Liu, Reducing The Staggering Costs Of Environmental Disease In Children, Estimated At $76.6 Billion In 2008, Health Affairs, 30, no.5 (2011): 863-70.

## VI.    Lost Income Potential of Benton Harbor's Children (Plaintiffs)

352.    Benton Harbor's most vulnerable, its children, many of whom are Plaintiffs in this action, have suffered the most disastrous consequences from lead exposure—diminished potential over the course of their lives.

353.    The World Health Organization states that "[t]hese costs are sometimes referred to as lost opportunity costs . . . When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

354.    Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure.[57]

355.    Notably, this estimate relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

356.    This estimate also does not and cannot account for the effects of lost opportunities and diminished earning capacity has on a person's mind and on their self-image.

---

[57]    Trasande & Liu, *supra* n.57.

## VII.   Plaintiffs

357.   Plaintiffs were all minors when they were first exposed to and poisoned by Benton Harbor's lead contaminated water.

358.   Plaintiffs have, at all relevant times, lived in the City of Benton Harbor, and/or consumed/utilized water from Benton Harbor's public water system.

359.   The homes in which Plaintiffs reside are each connected to Benton Harbor's public water system; Plaintiffs' households receive drinking water from Benton Harbor's public water system.

360.   At all relevant times, Plaintiffs regularly drank tap water at home and other locations throughout Benton Harbor.

361.   At all relevant times, Plaintiffs regularly ate food that was washed, cooked, and/or otherwise prepared using Benton Harbor's tap water.

362.   At all relevant times, Plaintiffs were unaware of the latent lead hazards lurking in their tap water.

363.   After the Defendants issued boil notices, Plaintiffs drank and otherwise used tap water after it was boiled in each of the ways previously described herein.

364.   Plaintiffs have been diagnosed with elevated blood-lead and/or bone-lead levels, and/or have exhibited signs and symptoms of lead poisoning.

365.   Each Plaintiff was lead-poisoned.

366.   Plaintiffs suffer from cognitive deficits; behavioral issues; difficulty focusing; difficulty completing schoolwork, chores, and/or other tasks; and have other emotional issues.

367.   Each of these issues was proximately caused by exposure to lead from Benton Harbor's tap water during the relevant time period.

368.   Plaintiffs will continue to manifest new and worsening injuries in the future and will face a lifetime of hardship, decreased earning capacity, and emotional distress.

## **CLAIMS FOR RELIEF**

### **COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER AGAINST DEFENDANTS THE CITY OF BENTON HARBOR, MUHAMMAD, O'MALLEY, WATSON, CLARK, OSWALD, SARKIPATO, ONAN, AND JOHN DOES 1 THROUGH 40**

369.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

370.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

371.   This right was clearly established at the time of Defendants' conduct, which caused Plaintiffs' exposure to and ingestion of lead contaminated water.

372.   Defendant Benton Harbor, Defendant City Employees Muhammad, O'Malley, Watson ("City Defendants"), and EGLE Defendant Employees Clark, Oswald, Sarkipato, and Onan ("EGLE Defendants") promulgated unconstitutional and unlawful policies that violated federal law and caused Plaintiffs' exposure to and ingestion of contaminated drinking water.

373.   At all relevant times, the Defendant City maintained abhorrent policies that consisted of not conducting proper drinking water testing for lead, refusing to report dangerous lead levels in drinking water, working with inept, unqualified, and dangerous contractors, failing to keep records required by federal and state law, allowing false or misleading statements to be issued to the public and to governmental authorities about the safety of the drinking water, and hiding, covering up, and otherwise obscuring the reported levels of lead in the distribution system.

374.   Each of the above-named and referenced policymaking officials who acted on behalf of the Defendant City and EGLE, promulgated policies that violated Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and federal law.

375.   Defendant Benton Harbor, EGLE Defendants, and City Defendants each allowed, tolerated, and acquiesced to the unconstitutional and unlawful customs

and practices of non-policymakers that were so permanent and well-settled as to imply the consent and authorization of the policymakers.

376.  Defendant Benton Harbor, EGLE Defendants, and City Defendants failed to train and supervise their employees to such a degree that amounts to deliberate indifference to the rights of those with whom they interacted directly, or by and through their agents and employees.

