## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DISTRICT

*A.M., a minor, by and through Iesha*
*Mitchell, Guardian and Next Friend, et al.,*

      Plaintiffs,

      v.

*Liesl Clark, Eric Oswald, Ernest Sarkipato,*
*Brandon Onan, et al.*

      Defendants.

_____/

Case No. 1:22-cv-0475

Hon. Hala Y. Jarbou
Hon. Philip J. Green

## *MITCHELL* PLAINTIFFS' OPPOSITION TO
## STATE DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

PROCEDURAL BACKGROUND ..............................................................1

CONCISE STATEMENT IN SUPPORT ...................................................1

SUMMARY OF FACTUAL ALLEGATIONS ..........................................2

   Historically Neglected .......................................................................2

   Lead and the Laws Meant to Protect the Public ................................3

   Benton Harbor – Dangerously Out of Compliance ...........................6

   The Water Crisis Begins....................................................................7

      Initial Documented Lead Level Exceedance...............................7

      First Monitoring Period (November 2018 to June 2019)............8

      Second Monitoring Period (July 2019 to December 2019) .........11

      Third Monitoring Period (January 2020 to June 2020)...............12

      Fourth Monitoring Period (July 2020 to December 2020)..........14

      Fifth Monitoring Period (January 2021 to June 2021)................15

      Sixth Monitoring Period (July 2021 to December 2021).............16

   Discrete Group Facing Special Danger – Children/Plaintiffs ............17

LEGAL STANDARD ............................................................................19

ARGUMENT ........................................................................................20

   I.    IT IS IMPROPER FOR THE COURT TO LOOK OUTSIDE THE COMPLAINT, AS STATE DEFENDANTS REQUEST..............20

   II.   DESPITE DEFENDANTS' TACTICAL ARGUMENTS TO THE CONTRARY, PLAINTIFFS' CLAIMS ARE ONLY AGAINST INDIVIDUAL DEFENDANTS ..........................................23

III.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ...................................................................................24

A.   Plaintiffs Plausibly Allege That Defendants Violated Plaintiffs' Constitutional Rights Through Their Conscious Shocking Behavior ...........26

   i.   Despite Defendants' creativity – the applicable standard is not a deliberate intent to injure. ...................................................27

   ii.   Considerations weigh heavily in favor of finding Defendants' conduct was conscious shocking. ........................................27

   iii.   Defendants' conduct constitutes deliberate indifference in the constitutional sense. ..................................................30

      1.   Oswald ........................................................................32

      2.   Sarkipato .....................................................................34

      3.   Onan............................................................................36

      4.   Clark ..........................................................................37

B.   Plaintiffs' Right To Bodily Integrity Was Clearly Established ...................39

C.   Plaintiffs' Right To Be Free From State-Created Danger Was Clearly Established ......................................................................42

   IV.   PLAINTIFFS PLAUSIBLY ALLEGE A STATE-CREATED DANGER CLAIM .............................................................................44

CONCLUSION ..............................................................................47

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................19, 20

*Bacon v. Snyder (In re Flint Water Cases)*,
    496 F. Supp. 3d 1070 (E.D. Mich. 2020)............................................................44

*Baynes v. Cleland*,
    799 F.3d 600 (6th Cir. 2015) ..............................................................................40

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................20

*Brown v. Snyder (In re Flint Water Cases)*,
    No. 18-10726, 2020 U.S. Dist. LEXIS 54400 (E.D. Mich. Mar. 27,
    2020) ...................................................................................................................44

*Buck v. Thomas M. Cooley Law Sch.*,
    597 F.3d 812 (6th Cir. 2010) ..............................................................................20

*Cartwright v. City of Marine City*,
    336 F.3d 487 (6th Cir. 2003) .......................................................................45, 46

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998)............................................................................................27

*Comstock v. McCrary*,
    273 F.3d 693 (6th Cir. 2001) ..............................................................................42

*Courtright v. City of Battle Creek*,
    839 F.3d 513 (6th Cir. 2016) ..............................................................................26

*Ewolski v. City of Brunswick*,
    287 F.3d 492 (6th Cir. 2002) .......................................................................30, 31

*Farmer v. Brennan*,
    511 U.S. 825 (1994)............................................................................................31

*Frees v. Duby*,
    2010 U.S. Dist. LEXIS 125265 (W.D. Mich. 2010)....................................21, 22

*Guertin v. Michigan*,
  912 F.3d 907 (6th Cir. 2019) ...................................................................... passim

*Henry v. Shawnee Specialties, Inc.*,
  No. 1:14-CV-1234, 2016 U.S. Dist. LEXIS 42887 (W.D. Mich. Mar.
  31, 2016) .............................................................................................................43

*Hope v. Pelzer*,
  536 U.S. 730 (2002) ............................................................................................39

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*
  542 F.3d 529 (6th Cir. 2008) .........................................................................28, 30

*In re Miller Energy Res. Sec. Litig.*,
  No. 3:11-CV-386-TAV-CCS, 2014 U.S. Dist. LEXIS 15810 (E.D.
  Tenn. Feb. 4, 2014) ............................................................................................22

*Jones v. City of Carlisle*,
  3 F.3d 945 (6th Cir. 1993) .................................................................................46

*Kallstrom v. City of Columbus*,
  136 F.3d 1055 (6th Cir. 1998) ......................................................................26, 43

*Keys v. Humana, Inc.*,
  684 F.3d 605 (6th Cir. 2012) .............................................................................19

*Kollaritsch v. Mich. State Univ. Bd. of Trs.*,
  No. 17-2445/18-0101, 2018 U.S. App. LEXIS 17379 (6th Cir. June 25,
  2018) ...................................................................................................................21

*Kostrzewski v. City of Wyo.*,
  No. 1:20-cv-682, 2021 U.S. Dist. LEXIS 229410 (W.D. Mich. May 6,
  2021) ..............................................................................................................44, 45

*Koubriti v. Convertino*,
  593 F.3d 459 (6th Cir. 2010) .............................................................................22

*Lipman v. Budish*,
  974 F.3d 726 (6th Cir. 2020) .............................................................................43

*Marble v. Snyder (In re Flint Water Cases)*,
   453 F. Supp. 3d 970 (E.D. Mich. 2020) ..............................................................43

*Marvaso v. Sanchez*,
   971 F.3d 599 (6th Cir. 2020) ...............................................................26

*Monell v. Dep't. of Soc. Servs.*,
   436 U.S. 658 (1978) ...................................................................23, 39

*Montgomery v. Whidbee*,
   No. 21-5327, 2022 U.S. App. LEXIS 6883 (6th Cir. Mar. 16, 2022) ................26

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ...........................................................................25

*R.S. v. Lucas Cnty. Children Servs.*,
   No. 22-3501, 2022 U.S. App. LEXIS 34847 (6th Cir. Dec. 16, 2022) ...............43

*Roane Cnty. v. Jacobs Eng'g Grp., Inc.*,
   No. 3:19-cv-206-TAV-HBG, 2020 U.S. Dist. LEXIS 73491 (E.D. Tenn.
   Apr. 27, 2020) ...............................................................................22

*Stiles v. Grainger Cnty.*,
   819 F.3d 834 (6th Cir. 2016) ...............................................................45

*Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*,
   700 F.3d 865 (6th Cir. 2012) ...............................................................42

*Tackett v. M&G Polymers, USA, LLC*,
   561 F.3d 478 (6th Cir. 2009) ...............................................................23

*Taylor v. Hillis*,
   No. 1:10-cv-94, 2011 U.S. Dist. LEXIS 145694 (W.D. Mich. Nov. 28,
   2011) ...........................................................................20, 21, 22, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...........................................................................19

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue
   Shield*,
   552 F.3d 430 (6th Cir. 2008) ...............................................................19

*Waid v. Earley (In re Flint Water Cases)*,
    960 F.3d 303 (6th Cir. 2020) ...............................................................40

*Waller v. Trippett*,
    49 Fed. Appx. 45 (6th Cir. 2002)........................................................46

*Wesley v. Campbell*,
    779 F.3d 421 (6th Cir. 2015) ...............................................................25

*White v. Pauly*,
    580 U.S. 73 (2017)...............................................................................40

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,
    413 F.3d 553 (6th Cir. 2005) ...............................................................21

**Statutes**
40 C.F.R. §§ 141.................................................................................3

40 C.F.R. §§ 141.80...........................................................................3

40 C.F.R. 141.82(c) ...........................................................................5

42 U.S.C.S. § 1431 .............................................................................3

**Other Authorities**
Benton Harbor City Charter, § 11.11 .................................................5

Benton Harbor City Charter, § 11.12 .................................................5

Benton Harbor City Charter, § 3.39 ...................................................5

Benton Harbor, Mich., Code of Ordinances § 11-142 .........................29

Benton Harbor, Mich., Code of Ordinances § 44-1 ............................29

Benton Harbor, Mich., Code of Ordinances § 44-16 ...........................29

Benton Harbor, Mich., Code of Ordinances, § 2–64............................5

**Rules**
Fed. R. Civ. P. 12(b)(6) ...........................................................19, 20, 22

Fed. R. Civ. P. 12(d)..........................................................................................23, 25

**Regulations**
Mich. Admin. Code R. 325.10604f(2)(e)(i-ii)...........................................................5

Mich. Admin. Code R. 325.10604f(3)(c)(i) ...............................................................5

## PROCEDURAL BACKGROUND[1]

Individual children poisoned by lead contaminated water in Benton Harbor, *Mitchell* Plaintiffs, filed their Complaint against, *inter alia*, State officials from the Michigan Department of Environment, Great Lakes, and Energy ("EGLE")[2] asserting two constitutional claims under 42 USC § 1983 for their role in the Benton Harbor Water Crisis. *Mitchell*, 1:22-cv-00475, ECF No. 1 ("Compl."). These defendants seek dismissal on the grounds of qualified immunity and failure to state a claim. This brief responds to that motion.

