UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

IESAH MITCHELL, Guardian and Next
Friend for A.M., a minor, et al.,

     Plaintiffs,

v.

THE CITY OF BENTON HARBOR,
  et al.,

     Defendants.

_____/

Hon. Hala Y. Jarbou
Hon. Phillip J. Green

Case No. 1:22-cv-0475

## REPORT AND RECOMMENDATION

Plaintiffs, minors who consumed lead-contaminated water in Benton Harbor, seek redress for harm allegedly resulting from consumption of that water.[1]  They have raised six claims and have named ten defendants, including officials of the State of Michigan's Department of Environment, Great Lakes, and Energy (EGLE) ("State Defendants"), the City of Benton Harbor and certain of its present and former municipal officials ("City Defendants"), and two private engineering firms: F&V Operations and Resource Management, Inc. ("F&V"), and Elhorn Engineering Company ("Elhorn").  (Complaint, ECF No. 1).

_____

[1] This is one of three related cases pending in this Court.  The other two are *Grant v. U.S. Environmental Protection Agency*, Case No. 1:22-cv-186, and *Braziel v. Whitmer*, Case No. 1:21-cv-960.

There are four federal claims and two state law claims.  Counts I and II raise substantive due process claims against the named state and city officials for alleged exposure to state created danger and violations of bodily integrity; Counts III and IV raise similar claims against F&V and Elhorn; and Counts VII and VIII raise state law claims of negligence against F&V and Elhorn.[2]

All of the defendants have moved to dismiss the federal claims against them. (ECF No. 81, 84, 86, 91, 93).  Plaintiffs responded (ECF No. 101, 102, 103, 104), and the defendants replied (ECF No. 108, 110, 111, 112).  For the reasons articulated below, the undersigned judicial officer recommends that the federal claims be dismissed.  The undersigned further recommends that the Court decline to exercise supplemental jurisdiction over the state claims.

### Introduction:  This is not Flint

Plaintiffs have made a concerted effort to equate the instant case to the "infamous government-created environmental disaster commonly known as the Flint Water Crisis." *Guertin v. State of Michigan*, 912 F.3d 907, 915 (6th Cir. 2019); *see also In re Flint Water Cases*, 960 F.3d 303 (6th Cir. 2020).  That crisis resulted from an ill-advised decision to switch the City of Flint's water supply from the Detroit Water and Sewerage Department (DWSD), which drew water from Lake Huron, to an outdated water treatment plant that drew water from the Flint River.  The water in the Flint River is nineteen times more corrosive than that in Lake Huron.  The

---

[2] There is no Count V or Count VI.

2

deciding officials compounded this problem by using a water treatment plant they knew was ill-equipped to handle the contaminants, and without adding chemicals to treat the water's known corrosivity.

"The harmful effects were as swift as they were severe." *Guertin*, 912 F.3d at 915. These effects included hair loss, skin rashes, a spike in deaths from Legionnaires' disease, and reports of dangerously high blood-lead levels in Flint children. These same officials twice turned down opportunities to reconnect to the DWSD, even after learning of the extent of the harm being visited on the consumers of the Flint water system.

The allegations in the instant complaint paint a very different picture from that described of the Flint water crisis. While Plaintiffs' complaint contains repeated bald assertions that the defendants "caused" the injuries Plaintiffs have allegedly suffered as a result of the lead contamination in the Benton Harbor water supply (*see* Complaint at ¶¶ 51, 59-62, 69-73, 78, 371-72, 384, 386, 390-91, 403, 418, 426-27, 436, 438, 451, 463, ECF No. 1, PageID.29, 32-34, 36-37, 39, 89, 92-93, 96, 99, 101, 103, 105, 108), singularly missing is any allegation specifying what any defendant did to cause the lead contamination.

There is no allegation that any city or state official did anything to change the source of water or the way the water was being processed. The city's water department has continuously used Lake Michigan as its source of the water, and has used the same water treatment plant it used prior to the elevated lead contamination. (*Id.* at ¶¶ 105, 110-12, PageID.43-44).

3

Rather, the Benton Harbor water system is more than one hundred years old and much of was "comprised of lead pipes and fixtures," (*id.* at ¶ 6, PageID.21), which needed to be replaced at a cost of approximately $124 million (*id.* at ¶ 154, PageID.51).[3]   In 2010, the governor "declared a state of financial emergency over Benton Harbor," and appointed an emergency manager for the city.  (*Id.* at ¶¶ 84-85, PageID.40).  The emergency manager – who is not a named defendant in this case – "slashed the City's budget" and cut in half the number of municipal staff positions.  (*Id.* at ¶ 86).  "The water plant suffered greatly from these cuts," contributing to the problems that later developed.  (*Id.* at ¶¶ 87, 157, PageID.40, 52).  The Benton Harbor water system lost two municipal clients in 2011 and 2013, respectively, eliminating half of its customers.  (*Id.* at ¶¶ 113-14, PageID.44).  The financial health of the city improved by 2016, but in 2018, Benton Harbor lacked funds "to satisfy [Safe Drinking Water Act] requirements," and it lacked funds "for civic improvements often available to more affluent communities."  (*Id.* at ¶¶ 89, 92, PageID.41).

"[L]ead leaches into drinking water when water corrodes older pipes made of lead or lead solder connections, like the ones in Benton Harbor's 100-year-old public water system."  (*Id.* at ¶ 132, PageID.48).  The lead contamination in the Benton Harbor water system resulted from the failure to implement effective corrosion

---

[3] According to Plaintiffs, "[t]he water system contains 347,645 feet (65.8 miles) of service pipes . . . and an estimated 5,877 service lines distributing water to residents." (Complaint at ¶ 96, ECF No. 1, PageID.42).   In May 2018, State of Michigan's Department of Environment, Great Lakes, and Energy (EGLE) gave the City of Benton Harbor $284,000 in grants to begin the process of replacing lead and galvanized water service lines.  (*Id.* at ¶ 148, PageID.50).

control measures.  (*Id.* at ¶¶ 8-9, 133, PageID.21-22, 48).  Plaintiffs claim that the defendants, both governmental and non-governmental, "botched" the treatment response after elevated levels of lead were detected in October 2018.  (*Id.* at ¶¶ 9, 17, PageID.22-23).

Plaintiffs essentially claim that, after the elevated levels of lead were detected, the State and City Defendants failed to take appropriate corrective action; failed to properly notify and educate the public regarding the lead contamination; failed to provide alternative safe drinking water; and made false and misleading statements regarding the safety of the drinking water.  Plaintiffs also place blame on the private engineering firms – F&V and Elhorn – that were brought in to provide guidance on how to implement corrosion control.  (*See id.* at ¶¶ 207-10, 216, 268-69, 284, 288, 290, 302, 309, PageID.61, 72, 74-75, 77-78).

The allegations in the complaint certainly support the conclusion that some of the officials could have, and should have, done more to abate the contaminants, to warn the public of the dangers associated with drinking the water, and to educate the public regarding the best ways of handling the contaminated water.  But the allegations sound in tort, not constitutional violations.

The long and the short of it is this:  assuming the allegations are true, some of the city and state officials mishandled the lead contamination, and they failed in their statutory obligations to the public.  If true, this is unacceptable, and Plaintiffs and other consumers of the Benton Harbor water system have paid a high price.  No one should minimize the problems Plaintiffs face, given the highly-elevated lead levels in

their drinking water from 2018 to 2021.  This is a very serious matter with very serious potential consequences.  And the undersigned assumes nothing about who may be at fault, or who should have done what, when.  Plaintiffs may ultimately be successful in their efforts to hold certain individuals accountable under statutory or state common law.  But this Court must assess Plaintiffs' federal due process claims under the "particularly high hurdle" embodied in the "shocks-the-conscience" standard.  *See Guertin*, 912 F.3d at 926.

In *Guertin*, the Sixth Circuit found egregious the alleged misconduct of those Flint officials whose actions caused the contamination of the water system and who compounded that misconduct with false statements encouraging the populace to drink the contaminated water.  *See id.* at 926-29.  Accordingly, the court held that the substantive due process claims could proceed against them.  But this is not Flint.

### Background of This Case

The following is taken from relevant statutory and regulatory authority, as well as exhibits filed by the State Defendants in the two related cases, *Grant v. U.S. Environmental Protection Agency*, Case No. 1:22-cv-186, and *Braziel v. Whitmer*, Case No. 1:21-cv-960.  The citations to the record in this section are from the *Braziel* case.  The undersigned has endeavored to limit this discussion to that which appears to be undisputed.  Nevertheless, the undersigned has not considered anything contained in the cited exhibits in making any of the recommendations contained in this Report and Recommendation.  This background is provided as a useful context to the issues addressed herein.

6

The Safe Drinking Water Act (SDWA) confers upon the Administrator of the EPA the authority to regulate "public water systems," including setting standards regarding harmful water contaminants. *See* 42 U.S.C. §§ 300f, 300g-1(b). The Act allows the EPA to confer upon the states the primary enforcement responsibility for these systems, including the authority to set standards that are at least as stringent as the national standards set by the EPA. *See* 42 U.S.C. § 300g-2(a)(1); 40 C.F.R. § 142.10(a). The State of Michigan has assumed this responsibility through EGLE. *See* MICH. COMP. L. 325.1003. EGLE implements Michigan's Lead and Copper Rule, which includes several provisions more stringent than the federal rule. *See* MICH. ADMIN. CODE R. 325.10604f.

Under the Lead and Copper Rule, a water supplier is required to test periodically, and to take "corrective action" if the 90th percentile lead level is more than 0.015 milligrams per liter (mg/l) in tap water samples collected during a monitoring period. MICH. ADMIN. CODE R. 325.10604f(1)(c).[4] This is commonly known as the lead "action level." Exceeding the lead action level is not a violation of the SDWA, nor does it necessarily constitute a public health emergency, but it requires the water supplier to take certain corrective actions, including notification, education, and remediation. *See id.* at 325.10604(f)(1). Among the remedial measures required are corrosion-control treatment and, if that is not effective, replacement of lead

---

[4] The parties have used the equivalent standard of fifteen parts per billion. The Court will hereafter do the same.

7

service lines.  *See id.* at 325.10604f(1)(d), (1)(f).  The notification requirement includes notice of the lead monitoring results.  *See id.* at 325.10604f(1)(g).  The educational requirements are spelled out in detail.  *See id.* at 325.10410(2)(a)(i)-(vi).