377.  Defendant Benton Harbor, EGLE Defendants, and City Defendants were well aware that their respective agents and employees were charged with and responsible for a variety of issues associated with the public water system, including but not limited to: (1) the reporting of high lead levels; (2) the assessment of and reporting on the water system's infrastructure; (3) interpreting and understanding federal and state law; (4) carrying out and/or monitoring public notifications and education regarding lead exposures; (5) conducting and monitoring lead testing; (6) reporting that federal and state laws were being violated by government actors and contractors; and (7) developing effective corrosion control techniques within the confines of the law.

378.  Defendant Benton Harbor, EGLE Defendants, and City Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

379.   Defendant Benton Harbor, EGLE Defendants, and City Defendants, while acting under color of state law, affirmatively perpetuated a dangerous situation and created a public health crisis when they deliberately denied, lied about, covered up, deceived, discredited, and ignored known dangers and risks of harm to which they exposed Plaintiffs, making them more vulnerable to said dangers.

380.   Defendant Benton Harbor, EGLE Defendants, and City Defendants were aware that their conduct would result in the deprivation of Plaintiffs' due process rights to be protected from and not made more vulnerable to the dangers of lead.

381.   Defendants' conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

382.   The dangers and risks of harm were discreet and special to Plaintiffs, young children who were Benton Harbor water users, and not risks affecting the public at large.

383.   The dangers and risks of harm to Plaintiffs from the exposure to lead, which were created and perpetuated by Defendant Benton Harbor, Defendant EGLE Employees, and City Defendants, were so extreme as to be equivalent to violence visited upon them.

384.   Defendants' conduct constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional, and economic harm to Plaintiffs.

385.   As a direct and proximate result of the unconstitutional acts of Defendant Benton Harbor, EGLE Defendants, and City Defendants, Plaintiffs fundamental rights to be free from state-created danger were violated, as were their liberty interests.

386.   These unconstitutional acts caused Plaintiffs' lead poisoning, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, and various health problems (including without limitation hair loss, skin rashes, and digestive and other organ problems).

387.   The conduct of Defendant Benton Harbor, EGLE Defendants, and City Defendants was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT II: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY
AGAINST DEFENDANTS THE CITY OF BENTON HARBOR,
MUHAMMAD, O'MALLEY, WATSON, CLARK, OSWALD, SARKIPATO,
ONAN, AND JOHN DOES 1 THROUGH 40**

388.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

389.   Plaintiffs have a clearly established and fundamental right to bodily integrity, pursuant to the substantive due process clause of the Fourteenth Amendment to the United States Constitution.

390.   This right was clearly established at the time of Defendants' conduct, which caused Plaintiffs' exposure to and ingestion of lead contaminated water.

391.   Defendant Benton Harbor, EGLE Defendants, and City Defendants promulgated unconstitutional and unlawful policies that violated federal law and caused Plaintiffs to ingest or otherwise use lead-contaminated drinking water.

392.   The Defendant City maintained abhorrent policies that consisted of not conducting proper drinking water testing for lead, refusing to report dangerous lead levels in drinking water, working with inept, unqualified, and dangerous contractors, failing to keep records required by federal and state law, allowing false or misleading statements to be issued to the public and to governmental authorities about the safety of the drinking water, and hiding, covering up, and otherwise obscuring the reported levels of lead in the distribution system.

393.   EGLE Defendants implemented policies that included divesting their obligations under federal law, refusing to enforce the laws that they swore to uphold, refusing to report dangerous lead levels in drinking water, working with inept, unqualified, and dangerous contractors, and failing to notify the public that their water was contaminated and unsafe to drink.

394.   The policymaking referenced herein, who acted on behalf of the Defendant City and EGLE, promulgated policies that violated Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and federal law.

395.   Defendant Benton Harbor, EGLE Defendants, and City Defendants allowed, tolerated, and acquiesced to the unconstitutional and unlawful customs and practices of non-policymakers that were so permanent and well-settled as to imply the consent and authorization of the policymakers.

396.   Defendant Benton Harbor, EGLE Defendants, and City Defendants failed to train and supervise their employees to such a degree that amounts to deliberate indifference to the rights of those with whom they interacted directly, or by and through their agents and employees.