## CONCISE STATEMENT IN SUPPORT

These defendants are not entitled to qualified immunity at this stage of the proceedings. Plaintiffs plausibly allege that the State officials' abhorrent conduct violated Plaintiffs' clearly established constitutional rights. Moreover, the Court should not accept facts outside the record in making its determination at this stage of the litigation.

---

[1] Because Plaintiffs set forth an overall summary of facts herein, Plaintiffs respectfully request that the Court read this pleading before reading Plaintiffs' other pleadings, i.e., Plaintiffs' opposition to the City Defendants' motion to dismiss, opposition to Defendant Elhorn Engineering Company's motion to dismiss, and opposition to F&V Operations and Resource Management, Inc.'s motion to dismiss.

[2] Eric Oswald, EGLE Director of Drinking Water and Environmental Health Division; Brandon Onan, Lead and Copper Unit Supervisor for EGLE; Ernest Sarkipato, Surface Water Treatment Specialist for EGLE; and Liesl Clark, Director of EGLE.

## SUMMARY OF FACTUAL ALLEGATIONS

Hundreds of individual children were lead poisoned and permanently damaged in the City of Benton Harbor by a group of actors who were supposed to protect them, *to wit:* **EGLE members** Eric Oswald, Brandon Onan, Ernest Sarkipato, and Liesl Clark ("State Defendants"); **The City of Benton Harbor and its employees** Mayor Marcus Muhammad ("Muhammad"), former City Manager Darwin Watson ("Watson"), and former Drinking Water Superintendent Michael O'Malley ("O'Malley") (collectively "City Defendants"); **and Engineers** Elhorn Engineering Company ("Elhorn") and F&V Operations and Resource Management, Inc. ("F&V"). Their individual and collective unconstitutional acts callously deprived children of their constitutional rights.

### Historically Neglected

In the southwestern corner of Michigan sits Benton Harbor — a historically impoverished population of approximately 10,000, who have suffered years of widespread lead contamination in their public drinking water. In the three decades leading up to the Benton Harbor Water Crisis ("BHWC"), the City lost significant tax revenue due to a mass exodus of residents. By March 2010, Michigan declared a state of financial emergency for Benton Harbor and appointed an emergency manager ("EM") who took control of its budget. The EM slashed the budget, eliminating fifty percent (50%) of the City's staff, resulting in a lack of resources

2

and capabilities for the Benton Harbor Water Treatment Plant ("BHWTP"). In 2016, the state of emergency was lifted. Compl., PageID. 40-45 (¶¶81-116).

But the City still lacked the financial resources to deliver safe water through their archaic water system, more than at least half of which contained substantial lead components, including pipes, service lines, joints, and solder.[3] Compl., PageID.42-43 (¶¶95-106).

### Lead and the Laws Meant to Protect the Public

Lead is a developmental neurotoxin, which can cause permanent damage to those who ingest it — particularly children. Compl., PageID.46 (¶122). Lead in pipes has the potential to leach into public water supplies if proper mitigation measures are not taken. Thus, Congress enacted the Safe Drinking Water Act ("SDWA") and authorized the Environmental Protection Agency ("EPA") to set national standards for drinking water, to protect against health effects from exposure to lead. Under this authority, the EPA implemented the Lead and Copper Rule ("LCR") and the National Primary Drinking Water Regulations ("NPDWR"), tailored specifically to minimize, and eliminate lead from public water supplies. The EPA delegated

---

[3] Benton Harbor was required by state law to complete an inventory of service line materials and, to date, has not developed a finished inventory. However, a preliminary inventory from December 2020 revealed shocking amounts of lead throughout the system: **51% of the City's service lines contain some form of lead or likely contain lead**. Compl., PageID.43 (¶¶ 102-104). And 47% of materials could not be accounted for (which should be assumed to contain lead until proven otherwise). Only 2% of the service lines are wholly *without* lead.

enforcement of these regulations to the EGLE (the state's Primacy Agency), to protect Michigan communities, like Benton Harbor, from lead in their water. Compl., PageID.45-46 (¶¶117-122).

Beyond EPA regulations, Michigan implemented its own SDWA and LCR to "provide for supervision and control over public water supplies." In 2018, following the Flint Water Crisis, Michigan legislators took additional steps to regulate lead in water, amending Michigan's SDWA to include more testing requirements. The 2018 revisions also assigned responsibility for replacing lead service lines to the water supplier – in this case, Benton Harbor. The law requires water suppliers to replace on average five percent (5%) of the system's lead service lines every year for 20 years. Compl., PageID.46-47 (¶¶123-127).

Municipalities are also required to test their water for, *inter alia*, lead, every three years. If this triennial testing reveals an "action level exceedance" for a contaminate, additional regulations for municipalities and Primacy Agencies are triggered. The action level for lead is exceeded at 15 parts per billion ("ppb"), in 10 percent (10%) of the sampling sites ("the 90th percentile"). When the action level is exceeded, municipalities and Primacy Agencies are required to meet additional requirements, including: (1) testing for lead every six months; (2) distributing public education materials; (3) delivering consumer notices of lead results; and (4)

correcting corrosion problems, beginning with a corrosion control study within six months after the first exceedance. Compl., PageID.47 (¶¶128-131).

**Proper corrosion control is essential**. Corrosion control is the process of treating chemical imbalances in water to prevent or minimize corrosion of lead pipes, and there are several different types. At issue in this case is a "phosphate blend," which is a combination of orthophosphate and polyphosphate. Compl., PageID.48-49 (¶¶137-138).

The Michigan LCR outlines steps that small and medium size water suppliers, like Benton Harbor, must take. The entity that controls the water supply (here, the City of Benton Harbor)[4] is required to determine optimal corrosion control treatment. Then, the EGLE can either require a corrosion control study, or can simply specify the optimal treatment to be implemented. Mich. Admin. Code R. 325.10604f(2)(e)(i-ii); *see also* ECF No. 1-12, PageID.221-225 (Ex. 13). Both the Michigan and federal LCRs require any corrosion control study to evaluate the effectiveness of *several* treatment techniques to inhibit corrosion. Mich. Admin. Code R. 325.10604f(3)(c)(i); 40 C.F.R. 141.82(c); ECF No. 1-12, PageID.221-225 (Ex. 13).

---

[4] Benton Harbor City Charter, § 3.39; § 11.11; § 11.12; Benton Harbor, Mich., Code of Ordinances, § 2–64.

When a phosphate blend is the chosen corrosion inhibitor, as was the case in Benton Harbor and which forms a significant part of the basis for this litigation, EPA guidelines provide that "special considerations" must be made, and the EPA warns that "[b]lended phosphates should be used with caution." This is because the polyphosphates are not typically an effective form of corrosion control. The EPA also provides a series of flowcharts for guidance regarding the appropriateness of corrosion inhibitors, which also addresses the dangers of utilizing a polyphosphate. Compl., PageID.48-49 (¶¶136-143); ECF No. 1-12, PageID.221-225 (Ex.13).

In accordance with state and federal law, State Defendants Oswald, Sarkipato, Onan, and Clark are responsible, in their individual capacities, for ensuring that municipalities — like Benton Harbor — are compliant with the SDWA rules. And City Defendants Muhammad, O'Malley, and Watson are responsible for running the public water supply. Compl., PageID.35-37, 45-47 (¶68; ¶¶70-73; ¶¶117-120; ¶¶123-128).

## Benton Harbor – Dangerously Out of Compliance

In May 2018, the EGLE awarded Benton Harbor $284,000.00 in grants to replace lead service lines. Compl., PageID.50 (¶¶148-149). Thereafter, Defendant Sarkipato, wrote a letter to Defendants Muhammad, Watson, and O'Malley, explaining that a sanitary survey of the BHWTP revealed that Benton Harbor's water supply lacked the financial and managerial capacity to meet the requirements of the

SDWA, *to wit*: "Findings of significant deficiency have been identified as having the potential to introduce contamination to the public water supply and must be addressed." ECF No. 4, PageID.281 (Ex. 4). Sarkipato's letter further informed Muhammad and Watson that it would cost $124 million to replace the "distribution pipe network alone." *Id*.; Compl., PageID.51-52 (¶¶151-157). The deficiencies identified, combined with an utter lack of corrosion control,[5] and the City's 100-year-old public system substantially comprised of lead components, set the stage for a public health disaster.