Pursuant to the requirements of the Lead and Copper Rule, Benton Harbor had been testing its water supply for lead every three years.  (Benton Harbor Drinking Water Advisory, ECF No. 142-7, PageID.1806).  Elevated lead levels were first detected in eight of the thirty water samples taken in the summer of 2018, with the 90th percentile of samples testing at 22 parts per billion.  (*Id.*).  Benton Harbor's water system operator notified EGLE of the action level exceedance on October 10, 2018.  (*See* B. Onan Decl. at ¶ 5, ECF No.142-3, PageID.1772).  There had been no change in the city's water source (Lake Michigan) or its water treatment that would account for the action level exceedance.  (*See id.*).[5]

On October 18, 2018, EGLE hosted a meeting with staff from MDHHS and the Berrien County Health Department to discuss how to educate the public on the lead exceedance and to introduce the county health department to EGLE staff with expertise in testing for lead in school drinking water.  (*Id.*).  On October 22, 2018, EGLE formally notified Benton Harbor of the lead action exceedance, and it ordered the city to issue a public advisory notice and to send educational materials to the

---

[5] Several city water systems similar to Benton Harbor's have not experienced a lead action level exceedance even though they have lead components, use Lake Michigan as a water source, and use treatment protocols that do not include a corrosion control additive.  These include St. Joseph, Muskegon, and Holland.  (B. Onan Decl. at ¶ 6, ECF No. 142-3, PageID.1772).

water system customers.  (Department of Environmental Quality Letter to Darwin Watson, Oct. 22, 2018, ECF No. 142-13).

Benton Harbor issued the notice on October 24, 2018, advising customers that the 90th percentile of water samples contained 22 ppb of lead, and noting that "[e]levated levels of lead in the drinking water can cause health concerns." (*See* Drinking Water Advisory, ECF No. 142-7, PageID.1806).  This advisory provided advice on how to reduce the risk of lead exposure by running water for three to five minutes before drinking, and using bottled water for baby formula.  (*Id.*).  The advisory also provided websites for obtaining additional information regarding lead in drinking water and a city hotline for questions about "water testing, health concerns, or getting [a] child's blood lead level tested." (*Id.*).  City officials held a press conference, which resulted in a newspaper article reporting on the lead level exceedance.  (*See Too much lead in Benton Harbor Water*, THE HERALD-PALLADIUM, Oct. 24, 2018, updated Oct.29, 2021, ECF No. 142-14).  The city partnered with local health departments to provide educational materials to at-risk consumers, and it distributed notices through schools.   (*See* Summary of Public Education Requirements, ECF No. 142-17).

On November 30, 2018, additional educational materials were mailed to Benton Harbor water customers alerting them to "IMPORTANT INFORMATION ABOUT LEAD IN YOUR DRINKING WATER." (ECF No. 142-15).  This four-page document addressed the health effects of lead and steps customers could take to reduce their exposure to lead.  (*Id.* at PageID.1909-10).  Among the suggestions for

9

reducing one's exposure to lead was running water to flush out the lead-containing water from the service lines, purchasing bottled water, and using a water filter approved to reduce lead.  (*Id.* at PageID.1909-10).  At least some water tests performed indicated a significant drop in lead levels following the water flushing procedure.  (*See* EGLE Drinking Water Laboratory Report, ECF No. 142-16).

As a result of the lead action level exceedance, Benton Harbor was required to submit, within six months after the end of the monitoring period in which the exceedance occurred, a recommendation to EGLE regarding the "optimal corrosion control treatment."  *See* MICH. ADMIN. CODE R. 325.10604f(2)(e)(i).  The monitoring period in which the lead action level was exceeded ended September 30, 2018, so the deadline for making the recommendation was March 30, 2019.  (Onan Decl. at ¶ 10, ECF No. 142-3, PageID.1773).  EGLE encouraged the city to submit the recommendation sooner than the statutory deadline due to concerns that the number of water samples that tested above the action level had jumped from two to 26.  (*Id.*).  EGLE's stated strategy was to "get some form of corrosion control installed as soon as possible while also gathering short-term data collected by the City and pursuing a longer-term corrosion control study through [an] administrative consent order (ACO)."  (E. Oswald Decl. at ¶ 5, ECF No. 142-12, PageID.1882).[6]

---

[6] EGLE is not required to order a corrosion control study under the statute.  *See* MICH. ADMIN. CODE R. 325.10604f(2)(e)(ii).  Rather, it has the discretion to order such a study within twelve months after the monitoring period in which the exceedance occurred.  If no study is ordered, EGLE must specify "optimal corrosion control treatment" within that twelve month period.  *See id.*

EGLE allowed Benton Harbor to use grant money previously given the city for use in identifying and replacing lead service lines to implement a treatment protocol to address the lead action level exceedance, including the retention of a private consulting firm.  (Onan Decl. at ¶ 11, ECF No. 142-3, PageID.1773).  Benton Harbor retained the services of Elhorn Engineering.  (*Id.* at ¶ 12, PageID.1774).  Elhorn provided water samples to Carus, a company that manufactures water treatment chemicals, for analysis.  (*Id.*).  Based on its analysis, Carus recommended the use of its product, a 70% orthophosphate blend (*Carus 8600*).  (*Id.* at ¶ 13).  Benton Harbor submitted this corrosion control proposal to EGLE on November 21, 2018.  (ECF No. 142-19).  The proposal also included the installation of "corrosion racks to monitor and verify performance results are optimal." (*Id.* at PageID.1986).  This proposed use of orthophosphate for corrosion control was not unusual, as it had been used by other water systems similar to Benton Harbor that drew water from Lake Michigan.  (Onan Decl. at ¶ 13, PageID.1774).  The EPA reviewed the proposed corrosion control plan and expressed no concerns.  (Oswald Decl. at ¶ 5, ECF No. 142-12, PageID.1882).  Benton Harbor submitted a formal permit application for corrosion control in January 2019.  (Permit, ECF No. 142-18).  EGLE approved the permit the following month. (*Id.* at PageID.1927).

The city then had twelve months from the date of the permit approval to implement the corrosion control treatment.  *See* Mich. Admin. Code R.

325.1064f(2)(e)(iv).  The city began that process on March 25, 2019,[7] eleven months before the statutory deadline.  EGLE required Benton Harbor to increase the frequency and number of lead testing sites.  (*See* Onan Decl. at ¶ 22, ECF No. 142-3, PageID.1777).  EGLE also required the city to submit a corrosion control study proposal by the end of April 2019, a requirement the city met on April 23, 2019.  (*See id.* at ¶¶ 20-21, 23, PageID.1777-78).  While the study proposal was insufficient in some respects, EGLE allowed its implementation due to the city's financial limitations and EGLE's interest in getting some data quickly.  (*Id.* at ¶ 23, PageID.1778).  The results of this study were inconclusive, and EGLE ordered the city to submit a new study proposal in February 2020.  (*Id.*).

There was some evidence that Benton Harbor's initial corrosion control protocols were working.  (*See id.* at ¶ 26, PageID.1779; *see also Benton Harbor Drinking Water Lead Testing*, ECF No. 142-4, PageID.1784 (lead testing percentages)).[8]  But, by January 2020, EGLE staff were concerned that the corrosion

---

[7] *See* O'Malley Email to DEQ, Mar. 27, 2019, *Grant v. U.S. Environmental Protection Agency*, Case No. 1:22-cv-186, ECF No. 101-22.

[8] Although the 90th percentile rose to 27 ppb in the first part of 2019, and 32 ppb in late 2019, the elevated levels were likely due to the fact that Benton Harbor was required to collect and test the fifth liter sample drawn from each site, and not simply the first.  (Onan Decl. at ¶ 26, ECF No. 142-3, PageID.1779-80).  "The change to collect fifth liter samples often results in finding more lead.  That is because the fifth liter collects water that is more likely to have been sitting in the building's service line, and if that line is made of lead, the fifth liter is more likely to have lead in it than the first liter."  (*Id.*, PageID.1780).  In addition, the testing protocol required six to eight hours of stagnation, a greater level of stagnation than is typically encountered in residential use, which protocol "is designed to help identify the worst case scenarios."  (*Id.*).

control treatment was not working quickly enough.  (*See* Onan Decl. at ¶ 28, PageID.1780-81).  EGLE consulted with EPA and with an engineer who performed a corrosion control study in Flint.  The engineer recommended that Benton Harbor increase the orthophosphate to either 100% or a 90% blend at a higher rate of induction.  (*Id.* at ¶ 29, PageID.1781).  On February 13, 2020, EGLE directed Benton Harbor to increase its orthophosphate level to 90% at the rate of 3 mg/L no later than the end of that month, and to submit a third-party study proposal within the following six months.  (EGLE Letter to Ellis Mitchell, Feb. 13, 2020, ECF No. 142-21, PageID.1992-93).  While the lead levels declined over time, they continued to exceed the action level through the monitoring period ending in December 2021.  (*See* ECF No. 142-4, PageID.1784; ECF No. 142-5, PageID.1787 (lead sampling data)).  Water samples tested during the three six-month monitoring periods following 2021 showed lead levels below the action level.  (*See* EGLE Press Release, July 7, 2022, ECF No. 142-41).

In the beginning of the action level exceedance period, Benton Harbor made bottled water available for pickup at city hall, but it did not provide water filters. (Onan Decl. at ¶ 14, ECF No. 142-3, PageID.1774).  Upon learning this information in January 2019, EGLE worked with MDHHS and the Berrien County Health Department to ensure water filters were made available to all residents at no cost. (*Id.* at ¶¶ 14-15, PageID.1774-75).

The EPA conducted a study of these filters, which were the same as used in Flint.  That study confirmed that the filters "consistently reduc[ed] the lead in tap

13

water, in most cases to undetectable levels, and in all cases to levels that would not result in a significant increase in overall lead exposure."  (*See Flint, MI Filter Challenge Assessment*, ECF No. 142-54, PageID.2560; *see also Benton Harbor, Michigan, Drinking Water Study Results*, ECF No. 142-55, PageID.2566 ("[F]ilters, when properly installed and used, remove lead from drinking water as expected.").