397.   Defendant Benton Harbor, EGLE Defendants, and City Defendants were well aware that their respective agents and employees were charged with and responsible for a variety of issues associated with the public water system, including

but not limited to: (1) the reporting of high lead levels; (2) the assessment of and reporting on the water system's infrastructure; (3) interpreting and understanding federal and state law; (4) carrying out and/or monitoring public notifications and education regarding lead exposures; (5) conducting and monitoring lead testing; (6) reporting that federal and state laws were being violated by government actors and contractors; and (7) developing effective corrosion control techniques within the confines of the law.

398.   The conduct of Defendant Benton Harbor, EGLE Defendants, and City Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental right to bodily integrity, as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

399.   Defendant Benton Harbor, EGLE Defendants, and City Defendants were aware that their conduct could and likely would result in the deprivation of Plaintiffs' fundamental rights to bodily integrity.

400.   Defendant Benton Harbor, EGLE Defendants, and City Defendants deliberately and knowingly violated Plaintiffs' constitutionally protected rights to bodily integrity, by creating and perpetuating Plaintiffs' exposure to lead-contaminated water, with a deliberate indifference to the known risks of harm that could, and ultimately did occur to Plaintiffs.

401.   At each instance described herein, Defendant Benton Harbor, EGLE Defendants, and City Defendants had the time and opportunity to reflect and deliberate before acting and/or failing to act.

402.   As a direct and proximate result of the unconstitutional acts of Defendant Benton Harbor, EGLE Defendants, and City Defendants, Plaintiffs' fundamental rights to bodily integrity were violated, as were their liberty interests.

403.   These unconstitutional acts caused Plaintiffs' lead poisoning, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, and various health problems (including without limitation hair loss, skin rashes, and digestive and other organ problems).

404.   The conduct of Defendant Benton Harbor, EGLE Defendants, and City Defendants was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT III: VIOLATION OF PLAINTIFFS' RIGHT TO BE FREE FROM STATE CREATED DANGER PURSUANT TO 42 U.S.C. § 1983 AGAINST DEFENDANTS ELHORN ENGINEERING, F&V, AND JOHN DOES 1 THROUGH 40

405.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

406.   Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

407.   These rights were clearly established at the time of Defendants' conduct, wherein Plaintiffs ingested or otherwise used and consumed lead-contaminated water.

408.   Defendants, while acting under color of state law, pursuant to contracts with EGLE and the City Defendants, and with an extreme degree of culpability, affirmatively created and/or exacerbated the dangers to which Plaintiffs were exposed, making them more vulnerable to said dangers.

409.   Defendants acted under color of state law when they: (1) exercised powers that were traditionally and exclusively reserved to the state; (2) when they acted under coercion from government officials; (3) when they became so entwined

with the governmental policy-setting; and/or (4) when the government so entwined itself in Defendants' management.

410. There is a sufficiently close nexus between Defendants and the government actors such that Defendants' actions may be fairly treated as those of the state itself.

411. Defendants further acted under color of state law when they conspired with government officials to violate Plaintiffs' rights, privileges, and immunities secured by the Constitution and by federal law.

412. Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

413. Defendants, while acting under color of state law, affirmatively perpetuated a dangerous situation and created a public health crisis when they deliberately denied, lied about, covered up, deceived, discredited, and ignored known dangers and risks of harm to which they exposed Plaintiffs, making them more vulnerable to said dangers, in violation of federal law and/or for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of laws, or of equal privileges and immunities under those laws.

414.   Defendants knew or should have known that their conduct violated the law.

415.   Defendants knew or should have known that their conduct could, and likely would result in severe and permanent injuries to Plaintiffs; in deprivation of Plaintiffs' due process rights to bodily integrity; and in Plaintiffs' rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by Defendants.

416.   This conduct was reckless, deliberately indifferent, and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

417.   The dangers and risks of harm to Plaintiffs from their lead exposure were created and perpetuated by Defendants, and were so extreme as to be equivalent to violence visited upon them.

418.   Defendants' conduct constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional, and economic harm to Plaintiffs.