### The Water Crisis Begins

### Initial Documented Lead Level Exceedance

On October 25, 2018, the 90th percentile of sampling sites returned a presence of lead at an average of 22 ppb—well in excess of the action level. As a result, EGLE representatives issued an advisory to Benton Harbor, which severely downplayed the urgency of the situation. Mayor Muhammad held a press conference where he flooded the community with misinformation. He downplayed the seriousness of the situation and urged residents **not** to be on "high alert." He claimed there was no "emergency." And he was adamant that **no one** should "panic." Compl., PageID.53-55 (¶¶162-174)). Muhammad did not provide information regarding the dangers of

---

[5] Benton Harbor was not using any form of corrosion control. Compl., PageID.57 (¶185).

lead. He did not mention that children are most vulnerable to the consequences of lead exposure. And he failed to say that proper consumer notices regarding lead testing results were not delivered to residents as required by law. For his part, City Manager Watson lied publicly when he stated that Benton Harbor's water system did **not** contain lead lines. Compl., PageID.55-56 (¶175; ¶¶182-183). He also made statements falsely implying that any lead problem was not systematic, but rather isolated to individual plumbing lines found in some individual homes. Compl., PageID.53-54 (¶¶167-172).

### First Monitoring Period (November 2018 to June 2019)

The following month, November 2018, Muhammad continued to make misleading statements, further pacifying and lying to the public and Plaintiffs, when he told them that the City would replace 40% of service lines (despite a cost of $124 million, and the City having only received a tiny fraction of that amount by way of the aforementioned grant). Additionally, then Drinking Water Superintendent, O'Malley, lied to the public, stating that Benton Harbor was delivering clean water; that residents could drink it. Also, O'Malley failed to provide filters or bottled water to anyone in the community—even to homes over the action level. Compl., PageID.59-60 (¶¶196-197; ¶200); *see also* ECF No.1-4, PageID.163 (Exhibit 5).

Contrary to City Defendants' false statements, under the circumstances and pursuant to state law and federal law and EPA guidance, the City was required to

undertake a corrosion control study and implement optimal treatment. State Defendants Oswald, Sarkipato, and Onan were responsible for ensuring that these actions were undertaken. Both sets of defendants failed. *See generally* ECF No. 1-12, PageID.221-224 (Ex. 13).

In January 2019, Watson and O'Malley submitted a permit application on behalf of the City to the EGLE based on Defendant Elhorn's recommendation regarding corrosion control. Compl., PageID.61 (¶¶207-208); ECF No. 1-6, PageID.167-170 (Ex. 7). The permit sought approval to implement a polyphosphate blend, Carus 8600. However, the recommendation was dangerously flawed, in that the corrosion control study proposal contained therein did not comply with requirements of the Michigan or Federal LCR or EPA guidance, and the recommendation for Carus 8600 itself went against EPA guidance. *See* ECF No. 1-12, PageID.221-225 (Ex. 13).; Compl., PageID. 61, 49-50 (¶208-10; ¶142-143).

After receiving the permit application, EGLE engineers emailed Sarkipato and Onan with serious concerns. Compl., PageID.61-62 (¶¶211-213); s*ee also* ECF No. 1-7; 1-8, PageID.193-199 (Ex. 8, 9). They warned that the application did not provide any information as to how Elhorn and the City planned to create optimal corrosion control; the application contained incorrect calculations; and the corrosion control proposal was unlike any previously made for cities like Benton Harbor. *Id*.

Yet despite these concerns, in February 2019 Sarkipato and Onan approved the permit application. Compl., PageID.62 (¶213); ECF No. 1-8, PageID.199 (Ex. 9).

Five months after the first action level exceedance, and after the public had been lied to by City Defendants regarding the safety of their water, and after State Defendants approved a permit that garnered serious concern from state engineers, State Defendants Oswald and Sarkipato entered an Administrative Consent Order ("ACO") with City Defendants Muhammad and O'Malley. The ACO stated that the City was in violation of the SDWA, and mandated that Benton Harbor undertake one of two things: (1) submit a proposal for optimal corrosion control treatment; or (2) submit a corrosion control study by the end of April 2019. Compl., PageID.62 (¶214); ECF No. 4, PageID.275 (Ex. 4).

Despite the requirements of the ACO, neither O'Malley nor Elhorn provided anything whatsoever to the EGLE that complied with the ACO within the specified timeframe. Compl., PageID.63 (¶¶215-216); Compl., 1-10, PageID.217 (Ex. 11).

Meanwhile, on March 27, 2019, O'Malley sent correspondence to Sarkipto and Onan, informing them that the City had begun feeding Carus 8600 into the distribution system. Compl., PageID.63 (¶¶221); ECF No. 1-11, PageID.219 (Ex. 12). This occurred before a corrosion control treatment study was finalized or conducted, without the ability to meaningfully monitor the water, and with a complete disregard for EPA guidance. Compl., PageID.64 (¶¶222-226); ECF No. 1-

12, PageID.221-225 (Ex. 13); *see also* Compl., PageID.64 (¶¶222-226). Yet even knowing all of this, Sarkipato and Onan failed to raise any alarms, and even undertook "tons of work" to help the City start feeding this untested "treatment" into the public drinking water. ECF No. 1-11, PageID.219 (Compl. Ex. 12).

Around this time, O'Malley also obscured lead testing efforts, refused to disclose the addresses of testing sites to the EGLE, and inexplicably requested that the EGLE reduce the number of sites sampled for lead contamination. Compl., PageID.64-65 (¶¶228-230).

In June 2019, at the end of the first monitoring period, the public water system continued to exceed lead action levels. Testing showed lead levels at 27 parts ppb in the 90th percentile of sampled sites. As a result, and after months of feeding an untested and unmonitored phosphate blend into the public water supply, the presence of lead in the public drinking water had actually **increased.** Compl., PageID.65 (¶232-235).

### Second Monitoring Period (July 2019 to December 2019)

In November 2019, despite the results from the first monitoring period, O'Malley shockingly told a public committee that the Carus 8600 "treatment" was working ahead of schedule, despite full knowledge that lead levels were even higher than prior to its implementation, and that the City was not in compliance with the SDWA or the LCR. Compl., PageID.68 (¶¶245-249).

11

Going along with this lie, Oswald publicly defended the use of Carus 8600 to a concerned environmental organization, the Great Lakes Environmental Law Center ("GLELC"), by dishonestly responding to a letter he received from the group, which expressed concern that the misuse of the "treatment" was exposing residents to elevated levels of lead in their drinking water. Oswald brazenly stated that the generic treatment was safe and had been approved by the EGLE, and falsely asserted that Carus 8600 was effectively reducing corrosion control rates. Compl., PageID.66-67 (¶¶241-244); ECF No. 1-12, PageID.220-225 (Ex. 13).

But the truth was, at the end of the second six-month monitoring period, corrosion rates were not improving, and lead levels were even higher than prior to implementation of Carus 8600. Compl., PageID.68 (¶249).

### Third Monitoring Period (January 2020 to June 2020)

In February 2020, Onan drafted a crucial letter to the City Manager about the ineffective corrosion control that was being implemented. But the letter ignored the advice of two agency specialists, and disregarded statutory mandates, which required Onan to direct the City to investigate *a range* of corrosion control options. Instead of heeding this advice and conforming to the regulations, Onan focused the letter *only on modifying the current* corrosion method, while acknowledging *internally* that what he was directing the City to do was not an "ideal" solution. Compl., PageID.69-70 (¶¶253-259); ECF No. 1-14, PageID.232-233 (Ex.15).

12

Onan sent the letter to the City and O'Malley, (copying Sarkipato and Oswald), informing them that the current use of Carus 8600 was ineffective, and directing modifications to its use. (Adding to the problematic nature of Onan's letter was the fact that Onan, Sarkipato and Oswald requested these modifications without performing any testing to support their effectiveness or safety). The letter further explained that the EGLE intended to "quickly put into place treatment that will more efficiently lower corrosion rates in the distribution system for greater protection of public[,]" again without any testing or data to suggest how modifications could or would help, and without any detail as to what his mysterious plan included. Compl., PageID.69-70 (¶253; ¶¶259-260); ECF No. 1-13, PageID.228-230 (Ex. 14).

Subsequently, Oswald, Sarkipato, and Onan issued an Amended ACO, directing the City to obtain a corrosion control study proposal from a qualified third-party, and to submit it no later than September 2020 for their consideration. *See* ECF No. 6, PageID.332 (Ex. 16); Compl., PageID.71 (¶264). O'Malley responded on May 19, 2020 by falsely claiming that he and Elhorn had made the requested modifications to the treatment. He also included a proposal for a corrosion control study to be undertaken by Elhorn. *See* ECF No. 1-16, PageID.240 (Ex. 17).

Defendant Sarkipato (copying Onan) responded to O'Malley with an impotent letter, expressing concerns with the proposed study. Namely, he stated that the study lacked sufficient detail, and the daily supervision required therein was not feasible

under the managerial capacity of the City's water operations staff. He further stated that the treatment modifications identified as necessary had ***not been*** completed. Compl., PageID.72-73 (¶¶272- 276); ECF No. 1-16, PageID.240 (Ex. 17). But despite these alarming concerns, Sarkipato and Onan provided no further support or guidance to the City. Compl., PageID.73 (¶¶276-277).