## The Claims

The Second Amended Complaint contains the following six counts:

Count I:  The State and City Defendants violated Plaintiffs' Fourteenth Amendment Substantive Due Process Rights by Exposing them to State Created Danger;

Count II:  The State and City Defendants violated Plaintiffs' Fourteenth Amendment Substantive Due Process Rights by Violating Their Bodily Integrity;

Count III:  F&V and Elhorn violated Plaintiffs' Fourteenth Amendment Substantive Due Process Rights by Exposing them to State Created Danger;

Count IV:  F&V and Elhorn violated Plaintiffs' Fourteenth Amendment Substantive Due Process Rights by Violating Their Bodily Integrity;

Count VII:  F&V and Elhorn were professionally negligent regarding their water-treatment work for the City of Benton Harbor; and

Count VIII:  F&V and Elhorn were negligent regarding their water-treat work for the City of Benton Harbor.

## Procedural History

Plaintiffs filed their complaint on May 27, 2022.  (ECF No. 1).  The Court conducted a status conference on August 30, 2022, to discuss with counsel in each of the three related Benton Harbor water cases how to efficiently coordinate the

14

litigation.  (*See* Minutes, ECF No. 57; Order, ECF No. 58, PageID.496).  The Court ordered counsel for all parties to confer for the purposes of developing proposals for consolidating discovery, as well as coordinating with any pending state case.[9]  (ECF No. 58, PageID.497-98).

The Court conducted a second status conference on October 20, 2022.  (Minutes, ECF No. 69).  During that conference, the Court notified counsel that it may decline to exercise supplemental jurisdiction over the state claims in each of the related Benton Harbor water cases.  (*See* Omnibus Order, ECF No. 72, PageID.581).  It issued Plaintiffs an order to show cause within 21 days why the Court should not decline supplemental jurisdiction, requiring Defendants to respond within fourteen days thereafter.  (*Id.* at PageID.582).  The Court stayed Defendants' time for responding to the state claims pending the Court's decision on the issue of supplemental jurisdiction, and it set a deadline of December 2, 2022, for filing motions to dismiss.  (*Id.*).

All the defendants named in the four federal claims have filed motions to dismiss.  The State Defendants – EGLE Director Liesl Clark, EGLE Drinking Water and Environmental Health Division Director Eric Oswald, EGLE Surface Water Treatment Specialist Ernest Sarkipato, and EGLE Lead and Copper Unit Supervisor

---

[9] There are three known cases pending before Judge Douglas Shapiro in the Michigan Court of Claims:  *Daretha Braziel v. EGLE*, Case No. 22-0046-MM; *Oliver Kavanaugh v. EGLE*, Case No. 22-0050-MM; and *Jennifer Janssen-Rogers v. EGLE*, Case No. 22-0246-MM.  The *Daretha Braziel v. EGLE* case is related to the instant case.  (*See* Second Amended Complaint, ECF No. 82, PageID.1113).

Brandon Onan – have moved to dismiss the federal claims against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (ECF No. 91). The City Defendants – the City of Benton Harbor, Mayor Marcus Muhammad, Water Plant Manager Michael O'Malley, and City Managers Darwin Watson and Ellis Mitchell – separately moved to dismiss the federal claims under Rule 12(b)(1) on the basis of sovereign immunity and qualified immunity (ECF No. 86) and under Rule 12(b)(6) for failure to state a claim (ECF No. 93).

On May 8, 2023, the Court conducted oral argument on the pending motions. (Minutes, ECF No. 116; Hrg. Tr., ECF No. 119). The undersigned has taken into consideration all that was discussed during that hearing, along with all the parties' briefs.

## STANDARDS

I. <u>Motions to Dismiss for Lack of Subject Matter Jurisdiction</u>

If a challenge is asserted to the Court's subject matter jurisdiction under Rule 12(b)(1), "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Houchens v. Beshear*, 850 Fed. Appx. 340, 342 (6th Cir. 2021). Moreover, the Court "must" consider a jurisdictional challenge first because Defendants' other arguments for relief are moot if the Court lacks jurisdiction. *Ibid.*

Motions challenging subject matter jurisdiction may be based on a "facial" or a "factual" attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack challenges jurisdiction looking only to the allegations in a complaint, taking them as true, while a factual attack challenges "the factual existence of subject

16

matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).  In a factual attack, a court has broad discretion as to what evidence to consider, including evidence outside of the pleadings, and it "has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case."  *Id.* at 759-60 (citing *Ritchie*, 15 F.3d at 598).

II.   <u>Motions to Dismiss for Failure to State a Claim</u>

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a " 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—that the pleader is entitled to relief." *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The burden to obtain relief under Rule 12(b)(6) rests with the defendant. *See, e.g., DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ibid*. A motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Ibid*.

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided such are referenced in the complaint and central to the claims therein. *See Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008); *see also*, *Continental Identification Products, Inc. v. EnterMarket, Corp.*, 2008 WL 51610, at *1 n.1 (W.D. Mich., Jan. 2, 2008) ("an exhibit to a pleading is considered part of the pleading" and "the Court may properly consider the exhibits. . .in determining whether the complaint fail[s] to state a claim upon which relief may be granted without converting the motion to a Rule 56 motion"); *Stringfield v. Graham*, 212 Fed. Appx. 530, 535 (6th Cir. 2007) (documents "attached to and cited by" the complaint are "considered parts thereof under Federal Rule of Civil Procedure 10(c)").

18

## ANALYSIS

The undersigned judicial officer will address first the jurisdictional issue raised in the City Defendants' Rule 12(b)(1) motion.  Then, the four federal claims will be analyzed as to whether they state a cognizable claim under Rule 12(b)(6).  Finally, the issue of whether the Court should retain supplemental jurisdiction will be addressed.

I.  <u>The City Defendants' Rule 12(b)(1) Motion to Dismiss Should be Denied</u>

In their Rule 12(b)(1) motion, the City Defendants claim that they are entitled to sovereign immunity as well as qualified immunity.  (ECF No. 86, PageID.696).  But the only potential discussion of this issue in their brief is the unsupported assertion regarding a putative equal protection claim that, "[a]bsent some showing of disparate treatment, the City Officials are entitled to governmental immunity."  (ECF No. 87, PageID.726).  This is manifestly insufficient to warrant dismissal of any claim under Rule 12(b)(1).[10]  Moreover, the courts have already ruled otherwise.  "Sovereign immunity 'does not extend to counties and similar municipal corporations,' such as the defendants associated with the City of Flint in these cases."  *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) (quoting *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977)).  Having failed to demonstrate an

---

[10] It is not clear whether this argument is limited to the *Grant* case, as there is no Equal Protection claim in this case.

entitlement to any government immunity, the undersigned recommends that the City Defendants' Rule 12(b)(1) motion (ECF No. 86) be denied.[11]

II.   Plaintiffs' "State-Created-Danger" Claims Should be Dismissed

In Counts I and III of the complaint, Plaintiffs essentially claim that the defendants are responsible for their exposure to lead-contaminated water, thereby subjecting Plaintiffs to a "state created danger."  (Complaint at ¶¶ 369-87, 405-21, ECF No. 1, PageID.88-92, 97-100).  Count I names the State and City Defendants, who are undoubtedly state actors.  Count II names F&V and Elhorn, private engineering firms, claiming that they were acting under color of state law.  As explained below (see section III-B), Plaintiffs' allegations fail to establish that either firm's conduct meets any of the tests for state actor.  For purposes of the state created danger claim, the Court need not address that issue as Plaintiffs have failed to state such a claim even against state actors.

Counts I and III are facially deficient in three respects: (1) each fails to allege that any of the defendants engaged in an affirmative act that increased harm to Plaintiffs by a private third party; (2) each fails to plausibly allege that any of the defendants placed Plaintiffs at a risk greater than that of the public at large; and (3) each fails to plausibly allege that any of the defendants knew or should have

_____

[11] The City Defendants also argue that they are entitled to qualified immunity.  (ECF No. 86, 87).  The Court need not address this issue as Plaintiffs have failed to plausibly allege a constitutional violation against any of the City Defendants.

known that their actions specifically endangered Plaintiffs.  Accordingly, Counts I and III must be dismissed as to all defendants.

The state-created-danger doctrine is an exception to the general proposition that the Due Process Clause of the Fourteenth Amendment does not impose upon a state an affirmative duty to protect its citizens from private acts of violence.  *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (citing *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195 (1989)).  In *DeShaney*, the Supreme Court noted that the Due Process Clause imposes a duty to protect an individual against the private acts of violence where there is a "special relationship" between the state and the individual, such as an individual who has been taken into custody against his will.  489 U.S. at 198-200.

With this guidance, the Sixth Circuit, as well as other circuits, have recognized "a constitutional violation under a state-created-danger theory of liability." *Kallstrom*, 136 F.3d at 1066 (citing cases).  "Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to *private acts* of violence."  *Id.* (citing *Sargi v. Kent City Board of Education*, 70 F.3d 907, 913 (6th Cir. 1993)) (emphasis added). Inasmuch as any state is involved in a multitude of activities that have the potential to increase the risk of harm to certain individuals, the Sixth Circuit requires one asserting a state-created-danger claim to show "special danger," unless there is a "special relationship" between the state and the individual.  *Kallstrom*, 136 F.3d at 1066).  "The victim faces 'special danger' where the state's actions place the victim

21

specifically at risk, as distinguished from a risk that affects the public at large." *Id.*

(citing *Jones v. City of Carlisle*, 3 F.3d 945, 949 (6th Cir. 1993); *Janan v. Trammell*,

785 F.2d 557, 560 (6th Cir. 1986)).

To state a claim for state created danger, Plaintiffs' allegations  must plausibly

establish three elements:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a *third party*;
>
> (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and
>
> (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (quoting *Cartwright v. Marine*

*City*, 336 F.3d 487, 493 (6th Cir. 2003), and citing *Kallstrom*, 136 F.3d at 1066)

(emphasis added).[12]   Assessing the allegations in the amended complaint against

these elements, Plaintiffs fall well short of stating a claim for state created danger.

---

[12] In *Schneider v. Franklin County, Ohio*, 288 Fed. Appx. 247, 252 (6th Cir. 2008), the court included an incomplete version of this circuit's test for a state-created danger claim that did not include the requirement that the exposure to harm must be from a third party, despite citing the *Kallstrom* for that test.  Nothing in that decision suggests an intention to overturn *Kallstrom*.  Moreover, as an unpublished decision, *Schneider* is not binding on this Court.  *See, e.g., United States v. Flores*, 477 F.3d 431, 433-34 (6th Cir. 2007).

As to the first element, there is nothing in the complaint that so much as suggests that Plaintiffs suffered any harm from a third party, or that they were at risk of harm from a third party.[13]  To the extent the complaint accuses anyone of harming them it is the defendants themselves, not a third party.