419.   As a direct and proximate result of Defendants' unconstitutional acts, Plaintiffs were deprived of their rights, privileges, and immunities secured by the

Constitution of the United States, and federal law, including the right to bodily integrity, the right to be free from state created danger.

420.   As a direct and proximate result of Defendants' unconstitutional acts, Plaintiffs have and will continue to suffer personal injuries, including but not limited to: lead poisoning, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, and various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems)

421.   Defendants' conduct was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT IV: VIOLATION OF PLAINTIFFS' RIGHT TO BODILY
INTEGRITY PURSUANT TO 42 U.S.C. § 1983
AGAINST DEFENDANTS ELHORN ENGINEERING, F&V, AND JOHN
DOES 1 THROUGH 40**

422.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

423.   Plaintiffs have a clearly established and fundamental right to bodily integrity, pursuant to the substantive due process class of the Fourteenth Amendment to the United States Constitution.

424.   This right was clearly established at the time of Defendants' conduct, wherein Plaintiffs were exposed to lead contaminated water.

425.   Defendants violated, threatened, and/or endangered Plaintiffs' fundamental right to and liberty interest in bodily integrity, as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

426.   Defendants, while acting under color of state law, affirmatively caused, continued, increased, and perpetuated Plaintiffs' exposure to lead.

427.   Defendants, while acting under color of state law, and pursuant to contracts with the EGLE and City Defendants, affirmatively caused and exacerbated Plaintiffs' lead exposure, the latter of which making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

428.   Defendants acted under color of state law when they: (1) exercised powers that were traditionally and exclusively reserved to the state; (2) when they

101

acted under coercion from government officials; (3) when they became so entwined with the governmental policy-setting; and/or (4) when the government so entwined itself in Defendants' management.

429.   There is a sufficiently close nexus between Defendants and the government actors such that Defendants' actions may be fairly treated as those of the state itself.

430.   Defendants further acted under the color of state law when they conspired with the government to violate Plaintiffs' rights, privileges, and immunities secured by the Constitution and by federal law.

431.   Defendants further acted under the color of state law when they conspired with the government to violate Plaintiffs' constitutional rights.

432.   Defendants knew or should have known that their conduct violated federal law.

433.   Defendants knew or should have known that their conduct could and likely would result in injury to Plaintiffs, and would result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or from being made more vulnerable to the dangers affirmatively created and perpetuated by Defendants.

434.   This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

435.   The dangers and risks of harm to Plaintiffs from the exposure lead, which were created and perpetuated by Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

436.   These Defendants' conduct constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional, and economic harm to Plaintiffs.

437.   As a direct and proximate result of the unconstitutional acts of these Defendants, Plaintiffs' fundamental rights to bodily integrity were violated, as were their liberty interests.

438.   These unconstitutional acts caused Plaintiffs' lead poisoning, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, and various health problems (including without limitation hair loss, skin rashes, and digestive and other organ problems).

439.   The conduct of these Defendans was reckless, evinced callous indifference to Plaintiffs' rights, and included intentional violations of federal law, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT VII: PROFESSIONAL NEGLIGENCE AGAINST DEFENDANTS ELHORN, F&V, AND JOHN DOES 1 THROUGH 40

440.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

441.   Defendants undertook, for consideration, to render services for EGLE and/or the City of Benton Harbor and its residents, including Plaintiffs.

442.   Defendants undertook, for consideration, to perform a duty owed to Plaintiffs by EGLE and/or the City of Benton Harbor.

443.   Defendants knew or should have known that such services were necessary for the protection of Plaintiffs.

444.   Based on their undertaking, Defendants had a duty to Plaintiffs, as residents and water users in the City of Benton Harbor, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by professionals, as well as an ethical duty to report to the public and to public authorities the dangers associated with and caused by the failure to properly maintain, install, operate, survey, design, remediate, and/or repair the City's public

water system, and by the failure to properly design, install and/or utilize proper corrosion control for the City's drinking water.

445.   Defendants also had a duty to notify Plaintiffs, the public, and the proper authorities of unethical, illegal practices of individuals and entities whose conduct posed a threat to public health.

446.   Defendants' duty to notify was triggered by but not limited to their intimate awareness of the failure to properly maintain, install, operate, survey, design, remediate, and/or repair the City's public water system and the failure to properly design, install and/or operate a corrosion control treatment for the City's drinking water.