By the end of the third monitoring period (June 2020), more than a year had passed since the City and Elhorn introduced Carus 8600 into the water supply, and lead levels remained in excess of action levels and continued to rise. Compl., PageID.73 (¶278).

**Fourth Monitoring Period (July 2020 to December 2020)**

On July 28, 2020, the City submitted a new proposal for corrosion control, again prepared by Elhorn, and again recommending the use of Carus 8600 as the corrosion inhibitor. Compl., PageID.74 (¶¶283-285). The proposal included provisions for daily monitoring and oversight, which the City lacked the financial and managerial capacity to implement. But despite the substance of the proposal, O'Malley made zero changes to the water operations staff, and took not a single measure to provide for the daily monitoring and oversight identified in the proposal. Shockingly, the EGLE nonetheless blessed the proposal. Compl., PageID.74-5 (¶¶283-288).

In November 2020, representatives from the EGLE revoked O'Malley's credentials with regard to the BHWTP. The City placed him on administrative leave and hired another engineering firm, F&V, to replace him, a decision that was ultimately regrettable and did not cause any improvement in the situation whatsoever. Compl., PageID.34, 75 (¶64; ¶¶289-290). At the end of 2020, lead levels exceeded action levels for a fifth time. Compl., PageID. 75 (Compl. ¶¶291-292).

### Fifth Monitoring Period (January 2021 to June 2021)

In early 2021, after multiple rounds of inadequate corrosion control and lead level exceedances, Sarkipato and others from the City finally called for a formal Request for Proposal ("RFP"), seeking alternative treatments, and to hire an additional engineering firm to determine optimal corrosion control for the water system. The City included F&V as the primary reviewer for RFP responses. Compl., PageID.34, 76-77 (¶64; ¶¶296-302).

One of the engineering firms with interest in the RFP articulated serious concerns to Sarkipato. They insisted that what the RFP called for was out of compliance with state and federal regulations, and that the $50,000 budget included therein was nowhere near sufficient to pay for required testing. In response, Sarkipato never suggested to increase the budget for testing, nor did he make any other changes to the RFP. ECF No. 1-19, PageID.252-255 (Ex. 20); Compl., PageID. 76-77 (¶¶296-302). For its part, the City refused to increase the testing budget.

Compl., PageID.77 (¶300). Together, Sarkipato, F&V and other officials chose a proposal based on this insufficient RFP. Compl., PageID. 76-67 (¶¶296-302); ECF No. 1-18, PageID.247-249 (Ex. 19); ECF No. 1-19, PageID.252-255 (Ex. 20).

By June 2021, lead levels remained in exceedance of federal action levels. Testing results returned an elevated presence of lead at 24 ppb, with the highest sample testing at 889 ppb, again exceeding the lead action level. After nearly three years of lies, inaction, and payments to engineering companies who appeared to know no more than non-engineers as to how to control corrosion rates, the presence of lead in Benton Harbor's water remained well in excess of lead action levels. Compl., PageID.78 (¶¶306-307).

### Sixth Monitoring Period (July 2021 to December 2021)

In September 2021, representatives from the EPA visited the BHWTP and inspected the water system. F&V, who was charged with operation and maintenance of the plant, was unable to answer even the simplest questions posed by inspectors and was unable to demonstrate any ability whatsoever to perform certain tasks, including the necessary testing to run the plant. Compl., PageID.78-79 (¶¶309-311). EPA inspectors also found several vital pieces of equipment that had been long out of service, and uncovered a myriad of unsanitary, defectively designed, and otherwise hazardous conditions. Following the inspection, the EPA demanded a copy of F&V's contract with the City, but the City refused to provide it. The totality

of the inspection combined with the City's obstinance in providing the contract resulted in a scathing EPA report. Compl., PageID.79 (¶¶312-316).

After three years of Defendants' failures at various levels to provide safe water, the presence of lead in the public drinking water remained in excess of action levels. Compl., PageID.82 (¶¶334-335). In December 2021, testing results returned an elevated presence of lead at 15 ppb, with the highest sample testing at 48 ppb. Throughout this time, representatives from the EGLE and the City continuously botched delivery of water alternatives to residents. Compl., PageID.80 (¶¶320-323).

The prolonged crisis caught the attention of the Michigan House Oversight Committee, which convened to investigate how it occurred and why it continued. Compl., PageID.80-81 (¶¶323-329). The Committee interviewed representatives from the EGLE, the City, and engineers — including Defendant EGLE Director Clark, who dodged questions about the quality of Benton Harbor's water. It was not until a state legislator pressed the issue after multiple vague responses, that Clark finally answered honestly: "No, [the water in Benton Harbor is not safe to drink]. It's not. People should be drinking bottled water." Compl., PageID.81 (¶¶325-328).

**<u>Discrete Group Facing Special Danger – Children/Plaintiffs</u>**

Plaintiffs—all children during the Benton Harbor water crisis— were exposed to lead contaminated water at their homes and at various other locations throughout the community, including public and private establishments that served them lead

contaminated water, and food prepared with that water. Compl., PageID.24, 56 (¶26; ¶183).

Exposure to lead created a special danger for Plaintiffs. Because lead is a developmental neurotoxin, it is particularly poisonous for children. Compl., PageID.46, 91 (¶122; ¶382). According to the World Health Organization ("WHO"), lead affects children's brain development, resulting in reduced intelligence quotient, behavioral changes – such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. The neurological and behavioral effects of lead are irreversible. According to the EPA, young children, infants, and fetuses are particularly vulnerable to lead. Compl., PageID.83 (¶343).

A dose of lead that would have little effect on an adult can have a significant impact on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells. Even brief exposure to a low dose of lead can cause devastating and permanent ailments in children. **It is widely understood that there is no known safe blood lead concentration**. This fact underscores that any conduct that creates, increases, or prolongs lead exposure for children can have a serious, irreversible impact on lives and livelihoods. Compl., PageID. 82-86 (¶¶ 336-356).

Collectively, all of the Defendants' conduct, as previously described herein, led to a completely avoidable, but nonetheless monumentally tragic impact on an already underserved community. And the most vulnerable and most precious members of that community, these minor Plaintiffs, have and will continue to suffer the life-long, catastrophic effects of their lead poisoning.

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).[6] When deciding such a motion, courts must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). Courts must also "consider the complaint in its entirety," including documents incorporated therein by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions"

---

[6] Unless indicated otherwise, case quotes are "cleaned up" throughout, i.e., internal quotation marks and citations are omitted.

or "a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Ultimately, a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.    IT IS IMPROPER FOR THE COURT TO LOOK OUTSIDE THE COMPLAINT, AS STATE DEFENDANTS REQUEST

Buried in the statement of "facts" and legal standard sections of Defendants'[7] pleading, is an improper argument that the Court should consider ***forty-eight exhibits*** attached to their 12(b)(6) motion. *Taylor v. Hillis*, No. 1:10-cv-94, 2011 U.S. Dist. LEXIS 145694, at *6 (W.D. Mich. Nov. 28, 2011) ("Defendants improperly attempted to support their motion to dismiss with exhibits.")

Under Rule 12(b)(6), "a court is generally restricted to examining the adequacy of the plaintiff's complaint." *Id.; Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010) (courts limited to the pleading on 12(b)(6) motions). Although the Sixth Circuit recognizes that, in addition to the allegations of the complaint, the court "***may*** also consider" other materials such as materials "that are integral to the complaint" "public records," or materials "appropriate for the taking of judicial notice," *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d

---

[7] Going forward for the remainder of the pleading, the State Defendants are referred to as "Defendants."

553, 560 (6th Cir. 2005) (emphasis added), these exceptions "are not without limitation," *Taylor*, No. 1:10-cv-94, 2011 U.S. Dist. LEXIS 145694 at \*7.

Defendants seek to exploit these limited exceptions by attaching forty-eight exhibits under the guise of: (1) judicial notice; (2) "government records;" and (3) material unilaterally deemed by them as "referenced in the complaint," or "key" to Plaintiffs' claims. ECF No. 92, PageID.784-803 (FNs. 1-26).  To argue that each, let alone any of these documents fall under these exceptions is at best tenuous, and at worst a complete misrepresentation.

First, judicial notice is "a limited tool and, for it to be available, a high degree of indisputability is the essential prerequisite." *Frees v. Duby*, 2010 U.S. Dist. LEXIS 125265 at \*7 (W.D. Mich. 2010). Specifically, the exception is "limited to documents capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* Yet Defendants inappropriately request that the Court consider close to fifty exhibits, including news articles containing subjects of reasonable dispute (*see, e.g.,* State Exhibits 29-37, 48). *Kollaritsch v. Mich. State Univ. Bd. of Trs*., No. 17-2445/18-0101, 2018 U.S. App. LEXIS 17379, at \*5 (6th Cir. June 25, 2018) (declining to take judicial notice of news articles for the same reason).[8]

---

[8] Moreover, the case Defendants cite in support establishes that the articles can only be used for the "limited purpose of establishing what information was

Second, to the extent the "government record" exception is meant to make reference to the public records exception, that exception is a very "narrow" one, and does **not** apply to internal documents like those attached to Defendants' motion—— for example, a PowerPoint presentation sent by the EGLE to the EPA, and internal letters and emails between the City, the EGLE, and others (State Exhibits 2, 10, 11, 15, 22, 46). *See Frees*, 2010 U.S. Dist. LEXIS 125265 at *6-7.