Plaintiffs similarly fail to plausibly allege the second element: that an action by the defendants created a risk "special" to them, as opposed to the public at large. The lead contamination in the Benton Harbor water system affected all users of the system.  Plaintiffs have failed to plausibly allege that they were at a risk greater or different from the rest of the population using that water system.[14]  *See In Re Flint Water Cases*, 384 F. Supp.3d 802, 865 (E.D. Mich. 2019) ("An entire city, plus all those who visit, work, or pass through that city is, by definition, 'the general public'.").

---

[13] The Sixth Circuit has consistently articulated the first element of a state-created-danger to include a risk of "violence" from a third party, not simply "harm."  *See Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006); *Cartwright v. Marine City*, 336 F.3d 487, 493 (6th Cir. 2003); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998).  In the instant case, this distinction matters not.  Accordingly, the undersigned judicial officer will address it in manner most favorable to Plaintiffs' position.

[14] Plaintiffs offer the conclusory claim that "[t]he dangers and risks of harm were discreet and special to Plaintiffs, young children who were Benton Harbor water users, and not risks affecting the public at large," along with the contention that lead poisoning causes "brain and/or developmental injuries."  (Complaint at ¶¶ 382, 386, ECF No. 1, PageID.91-92).  Lead poisoning unquestionably affects children differently and perhaps to a greater degree, but it is not fundamentally different than the risks to the public at large.

Finally, and as explained below (see sections III-B and IV), Plaintiffs have failed to plausibly allege that any of the defendants took any *action* to cause the lead contamination in Benton Harbor.  Accordingly, Plaintiffs cannot establish that the defendants knew or should have known that they could be responsible for specifically endangering Plaintiffs.

During oral argument, Plaintiffs' counsel contended that Plaintiffs were subject to harm from third parties; the third parties being "[a]ny entity that provide[d] water to children in the city of Benton Harbor," including schools, restaurants, and libraries.   (Hrg Tr. at 32-33, ECF No. 119, PageID.1747-48). Counsel also argued that this case differs from *In Re Flint Water Cases* in that the instant Plaintiffs are children, who face more significant risks from the ingestion of lead than adults, and who do not get to decide where they go or where they get the water they drink.  (*Id.* at 33-38, PageID.1748-53).  The latter points are certainly true, but none of these arguments warrant a different outcome.  Judge Levy rejected a similar theory – one involving mothers feeding their children formula containing tainted water – "in its entirety."  384 F. Supp.3d at 864.  While children may be characterized as a subset of the general public, such characterization is still too generalized for application of the state created danger doctrine.  *See id.* at 864-65.  As Judge Levy noted:

> The largest groups the Sixth Circuit has determined were able to pursue a state created danger claim were in *Kallstrom*, where a city's release of private information of three undercover officers "placed the personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy," and in *McQueen*, where the risk

of a shooter in a school posed a risk to the five students in the room with
him and . . . those in the school building.

*Id.* at 865 (quoting *Kallstrom*, 136 F.3d at 1067, and citing *McQueen v. Beecher

Community Schools*, 433 F.3d 460, 468 (6th Cir. 2006)).

III.      <u>All the Claims Against F&V and Elhorn Should Be Dismissed</u>

The two private contractor defendants – F&V and Elhorn – are engineering

firms, which, at various times, provided consultation and other services regarding the

Benton Harbor water system.  Each has moved under Rule 12(b)(6) to dismiss the

federal claims against them.  (ECF No. 81 (F&V); ECF No. 84 (Elhorn)).  Each argues

that Plaintiffs have failed to establish that it is a "state actor," a predicate to asserting

a Section 1983 claim against it, and that Plaintiffs have otherwise failed to satisfy

the pleading requirements for the claims asserted.  (ECF No. 81, PageID.649; ECF

No. 84, PageID.676).  For the following reasons, the undersigned judicial officer

agrees and recommends that each of their motions to dismiss be granted as to all

federal claims.

A.      <u>Section 1983 – State Actors</u>

Under federal law, state actors are prohibited from violating the constitutional

and statutory rights of individuals.  That statute provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress. . . .

42 U.S.C. § 1983.  Accordingly, to state a Section 1983 claim, Plaintiffs must plausibly allege both "(1) the deprivation of a right secured by the Constitution or laws of the United States and (2) the deprivation was caused by a person acting under color of state law." *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995) (internal quotes and citation omitted).  "A plaintiff may not proceed under § 1983 against a private party 'no matter how discriminatory or wrongful' the parties' conduct." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (citing *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).  In other words, only "state actors" are subject to liability under Section 1983.

The Sixth Circuit employs three tests for determining whether a private party's conduct amounts to state action.  The first is the "public function test," which requires proof "that the private entity exercise[d] powers which are traditionally and exclusively reserved to the state." *Ellison*, 48 F.3d at 195 (internal quotes omitted).  The second, the "state compulsion test," requires a showing that the state "significantly encouraged or somehow coerced the private party, either overtly or covertly, to take particular action so that the choice is really that of the state." *Id.*  The third is the "nexus test," which requires proof of "a sufficiently close relationship (i.e., through state regulation or contract) between the state and the private actor . . . that the action taken may be attributed to the state." *Id.*

26

B.   <u>Plaintiffs Have Failed to Plausibly Allege That Either F&V or Elhorn Was a State Actor</u>

Looking to Plaintiffs' complaint, the undersigned finds few specific allegations of misconduct against F&V or Elhorn – as opposed to negligence – and certainly nothing that satisfies any of the tests for state actor.  As such Plaintiffs have failed to plausibly allege that either of the engineering firms acted under color of state law.

1.   *Elhorn Engineering Company.*

Elhorn Engineering Company is a Michigan corporation that rendered "specialized engineering services" to Benton Harbor and EGLE after the elevated lead levels were detected in the city's water system, specifically with regard to the implementation of corrosion control studies and treatment.  (Complaint at ¶¶ 49, 63, 188, 207, PageID.29, 34, 57, 61).  In January 2019, Benton Harbor Water Department Director Michael O'Malley submitted a permit application for "corrosion protection" to EGLE based on his consultation with Elhorn, and which included Elhorn's recommendation of *Carus 8600* as the corrosion control agent.  (*Id.* at ¶¶ 208-09, PageID.61).  Sometime later in 2019, Elhorn drafted a letter that the city submitted to EGLE pursuant to an Administrative Consent Order (ACO) the mayor signed, which required the submission of *either* a proposal "for optimal corrosion control treatment" *or* a "corrosion control study."  (*Id.* at ¶¶ 214, 216, PageID.62-63).  On March 27, 2019, the city began using *Carus 8600* under the direction and guidance of

EGLE and Elhorn.[15]  (*Id.* at ¶¶ 221, 227, 240, PageID.63-64, 66).  In July 2020, Elhorn

prepared another proposal for a corrosion control study, which the city submitted to

EGLE, and which again recommended the use of *Carus 8600*.  (*Id.* at ¶¶ 283-85,

PageID.74).    Plaintiffs  generally  assert  that  Elhorn  "knowingly  delivered

substandard, and insufficient services and advice to [Benton Harbor] and EGLE."

(*Id.* at ¶ 63, PageID.34).  More specifically, Plaintiffs allege that Elhorn's performance

was deficient in that it ignored viable options to *Carus 8600*; it failed to conduct

testing or "appropriate studies" to ensure the effectiveness of the treatment; and it

failed to properly monitor the effectiveness of the treatment.  (*Id.* at ¶¶ 63, 220, 225,

226, 240, PageID.34, 63-64, 66).

### 2. *F&V Operations and Resource Management, Inc.*

F&V Operations and Resource Management, Inc., is a Michigan corporation

that entered into a contract with the City Benton Harbor in November 2020, to

operate the city's water plant.  (Complaint at ¶¶ 50, 64, 289, PageID.29, 35, 75).  In

June 2021, someone from F&V served on a team of individuals from EGLE and the

Abonmarche engineering firm that made a recommendation to the city regarding a

corrosion control proposal.   (*Id.* at ¶ 302, PageID.77).   In September 2021, F&V

employees "were unable to answer simple questions posed by EPA inspectors" during

an inspection tour, and they were unable to demonstrate "certain tasks and testing

---

[15] *Carus 8600* is a generic phosphate blend.  Plaintiffs complain that neither EGLE
nor the city nor Elhorn attempted to "tailor" this blend "to the unique conditions
present in the public water system."  (Complaint at ¶¶ 209-10, PageID.61).

necessary for running the [water] plant."  (*Id.* at ¶ 310, PageID.78).  Plaintiffs assert

that F&V "delivered substandard and insufficient services to the City and was a

substantial factor in the perpetuation of the water crisis."  (*Id.* at ¶ 64, PageID.35).

> 3.  *Plaintiffs' allegations are manifestly insufficient to satisfy any
>      of the three "state actor" tests.*

None of the allegations in the complaint suggest that either Elhorn or F&V

exercised authority "traditionally and exclusively reserved to the state."  To the

contrary, the allegations suggest, if true, that both firms provided bad advice and

that they negligently discharged their duties under their respective contracts with

the City of Benton Harbor.  Nor is there any suggestion that any state actor

"significantly encouraged" or "coerced" either Elhorn or F&C to do anything.

Plaintiffs describe a contractual relationship between the two private engineering

firms and city and state officials, but there is nothing in the allegations to support a

finding that either firm was the decision maker, as opposed to the advisor, regarding

the handling of the lead contamination.  Accordingly, no matter how close the

relationship was between either Elhorn and the city or F&V and the city, Plaintiffs

cannot show that either firm is a "state actor" under the "nexus test."  *See Ellison*, 48

F.3d at 195 (nexus requires proof of "a sufficiently close relationship . . . between the

state and the private actor . . . that the *action taken* may be attributed to the state").

Even F&V's assumptions of the day-to-day operation of the water plant does

not render it a state actor.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts

of [] private contractors do not become acts of the government by reason of their

significant or even total engagement in performing public contracts.").  Plaintiffs'

reliance on *O'Brien v. Township of New Buffalo*, Case No. 1:01-cv-0365, 2003 WL 25426577 (W.D. Mich. July 21, 2003), is misplaced for at least two reasons.

First, the issue of whether a private firm is acting under color of state law is highly fact dependent.  *See Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295 (2001).  The facts supporting the finding of a "symbiotic relationship" in *O'Brien* were such that the Court concluded that "an outsider would consider [the contractors] to have acted on behalf of the Township." *Id.* at *6.  In the instant case, the documents between Benton Harbor and EGLE regarding the permitting process for the use of *Carus 8600* indicate that the city was acting on its own behalf, with the benefit of the expertise of the private engineers.