447.   Plaintiffs relied on Defendants to inspect the City's water treatment system, including an evaluation of the corrosion control program, to make sure that the water was safe.

448.   Defendants failed to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by similarly situated professionals.

449.   Indeed, Defendants failed to use even reasonable care.

450.   Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care to protect Plaintiffs.

451.   Defendants' failures to exercise reasonable care to protect Plaintiffs, proximately caused Plaintiffs' injuries, all of which were entirely foreseeable.

452.   Defendants' acts and/or omissions constitute gross negligence, as they were so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

453.   As a direct and proximate result of the above Defendants' negligent and/or reckless conduct, Plaintiffs have suffered past and present personal injuries, and will with reasonable certainty suffer future personal injuries, including but not limited to: lead poisoning, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, mortification, medical expenses, wage loss, and various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems).

454.   Defendants' conduct evinces actual malice and/or gross negligence, and was willful, wanton or constituted a reckless disregard for the safety of others, and as such, Plaintiffs are entitled to an award of punitive damages.

## COUNT VIII: NEGLIGENCE
## AGAINST DEFENDANTS ELHORN, F&V,
## AND JOHN DOES 1 THROUGH 40

455.   Plaintiffs incorporate by reference all preceding allegations set forth above as if fully stated herein.

456.   Defendants undertook, for consideration, to render services for EGLE and/or the City of Benton Harbor, which they should have recognized as necessary for the protection of Plaintiffs.

457.   Defendants undertook, for consideration, to perform a duty owed to Plaintiffs by the City of Benton Harbor and/or EGLE.

458.   Based on their undertaking, Defendants had a duty to Plaintiffs, as residents and water users in the City of Benton Harbor, to exercise a reasonable degree of care, as well as an ethical duty to report to the public and to public authorities the dangers associated with and caused by the failure to properly maintain, install, operate, survey, design, remediate, and/or repair the City's public water system, and by the failure to properly design, install and/or utilize proper corrosion control for the City's drinking water.

459.   Defendants also had a duty to notify Plaintiffs, the public, and the proper authorities of unethical, illegal practices of individuals and entities whose conduct posed a threat to public health.

460.   Plaintiffs relied on Defendants to inspect the City's water treatment system, including an evaluation of the corrosion control program, to make sure that the water was safe.

461.   Defendants failed to exercise reasonable care.

462.   Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care to protect Plaintiffs.

463.   Defendants' failures to exercise reasonable care to protect Plaintiffs, proximately caused Plaintiffs' injuries, all of which were entirely foreseeable.

464.   Defendants' acts and/or omissions constitute negligence, as they were so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

465.   As a direct and proximate result of the above Defendants' negligent and/or reckless conduct, Plaintiffs have suffered past and present personal injuries, and will with reasonable certainty suffer future personal injuries, including but not limited to: lead poisoning, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, mortification, medical expenses, wage loss, and various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems).

108

466.   Defendants' conduct evinces actual malice and/or gross negligence, and was willful, wanton or constituted a reckless disregard for the safety of others, and as such, Plaintiffs are entitled to an award of punitive damages.

## **RELIEF REQUESTED**

Plaintiffs demand judgment against Defendants for:

b.   Compensatory damages;

c.   Punitive damages;

d.   Exemplary damages;

e.   Pre-judgement and post-judgment interest;

f.   Attorneys' fees and litigation expenses; and

g.   Any other relief the Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial on all issues so triable in this action.

Dated: May 27, 2022.

Respectfully submitted,

**LEVY KONIGSBERG LLP**

<u>/s/ Kimberly L. Russell</u>
Kimberly L. Russell
Corey M. Stern (admission forthcoming)
Amber R. Long (admission forthcoming)
John P. Guinan
605 Third Ave., 33rd Fl.
New York, New York 10158
(212) 605-6200
klrussell@levylaw.com
cstern@levylaw.com
along@levylaw.com
jguinan@levylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2022, the foregoing document was filed via the U.S. District Court's CM/ECF electronic system and a copy thereof was served upon all counsel of record.

/s/ Kimberly L. Russell
Kimberly L. Russell