Third, although courts can consider exhibits incorporated by reference into a complaint, this applies to exhibits *attached* to the complaint. *Taylor*, No. 1:10-cv-94, 2011 U.S. Dist. LEXIS 145694 at *6 ("The exhibits in question were not attached to plaintiff's amended complaint, such that they could be considered[.]"); *Koubriti v. Convertino*, 593 F.3d 459, 462 n.1 (6th Cir. 2010). And to the extent Defendants argue that certain exhibits are integral to the complaint or claims, they must establish that those exhibits are not subject of reasonable dispute, which they have failed to do. *See In re Miller Energy Res. Sec. Litig.,* No. 3:11-CV-386-TAV-CCS, 2014 U.S. Dist. LEXIS 15810, at *43 (E.D. Tenn. Feb. 4, 2014).

Accordingly, the Court cannot and should not consider Defendants' exhibits without *sua sponte* converting the Rule 12(b)(6) motion to one for summary judgment. *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 487-88 (6th Cir.

_____

within the public realm." *Roane Cnty. v. Jacobs Eng'g Grp., Inc.*, No. 3:19-cv-206-TAV-HBG, 2020 U.S. Dist. LEXIS 73491, at *12 (E.D. Tenn. Apr. 27, 2020).

2009) (citing Fed. R. Civ. P. 12(d)). Defendants have not requested this relief, let alone set forth any compelling reason for the Court to do so.[9] Therefore, here, "in the exercise of discretion, the court should disregard [D]efendants' proffered exhibits and treat [D]efendants' motion as a straightforward Rule 12(b)(6) motion." *Taylor*, No. 1:10-cv-94, 2011 U.S. Dist. LEXIS 145694 at *9-10.

## II.    DESPITE DEFENDANTS' TACTICAL ARGUMENTS TO THE CONTRARY, PLAINTIFFS' CLAIMS ARE ONLY AGAINST INDIVIDUAL DEFENDANTS

Plaintiffs did not name the EGLE as a defendant, and Plaintiffs do not seek to bring a claim against the EGLE under *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978) (because, of course, the EGLE is not a municipality and *Monell is inapplicable*). In those instances in the Complaint where Plaintiffs refer to the actions taken by the EGLE, Plaintiffs are referring to actions taken by the named EGLE officers – Oswald, Sarkipato, Onan, and Clark – as is supported by their specific allegations and attached exhibits.[10] *See, e.g.,* Compl., PageID.62 (¶213) ("Despite these detailed and valid concerns, EGLE approved [the] permit"); ECF No. 1-8, PageID.199-198 (Ex. 9) (Onan and Sarkipato discussing approving permit).

---

[9] Should the Court disagree, it is important to note that this decision "should be exercised with great caution and attention to the parties' procedural rights." *Tackett*, 561 F.3d at 487 (ruling court needed to give plaintiffs notice and opportunity to respond); *see also* Fed. R. Civ. P. 12(d)*.*

[10] It is telling that the first argument lodged by Defendants for dismissal of Plaintiffs' Complaint refers to a cause of action that Plaintiffs have not pled.

As to the remaining allegations, which describe bad acts of the EGLE without specifically ascribing it to a named actor, *see, e.g.,* Compl., Page ID.53, 64 (¶¶163),[11] it is reasonable to infer that these unconstitutional actions were taken by Oswald, Sarkipato, Onan, and Clark, as they are the high ranking officials – directors, supervisors, and specialists – in the water safety units of the EGLE, most likely to have taken or approved these actions.[12] Moreover, it is for this reason that Plaintiffs included "John Doe" Defendants, who are defined as agents, employees, and/or contractors of the State. Compl., PageID.38 (¶¶74-76). Thus, to the extent Defendants suggest that any of Plaintiffs' allegations should be disregarded for these reasons, those arguments should be rejected in totality.

## III.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants argue they are entitled to qualified immunity in their individual capacities because Plaintiffs fail to meet the "shocks-the-conscience" test, and because, according to them, the right asserted is not clearly established. These arguments are without merit as to both constitutional claims.

---

[11] This allegation asserts: "On October 24, 2018, EGLE issued a state advisory for lead on the City of Benton Harbor, which severely downplayed the urgency of the water crisis."

[12] Moreover, this further supports why Defendants' motion to dismiss on qualified immunity should not be resolved before Plaintiffs are permitted discovery as discussed in Section III.

As an initial matter, the Defendants' argument is premature and the Court should not consider it at this stage. The Sixth Circuit has historically cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015). Rather, the fact-intensive nature of the qualified immunity analysis makes dismissal, if warranted, better suited to the summary judgment phase, after discovery has been conducted. *Id.* (citing cases).[13] The importance of discovery prior to addressing this issue cannot be overstated. It is essential that Plaintiffs be permitted to gather information so that they be able to better point to specific instances of conduct showing "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020). Thus, if the Court has any inclination to even consider Defendants' baseless assertions on this issue, discovery should first be allowed.

Relatedly, to overcome an assertion of qualified immunity at this stage, the complaint need only "plausibly allege" facts showing that: (1) the constitutional right involved was clearly established; and (2) the defendant violated the

---

[13] This is because "[w]hen qualified immunity is asserted at the pleadings stage," as Defendants have done, "the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Pearson v. Callahan*, 555 U.S. 223, 238-39 (2009).

constitutional right. *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). This is a "**a low bar**, given that granting qualified immunity at the motion to dismiss stage is usually disfavored." *Id.* (emphasis added); *Montgomery v. Whidbee*, No. 21-5327, 2022 U.S. App. LEXIS 6883, at *5 (6th Cir. Mar. 16, 2022) (same). Contrary to Defendants' arguments, Plaintiffs meet this standard on both of their constitutional claims against Oswald, Onan, Sarkipato, and Clark.

### A.   Plaintiffs Plausibly Allege That Defendants Violated Plaintiffs' Constitutional Rights Through Their Conscious Shocking Behavior

Without foundation, Defendants argue that Plaintiffs do not establish constitutionally repugnant, conscience-shocking behavior by the individual Defendants. Despite this contention, Plaintiffs specifically allege "facts that demonstrate what each defendant did to violate" Plaintiffs' constitutional rights (bodily integrity and to be free from state-created danger )[14] and that the specific conduct alleged "shocks the conscience." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016); *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019).

---

[14] Defendants do not argue that the right to bodily integrity or to be free from state-created danger are not protected by the Constitution. Accordingly, they have waived this argument. Nevertheless, these rights *are* protected. *See Guertin*, 912 F.3d at 918-22 (bodily integrity); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (state-created danger).

i.   **Despite Defendants' creativity – the applicable standard is not a deliberate intent to injure.**

As a global matter, Defendants wholly misrepresent the "conscious shocking" behavior standard. They assert that Plaintiffs must allege conduct that was "deliberately intended to injure," ECF No. 92, PageID.811. Application of this standard is a fantasy. The "measure of what is conscience shocking is no calibrated yard stick," nor is it "subject to mechanical application." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847, 850 (1998).[15] And because Plaintiffs do not allege that defendants intended to injure them, the applicable standard is "whether defendants acted with **deliberate indifference in the constitutional sense."** *Guertin*, 912 F.3d at 926 (emphasis added).

ii.   **Considerations weigh heavily in favor of finding Defendants' conduct was conscious shocking.**

The Sixth Circuit has set forth specific considerations for evaluating whether an actor's conduct rises to the level of conscious shocking or arbitrary in the constitutional sense. This includes: (1) the time for deliberation; (2) the nature of the relationship between the state actor and the plaintiff; and (3) whether a legitimate

---

[15] In determining where challenged conduct falls on this spectrum, courts measure the allegations against two extremes. *Guertin*, 912 F.3d at 923. One end is conduct that is "intended to injure," and the other is negligence. *Id*. In between these extremes are situations "rather in the middle, what the [c]ourt has deemed something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Id.*; *Lewis*, 523 U.S. at 849.

purpose motivated the conduct. *Guertin*, 912 F.3d at 924-25.[16] Under these considerations, the less voluntary the government-plaintiff relationship, the more time to deliberate, and the lesser the extent to which the government is pursuing a legitimate end, the more likely the conduct raises to the level of conscious shocking or arbitrary. *Guertin*, 912 F.3d at 924. Here, Plaintiffs' allegations align with and closely track these considerations.

Defendants had sufficient time to deliberate before each of their actions and omissions. Compl., PageID.95 (¶401). All the alleged decisions by Oswald, Sarkipato, Onan, and Clark "took place over a series of days, weeks, months, and years, and did not arise out of time-is-of-the-essence necessity." *Guertin*, 912 F.3d at 923-24; *see also Lewis*, 523 U.S. at 853 (When actors have the "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations … indifference is truly shocking.").