Moreover, as Plaintiffs assert, Elhorn provided services both to Benton Harbor and to EGLE.  (*See* Complaint at ¶ 63, ECF No. 1, PageID.34).  One would hardly expect a private party to "act on behalf of" two government agencies regarding the same matter, one of which had oversight and regulatory authority over the other.

Elhorn and F&V are private engineering firms that provide consultative services to various clients.  The City of Benton Harbor lacked the expertise to determine the best corrosion control protocols; accordingly, they sought the expertise of the private engineering firms – whether that was a good decision is not relevant to

the determination of the state actor issue.   There is no indication that the city surrendered its decision-making authority to either contractor.[16]

Second, the *O'Brien* decision appears to be somewhat of an outlier, particularly in light of the Supreme Court's decisions regarding this issue.   In *Brentwood*, for example, the Court noted that challenged activity may be deemed state action when it results from the state's exercise of "coercive power"; when the state provides "significant encouragement, either overt or covert"; when a private actor operates as a "willful participant in joint activity" with the state; when the private actor is "entwined" with the state in policymaking; or when the state is "entwined in [the private actor's] management or control."   531 U.S. at 296 (citations omitted).   Given Plaintiffs' allegations the benefit of any reasonable inference, the activities of Elhorn and F&V do not rise to the level of a symbiotic relationship with the City of Benton Harbor, or EGLE for that matter.   To find that Elhorn or F&V was acting under color of state law would be to paint with too broad a brush.

The undersigned acknowledges that it may be sufficient for purposes of asserting actions under "color of state law" to allege that the private entity corruptly "conspired" with a state actor to violate someone's rights.   *See Dennis v. Sparks*, 449 U.S. 24, 29 (1980) (holding that private parties who corruptly conspired with a judge to obtain an injunction against another party was sufficient to allege that the private

---

[16] Plaintiffs acknowledge that Benton Harbor failed to make changes in the daily monitoring and oversight of the corrosion control process that were recommended by Elhorn.   (*See* Complaint at ¶¶ 286-87, ECF No. 1, PageID.74-75).

parties were state actors for purposes of a Section 1983 claim).  But here, Plaintiffs have failed to include a single act that Elhorn or F&V allegedly committed, or a single decision either made to cause any of the city officials to do anything regarding the water system.  Instead, every allegation simply identifies these firms as working for, and under the direction of, the City of Benton Harbor or EGLE.  State and local officials regularly consult with private firms about all sorts of matters.  Working cooperatively with government officials does not alone make a private firm a "state actor" for purposed of a Section 1983 claim.

C.    Even if State Actors, Plaintiffs' Complaint Fails to State a Claim for a Substantive Due Process Violation for Bodily Integrity

Elhorn and F&V each alternatively argue that, even if deemed to be a "state actor" for purposes of Plaintiffs' Section 1983 claims, the complaint fails to state a claim against it.  The undersigned agrees.

A Section 1983 claim "cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right." *Terrance v. Northville Regional Hospital*, 286 F.3d 834, 842 (6th Cir. 2002) (emphasis in original).  In other words, Plaintiffs must identify *which* defendants committed *which* acts that purportedly violated their rights.  *See id.* (citing *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986)).

The allegations in the complaint paint both Elhorn and F&V as negligent in the exercise of their contractual duties to the City of Benton Harbor.  (*See* Complaint at ¶¶ 63, 64, 208, 210, 216, 220, 225, 226, 227, 240, 309, 310, ECF No. 1, PageID.34,

32

61, 63-64, 66, 78).  But the complaint says nothing to establish that either firm did

anything to that would "shock the conscience."

As such, and for the reasons stated in section IV, below, Plaintiffs have failed

to state a due process bodily integrity claim against either of the two private

consultants.  Accordingly, the undersigned judicial officer recommends that the Court

dismiss all the federal claims – Counts III and IV – as against each of defendants

Elhorn and F&V.[17]

IV.   Plaintiffs' "Bodily Integrity" Claim Should Be Dismissed Against the State and
      City Defendants

In Count II, Plaintiffs claim that the State and City Defendants violated their

substantive due process right to bodily integrity.  Cognizant that a Rule 12(b)(6)

motion tests the sufficiency of the factual allegations in a complaint, *see, e.g.,*

*Twombly*, 550 U.S. at 545, the undersigned judicial officer has carefully reviewed the

factual allegations regarding Count II, giving Plaintiffs the benefit of every

reasonable inference.  Having completed that review, the undersigned finds that the

allegations fall short of plausibly alleging a bodily integrity claim as against any of

the State or City Defendants.

A.   Due Process Standards – Bodily Integrity Claims

The Due Process Clause of the Fourteenth Amendment significantly restricts

government action.  "[It] was intended to prevent government 'from abusing its

---

[17] As explained in section II, above, Plaintiffs fail to state a "state-created-danger"
claim as to any defendant, including Elhorn and F&V.

power, or employing it as an instrument of oppression.' " *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (quoting *DeShaney*, 489 U.S. at 196). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)). This applies "whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations omitted)). "[Supreme Court] cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'." *Id.* at 846 (quoting *Collins*, 503 U.S. at 129).

There are both procedural and substantive due process components in the Fourteenth Amendment. *See Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). "Procedural due process generally requires that the state provide a person with notice and opportunity to be heard before depriving that person of a property or liberty interest." *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005). A plaintiff must first demonstrate a deprivation of protected property or liberty interest before the court will consider whether the process afforded the plaintiff was sufficient. *See Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002).

Substantive due process, on the other hand, "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). It protects "fundamental rights and liberties,"

34

including the right to bodily integrity.  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).  It also protects against arbitrary and capricious government action " 'that shocks the conscience' and violates the 'decencies of civilized conduct.' "  *Lewis*, 523 U.S. at 846-47 (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).  "[T]he central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body."  *Guertin*, 912 F.3d at 919 (citing *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 269-70 (1990)).

This Court is guided by the analysis in *Guertin*, in which the Sixth Circuit analyzed bodily integrity claims regarding decisions and actions that caused the lead-contamination in the Flint, Michigan, water system.   "Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant."  *Guertin*, 912 F.3d at 922.  The Sixth Circuit has adopted "the 'shocks-the-conscience' rubric to evaluate intrusions into a person's right to bodily integrity."  *Id.* (citing *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 725 (6th Cir. 1996)).  Accordingly, to state a substantive due process claim, Plaintiffs must plausibly allege both the "deprivation of a liberty or property interest" and "conscience shocking conduct."  *Guertin* 912 F.3d at 922.  "Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees."  *Id.* at 923.

35

Governmental infliction of lead-contamination on an individual is unquestionably a "harm striking at the core of [that person's] bodily integrity." *Id.* at 925. The remaining issue, then, is whether Plaintiffs have alleged plausible facts, which if true, establish that any of the defendants engaged in conduct relating to the lead-contamination of the Benton Harbor water supply that "shocks the conscience." *See id.* at 925-32.

B. Plaintiffs Fail to Allege Plausible Facts Showing That Any of the State or City Defendants Engaged in Conduct That Shocks the Conscience

Plaintiffs allege generally that the State and City Defendants' "decisions, actions, and inaction deprived Plaintiffs of their constitutional right to be free from harm caused to their bodies by their government, and caused them permanent injuries." (Complaint at ¶ 24, PageID.24). Plaintiffs also assert that the defendants "exacerbated the [water] crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct." (*Id.* at 31, PageID.25). The complaint's bodily integrity claim is long on conclusions and short on specifics.

The Sixth Circuit "has consistently held that damage claims against governmental officials alleged to arise from violations of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right." *Terrance*, 286 F.3d at 842 (emphasis in original). Plaintiffs cannot demonstrate that a

particular defendant's actions shock the conscience without assessing each defendant's alleged actions individually. *See Guertin*, 912 F.3d at 926.

A review of the specific allegations against each of the State and City Defendants reveals that the complaint falls well short of stating a constitutional violation against any of them.[18] At most, Plaintiffs' allegations suggest that some of the defendants may have been negligent in the exercise of their duties. During oral argument, Plaintiffs' counsel urged the Court to review the exhibits attached to the complaint, and which are incorporated by reference into the complaint. As will be noted in the following analysis, the undersigned has done just that.

### 1. *EGLE Director Liesl Clark*

Plaintiffs claim that EGLE Director Liesl Clark "was deliberately indifferent to the suffering and injuries to Plaintiffs when she made decisions and statements that concealed and prolonged the current public health crisis." (Complaint at ¶ 70, PageID.36). Plaintiffs further contend that Director Clark was one of the EGLE officials responsible for creating and implementing "policies, customs, and practices" that prolonged the public health crisis resulting from the lead contamination of Benton Harbor's drinking water. (*Id.* at ¶ 68, PageID.35). To support these

---

[18] Plaintiffs state that they are suing the State Defendants only in their individual capacities. (*See* Complaint at ¶¶ 70-73, PageID.36-37). It is unclear why the complaint also includes an allegation that each of them was an "employee and/or official of EGLE with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978)." (*Id.*). A *Monell* claim is an "official-capacity" suit against the government agency. *See Monell*, 436 U.S. at 690 n.55.

contentions, Plaintiffs offer the singular specific allegation that Director Clark "dodged" questions from Michigan's House Oversight Committee during an October 22, 2021, hearing before acknowledging that the Benton Harbor water was not safe to drink (*id.* at ¶¶ 322-28, PageID.80-81).

Plaintiffs bodily injury claim against Director Clark rests on purely conclusory assertions of liability and one specific instance in which she was arguably less than candid with a committee of the state legislature. The first is manifestly insufficient to support a due process claim, and the second, even if true, hardly rises to the level of conduct that shocks the conscience.

### 2. *EGLE Drinking Water Director Eric Oswald*

Plaintiffs claim that EGLE Drinking Water Director Eric Oswald "was deliberately indifferent to the suffering and injuries to Plaintiffs when he made decisions and statements that concealed and prolonged the current public health crisis." (Complaint at ¶ 71, PageID.36). Plaintiffs further contend that Director Oswald was one of the agency officials who implemented policies and practices that prolonged the public health crisis resulting from the lead contamination in the Benton Harbor water system. (*Id.* at ¶ 68, PageID.35).