The nature of the relationship between Defendants and Plaintiffs was certainly involuntary. Michigan law mandates that the EGLE (as the Primacy Agency for the entire state) enforce safe drinking water standards for Benton Harbor's water supply, Compl., PageID.46 (¶¶118-123), and Plaintiffs are required to connect to that water

---

[16] *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, explains that these factors should be considered when the alleged conduct is, as it is here, "worse than negligent but was not done for the purpose of injuring someone or in furtherance of invidious discrimination." 542 F.3d 529, 536 (6th Cir. 2008).

supply. *See* Benton Harbor, Mich., Code of Ordinances, § 44-19; § 44-16; § 44-1; § 11-142. Moreover, as directors, supervisors, and specialists at the EGLE,[17] Oswald, Sarkipato, Onan, and Clark each possess unique authority prescribed specifically to them to regulate Benton Harbor's water supply by enforcing SDWA regulations, approving corrosion control proposals, and holding Benton Harbor officials accountable for deviations from statutory requirements that threaten public health. Compl., PageID.35-37 (¶¶65-73). In fact, Defendants concede they are regulators and that their authority is to "promulgate[] rules setting safe water standards and providing operating guidelines for municipal water systems." ECF No. 92, PageID.785, 817, 820, 821. This control scheme is analogous to what the Sixth Circuit found created an involuntary relationship in Flint. *See Guertin*, 912 F.3d at 925-26.

As to a legitimate government purpose, while Defendants repeatedly argue that they "helped remedy dangers to the public" through their regulatory decisions, (despite being untrue) such does not prove that a legitimate government purpose was served through their harmful choices, which compounded and prolonged the Benton Harbor Water Crisis. Indeed, "acting merely upon a government interest does not remove an actor's decision from the realm of unconstitutional arbitrariness."

---

[17] These are not elected positions, and even if they were the minor Plaintiffs would have been unable to vote to elect them, making the relationship with Plaintiffs even more involutory.

*Guertin*, 912 F.3d at 926; see also *Hunt*, 542 F.3d at 543 ("[W]e have held open the possibility that in extreme cases the governmental actor's choice to endanger a plaintiff in the service of a countervailing duty would be deemed arbitrary[.]").

### iii.   Defendants' conduct constitutes deliberate indifference in the constitutional sense.

As set forth above, the correct standard under a "conscious shocking" inquiry is deliberate indifference. This "has been equated with subjective recklessness[], and requires the § 1983 plaintiff to show that the state official knows of and disregards an excessive risk to [the victim's] health or safety." *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002). Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Having drawn the inference, the official must act ***or fail to act*** in a manner demonstrating reckless or callous indifference toward the individual's rights." *Id.* (emphasis added).

Regarding awareness, Defendants do not dispute that Plaintiffs plausibly allege Oswald, Onan, Sarkipato, and Clark were aware of the excessive risk of lead contamination in Benton Harbor throughout *and before* the crisis began. Nor could they. As directors, supervisors, and specialists of the Primacy Agency responsible for implementation and enforcement of drinking water regulations, they are aware of the requirements of those rules and the dangers that come with flouting them. Compl., PageID. 35, 46 (¶¶65-66; ¶123). There is also no doubt that they were aware

30

of widely accepted science—set forth by reputable organizations like the WHO—establishing that lead poses particular dangers for children. Compl., PageID. 82-86 (¶¶ 336-356). *See Ewolski*, 287 F.3d 492, 513 n.7 ("[A]wareness of a risk may be proved circumstantially by evidence suggesting that 'the defendant official being sued had been exposed to information concerning the risk and thus 'must have known' about it.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Moreover, these Defendants were well aware that Benton Harbor's water system was a ticking time bomb. As EGLE directors, supervisors, and specialists, they knew the City had lead lines and contained lead plumbing. Compl., PageID.35-37, 50-52 (¶¶65-68; ¶¶ 70-73; ¶¶148-156). They were also acutely aware that the 2018 sanitary survey uncovered gross deficiencies within the system, such that the system could not defend against potential lead problems. Compl., PageID. 50-52, 54 (¶¶148-157; ¶170); *see also* ECF No. 4, PageID.281-285 (Ex. 4). Indeed, after the first exceedance, Oswald admitted the water crisis had been ongoing for an indefinite period of time. Compl., PageID.51 (¶150).

Despite this knowledge, Oswald, Sarkipato, Onan, and Clark's actions and omissions demonstrate reckless or callous indifference toward Plaintiffs' rights. *See Ewolski*, 287 F.3d at 513. Set forth specifically as follows:

### 1. **Oswald**

Oswald waited until **five months** after the first documented lead action level exceedance to issue an Administrative Consent Order with Benton Harbor. Compl., PageID.62 (¶214); ECF No. 1-9, PageID.202 (Ex. 10). This delay allowed the implementation of an ineffective corrosion control treatment (Carus 8600) before a corrosion control treatment study was finalized or conducted, in complete disregard for EPA guidance,[18] and without the ability to meaningfully monitor the water. ECF No. 1-12, PageID.221-225 (Ex. 13); Compl., PageID.64 (¶¶222-226). As a result, lead levels rose even higher than prior to the first exceedance. Compl., PageID.68 (¶249).

Next, in November 2019, when the GLELC reached out to Oswald concerning the misuse of Carus 8600, not only did Oswald fail to act, but he lied to conceal and minimize the crisis. He also lied when he represented that the water was being treated safely, and that Carus 8600 was reducing "corrosion control rates." Compl., PageID.66-67 (¶¶241-244); ECF No. 1-12, PageID.220-225 (Ex. 13). Meanwhile,

---

[18] In the "fact" section of Defendants' brief, they assert: "While Plaintiffs were critical of the lack of a full corrosion control study before the treatment was approved . . . the applicable regulations do not require a study in advance of starting treatment." ECF No. 92, PageID.796. However, the EPA guidelines provide that any system with lead service lines be required to conduct a corrosion control study. And the fact that Carus 8600 was introduced into the system before a corrosion control study is particularly alarming, given that the EPA has stated that "special considerations" be considered when introducing blended phosphates. ECF No. 1-12, PageID.221-225 (Ex. 13).

Oswald was aware that lead levels (and corrosion rates) continued to rise above the action level. Compl., PageID.68 (¶249). Indeed, he was included on correspondence a short time later indicating that Carus 8600 was ***not*** achieving desired results, and that the EGLE wanted the City to find new methods to "more effectively lower corrosion control rates … for greater protection of public health." ECF No. 1-13, PageID.228-29 (Ex. 14). This is conscious shocking behavior. *See Guertin*, 912 F.3d at 927-28 (MDEQ members who failed to act on warning and lied about the corrosion control program acted with conscious shocking indifference).

Defendants' attempts to excuse this conduct are as creative as they are shameful. They rely on an exhibit from outside the pleadings—a November 2019 letter from Oswald to GLELC—and ask the Court to **infer in their favor** that Oswald was not talking about lead levels, but instead was "plainly referring to the rate at which the water in Benton Harbor would corrode metal." ECF No. 92, PageID.815. The difference is inconsequential. Discussing the rate of corrosion and lead levels are one-in-the-same, as lower lead levels are the result of lower corrosion rates. In any event, it is improper to infer **any** facts in Defendants' favor at this stage.

Defendants further speculate that even if Oswald was referring to lead levels, he was "accurate" in saying they had decreased. In support, they point to the May 2020 letter from O'Malley, and his statement that although the EGLE had found increasing lead levels, *his own investigation* found the opposite. ECF No. 6,

PageID.332 (Ex.16). But contrary to Defendants' efforts, O'Malley's letter does not contradict the allegation that Oswald responded dishonestly to the GLELC, when he said that levels were decreasing. There is no way that in November 2019 Oswald could have been basing his statement on O'Malley's May 2020 letter. Oswald's statement came **six months before** O'Malley's letter was ever sent.[19]

### 2. <u>Sarkipato</u>

After the first lead action level exceedance was documented in October 2018, Sarkipato botched every opportunity to help Benton Harbor. Moreover, he ignored and overruled concerns from lower level EGLE employees and other concerned entities about corrosion control proposals from the City and Elhorn. Compl., PageID.37 (¶73).

By February 2019, Sarkipato was on notice from EGLE engineers that the corrosion control permit sought by the City and Elhorn included corrosion control proposals unlike any implemented for communities like Benton Harbor. Further, the engineers informed Sarkipato that the calculations within the permit were likely incorrect, and that the application did not contain any information as to how Elhorn would provide optimal corrosion control. Despite these detailed concerns, Sarkipato

---

[19] Moreover, it would be deliberate indifference to rely on this information from O'Malley especially given that Oswald knew O'Malley had a history of concealing the water crisis to the public. *See* ECF No. 1-4, PageID.162 (Ex. 5) (Oswald on correspondence discussing concerns with O'Malley lying directly to a citizen about the potability of the water)

and Onan approved the permit.[20] Compl., PageID.61-62 (¶¶211-213); ECF No. 1-7, PageID.193-197(Ex. 8); ECF No. 1-8, PageID.198 (Ex.9). Nor did he raise an alarm when O'Malley informed him that he had begun implementing Carus 8600 into the water supply **before** a corrosion control treatment study was finalized or conducted, without the ability to meaningfully monitor the water, and with a complete disregard for EPA guidance. ECF No. 1-11, PageID.219 (Compl. Ex. 12).