To support these contentions, Plaintiffs offer the following specific allegations. In May 2018, when EGLE gave Benton Harbor $284,000 in grants to begin the process of replacing lead and galvanized water service lines, Director Oswald stated that "it is impossible to know for sure when lead first leached into Benton Harbor's

drinking water, citing systemic issues." (*Id.* at ¶¶ 148, 150, PageID.50-51).[19]   In March 2019, Director Oswald entered into an Administrative Consent Order (ACO) with the mayor of Benton Harbor, which required the city to submit by the end of the following month either "a proposal for optimal corrosion control treatment" or "a corrosion control study." (*Id.* at 214, PageID.62).[20]   In November 2019, an organization sent Director Oswald a letter expressing "serious concerns" regarding the elevated lead levels in Benton Harbor's drinking water, in response to which Director Oswald stated that the water was safe due to the *Carus 8600* treatment, which had been approved by EGLE. (*Id.* at ¶ 241, PageID.66-67).[21]   Director Oswald "further indicated, dishonestly and publicly, that the results of internal studies indicated the inhibitor (*Carus 8600*) was effectively reducing corrosion rates." (*Id.* at ¶ 244, PageID.67).

The import of these allegations, giving Plaintiffs the benefit of every reasonable inference, is that EGLE Drinking Water Director Oswald knew of the lead contamination in Benton Harbor's drinking water and failed to take sufficient

---

[19] Plaintiffs cite to an article: *In Benton Harbor, residents' complaints of lead-tainted water carry echoes*, GREAT LAKES NOW (Oct. 11, 2021) (Complaint at ¶¶ 149-50 nn.14-15).

[20] "An Administrative Consent Order is a tool EGLE uses to bring entities into compliance with regulations." (Complaint at ¶ 214 n.31, PageID.62). A copy of the ACO is found in Exhibit 10 to the Complaint (ECF No. 1-9).

[21] Plaintiffs provide a copy of the organization's letter to Director Oswald (Complaint Exhibit 13, ECF No. 1-12). They do not, however, provide any documentation regarding Director Oswald's purported response to that letter.

action to protect and notify the public.  He also made erroneous, and *perhaps* dishonest – statements about the effectiveness of the corrosion control treatment that was approved by EGLE.  Apart from Plaintiffs' conclusory statement that Director Oswald made "dishonest" public statements – which is unsupported by any specific allegation of dishonesty – the most that can be gleaned from the complaint is the unsupported inference that Director Oswald's statement about the effectiveness of *Carus 8600* was knowingly false, and not simply erroneous.

These allegations are insufficient to state a claim for a due process violation. Not every bad act or wrongful conduct will support a due process claim.  *See Guertin* at 931 (allegations that MDHHS employees "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers" were insufficient to state a due process claim).

### 3. *EGLE Surface Water Treatment Specialist Ernest Sarkipato*

Plaintiffs claim that EGLE Surface Water Specialist Sarkipato "was deliberately indifferent to the suffering and injuries to Plaintiffs when he made decisions and statements that concealed and prolonged the current public health crisis." (Complaint at ¶ 73, PageID.37).  Plaintiffs further contend that Mr. Sarkipato was one of the agency officials who implemented policies and practices that prolonged the public health crisis resulting from the lead contamination in the Benton Harbor water system.  (*Id.* at ¶ 68, PageID.35).

To support these contentions, Plaintiffs offer the following specific allegations. Mr. Sarkipato sent a letter to Benton Harbor's mayor in late 2018, after EGLE had completed a sanitary survey of the city's water treatment plant, "falsely and deceptively understat[ing] the dangerous issues associated with the water system, by stating that the City made significant efforts to 'maintain and improve the historically neglected water system'. " (*Id.* at ¶ 153, PageID.51). Mr. Sarkipato estimated that it would cost $124 million to replace the Benton Harbor water service lines, noting that this "represents a significant challenge for the City." (*Id.* at ¶ 154, PageID.51). Mr. Sarkipato stated that " '[p]roper care and maintenance of the system is necessary to protect the health of all customers,' " and he noted "several significant deficiencies that hindered the City of Benton Harbor from coming into compliance with the [Safe Drinking Water Act]." (*Id.* at ¶¶ 155-56, PageID.51-52). In February 2019, EGLE engineers sent an email to Mr. Sarkipato to "warn" that the proposal to use *Carus 8600* "was unlike other corrosion control proposals" previously implemented to address lead service lines. (*Id.* at ¶ 211, PageID.61-62). A review of the emails upon which Plaintiffs rely for this allegation reveals Plaintiffs' somewhat hyperbolic use of the term "warning." Moreover, nothing in the email correspondence suggests conscience-shocking conduct.

Plaintiffs cite a chain of emails between employees of the Michigan Department of Environmental Quality, including Mr. Sarkipato. (*See* Complaint, Exhibit 8, ECF No. 1-7)). These emails appear to reflect discussions between the employees regarding Elhorn's recommendations for corrosion control, including the

proposed dosage of the *Carus 8600*.  The discussions appear to be geared toward reaching a consensus on Benton Harbor's permit application.  Some initial concerns regarding dosage appear to have been resolved.  (Compare ECF No. 1-7, PageID.196, with *id.* at PageID.194).  The only indication of a disparity with other corrosion control proposals is the statement concerning the chemical feed rate in which the employee appears to have mistakenly understood the proposed rate to be 1.05 ppm, when Elhorn's proposed rate was 1.50 ppm.  (Compare Onan email, Feb. 7, 2019, ECF No. 1-7, PageID.195, with Thurston email, Feb. 21. 2019, *id.* at PageID.194).  The last in the series of emails is one from Mr. Sarkipato in which he expressed appreciation for the input from the others and noted that he was going to "wait for consensus." (*Id.* at PageID.194).[22]

The only purportedly false or deceptive statement attributed to Mr. Sarkipato is his 2018 assertion that Benton Harbor had made "significant efforts" to maintain and improve its water system.  (*See* Complaint at ¶ 153, PageID.51).  Putting aside

---

[22] Plaintiffs also cite to email exchanges between Mr. Sarkipato and EGLE Lead and Copper Unit Supervisor Brandon Onan concerning a lack of a corrosion control study in Benton Harbor's permit application.  (Complaint at ¶ 213 n.30, ECF No. 1, PageID.62 (Exhibit 9, found at ECF No. 1-8)).  The emails indicate that the city advised EGLE of its plan to conduct "a coupon study to identify optimum dose for the proposed product," and that EGLE was interested in evaluating the planned coupon study.  (ECF No. 1-8, PageID.199).  It should be noted that EGLE is not required to order a corrosion control study under the statute.  *See* Mich. Admin. Code R. 325.10604f(2)(e)(ii).  Rather, it has the discretion to order such a study within twelve months after the monitoring period in which the exceedance occurred.  If no study is ordered, EGLE must specify "optimal corrosion control treatment" within that twelve month period.  *See id.*

the inherently subjective nature of the statement, this supposed false assertion was made to the mayor of that city, one who presumably would have known of the extent of its accuracy.  Singularly lacking is any allegation that Mr. Sarkipato did anything wrong, much less conscience shocking.  To the contrary, Plaintiffs concede that Mr. Sarkipato recognized both the need to replace the affected water lines and the difficulties the city faced in accomplishing that task.  Perhaps he could have done more, and more quickly, but the Court is left to speculate on that.  Even so, mere failure to take action is insufficient to sustain a bodily injury claim.  *See Guertin*, 912 F.3d at 930.

### 4.  *EGLE Lead and Copper Unit Supervisor Brandon Onan*

Plaintiffs claim that EGLE Lead and Copper Unit Supervisor Brandon Onan "was deliberately indifferent to the suffering and injuries to Plaintiffs when he made decisions and statements that concealed and prolonged the current public health crisis."  (Complaint at ¶ 72, PageID.37).  Plaintiffs further contend that Mr. Onan was one of the agency officials who implemented policies and practices that prolonged the public health crisis resulting from the lead contamination in the Benton Harbor water system.  (*Id.* at ¶ 68, PageID.35).[23]

To support these contentions, Plaintiffs offer the following specific allegations. In early 2020, during internal EGLE discussions about the effectiveness of *Carus*

---

[23] By this point, it should be evident that Plaintiffs have repeated verbatim the same conclusory claims with respect to each of the State Defendants.

*8600*, Mr. Onan told two specialists "that he was 'not comfortable entertaining the idea of pH/alkalinity adjustments' or other forms of corrosion control as mandated by the federal and state [Lead and Copper Rules]." (*Id.* at ¶ 257, PageID.70). He then sent a letter to the Benton Harbor city manager, dated February 13, 2020, mandating changes to the corrosion control protocols due to EGLE's assessment that the *Carus 8600* was not reducing the amount of lead in the water quickly enough. (*Id.* at ¶ 253, PageID.69; *see also* Complaint Exhibit 14, ECF No. 1-13 (a copy of Mr. Onan's letter)). Plaintiffs complain that Mr. Onan sent the letter despite concerns raised internally by EGLE staff members. (*Id.* at ¶¶ 254-58, PageID.69-70).[24]  Mr. Onan's letter "demanded" that the city "modify its corrosion control by changing the treatment rate by the end of February 2020." (*Id.* at ¶ 259, PageID.70).

Plaintiffs allegations against EGLE Supervisor Onan are puzzling. The undersigned is cognizant of the requirement to view Plaintiffs' allegations in light most favorable to their claims. But it is difficult to discern what Plaintiffs believe Mr. Onan did wrong, much less that he engaged in conscious-shocking conduct.

---

[24] Plaintiffs cite to an email exchange between Mr. Onan and EGLE Surface Water Treatment Specialist Bob London, which exchange was copied to a number of state officials. (*See* Complaint at ¶ 254 n.39, ECF No. 1, PageID.69 (citing Complaint Exhibit 15, ECF No. 1-14)). Mr. London had reviewed a draft of the letter and offered a couple of suggested changes, including that the letter make clear that Benton Harbor include a review of several treatment options in its corrosion control study. (ECF No. 1-14, PageID.233). In his response, Mr. Onan provided an explanation for his decision to remain "more focused on [orthophosphate] inhibitor treatment." (*Id.* at PageID.232). Plaintiffs offer nothing further to suggest that Mr. Onan's explanation was unsatisfactory to anyone copied on the email.

5. *Benton Harbor Mayor Marcus Muhammad*

Plaintiffs sue Mayor Marcus Muhammad in his individual and official capacities claiming that he "caused" Plaintiffs injuries as a result of his "deliberate indifference" and his "deprivation" of their constitutional rights. (Complaint at ¶ 60, PageID.33). In support of this claim, Plaintiffs offer the following specific allegations.