In early 2021, after three rounds of inadequate corrosion control under Elhorn, Sarkipato and others finally sought requests for proposals (RFP) to address the crisis. Compl., PageID. 76-77 (¶¶296-301). After reading through the RFP, another engineering firm articulated serious concerns to Sarkipato. The firm made very clear that the RFP was out of compliance with state and federal regulations, and that the $50,000 budget therein was nowhere near sufficient to cover the costs of necessary testing. ECF No. 1-18, PageID.247-249 (Ex. 19). Rather than heed this advice, Sarkipato suggested zero changes to the RFP or its budget. This ultimately further prolonged and compounded the crisis. ECF No. 1-19, PageID.252-255 (Ex. 20); Compl., PageID. 77 (¶302).

---

[20] Defendants assert that these concerns were discussed and that the EGLE engineers who raised the concerns ultimately approved of the permit. ECF No. 92, PageID.797. However, the Complaint exhibit they cite in support does not establish that all of the concerns were addressed or that the engineers approved the permit. *See* ECF No. 1-8, PageID.199 (Ex. 9). To infer as much, asks the Court to impermissibly construe facts in the light most favorable to Defendants.

Sarkipato was also acutely aware that City officials were lying to the public about the risks associated with their drinking water, and he chose to take no action whatsoever regarding those risks or their public statements. When water users and a non-profit notified Sarkipato that O'Malley was telling residents that they could drink water from the tap, and that the City was not providing water filters or bottled water to anyone—not even to people living in homes that tested above the lead action level limit—Sarkipato chose not to intervene. Compl., PageID.59-60 (¶¶198-205); ECF No. 1-4, PageID.162 (Ex. 5). These are conscious shocking actions. *See Guertin*, 912 F.3d at 927-28 (turning down advice despite knowing significant problems and permitting, failing to act on warning, and permitting false statements to the public constituted conscious shocking indifference)

### 3. <u>Onan</u>

Like Oswald and Sarkipato, Onan was responsible for specific functions prior to and during the water crisis. Like the others, Onan ignored, and overruled concerns raised with regard to the City's permit and failed to raise alarms when he was informed that O'Malley was prematurely implementing Carus 8600 into the water supply. Compl., PageID.193-197 (Ex. 8); ECF No. 1-11, PageID.219 (Compl. Ex. 12). In February 2020, he prepared a crucial letter to the City Manager regarding the ineffectiveness of the corrosion control that had been implemented. But in preparing the letter, he intentionally omitted advice from two agency specialists, as well as

statutory mandates that the City needed to investigate a range of corrosion control options. Instead, he recommended the solution that he himself characterized as "not ideal." Compl., PageID.69-70 (¶¶253-258); ECF No. 1-14, PageID.232-233 (Ex. 15).

Moreover, like Sarkipato, Onan was aware that O'Malley lied to residents when he informed them that the City was delivering "clean water … to the tap and [they] should have no problem drinking it." He also knew and did nothing about the City not providing water filters or bottled water to its residents. And at no time did he intervene. Compl., PageID.59-60 (¶¶198-205); ECF No. 1-4, PageID.162 (Ex. 5). These are conscious shocking behaviors. *Guertin*, 912 F.3d at 927-28 (turning down water advice despite knowing significant problems and permitting false statements to the public constituted conscious shocking indifference).

### 4. **Clark**

Clark serves as the Director of EGLE and is chiefly responsible for enforcement of the laws and regulations regarding safe water for Michiganders. Throughout the water crisis, Clark was fully aware of the risks threatening Benton Harbor, and at all times she failed to act.

Three years after the crisis began, Clark attended a House Oversight Committee hearing, aimed at discovering why the crisis had not been prioritized. But rather than putting the health of the community first, she repeatedly "dodged"

questions about the safety of the water four times. It was only after being asked, point blank by Representative Steven Johnson – who said "Let's just talk like normal people. It's a normal question. Is the water in Benton Harbor safe to drink or not?" – that she finally conceded it was not.[21] Compl., PageID.80-81 (¶323-328). Although Defendants minimize her conduct by simply asserting it was the "opposite" of conscious shocking, when an entire community is being poisoned by water from their taps, and the Director of the organization charged with ensuring the safety of that water "belittles" that concern by failing to be forthright in a public hearing, such conduct is conscious shocking. *See Guertin*, 912 F.3d at 928 (finding that MDEQ employee who "belittled, and aggressively dampened attempts by the scientific community to challenge the government's assertions that Flint did not have a problem with its drinking water" to be conscious shocking behavior).

The allegations set forth in the Complaint wholly support that Oswald, Sarkipato, Onan and Clark made decisions and statements that prolonged and compounded the public health crisis. Compl., 35-37 (¶68; ¶¶70-73). And in doing so, they acted, and failed to act, in a manner that was conscious shocking, depriving Plaintiffs of their constitutional right to bodily integrity and to be free from state-

---

[21] Obviously, Clark did not realize for the first time, in real time, at the House Oversight Committee meeting that the City's water was unsafe to consume. Thus, this admission indicates she was aware of the fact prior thereto, and clearly she failed to act despite this knowledge.

created danger. *Cf. Guertin*, 912 F.3d at 928 ("MDEQ defendants created the Flint Water environmental disaster and then intentionally attempted to cover-up their grievous decision. Their actions shock our conscience.").[22]

**B.   Plaintiffs' Right To Bodily Integrity Was Clearly Established**

Defendants argue that Plaintiffs' right to bodily integrity is not clearly established, because Plaintiffs do not allege "the same clearly established right" as the Sixth Circuit discussed in *Guertin*. Specifically, they argue that, unlike *Guertin*, here, there was: no water switch; no state-appointed emergency manager; and no statement assuring the public of the water's safety. ECF No. 92, PageID.819-821. These arguments are severely flawed, and they fail.

Plaintiffs need not necessarily point to any single case with the same facts that coincide with facts **exactly** like those pled here. Indeed, the Supreme Court has made clear that "officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 733 (2002). Instead, the unlawfulness of Defendants' conduct can be clearly established through the "general

---

[22] In addition to lack of conscious shocking conduct, Defendants raise two additional arguments. These are non-starters. First, Defendants reassert that Plaintiffs are asserting a *Monell* allegation against them. As discussed above, this is false. Second, Defendants argue that Plaintiffs allege a failure to supervise claim. This is simply not true. As demonstrated in the individual conduct explained above, the Defendants deliberately chose to act in defiance of their employees' warnings, demonstrating that the Defendants were acting on their own authority.

reasoning that [*Guertin*] employ[ed]." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015); s*ee also White v. Pauly*, 580 U.S. 73, 79 (2017).

*Guertin* clearly established that any reasonable official should have known that "taking affirmative steps to systematically contaminate a community through its public water supply with deliberate indifference" constitutes conscious shocking behavior, prohibited by the Due Process Clause of the United States Constitution. *Guertin*, 912 F.3d at 933. In *Guertin*, the Sixth Circuit ruled that although no prior cases had set out that the exact actions taken by defendants were unconstitutional, such could be "inferred from" the long line of Supreme Court cases, which held that an "individual's right to bodily integrity is sacred, founded upon informed consent, and may be invaded only upon a showing of a government interest." *Id.* at 934-936.

That reasoning applies equally here. Even if the facts of *Guertin* are not fully aligned with those at issue here (they are), the reasoning of *Guertin* **as well as** the reasoning of the Supreme Court cases it relied on are more than sufficient to put officials here on notice that their conduct—which caused Plaintiffs to be invaded with lead contaminated water, without consent, or a showing of a valid government interest—was unconstitutional. *Baynes*, 799 F.3d at 612; *see also Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303, 323 (6th Cir. 2020) (ruling that *Guertin* resolved whether the right to bodily integrity is clearly established in a case stemming from different allegations about the legionella-contaminated water).

In any event, *Guertin*'s facts are sufficiently like those here. Both involve affirmative acts of government officials, causing lead contamination to exist or worsen, while publicly minimizing the crisis in the meantime. *Guertin*, 912 F.3d at 933; Compl., PageID.37, 59-60, 62, 66-67, 80-81 (¶73; ¶¶198-205; ¶214; ¶¶241-244; ¶323-328); ECF No. 1-4, PageID.162 (Ex. 5); ECF No. 1-9, PageID.202 (Ex. 10); ECF No. 1-12, PageID.220-225 (Ex. 13).