Sometime after an October 2018 sanitary survey of the Benton Harbor water treatment plant, the mayor received a letter from EGLE Surface Water Specialist Sarkipato in which the mayor was advised that the city had made "significant efforts to maintain and improve the historically neglected water system'." (*Id.* at ¶¶ 151-53, PageID.51).[25] Mr. Sarkipato's letter also noted that it would cost $124 million to replace lead-contaminated water service lines, that proper maintenance of the system is "necessary to protect the health of all customers," and that there were "several significant deficiencies that hindered" the city's ability to come into compliance with

---

[25] Plaintiffs cite a March 8, 2019, Administrative Consent Order (ACO) to support the allegation regarding the Sarkipato letter. (*See* Complaint at ¶ 152 n.16, ECF No. 1, Page ID.51 (citing Complaint Exhibit 4)). A copy of the Sarkipato letter, which is dated October 3, 2018, is attached to that ACO. (*See* Complaint Exhibit 4, ECF No. 4, PageID.281-85). In that letter, Mr. Sarkipato did note that Benton Harbor "[had] made significant efforts to maintain and improve the historically neglected water system," but the letter also included a number of "major findings" that required "immediate attention by the City." (*Id.* at PageID.281). These findings relate to a number of issues that appear to have little to do specifically with potential lead contamination. (*See id.* at PageID.281-85). Similarly, the March 8, 2019, ACO addresses a number of problems in the water system, including one for "optimal corrosion control," (ACO at ¶ 2.6, ECF No. 4, PageID.275), but the ACO makes no mention of lead contamination. It is evident that the Benton Harbor water department had a great many longstanding problems, the most serious of which was the 2018 to 2021 lead contamination.

the Safe Water Drinking Act.  (*Id.* at ¶¶ 154-56, PageID.51-52).  EGLE used this letter and the results of the sanitary survey to secure an ACO with the city.  (*Id.* at ¶ 158).  Mayor Muhammad was angry with the state, telling state legislators: "I was cross-eyed because on one hand you had a state official to deplete the water labor [during the state of financial emergency] and then another [state] official coming back saying you need to increase it." (*Id.* at ¶¶ 159-60, PageID.52).[26]  The mayor thereafter took no action to bring the city into compliance with the Safe Water Drinking Act. (*Id.* at ¶ 161, PageID.52).  The mayor "downplayed" the seriousness of lead contamination and stated the following during a press conference about the lead advisory: "Although we want to send out a notice and make this announcement, it's not being . . . delivered as a high alert, emergency 911, panic frenzy.  This is FYI, and you can work with our city staff to find ways to get tested." (*Id.* at ¶¶ 173-74, PageID.55).  Sometime around May 2018, Mayor Muhammad "claimed" to have enough funds to replace forty percent of the city's service lines, despite the fact that the city had only received $284,000 in grant money and had been advised a total cost replacement was $124 million.  (*Id.* at ¶¶ 196-97, PageID.59).  The mayor signed the ACO on March 8, 2019, which required the submission of certain proposals or studies for corrosion, in response to which the city submitted an "insufficient" one-page document drafted by the Elhorn engineering firm.  (*Id.* at ¶¶ 214-16, PageID.62-63).

---

[26] Plaintiffs cite a Detroit Free Press article, *"I have not time for this": Emails show officials sniping amid Benton Harbor lead crisis* (Associated Press, Nov. 8, 2021) (*see* Complaint at ¶ 160 n.17, ECF No. 1, PageID.52).

Giving them the benefit of all reasonable inferences, Plaintiffs allegations, taken as true, plausibly support a conclusion that the mayor failed to take sufficient action to deal with the lead contamination in the water, and that he was less than candid with the public concerning the seriousness of the contamination and what was needed to address the problem.  The allegations suggest that he may have been negligent, and even that he may have violated his fiduciary obligations to the residents of Benton Harbor, but they fall short of a due process violation.

6.  *Former Benton Harbor Water Plant Manager Michael O'Malley*

Michael O'Malley is the former Benton Harbor Water Plant Manager. Plaintiffs are suing him in his individual and official capacities for injuries caused by his deliberate indifference in the decisions and statements he made during his tenure as water plant manager regarding the lead contamination in the city's water system. (Complaint at ¶ 61, PageID.33).[27]   In support of this claim, Plaintiffs offer the following specific allegations.

---

[27] The fact that Plaintiffs acknowledge that Mr. O'Malley no longer holds municipal office (*see* Complaint at ¶ 289, ECF No. 1, PageID.75), constitutes an independent basis for dismissing the official-capacity claims against them.  *See O'Donnell v. Brown*, 335 F. Supp.2d 787, 815 (W.D. Mich. 2004) ("[O]fficial capacity suits 'generally represent only another way of pleading an action against the entity of which an officer is an agent' . . . 'the real party in interest is the entity.' " (quoting *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 n.55 (1978); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

Mr. O'Malley stated at some point that the $284,000 in EGLE grant money would be used to replace lead lines in private homes, despite the fact that the grant was intended to perform a general inventory of the city's water service lines. (*Id.* at ¶ 195, PageID.58).[28]   In January 2019, Mr. O'Malley "incorrectly" told a Benton Harbor resident that the City was delivering "clean water right to the tap and [she] should have no problem drinking it." (*Id.* at ¶¶ 198-200, PageID.59-60).[29]   Mr. O'Malley advised a non-profit organization that the city was not providing filters or bottled water to anyone, including those living in homes that tested above the "lead action limit." (*Id.* at ¶ 202, PageID.60).

Mr. O'Malley worked with the Elhorn engineering firm, and sometime in January 2019, he submitted a permit application to EGLE for "corrosion protection," based on consultation with Elhorn, despite the fact that there had been no "proper corrosion control study." (*Id.* at ¶¶ 207-08, PageID.61).[30]   The permit application sought permission to use the *Carus 8600* for corrosion control. (*Id.* at ¶¶ 209, 221,

---

[28] Plaintiffs cite a Herald Palladium article, *"BH homes test positive of high lead levels* (Nov. 23, 2018) (Complaint at ¶ 194 n.22, ECF No. 1, PageID.58).

[29] Plaintiffs cite a Herald Palladium article, *State to require Benton Harbor water plant changes* (Jan. 23, 2019) (Complaint at ¶ 198 n.24 (referencing ¶ 88 n.1)).

[30] Plaintiffs cite an EGLE Regulatory Status Update, dated January 23, 2019 (Complaint at ¶ 207 n.27 (Exhibit 6, ECF No. 1-5), and the Benton Harbor Permit Application, Jan. 24, 2019 (*id.* at ¶ 208 n.28 (Exhibit 7, ECF No. 1-6)). The corrosion-control recommendation from Elhorn, which was attached to the permit application, included a proposal "to install corrosion couple racks to monitor and verify performance results are optimal." (ECF No. 1-6, PageID.172).

PageID.61, 63).[31]  Following the introduction of *Carus 8600*, Mr. O'Malley "obscured" the city's lead testing; he refused to disclose to EGLE the testing sites; and he asked EGLE to reduce the number of testing sites.  (*Id.* at ¶¶ 228-30, PageID.64-65).[32]

In July 2019, Mr. O'Malley publicly promised that the corrosion control would coat the water pipes to prevent lead from leaching into the drinking water, but he noted that this had not yet taken effect.  (*Id.* at ¶¶ 235-37, PageID.65-66).   In November 2019, he "dishonestly" told members of the Benton Harbor Safety and Recreation Committee that the *Carus 8600* was working ahead of schedule, even though he had only tested seven of the sixty houses required to be tested by the Safe Water Drinking Act.  (*Id.* at ¶¶ 246-48, PageID.68).   But, in January 2020, Mr. O'Malley "backed off" his assertion that the corrosion control was ahead of schedule, noting it could take up to eighteen months for the treatment to sufficiently coat the water lines.  (*Id.* at ¶¶ 251-52, PageID.69).

In a May 19, 2020, letter to EGLE, Mr. O'Malley "dishonestly maintained that the City properly completed EGLE's original requirements, pursuant to the March 2019 ACO," and he "falsely" claimed that Elhorn's single page letter fulfilled the ACO's "corrosion control study" requirement.   (*Id.* at ¶¶ 265-66, PageID.71).

---

[31] Plaintiffs cite an email, dated March 27, 2019, from Mr. O'Malley to EGLE staff, advising that the city had begun feeding the orthophosphate (*Carus 8600*) into the water system and noting it would take "a few days in a row to iron out a dose of 1.5 ppm," and noting initial dosage rates of 1.35 and 1.18 ppm.  (Complaint at ¶ 221 n.34 (Exhibit 12, ECF No. 1-11, PageID.219)).

[32] Plaintiffs provide no documentation regarding these allegations.

Plaintiffs cite a memorandum from Mr. O'Malley to Mr. Sarkipato and other EGLE

staff members, dated May 19, 2020.  (Complaint at ¶ 266 n.40, ECF No. 1, PageID.71

(Exhibit 16, ECF No. 6)).[33]  Elhorn's single-page "Corrosion Control Treatment Plan

& Study Proposal" notes that a "formal proposal" would be written based on data

collected from the Corrosion Coupon Test Racks that were to be installed in Benton

Harbor's water system.  (Complaint Exhibit 11, ECF No. 1-10).  EGLE sent a response

to Mr. O'Malley's May 19, 2020, letter, noting that, "[w]hile the approach for the

corrosion control study plan has merit, [EGLE had] two concerns with the proposed

plan."  (Complaint Exhibit 17, ECF No. 1-16, PageID.240).  The first concern regarded

the lack of detail in the proposed study plan; the second related to the water

department's lack of managerial capacity to perform the requirements of some parts

of the study.  (*Id.*).  EGLE concluded this letter by asking Mr. O'Malley to "accept

---

[33] Plaintiffs' allegation that Mr. O'Malley "dishonestly" maintained that the City had completed the requirements of the ACO is misleading.  The memorandum itself makes clear that Mr. O'Malley merely indicated that the requirement to submit *either* "an optimal corrosion control treatment" *or* a "corrosion control study" had been completed by March 21, 2019, "when corrosion protection treatment began."  (ECF No. 6, PageID.332).  Plaintiffs may take issue with whether the corrosion protection treatment was "optimal," but Plaintiffs' characterization is, to say the least, inaccurate.  The undersigned can find nothing in the memorandum stating that a one-page letter satisfied the requirement for a third-party "corrosion control study." Moreover, what was required was a corrosion control study *proposal* not a corrosion control study.  (*See id.*).  With respect to that requirement, Mr. O'Malley discussed his own investigation of lead levels in Benton Harbor, his assessment of the effectiveness of *Carus 8600*, and his concerns about the more aggressive treatment EGLE imposed in February 2020.  (*Id.* at PageID.332-33).  He mentioned receipt of "a *quotation* for a corrosion control study" and he stated his "certainty" that "the ACO regarding a Corrosion Study [would] be accepted by the City and given to . . . EGLE as the City's response."  (*Id.* at PageID.333).

these comments and concerns as part of a constructive conversation," and the EGLE staff offered continued assistance to the city.[34]  (*Id.* at PageID.241).