The distinctions put forth by Defendants——no switch of source water; no state-appointed emergency manager; and no public statement assuring the public of the safety of the water — are of no moment. The switch to the water treatment plant in Flint and that there had been emergency managers appointed were not relevant in the Sixth Circuit's "clearly established" analysis. *See generally Guertin*, 912 F.3d at 932-935. Rather, the germane facts were that government officials knew the water was "unsafe for public use, distribut[ed] … without taking steps to counter its problems and assuring the public in the meantime that it was safe." *Id.* at 933. That is what the Sixth Circuit found "any reasonable official should have known … [and what] constitutes conscience-shocking conduct prohibited by the substantive due process clause." *Id.* at 933.

As to public statements, Plaintiffs certainly **do** allege that Defendants misrepresented the safety of the water to the public—Oswald wrote to GLELC and falsely asserted that Carus 8600 treatment was lowering corrosion rates. Compl.,

PageID.66-67 (¶¶241-244).[23] Additionally, Sarkipato and Onan knew O'Malley was

deceiving the public when he said the water was safe to drink. While unnecessary,

these facts are sufficiently similar to those considered by the Sixth Circuit in *Guertin*.

*See Sutton v. Metro. Gov't of Nashville & Davidson Cnty*., 700 F.3d 865, 876 (6th

Cir. 2012) ("A court need not have previously held illegal the conduct in the precise

situation at issue[.]"); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) ("We

need not, of course, find a case in which the very action in question has previously

been held unlawful[.]"). Indeed, *Guertin* held that the right was clearly established

against MDEQ[24] defendants who did not even make any statements to the public at

large themselves. *See generally Guertin,* 912 F.3d at 926-928 (Earley, Ambrose,

Busch, and Michael Prysby).[25]

## C.  Plaintiffs' Right To Be Free From State-Created Danger Was Clearly Established

Defendants do not challenge that Plaintiffs' right to be free from state-created

danger was clearly established, and therefore they have conceded it was, and they

---

[23] The Defendants argue Oswald's statement was not false, but "accurate." This is wrong for the reasons discussed *supra. See* Section III (A)(iii)(1).

[24] The Michigan Department of Environmental Quality ("MDEQ") was the state entity that preceded the EGLE. They are one and the same.

[25] Defendants also argue that Plaintiffs are asserting a different constitutional right — like a "right to a pre-treatment corrosion control study" or "to have state officials immediately provide bottled water to water system that has a lead level exceedance." ECF No. 92, PageID.821-822. This is a total mischaracterization of Plaintiffs' allegations.

have thus waived their opportunity to argue it wasn't. *Henry v. Shawnee Specialties, Inc.*, No. 1:14-CV-1234, 2016 U.S. Dist. LEXIS 42887, at *32 (W.D. Mich. Mar. 31, 2016) ("This argument was not raised in [defendant's] initial brief; thus, it is not properly before the Court."); *see also R.S. v. Lucas Cnty. Children Servs.*, No. 22-3501, 2022 U.S. App. LEXIS 34847, at *17 (6th Cir. Dec. 16, 2022) ("We need not address the clearly established prong of the qualified immunity analysis because the [defendants] did not raise it."). However, out of an abundance of caution, Plaintiffs will address this point.

Courts in this Circuit (and others) have long reasoned that the right to be free from state-created danger is clearly established and have provided specific examples sufficient to place these Defendants on notice that their conduct—taking actions that increased lead levels in the public water supply and minimizing a crisis—was unconstitutional. *See, e.g., Lipman v. Budish*, 974 F.3d 726, 742 (6th Cir. 2020) ("the right to avoid state-created danger is clearly established in this circuit"); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998).

Further, while the Eastern District dismissed certain state-created danger claims, as they related to the Flint Water Crisis, the court did not dismiss those claims on the basis that the right was not clearly established. Rather, those claims were dismissed because of pleading deficiencies that do not exist here. *Marble v. Snyder (In re Flint Water Cases)*, 453 F. Supp. 3d 970, 987-88 (E.D. Mich. 2020) (failed to

state claim because did not allege third party or special danger to discrete group); *Bacon v. Snyder (In re Flint Water Cases)*, 496 F. Supp. 3d 1070, 1083-84 (E.D. Mich. 2020) (same); *Brown v. Snyder (In re Flint Water Cases)*, No. 18-10726, 2020 U.S. Dist. LEXIS 54400, at *8 n.8 (E.D. Mich. Mar. 27, 2020) (failed to state claim because did not allege any factual allegations in support).

Indeed, because the Eastern District did not address whether the right was clearly established, such "leaves open the possibility" that the state-created danger right as asserted here **was** clearly established, "depending on how the facts develop." *Kostrzewski v. City of Wyo*., No. 1:20-cv-682, 2021 U.S. Dist. LEXIS 229410, at *19 (W.D. Mich. May 6, 2021) ("With this door left open, the Circuit's continued reminders that qualified immunity is generally best left for summary judgment, and at present, the particularly muddied facts of this case, the Court declines to grant Defendants qualified immunity at ***this early stage***.") (emphasis added).

## IV.   PLAINTIFFS PLAUSIBLY ALLEGE A STATE-CREATED DANGER CLAIM

As set forth above in Section III(A) *supra*, Plaintiffs have already established that the Defendants' conduct rises to the requisite level of conscious shocking behavior. However, Defendants further argue that Plaintiffs "cannot plausibly allege the elements of a state-created danger claim." ECF No. 92, PageID.823. They are wrong, as Plaintiffs meet all three of the required elements to succeed at this stage on such a claim.

44

First, Plaintiffs allege an affirmative act by the state, which either created or increased the risk that plaintiffs would be exposed to an act of violence by a third party. *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). As explained in Section III(A) above, Defendants' actions directly led to further contamination of the water, minimization of the crisis, and encouraged the public to drink contaminated water. Compl., PageID.37, 59-60, 62, 66-67, 80-81 (¶73; ¶¶198-205; ¶214; ¶¶241-244; ¶323-328); ECF No. 1-4, PageID.162 (Ex. 5); ECF No. 1-9, PageID.202 (Ex. 10); ECF No. 1-12, PageID.220-225 (Ex. 13).  As a result, several private parties, such as restaurants, day cares and schools, and other businesses generally, which provide water for their customers and clientele (movie theaters, bowling alleys, etc.) exposed Plaintiffs to the hazardously lead contaminated water, either through serving them water or using water to prepare and cook their food. Compl., PageID. 56,87 (¶183; ¶360; ¶361). Thus, by causing the crisis to continue and worsen, Defendants absolutely "increased [] plaintiffs' risk of [being] harm[ed]" by private businesses serving water to them in Benton Harbor. *Stiles v. Grainger Cnty.*, 819 F.3d 834, 854 (6th Cir. 2016); *see also Kostrzewksi*, 2021 U.S. Dist. LEXIS 229410, *12-13.

Second, Plaintiffs allege a special danger, wherein Defendants' actions placed Plaintiffs specifically at risk (as distinguished from a risk that affects the public at large). *Cartwright*, 336 F.3d at 493. The Sixth Circuit has recognized "limited and

specifically definable" groups, like Plaintiffs, to satisfy the special-danger requirement. *Waller v. Trippett*, 49 Fed. Appx. 45, 50-51 (6th Cir. 2002). Here, Plaintiffs are comprised of a recognizable, limited, and definable group—**minors** who resided in Benton Harbor at all material times. Compl., PageID. 91 (¶382). Plaintiffs specifically allege that they were children when they were first exposed to and poisoned by the City's lead contaminated water, Compl., PageID.87 (¶357), and that the hazardous condition, caused and worsened by the Defendants (lead contaminated water), poses a more significant danger to them. Compl., PageID.21, 46, 82-84 (¶3; ¶122; ¶338; ¶343-345). These allegations are more than sufficient to plead a state-created danger claim, as they evidence the specific danger was greater to Plaintiffs "than to any other citizen on the City streets." *Jones v. City of Carlisle*, 3 F.3d 945, 949-50 (6th Cir. 1993).

Finally, for the same reasons Plaintiffs set forth in Section III(A)(iii) above, Plaintiffs' allegations also succeed in showing that Defendants knew, or should have known, that their actions could and would endanger Plaintiffs to the devastating harms of lead contaminated water. *Cartwright*, 336 F.3d at 493.

## CONCLUSION

Considering the forgoing, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.

Dated:          January 25, 2023                    Respectfully submitted,

**LEVY KONIGSBERG LLP**

/s/Corey M. Stern
Corey M. Stern
Melanie Daly
Kimberly Russell
605 Third Ave., 33rd Floor
New York, New York 10158
(212) 605-6200
(212) 605-6290 (facsimile)
cstern@levylaw.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(b)(ii), I certify that the *Mitchell* Plaintiffs' Opposition Brief complies with the word limit set forth in Local Rule 7.3(b)(i) having a total word count of 10,798 words (including headings, footnotes, citations and quotations) as generated using version 16.66.1 of Microsoft Word software.

**LEVY KONIGSBERG LLP**

/s/ Melanie Daly
Melanie Daly
605 Third Ave., 33rd Floor
New York, New York 10158
mdaly@levylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2023 I electronically filed this document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

**LEVY KONIGSBERG LLP**

/s/ Kimberly Russell
Kimberly Russell
605 Third Ave., 33rd Floor
New York, New York 10158
krussell@levylaw.com