In November 2020, EGLE revoked Mr. O'Malley's license, and Benton Harbor placed him on administrative leave and later terminated his employment.  (*Id.* at ¶ 289, PageID.75).  Plaintiffs do not allege that the revocation of Mr. O'Malley's license or the termination of his employment was related to his handling of the lead contamination in the water system.

Taken as true, and giving Plaintiffs' allegations the benefit of every reasonable inference, the complaint may support a conclusion that Mr. O'Malley was negligent, and perhaps that he was guilty of malfeasance.  But the complaint falls short of stating a claim for a substantive due process violation against him.

### 7.  *Benton Harbor City Manager Darwin Watson*

Darwin Watson was the City Manager for Benton Harbor.  Plaintiffs sue Mr. Watson in his individual and official capacities, claiming that he acted with "deliberate indifference" with respect to his decisions and statements regarding the lead contamination in the city's water system.  (Complaint at ¶ 62, PageID.33-34).[35] In support of this claim, Plaintiffs offer the following specific allegations.

_____

[34] Benton Harbor submitted another proposed Corrosion Study Plan on July 28, 2020. (Complaint Exhibit 18, ECF No. 1-17).

[35] Mr. Watson is no longer a municipal official (*see* Complaint at ¶ 44, ECF No. 1, PageID.27), which is an independent basis for dismissing the official-capacity claims against him.  *See, e.g., O'Donnell v. Brown*, 335 F. Supp.2d 787, 815 (W.D. Mich. 2004).

In late 2018, Mr. Watson "advised homeowners that they were responsible for replacing water lines from the sidewalk to the house." (*Id.* at ¶¶ 163, 167, PageID.53). In an October 2018 city press conference, Mr. Watson "lied" when he "publicly stated that the city had no lead lines (despite his intimate knowledge of the May 2018 EGLE grant the City received to replace lead lines)." (*Id.* at ¶¶ 173, 175, PageID.55).  But by November 2018, he "backtracked" from that statement, indicating that the city would hire contractors to investigate the source of lead. (*Id.* at ¶¶ 191, 194, PageID.58).

These allegations warrant little analysis.  The most that can be gleaned from these allegations is that Mr. Watson deceived the public for one month regarding the potential cause of the lead contamination.  Practicing deception is hardly a virtue, but there is nothing here that suggests conscience-shocking conduct.

### 8. *Comparison to the "Flint Water Crisis Case"*

The Sixth Circuit opinion in *Guertin* is instructive to the analysis of Plaintiffs' claims in the instant case.[36]  The Sixth Circuit held that the *Guertin* plaintiffs had adequately stated a claim for a due process bodily integrity claim against certain of the named defendants.  These included the officials who were among the "chief architects" of the decision to switch water sources and to use a plant they knew could

---

[36] Plaintiffs filed a highlighted copy of the *Guertin* complaint.  (ECF No. 117-1).  The State Defendants responded by filing their own highlighted version of it.  (ECF No. 118-1).  The undersigned has not considered either document.  This Court is guided by the Sixth Circuit's analysis of the allegations in the *Guertin* complaint, not the complaint itself.

not safely process the water, especially in light of "the Flint River's known environmental issues and the problems associated with lead exposure." *Id.* at 926. The defendants facing potential liability also included some officials from Michigan's Department of Environmental Quality, who "played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications." *Id.* at 927.

On the other hand, the Sixth Circuit reversed the denial of motions to dismiss by those defendants who were not involved in the decision-making or the implementation of the decision to switch water sources. *See Guertin*, 912 F.3d at 929-32. Those who were dismissed from the case included individuals who allegedly knew about the lead contamination and who failed to "protect and notify the public" of it, i*d.* at 929-30; those who attempted to discredit a study showing the effects of the lead contamination, *id.* at 930-31; and those who, knowing of the lead contamination, withheld data requested by researchers, and sought to attribute the elevated contamination levels to other causes. *Id.* at 932.

Key to the failure to state a claim against the latter group of defendants was the absence of any allegation that these defendants did anything to cause the consumption of lead-contaminated water. As the Court noted: "plaintiffs do not factually link [the defendants'] *inaction* to causing Flint residents to consume (or at least continue to consume) lead-tainted water. Nor do plaintiffs identify a source of law for the proposition that an individual violates the right to bodily integrity just because he failed to 'blow the whistle.' " *Id.*

53

The allegations in Plaintiffs' complaint offer nothing close to what was alleged against the officials in *Guertin* who were directly involved in *causing* Flint residents to consume lead-contaminated water.  At most, the allegations here suggest the same level of culpability as those in *Guertin* whose alleged involvement was insufficient to state a due process claim.

   C.   <u>Plaintiffs Cannot Maintain a *Monell* Claim Against the City of Benton Harbor</u>

A Section 1983 claim asserted against a municipal officer in his official capacity is, in actuality, a claim against the municipality the officer serves.  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 n.55 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").  In *Monell*, the Supreme Court held that "municipalities and other local government units [are] included among those persons to whom § 1983 applies."  436 U.S. at 690.  In what is now commonly referred to as "*Monell* claims," a plaintiff must demonstrate that the purported constitutional violation was caused by some official policy, practice, or custom.  *See id.* at 690, 694.  Accordingly, in order to succeed on a claim for municipal liability, Plaintiffs must demonstrate both:  (1) the violation of a constitutional right, and (2) that the City of Benton Harbor is responsible for the violation by virtue of a policy, practice or custom.  *See Ellis v. Cleveland Municipal School District*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Doe v. Claiborne County*, 103 F.3d 495, 505-06 (6th Cir. 1996)).

As noted above, Plaintiffs fail to plausibly allege a constitutional violation by any city employee.  Reading the complaint indulgently, the undersigned finds that the allegations support nothing more than negligence.

Without a plausible claim of constitutional violation against any of the City Defendants, Plaintiffs cannot sustain a *Monell* claim against the City of Benton Harbor.  *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").  But, even if Plaintiffs had plausibly alleged a constitutional violation, the outcome would be no different, as they have failed to plead any policy, practice or custom that purportedly *caused* the alleged constitutional violation.

V.    The Court Should Decline to Exercise Supplemental Jurisdiction
      Over the State Claims

The parties have submitted their respective views on whether the Court should entertain supplemental jurisdiction over the state claims.  (*See* ECF No. 75, 76, 77, 78).  Having taken these views into consideration, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over the state claims – Counts VII and VIII – and dismiss them without prejudice.

The doctrine of supplemental jurisdiction was originally established by the Supreme Court as a matter of federal common law under the term "pendent jurisdiction."  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).  It is now largely codified at 28 U.S.C. § 1367.

Under that statute, "the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Court may decline to exercise supplemental jurisdiction over such a claim if:

> (1)   the claim raises a novel or complex issue of State law,
>
> (2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)   the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1-4).

District courts retain broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims, discretion that "is bounded by constitutional and prudential limits on the use of federal judicial power. *See Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). "As a rule of thumb . . . [w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Id.* (citing *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7(1988)).

In determining whether to exercise supplemental jurisdiction after the dismissal of the federal claims, the Court must take into consideration the basis for the dismissal of the federal claims. "Not all 'pretrial dismissals' affect supplemental claims in the same manner." *Musson*, 89 F.3d at 1255. Dismissals following summary judgment do not affect the Court's ability to resolve supplemental claims. *Id.* But that is not in play here.

56

Appellate courts closely scrutinize, however, the retention of supplemental jurisdiction following the dismissal of claims under Rule 12(b)(6). *See id.* Dismissals under Rule 12(b)(6) trigger a "strong presumption in favor of dismissing supplemental claims." *Musson*, 89 F.3d at 1255 (citing *Taylor v. First America Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) (dictum); *Vild v. Visconsi*, 956 F.2d 560, 570 (6th Cir. 1992) (dictum); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (dictum); *Gaff v. Federal Deposit Insurance Corp.*, 814 F.2d 311, 319 (6th Cir. 1987) (reversing district court's decision to exercise supplemental jurisdiction after Rule 12(b)(6) dismissal)). One of the reasons for this presumption is that the dismissal comes early in the case, before the court has expended time or resources on the state claims. *See Musson*, 89 F.3d at 1255. That presumption may be overcome by "unusual circumstances," *Gaff*, 814 F.2d at 318; for example, "some prejudice arising from relegating the case for trial in the state court." *Nolan v. Meyer*, 520 F.2d 1276, 1280 (2d Cir. 1975).

The undersigned judicial officer can discern no circumstance that warrants a deviation for the presumptive practice. Accordingly, the Court should dismiss the state law claims without prejudice.

## Conclusion

For all the reasons outlined above, the undersigned judicial officer recommends the following:

1. that the State Defendants' Rule 12(b)(6) motion to dismiss for failure to state a federal claim (ECF No. 91) be granted and that Counts I and II of the Complaint be dismissed with prejudice as to them;

57

2.  that the City Defendants' Rule 12(b)(1) motion to dismiss (ECF No. 86) be denied;

3.  that the City Defendants' Rule 12(b)(6) motion to dismiss for failure to state a federal claim (ECF No. 93) be granted and that Counts I and II be dismissed with prejudice as to them;

4.  that F&V's Rule 12(b)(6) motion to dismiss for failure to state a federal claim (ECF No. 81) be granted and that Counts III and IV be dismissed with prejudice as to it; and

5.  that Elhorn's Rule 12(b)(6) motion to dismiss for failure to state a federal claim (ECF No. 84) be granted and that Counts III and IV be dismissed with prejudice as to it.

In addition, and for the reasons articulated above, the undersigned judicial officer recommends that the Court decline to exercise supplemental jurisdiction and dismiss the state-law claims – Counts VII and VIII – without prejudice, and to close this case.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: June 1, 2023                              /s/ Phillip J. Green
                                                PHILLIP J. GREEN
                                                United States Magistrate Judge