# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*A.M., a minor, by and through Iesha*
*Mitchell, Guardian and Next Friend, et al.,*

      Plaintiffs,

v.

*Liesl Clark, Eric Oswald, Ernest Sarkipato,*
*Brandon Onan, et al.*

      Defendants.

_____/

Case No. 1:22-cv-0475

Hon. Hala Y. Jarbou
Hon. Philip J. Green
**Oral Argument Requested**

### *MITCHELL* PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE GREEN'S REPORT AND RECOMMENDATION [ECF NO. 120] **\*\*ORAL ARGUMENT REQUESTED\*\***

**LEVY KONIGSBERG LLP**

/s/Corey M. Stern
Corey M. Stern
605 Third Ave., 33rd Floor
New York, New York 10158
(212) 605-6298
cstern@levylaw.com

/s/ Melanie Daly
Melanie Daly
605 Third Ave., 33rd Floor
New York, New York 10158
(212) 605-6298
mdaly@levylaw.com

*Attorneys for Plaintiffs*

## **Table of Contents**

CONCISE STATEMENT IN SUPPORT OF PLAINTIFFS' POSITION ...............1

PROCEDURAL BACKGROUND ..........................................................................1

FACTUAL BACKGROUND ................................................................................3

STANDARD OF REVIEW.....................................................................................4

OBJECTIONS .........................................................................................................5

I.    Objection No 1: The R&R Impermissibly Considered,
      Interpreted, and Relied upon Facts set forth by State
      Defendants ...............................................................................5

II.   Objection No. 2: The R&R Erred in Recommending
      Dismissal of Plaintiffs' Bodily Integrity Claims Against the
      State and City Defendants ......................................................6

      A.    Despite the R&R's Conclusion to the Contrary, the
            Benton Harbor Water Crisis is analogous to the Flint
            Water Crisis, and in any event, it was not required to
            be for Defendants' behavior to be considered conscious
            shocking. ..........................................................................7

      B.    The R&R's analysis was incomplete and contrary to
            Supreme Court and Sixth Circuit jurisprudence. ..................12

            1.   The conscious shocking standard applied by the
                 R&R was contrary to Supreme Court jurisprudence.
                 ........................................................................12

            2.   The R&R's analysis was incomplete insofar as it
                 failed to assess Sixth Circuit considerations that
                 bear on whether deliberate indifference amounts to
                 conscious shocking behavior.............................13

            3.   The R&R's conscious shocking analysis did not
                 consider Defendants' awareness of risk as required
                 by the Sixth Circuit. ........................................16

C.    **The R&R's analysis of Plaintiffs' specific allegations as to each Defendant was flawed because it did not apply the appropriate Sixth Circuit standard on a 12(b)(6) motion to dismiss.** ...........................................19

    1.    EGLE Director Liesl Clark ...................................21

    2.    EGLE Drinking Water Director Eric Oswald ...................23

    3.    EGLE Surface Water Treatment Specialist Ernest Sarkipato ...........................................25

    4.    EGLE Lead and Copper Unit Supervisor Brandon Onan ...........................................29

    5.    Benton Harbor Mayor Marcus Muhammad .......................30

    6.    Former Benton Harbor Water Plant Manager Michael O'Malley ...........................................31

    7.    Benton Harbor City Manager Darwin Watson ...................33

**VI.**    **Objection No. 6: The R&R Erred in Recommending Dismissal of Plaintiffs' Claims Against The Engineering Defendants** ...........................................41

    **A.**    **Plaintiffs plausibly alleged that F&V and Elhorn are state actors.** ...........................................41

    **B.**    **Plaintiffs plausibly alleged a substantive due process violation for bodily integrity.** ...........................................44

**VII.**    **Objection No. 7: The R&R Erred in Recommending that the Court Decline to Exercise Supplemental Jurisdiction** ...........................................45

**CONCLUSION** ...........................................45

**CERTIFICATE OF COMPLIANCE** ...........................................47

**CERTIFICATE OF SERVICE** ...........................................48

## <u>Table of Authorities</u>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...............................................................19, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................19, 22

*Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017)..........................................................10

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
     531 U.S. 288 (2001)..............................................................................................43

*Brown v. Matauszak*, 415 F. App'x 608 (6th Cir. 2011) ..........................................38

*Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812 (6th Cir. 2010) .......................5

*Cagayat v. United Collection Bureau, Inc*, 952 F.3d 749 (6th Cir. 2020) .............27

*Carthan v. Snyder,* 384 F. Supp. 3d 802 (E.D. Mich. 2019) ...................................36

*Cates v. Crystal Clear Techs.*, LLC, 874 F.3d 530 (6th Cir. 2017) .................20, 38

*Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir. 2003) ...........................................43

*Cope v. Gateway Area Dev. Dist., Inc.*, 624 Fed. App'x. 398 (6th Cir.
     2015) .....................................................................................................................21

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ...............................12, 13, 14

*Crugher v. Prelesnik*, 761 F.3d 610 (6th Cir. 2014).................................................20

*DELLIS v. Corr. Corp. OF Am.,* 257 F.3d 508 (6th Cir. 2001) ..............................30

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002)...................................14

*Frees v. Duby*, No. 1:10-cv-609, 2010 U.S. Dist. LEXIS 125265 (W.D.
     Mich. Nov. 29, 2010)..............................................................................................5

*Grinter v. Knight*, 532 F.3d 567 (6th Cir. 2008) .....................................................24

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019) ........................................ passim

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529 (6th Cir. 2008) ...................................................................................13, 15

*In re Flint Water Cases*, 384 F. Supp. 3d 802 (E.D. Mich. 2019) .........................39

*J.W. v. City of Jackson*, No. 3:21-CV-663-CWR-LGI, 2023 U.S. Dist. LEXIS 50424 (S.D. Miss. Mar. 23, 2023) ............................................................11

*Jackson v. Corizon Health, Inc.*, No. 2:19-CV-13382-TGB, 2020 U.S. Dist. LEXIS 113536 (E.D. Mich. June 17, 2020)................................................37

*Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006) .............................................40, 41

*Kostrzewski v. City of Wyo.*, No. 1:20-cv-682, 2021 U.S. Dist. LEXIS 229410 (W.D. Mich. May 6, 2021) ....................................................................40

*Ky. Tax Bill Servicing v. City of Covington*, No. 19-188-DLB-CJS, 2021 U.S. Dist. LEXIS 23444 (E.D. Ky. Feb. 8, 2021)................................................43

*M.S. by Covington v. Hamilton Cnty. Dep't of Educ.*, 756 F. App'x 510, 517 (6th Cir. 2018)...............................................................................13

*Marie v. Am. Red Cross,* 771 F.3d 344 (6th Cir. 2014)...........................................43

*McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006) ............................41

*Minges v. Butler Cnty. Agric. Soc'y*, 585 F. App'x 879 (6th Cir. 2014)................44

*O'Brien v. New Buffalo Twp.*, No. 1:01-CV-365, 2003 U.S. Dist. LEXIS 12824 (W.D. Mich. July 21, 2003) ................................................................42, 43

*Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000) ...................................................20

*Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir. 2012) .....................................................................................................10

*Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*, 894 F.3d 235 (6th Cir. 2018) .........................................................................5

*Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014) ........................................... passim

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982).........................................................42

*Scott v. Ambani*, 577 F.3d 642 (6th Cir. 2009)..................................................20, 21

*Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546 (6th Cir. 2008) ................................44

*Shimmel v. Mich. Dep't of Corr.*, No. 1:21-cv-358, 2023 U.S. Dist. LEXIS 46577 (W.D. Mich. Mar. 20, 2023)............................................4

*Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348 (6th Cir. 2014) ..................................................................................22

*Sifuentes v. Slickwraps*, No. 1:22-cv-1142, 2023 U.S. Dist. LEXIS 49970 (W.D. Mich. Mar. 24, 2023) ............................................................4

*Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308 (2007) ......................20

*Tolliver v. Noble*, 752 F. App'x 254 (6th Cir. 2018)................................................39

*Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303 (6th Cir. 2020)..........27, 36

*Waller v. Trippett*, 49 Fed. Appx. 45 (6th Cir. 2002)..............................................40

*Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015); .......................................21

*West v. Atkins*, 487 U.S. 42 (1988)........................................................................43

*Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006)...............................20

**Statutes**
28 U.S.C. § 636(b)(1)(C)............................................................................2

42 U.S.C. § 1983 ....................................................................................2

Fed. R. Civ. P. 72(b)(3) .............................................................................4

Rule 12(b)(6) ........................................................................20, 22, 37, 38

**Other Authorities**
Benton Harbor City Charter, § 3.39; § 11.11; § 11.12 ...........................................14

Benton Harbor, Mich., Code of Ordinances, § 2–64...............................................14

Benton Harbor, Mich., Code of Ordinances, § 44-19, § 44-16; § 44-1;
§ 11-142 ...........................................................................................................14

Elhorn Website, "*Water Purification Chemicals*"
https://www.elhorn.com/chemicals......................................................................44

EPA Recommendations, https://www.epa.gov/sites/default/files/2016-
03/documents/occtmarch2016.pdf at 43-49, 80..................................................17

**CONCISE STATEMENT IN SUPPORT OF PLAINTIFFS' POSITION**

The Constitutional Rights of the lead poisoned children in Benton Harbor are not less deserving of protection just because they do not live in Flint. The Honorable Magistrate Judge Phillip J. Green (hereafter respectfully referred to as "the Magistrate") issued a Report and Recommendation ("R&R), which erroneously held Plaintiffs to a higher pleading standard than is permissible at this stage in the litigation. Because the R&R's analysis of Plaintiffs' claims failed to adhere to the standards set forth by the United States Court of Appeals for the Sixth Circuit (the "Sixth Circuit"), following the recommendation will constitute reversible error. Therefore, Plaintiffs respectfully request that the Court reject the recommendation, deny the pending motions to dismiss, and exercise supplemental jurisdiction over Plaintiffs' state law claims.

**PROCEDURAL BACKGROUND**

Individual children in Benton Harbor, the *Mitchell* Plaintiffs,[1] filed suit for lead poisoning injuries resulting from lead contaminated water in Benton Harbor's public water system. Plaintiffs raised six claims and named ten defendants whose conduct caused this crisis, including officials from the State of Michigan's

---

[1] Plaintiffs incorporate by reference as if fully stated herein those objections made in *Braziel v. Whitmer*, Case No. 1:21-cv-960, which address the R&R's erroneous recommendations as to the same or similar claims brought by Plaintiffs here.

Department of Environment, Great Lakes, and Energy (EGLE) ("State Defendants"), the City of Benton Harbor and certain of its present and former municipal officials ("City Defendants"), and two private engineering firms: F&V Operations and Resource Management, Inc. ("F&V") and Elhorn Engineering Company ("Elhorn"). *Mitchell*, 1:22-cv-00475, ECF No. 1 ("Compl."). Specifically, Plaintiffs brought claims pursuant to 42 U.S.C. § 1983 against all Defendants and State law claims against each of the Engineering Defendants. All Defendants moved to dismiss the federal claims against them,[2] and Plaintiffs opposed. ECF No. 101, 102, 103, 104. On May 8, 2023, the Magistrate held oral argument on the motions. ECF No. 119. Thereafter, on June 1, 2023, the Magistrate issued a report and recommendation, recommending dismissal of Plaintiffs' federal claims with prejudice and for the Court to decline to exercise supplemental jurisdiction over the state-law claims and to dismiss them without prejudice. ECF No. 120 ("R&R."). These timely objections followed.[3]

---

[2] City Defendants also filed a motion to dismiss for failure to state a claim, ECF No. 93 (Mot.); 94 (Br.), but that only challenged the Grant Plaintiffs' Complaint.

[3] Per the R&R and 28 U.S.C. § 636(b)(1)(C), objections are due to the Court on June 15, 2023.

## FACTUAL BACKGROUND

When a community is faced with a lead action level exceedance there are three cornerstones that require urgent attention in order to avoid a crisis: corrosion control; a properly functioning water treatment plant; and transparency in communications with the public. In Benton Harbor, hundreds of individual children were lead poisoned and permanently damaged because Defendants responsible for those three cornerstones were callously and deliberately indifferent in their conduct in the following ways:

- Eric Oswald, EGLE Director of Drinking Water and Environmental Health; Brandon Onan, EGLE Lead and Copper Unit Supervisor, EGLE Ernest Sarkipato, Surface Water Treatment Specialist, and Liesl Clark, Director of EGLE approved the use and continued use of a dangerous corrosion inhibitor; allowed it to be administered without the appropriate safeguards; and lied about its effectiveness knowing lead levels were actually increasing.

- The City of Benton Harbor and its Mayor, Marcus Muhammad, City Manager, Darwin Watson, and Drinking Water Superintendent Michael O'Malley implemented the use of this corrosion inhibitor; lied about its effectiveness; and lied about the seriousness of the crisis and the safety of the water.

- Elhorn initially and continued to recommend the same unlawful and dangerous corrosion control strategy at every turn.

-  F&V led the water treatment plant into disarray.

Individually and collectively, these acts and omissions caused Plainitffs to suffer permanent brain damage and violated their constitutional rights.

3

## STANDARD OF REVIEW

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the district judge must review any part of a magistrate judge's disposition which has been objected to under a *de novo* standard of review. Subsequently, the district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. Fed. R. Civ. P. 72(b)(3); *Shimmel v. Mich. Dep't of Corr.*, No. 1:21-cv-358, 2023 U.S. Dist. LEXIS 46577, at *2 (W.D. Mich. Mar. 20, 2023).[4]

In reviewing a magistrate judge's disposition, the district court conducts its own review of the record and is not bound by the findings or conclusions of the magistrate. *De novo* review in these circumstances "requires at least a review of the evidence before the Magistrate Judge." *Sifuentes v. Slickwraps*, No. 1:22-cv-1142, 2023 U.S. Dist. LEXIS 49970, at *2 (W.D. Mich. Mar. 24, 2023); *Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981).

---

[4] Unless indicated otherwise, case quotes are "cleaned up" throughout, i.e., internal quotation marks and citations are omitted.

## OBJECTIONS

I.   **Objection No 1: The R&R Impermissibly Considered, Interpreted, and Relied upon Facts set forth by State Defendants**

In setting forth the factual background, the R&R impermissibly relied on the State Defendants' exhibits. R&R, PageID.1813-1821; *see Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010) (courts are "limited" to the Plaintiffs' pleading on 12(b)(6) motions). The R&R's substantial reliance on a declaration of State Defendant Brandon Onan is especially concerning. *See* R&R, PageID.1815, 1817, 1818, 1819, 1820. This one-sided declaration authored by Defendant Onan (likely with the help of counsel) is not the kind of document that can be considered at this stage under the "limited" judicial notice exception. *Frees v. Duby*, No. 1:10-cv-609, 2010 U.S. Dist. LEXIS 125265, at *7 (W.D. Mich. Nov. 29, 2010) (explaining that judicial notice exception is strictly "limited to documents capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *see also Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*, 894 F.3d 235, 245 (6th Cir. 2018) ("[Judicial notice] is limited: a court may take notice of the documents and what they say, but it [cannot] consider the statements contained in the document for the truth of the matter asserted.").

Although the R&R did state that it had "not considered anything contained in the cited exhibits in making any of the recommendations," it also explained that this

5

type of information was "useful context to the issues addressed herein." R&R, PageID.1813.[5] It is hard to reconcile how the utilization of a self-serving declaration, for context, does not constitute "consideration." Moreover, the "issues addressed" were the plausibility of Plaintiffs' allegations, and so, by relying on Defendants' exhibits as context for assessing those issues, the R&R necessarily and impermissibly construed facts in the Defendants' favor.

For these reasons, the Court should wholly reject the "Background of This Case" section of the R&R and disregard it in assessing Plaintiffs' allegations. Instead, Plaintiffs respectfully refer the Court to the comprehensive factual summary set forth in their oppositions to the City and State Defendants' motions as well as in their Complaint. *See* ECF No. 101, PageID.1287-1304; ECF No. 102, PageID.1343-1354; Compl, PageID.40-88.

## II.     Objection No. 2: The R&R Erred in Recommending Dismissal of Plaintiffs' Bodily Integrity Claims Against the State and City Defendants

The R&R concluded that Plaintiffs failed to allege plausible facts showing that State and City Defendants engaged in conscious shocking conduct, R&R, PageID.1843-1861. For the following reasons, the Court should reject the recommendation to dismiss Plaintiffs' bodily integrity claims.

---

[5] State Defendants' responsive pleadings included 49 exhibits, including the Onan declaration, none of which should have been considered on a 12(b)(6) motion to dismiss. *See* ECF No. 101, PageID.1305-1308.

**A. Despite the R&R's Conclusion to the Contrary, the Benton Harbor Water Crisis is analogous to the Flint Water Crisis, and in any event, it was not required to be for Defendants' behavior to be considered conscious shocking.**

The R&R's conclusion that Defendants' conduct was not conscious shocking can be boiled down to a single foundational finding: "This is not flint." R&R, PageID.1859-1861; *see also* PageID.1809. But this conclusion and its underlying reasoning are incorrect for the following reasons.

First, the Benton Harbor Water Crisis is analogous to the Flint Water Crisis, as is the underlying conduct of City and State officials prior to and during both. In Flint and Benton Harbor, what qualifies each as a "crisis" (and is foundational to claims for bodily integrity) is the same—children were unknowingly exposed to lead contaminated water for prolonged periods of time. While the catalyst for the crisis in Flint was a decision to switch water sources, what ultimately caused the crisis was two-fold: (1) City and State officials' and engineers' ongoing and deliberately indifferent decisions regarding a corrosive water source; and (2) their public misinformation campaigns about the water's safety.

In *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019), the Sixth Circuit found individuals who took part in **either** (or both) of those activities to have acted in a conscious shocking manner. Specifically, for City officials, by making the decision to switch sources despite warnings about the source and the ability of the water treatment plant to treat that source; by ignoring warnings about how to effectively

7

treat the new water source **after the switch occurred**; by making statements that the water was safe to drink **after the switch occurred**; and by continuing to utilize a corrosive water source despite knowing that it was causing lead contamination. *Id.* at 926-927. As to the MDEQ (now known as EGLE), the Court held that officials' conduct rose to an actionable level when they authorized the use and improper treatment of the corrosive water source, and/or falsely assured the public that the water was safe **after the switch occurred**. *Id.* at 927-929.

In Benton Harbor, while there was no source switch, what caused the crisis (children drinking lead contaminated water for a prolonged period of time) is the *same conduct* that caused the crisis in Flint: City and State officials and private engineers ignored warnings about how to effectively treat the water; they made statements that the water was safe to drink; and they continued to utilize a corrosion inhibitor that not only failed to inhibit corrosion, but made it worse and prolonged the amount of time children were exposed to lead contaminated water. The only difference being in Flint, the actionable conduct related to an initial choice to use and the continued use of a ***corrosive water source*** without proper treatment, despite knowledge it may result in increased lead levels. Whereas in Benton Harbor, the actionable conduct relates to an initial choice to use and the continued use of an *ineffective corrosion control treatment* (Carus 8600) ***on a corrosive water source***,

despite knowledge it could result in increased lead levels which were already above the action level.[6]

Contrary to the R&R's conclusion and attempt to compare Plaintiffs allegations to those that were dismissed in *Guertin*, Plaintiffs' allegations are distinct from those which the *Guertin* Court found to be lacking to rise to the level of conscious shocking. In *Guertin*, the Court ruled that some allegations were insufficient where there were "**no facts connecting** [officials] to the switch to the Flint River or the decision not to treat the water, and there [was] **no allegation that they took any action causing plaintiffs to consume the lead-contaminated water**." *Id.* at 930 (emphasis added). Or when "plaintiffs [did] not factually link [official's conduct] to causing Flint residents to consume (or continue to consume) lead-tainted water." *Id.* at 932 (emphasis added).

Unlike those rejected allegations, here, Plaintiffs do allege facts connecting the City and State Defendants to the underlying decisions to use and continue to use Carus 8600 (which like the switch and decision not to treat the water in Flint, resulted in increase in lead levels), and do include allegations that these defendants took actions falsely assuring the public that the water was safe (which like the Flint

---

[6] In other words, the fact that there was no switch of water source which started the crisis in Benton Harbor is inconsequential to the constitutional analysis. The Court may consider the decision to use and continue to use Carus 8600 as equivalent to decision to switch and continue to use the Flint River.

officials'' lies, caused the minor Plaintiffs' to consume the water).[7] Under *Guertin*, this is absolutely sufficient to support a finding of conscious shocking behavior. *See Guertin*, 912 F.3d at 926-929.

Second, and notwithstanding the distinct parallels between government officials' conduct in Flint and Benton Harbor, the reasoning that their conduct must match in order to be considered unconstitutional is flawed. Plaintiffs need not show that City and State Defendants in Benton Harbor initially caused the lead contamination to plausibly allege bodily integrity claims. To show that a "person's fundamental right to bodily integrity has been violated, a Plaintiff does not need to establish any constitutional significance to the means by which the harm occurs." *Boler v. Earley*, 865 F.3d 391, 408 n.4 (6th Cir. 2017) (emphasis added). Rather, bodily integrity is more broadly defined as the right "to be free from forcible intrusions on their bodies against their will, absent a compelling state interest." *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012); *see also Guertin*, 912 F.3d at 919. Plaintiffs can (and do) plausibly allege a bodily integrity claim based on allegations that these Defendants took actions that increased lead levels in the water, and increased the likelihood Plaintiffs would be exposed to contaminated water.

---

[7] The specific allegations as to each defendant is detailed below.

Moreover, the initial conduct exhibited by officials in Flint is not the floor for liability. In recognizing the rights of Flint children, neither the District Court nor the Sixth Circuit held that what occurred constitutes the minimum requirement for liability, such that any conduct not as bad would fail to constitute conscious shocking behavior. In that regard, courts found conscious shocking behavior before *Guertin,* and continue to find conscious shocking behavior without relying expressly on *Guertin* as the measure of actionable conduct. Indeed, the Southern District of Mississippi recently ruled:

> What makes the allegations here conscience-shocking (and therefore unconstitutional) is the way the City and State [defendants] handled the situation. Upon learning of the toxic levels of lead in the City's water supply, the defendants did not move residents to a safer water system, allocate additional funding to fix the existing system, or even timely warn residents of the dangers lurking in their pipes.

*J.W. v. City of Jackson*, No. 3:21-CV-663-CWR-LGI, 2023 U.S. Dist. LEXIS 50424, at *92 (S.D. Miss. Mar. 23, 2023).

Finally, it is also worth noting that the conduct here is arguably worse than that in Flint for at least three reasons. One, the children in Benton Harbor were exposed to lead contaminated water for approximately twice as long as children were in Flint. ECF No. 119, PageID.1725. Two, the Defendants' deliberate conduct occurred after they already knew that the lead levels were outrageously above the

11

action level[8] (as opposed to Flint officials – some of who's conduct occurred before there were and certainly before they knew of unsafe lead levels). Three, Defendants here were intimately aware of the Flint Water Crisis and because of that, for lack of better phrase, should have been on high alert and hyper-focused on protecting children in Benton Harbor.

### B. The R&R's analysis was incomplete and contrary to Supreme Court and Sixth Circuit jurisprudence.

1. <u>The conscious shocking standard applied by the R&R was contrary to Supreme Court jurisprudence.</u>

Indeed, the R&R's analysis did exactly what the Supreme Court has previously cautioned against in undertaking a conscious shocking analysis. In *County of Sacramento v. Lewis,* the Supreme Court held that:

> Rules of due process are not, however, subject to mechanical application … Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking.

523 U.S. 833, 850 (1998).

The R&R's analysis runs afoul of this principal. Instead of considering the context and circumstances of what happened in Benton Harbor, the analysis

---

[8] At one point, after the implementation of Carus 8600 and the involvement of City and State Defendants, the highest sample test (from a sample of only 79 locations) came in at 889 ppb. That is **874 ppb higher** than the 15 ppb action level. Compl., PageID.78 (¶306).

mechanically applied *Guertin* as a "calibrated yardstick" for what constitutes conscious shocking conduct. *Lewis*, 523 U.S. at 850 ("the measure of what is conscience-shocking is no calibrated yard stick"); *see also M.S. by Covington v. Hamilton Cnty. Dep't of Educ.,* 756 F. App'x 510, 517 (6th Cir. 2018) (shock-the-conscience claim inquiry "demands an exact analysis of circumstances")

2. The R&R's analysis was incomplete insofar as it failed to assess Sixth Circuit considerations that bear on whether deliberate indifference amounts to conscious shocking behavior.

The concept of unconstitutional conscious shocking conduct is based on a spectrum: allegations of negligent conduct is categorically not sufficient, whereas intentional injury almost always is. *See Lewis*, 523 U.S. at 836. When allegations fall in the middle of this spectrum, as is the case here, the Sixth Circuit has set forth specific factors that must be considered. *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014); *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 536 (6th Cir. 2008); *see also Guertin*, 912 F.3d at 924-926. These considerations include: (1) the time for deliberation; (2) the nature of the relationship between the state actor and the plaintiff; and (3) whether a legitimate purpose motivated the conduct. *Guertin*, 912 F.3d at 924. The R&R did not analyze or apply these factors.

Of the three factors, particularly important is the availability of time for deliberation. The Sixth Circuit has held that a "critical question in deliberate indifference cases is 'whether the circumstances allowed the state actors time to fully

consider the potential consequences of their conduct.'" *Range*, 763 F.3d at 590

(quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). Here,

City and State Defendants had significant and sufficient time to deliberate before

each of their actions and omissions. Compl., PageID.96 (¶401). All of the alleged

conduct "took place over a series of days, weeks, months, and years, and did not

arise out of time-is-of-the-essence necessity." *Guertin*, 912 F.3d at 923-924. This

weighs heavily in favor of finding deliberate indifference. *Lewis*, 523 U.S. at 853

(When actors have "time to make unhurried judgments, upon the chance for repeated

reflection, largely uncomplicated by the pulls of competing obligations …

indifference is truly shocking.").

The remaining factors also weigh strongly in favor of finding conscious

shocking conduct. The nature of the relationship here is involuntary. Regarding City

Defendants: Plaintiffs were <u>required</u> to receive water from the public water supply,

Benton Harbor, Mich., Code of Ordinances, § 44-19, § 44-16; § 44-1; § 11-142, and

that water supply is controlled by Benton Harbor, Benton Harbor City Charter,

§ 3.39; § 11.11; § 11.12; Benton Harbor, Mich., Code of Ordinances, § 2–64.

Regarding State Defendants: Michigan law mandates that the EGLE (as the Primacy

Agency for the state) enforce safe drinking water standards for Benton Harbor's

water supply, meaning that State Defendants were charged with approving corrosion

control proposals and holding Benton Harbor officials accountable for deviations

from statutory requirements that threaten public health. Compl., PageID.35-37, 46-46 (¶¶65-73; ¶¶118-123).

Moreover, City and State Defendants' assurances regarding the water's safety, and their minimization of the risks associated therewith, misled Plaintiffs so that they continued to be exposed to the water, effectively making said exposure to lead involuntary and robbing them of the ability to make an informed choice. This entire scheme of control is directly analogous to what the Sixth Circuit found created an involuntary relationship in Flint. *See Guertin*, 912 F.3d at 925-926.[9]

Finally, there was absolutely no legitimate governmental purpose for permitting the continuation of contamination in Benton Harbor's water for at least three years, nor have Defendants credibly stated one. And even if they had "act[ed] merely upon a government interest[,] [such] does not remove an actor's decision from the realm of unconstitutional arbitrariness." *Guertin*, 912 F.3d 907 at 926; *see also Hunt*, 542 F.3d at 543. Thus, this factor also weighs in favor of a finding of conscious shocking deliberate indifference.

---

[9] Beyond that, the Complaint explains that Plaintiffs were all minor children at the time they were exposed to contaminated water. Compl., PageID.87 (¶357). Therefore, the Court could reasonably infer that, as minor children, the nature of the relationship is even more involuntary than was true in *Guertin*, because children have virtually no choices as to their water source.

3. <u>The R&R's conscious shocking analysis did not consider Defendants' awareness of risk as required by the Sixth Circuit.</u>

Finally, the R&R failed to consider, as the Sixth Circuit requires, the "entirety of the situation [] including [the] defendant's awareness of the kind and degree of risk." *Range*, 763 F.3d at 591 ("[T]he type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all ***necessary factors*** in determining whether an official was deliberately indifferent.") (emphasis added).

Here, City and State Defendants were individually, collectively, and fundamentally aware of: the **tremendous risk** of increasing (already dangerously high) lead levels in Benton Harbor's water supply if they improperly implemented corrosion controls; the **known risk** that Plaintiffs would continue to be exposed to lead contaminated water if they were not warned about the situation; and of **the serious risks** associated with lead exposure and cognitive brain damage in children.

Specifically, as City officials and EGLE directors, supervisors, and specialists, these Defendants knew the City had lead service lines and homes with lead plumbing, and that the City did not have any corrosion control measures in place. Compl., PageID.36-37; 50-52; 54 (¶¶ 70-73; ¶¶147-157; ¶170). They were also acutely aware that a 2018 sanitary survey uncovered gross deficiencies within the system, such that the system could not defend against lead problems. Compl., PageID. 50-52 (¶¶148-157); *see also* ECF No. 4, PageID.281-285 (Compl. Ex. 4).

Indeed, after the first exceedance, Defendant Oswald conceded the water crisis had been ongoing for an indefinite period of time. Compl., PageID.51 (¶150).

As City officials and members of the primacy agency responsible for implementation and enforcement of drinking water regulations, these Defendants were also aware of requirements in the Lead and Copper Rule (both State and Federal), as well as guidelines from the United States Environmental Protection Agency ("EPA"). Compl., PageID. 35, 46 (¶¶65-66; ¶123). Namely, these Defendants were on notice of the import of corrosion control, and of the high risks associated with using a polyphosphate blend – like Carus 8600 – without applying recommended safeguards.

For example, when a phosphate blend is being considered as a corrosion inhibitor, EPA guidelines provide that "special considerations" must be made and warn that "[b]lended phosphates should be used with caution." This is because polyphosphates are not an effective form of corrosion control[10] and can actually **increase** levels of corrosion and lead contamination. Compl., PageID.48-50 (¶¶136-145); EPA Recommendations, https://www.epa.gov/sites/default/files/2016-03/documents/occtmarch2016.pdf at 43-49, 80. Therefore, the EPA recommends

---

[10] Specifically, the polyphosphate portion of the blend my counteract the benefit of the orthophosphate portion, leading to poor corrosion control. *See* https://www.epa.gov/sites/default/files/2016-03/documents/occtmarch2016.pdf at pdf. 49.

that anyone considering the use of a polyphosphate should first consider other corrosion inhibitors based on pH levels in the water,[11] and conduct a corrosion control study *or* provide additional monitoring. *Id.* at 32-41, 48-49. But in water systems with lead service lines, like Benton Harbor, the EPA guidelines provide that the State primacy agency (EGLE) should "require" a corrosion control study. *Id.* at 53. City and State Defendants were on notice of and fully aware of this information and guidance, yet none of these measures were taken prior to implementing Carus 8600.

There is also no doubt that these Defendants were keenly aware that without proper warnings, and worse yet by publicly insisting that the water was safe, minor Plaintiffs' exposure to contaminated water would continue. Further, these Defendants were certainly aware of the serious risks that lead exposure poses for children. Reputable organizations like the World Health Organization and the EPA have readily available literature, explaining that lead affects children's brain development in a permanent and irreversible way——resulting in reduced intelligence quotient and severe behavioral changes. It is also well known that exposure to even very low levels of lead has been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired

---

[11] The EPA has provided guidance for the preliminary identification of corrosion control inhibitors based on the pH levels detected in finished water samples. ECF No. 1-12, PageID.222 (Compl. Ex. 13).

hearing, and impaired formation and function of blood cells. Compl., PageID. 82-86 (¶¶ 336-352).

Overall, it is important to recognize that here, the "probability of harm [] was substantial," the "harm at issue" is devastatingly "serious" for the minor Plaintiffs, and there are allegations and "evidence from which a jury could find that the defendants knew of the scope and substance of the risk." *Range*, 763 F.3d at 591 (listing cases). If the R&R had included an analysis of Plaintiffs' allegations regarding State and City Defendants' awareness of these risks, then it would have found that Plaintiffs plausibly alleged conscious shocking conduct as to these Defendants. Accordingly, the Court should reject the R&R's conscious shocking analysis.

### C. The R&R's analysis of Plaintiffs' specific allegations as to each Defendant was flawed because it did not apply the appropriate Sixth Circuit standard on a 12(b)(6) motion to dismiss.

The R&R failed to apply the appropriate standard in evaluating Plaintiffs' Complaint. To survive a 12(b)(6) motion to dismiss, a complaint need only "state a claim to relief that is **plausible on its face**." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added). A complaint need not contain "detailed factual allegations" in order to be considered plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "This standard **does not impose a probability requirement** at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation

19

that discovery will reveal evidence of illegal [conduct.]" *Cates v. Crystal Clear Techs.*, LLC, 874 F.3d 530, 534 (6th Cir. 2017).

While the allegations contained in Plaintiffs' Complaint far exceed what is required, in evaluating whether a complaint meets the minimal standard, the Sixth Circuit provides that judges must **accept the complaint's allegations as true** and **draw all reasonable inferences in favor of the Plaintiff**.[12] *Crugher v. Prelesnik*, 761 F.3d 610, 613 (6th Cir. 2014). Because of this, it is impermissible for a judge to go "beyond the pleading and engage[] in fact finding" at the Rule 12(b)(6) stage, *Perry v. McGinnis*, 209 F.3d 597, 607 (6th Cir. 2000). The judge's "function is **not to weigh** the evidence." *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006). Finally, in the Sixth Circuit, "[d]ismissals of complaints under the civil rights statutes are scrutinized with special care." *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009) (emphasis added).

Here, the R&R violated each of these Sixth Circuit standards. As set forth specifically below, it did not accept Plaintiffs' allegations as true; went beyond the pleadings to engage in fact finding; and construed facts and inferences in the Defendants' favor. These errors result in the "critical threshold error" of improperly

---

[12] Courts must also "consider the complaint in its entirety," including documents incorporated therein by reference. *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 322 (2007).

holding Plaintiffs to a significantly higher standard than is permitted at this juncture. *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015); *Cope v. Gateway Area Dev. Dist., Inc*., 624 Fed. App'x. 398, 402 (6th Cir. 2015) (A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts to support his claim which would entitle him to relief.").

Because the R&R did not apply the proper standards, this Court can scrutinize the analysis of Plaintiffs' specific allegations "with special care," *Scott*, 577 F.3d at 646, choose to reject the analysis of Plaintiffs' allegations, and permit Plaintiffs claims to proceed against all of the defendants.

### 1. EGLE Director Liesl Clark

The R&R incorrectly found that Plaintiffs' bodily integrity claim against Director Clark "rests on purely conclusory assertions of liability and one specific instance in which she was arguably less than candid with a committee of the state legislature." R&R, PageID.1845.

First, Plaintiffs' allegations are not conclusory. They alleged that Clark was the Director of EGLE—the agency responsible for the implementation and enforcement of state and federal drinking water regulations—during all relevant times of the Benton Harbor Water Crisis. And they allege she "was deliberately indifferent to the suffering and injuries to Plaintiffs when she made decisions and statements that concealed and prolonged the current public health crisis." Compl.,

PageID.35-36 (¶65, ¶70). These allegations are not conclusory. *See, e.g., Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 361 (6th Cir. 2014) (ruling that an allegation which stated that defendant "made decisions about the district's response to that harassment" constituted a specific allegation). Rather, this allegation is sufficient for the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. By requiring more, the R&R erroneously created a heightened pleading standard. *See Twombly*, 550 U.S. at 548 (complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations").

Second, Plaintiffs' allegation that Clark "dodged" questions from Michigan's House Oversight Committee before reluctantly acknowledging that Benton Harbor water was not safe to drink <u>does</u> constitute conscious shocking behavior. This is true even under the R&R's application of its strict *Guertin* yardstick standard. When an entire community is being poisoned by water from their taps, and the Director of the organization charged with ensuring its safety "belittles" that concern by failing to be forthright in a public hearing, such conduct can only be considered conscious shocking. *See Guertin*, 912 F.3d at 928 (conscious shocking when MDEQ employee "belittled, and aggressively dampened attempts by the scientific community to challenge the government's assertions that Flint did not have a problem with its drinking water").

22

This is especially true, when one month prior to the subject hearing Clark was included on a communication with a coded message, which stated: "I warned there are some major red flags. It feels like we are back at square one having not learned much from Flint." *Braziel*, 1:21-cv-00960, ECF No. 68-14, PageID.723 (*Braziel* Compl. Ex. N); ECF No. 172, PageID.4520 (*Braziel* Hearing Tr.). *See Guertin*, 912 F.3d at 928 (conscious shocking when MDEQ official "callously excused Flint's lack of drinking water compliance as "'circumstances happen'").

### 2. EGLE Drinking Water Director Eric Oswald

The R&R found that aside from a "conclusory statement that [] Oswald made 'dishonest' public statements – which is unsupported by any specific allegation of dishonesty – the most that can be gleaned from the complaint is the unsupported inference that [] Oswald's statement about the effectiveness of Carus 8600 was knowingly false, and not simply erroneous." R&R, PageID.1847. This finding was in error.

First, the R&R did not acknowledge Plaintiffs' allegation that Oswald's delay in waiting five months after the first documented lead action level exceedance to issue an Administrative Consent Order ("ACO") allowed for the implementation of an ineffective corrosion control treatment (Carus 8600). Compl., PageID.62 (¶214). And that as a result, lead levels rose even higher than prior to implementing Carus 8600. Compl., PageID.68 (¶249). Nor did the R&R credit Plaintiffs' allegations

regarding Oswald's dishonesty and minimization of the crisis. Namely, that when a concerned environmental law organization (GLELC) warned Oswald of the dangers associated with implementation of Carus 8600, Oswald lied to conceal and minimize the crisis by telling them that the water being treated and distributed by the City was safe. Compl., PageID.67 (¶¶243-244).

Second, Plaintiffs' allegation that Oswald made dishonest public statements is not *conclusory*. Plaintiffs specifically alleged that Oswald "dishonestly and publicly" stated "the results of internal studies indicated [Carus 8600] was effectively reducing corrosion rates." Compl., PageID.67 (¶¶243-244), PageID.67. This is far more specific an allegation than what the Sixth Circuit has deemed conclusory. *Cf. Grinter v. Knight*, 532 F.3d 567, 576 n.5 (6th Cir. 2008) (allegation that simply stated "defendants violated [plaintiff's] equal rights in violation of § 1981" was conclusory).

Moreover, contrary to the R&R's finding, the allegation that Oswald's statement was dishonest *is supported* by facts. As set forth in the allegations and exhibits attached to Plaintiffs' complaint, when Oswald said that corrosion rates were decreasing, corrosion rates were actually increasing. Compl., PageID.68 (¶249). Oswald was also included on correspondence corroborating that Carus 8600 was not achieving desired results, and that the EGLE sought to find new methods to

"more effectively lower corrosion control rates … for greater protection of public health." ECF No. 1-13, PageID.228-29 (Compl. Ex. 14).

Finally, even under the R&R's application of its strict *Guertin* yardstick standard, Plaintiffs have plausibly alleged conscious shocking behavior. *See Guertin*, 912 F.3d at 927-928 (conscious shocking when MDEQ members "did not act on [a] warning" that water treatment plant could not properly treat water and instead told the community that the "MDEQ was 'satisfied with the City's ability to treat water" and "lied" about a "optimized corrosion control program").

### 3. EGLE Surface Water Treatment Specialist Ernest Sarkipato

The R&R incorrectly found that "[s]ingularly lacking is any allegation that Mr. Sarkipato did anything wrong, much less conscience shocking." R&R, PageID.1850. This finding is plainly erroneous.

Plaintiffs specifically allege that Sarkipato made decisions that concealed and prolonged the crisis. Compl., PageID.37 (¶73). A crucial and mandatory lifeline in addressing a lead problem is implementation of optimized corrosion control. Plaintiffs allege that in approving the first permit related to this critical action, Sarkipato was deliberately indifferent to major risks associated therewith.[13] EGLE

---

[13] In addition, it can be reasonably inferred that Sakripato was deliberately indifferent for approving a permit that was fatally flawed for the additional reasons pointed out by the GLELC. ECF No. 1-12, PageID.221-225 (Exhibit 13). Specifically: (1) the corrosion control study proposal did not comply with the

engineers warned Sarkipato that the permit (which included the use of Carus 8600) was deficient as follows: (1) it contained a corrosion control proposal unlike any implemented for communities like Benton Harbor; (2) it was wrought with incorrect calculations; (3) it lacked any information whatsoever as to how Carus 8600 would provide optimal corrosion control; and (4) the permit failed to require a corrosion control study prior to implementing the Carus 8600. Yet, despite these concerns, Sarkipato approved the permit. Compl., PageID.61-62 (¶¶211-213); ECF No. 1-7, PageID.193-197(Compl. Ex. 8); ECF No. 1-8, PageID.198 (Compl. Ex.9).

The R&R did not accept this allegation as true. Instead, the R&R impermissibly weighed the evidence, concluding that the email exchange within an exhibit to Plaintiffs' Complaint "appeared" to show that concerns raised by the EGLE engineers were resolved before the approval of the permit. R&R,

---

requirements of the Michigan or Federal Lead and Copper Rule, in that it only stated that it would test the efficacy of the Carus 8600 blend. And it did not call for the study of different corrosion control treatments (as required by the Michigan and Federal Lead and Copper Rule) or call for the study of variable doses or different blend ratios of Carus 8600; (2) the recommendation to use Carus 8600 did not follow EPA special considerations because Elhorn recommended this corrosion control treatment based on a "generic plan," not the unique conditions present in the Benton Harbor water supply, and failed to take into consideration the use of other potential corrosion control inhibitors listed in EPA guidance documents; and (3) the recommendation to use Carus 8600 as the corrosion inhibitor did not follow EPA guidance, because it recommended a specific dose of Carus 8600, without recommending that a corrosion control study take place first, even though EPA guidelines provide that any system with lead service lines be required to conduct a corrosion control study.

PageID.1848-1849. Thus, the R&R improperly construed facts in Defendants' favor. A review of the email exchange does not conclusively establish that the permit issues were resolved. ECF No. 1-7, PageID.193-197 (Compl. Ex. 8).[14] Nor does it expressly contradict or utterly discredit Plaintiffs' allegations. *See Cagayat v. United Collection Bureau, Inc*, 952 F.3d 749, 755 (6th Cir. 2020) (overturning district court's grant of motion to dismiss because district court erroneously construed Plaintiffs' exhibit in favor of defendants insofar as it did not "sufficiently contradict" Plaintiffs' allegation to make it implausible); *see also Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303, 329 (6th Cir. 2020) ("For a document to contradict the complaint, it must utterly discredit the allegations.")."[15]

The R&R further determined that because Michigan's Lead and Copper Rule does not require a corrosion control study, it was acceptable that Sarkipato approved a permit that did not include one. R&R, PageID.1848-1849; 1849 n.22. Not only does this constitute impermissible fact finding and weighing of evidence, it misses the point of the allegation. Plaintiffs take issue with Sarkipato not recommending a

---

[14] It does reasonably suggest, however, that Sarkipato was fully aware that the poly phosphate blend would almost certainly worsen the situation.  ECF No. 1-7, PageID.194 (Compl. Ex. 8) (Sarkipato: "I recall their concerns being the poly portion of the blend may be too high **and counterproductive** above this amount. I wonder if [Elhorn] would provide supporting science for this!?")

[15] Moreover, there is plenty of factual content that clearly supports the inference that this Sarkipato's approval of the permit was not only wrong but conscious shocking activity: the feeding of Carus 8600 actually increased the presence of lead in the public drinking water supply. Compl., PageID.65 (¶232-235).

corrosion control study because it goes against EPA guidance, not Michigan's Lead and Copper Rule.

The R&R also failed to consider Plaintiffs' allegations that Sarkipato authorized and approved others' conscious shocking decisions. To that end, Sarkipato was aware that and did not intervene when Defendant O'Malley lied to residents in claiming the City was delivering "clean water … to the tap and [they] should have no problem drinking it." Sarkipato knew and did nothing about the City's failure to provide filters or bottled water to its residents. Compl., PageID.59-60 (¶¶198-205); ECF No. 1-4, PageID.162 (Compl. Ex. 5). Sarkipato did not intervene upon learning that a 2021 RFP to address corrosion issues was out of compliance with state and federal regulations, or upon learning that the $50,000 budget associated therewith was wholly insufficient to cover the costs of required testing. Compl., PageID.77 (¶¶299); ECF No. 1-18, PageID.247-249 (Compl. Ex. 19); (email to Sakripato expressing "concern" that the RFP budget was too low to address even a fraction of the work that needed to be done).

These clear and specific allegations, even under the R&R's application of its strict *Guertin* yardstick standard, plausibly allege conscious shocking behavior. *See Guertin*, 912 F.3d at 927-928 (conscious shocking when MDEQ members "did not act on [a] warning" that using the Flint water treatment plant would not properly treat the water); *id.* at 927 (MDEQ defendants who "played a pivotal role in

28

authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications" acted in a conscious shocking manner).

### 4. EGLE Lead and Copper Unit Supervisor Brandon Onan

The R&R found that "allegations against EGLE Supervisor Onan are puzzling" and that "it is difficult to discern what Plaintiffs believe Mr. Onan did wrong, much less that he engaged in conscious-shocking conduct." R&R, PageID.1851. This finding is plainly wrong.

Plaintiffs alleged that when Onan wrote a critical letter to the City, at a pivotal juncture in Benton Harbor's corrosion control story (addressing the ineffectiveness of Carus 8600), **he intentionally omitted an important warning from EGLE Surface Water Treatment Specialist, Bob London**. As a result, the path Onan demanded the City take did not comply with Michigan's Lead and Copper Rule, and resulted in further lead contamination. Compl., PageID.69-70 (¶¶253-258); ECF No. 1-14, PageID.232-233 (Compl. Ex. 15).

The R&R did not accept this allegation as true. Instead, the R&R reasoned that because Plaintiffs did not offer additional evidence showing why Onan's explanation for choosing not to include London's "suggested changes," Plaintiffs allegation should be discredited. R&R, PageID.1851 n.24. This fails to take Plaintiffs' allegation as true and improperly construes the facts in Defendants' favor.

29

First, London's comments were not merely a suggested change, but rather a <u>warning</u> that Onan was "direct[ing]" the City to take a path that did not "follow the requirements of the [Lead and Copper] rule." ECF No. 1-14, PageID.232-233 (Compl. Ex. 15). Second, the point of Plaintiffs' allegation is that Onan was deliberately indifferent in failing to heed the warning, and therefore any justification for failing to do so is irrelevant. If adopted, this finding constitutes reversible error. *See DELLIS v. Corr. Corp. OF Am.,* 257 F.3d 508, 512 (6th Cir. 2001) (vacating dismissal when district court "assumed" defendants' actions were "justified")

Considering all of the above, even under the R&R's application of its strict *Guertin* yardstick standard, these allegations plausibly allege conscious shocking behavior. *Guertin*, 912 F.3d at 927-928 (conscious shocking when MDEQ members "did not act on [a] warning" that using the Flint water treatment plant would not properly treat the water); *id.* ("turning down" an opportunity to address the water issue after knowing of "significant problems with the water were especially egregious").

5. <u>Benton Harbor Mayor Marcus Muhammad</u>

The R&R erroneously found that Plaintiffs' allegations against Muhammad support only "a conclusion that the mayor failed to take sufficient action to deal with the lead contamination in the water, and that he was less than candid with the public

concerning the seriousness of the contamination and what was needed to address the problem." R&R, PageID.1854.

Plaintiffs' allegations and supporting factual content support a reasonable inference that Muhammad's conduct and interactions with the public was far worse than "less than candid." Subsequent to the first documented lead level exceedance, Muhammad **outright lied** to the public at a press conference, assuring the community that the City's water supply issues were not serious. Compl., PageID.55 (¶¶173-174). The next month, Muhammad continued to mislead the public, including Plaintiffs, when he **outright lied** again, stating publicly that the City would replace 40% of service lines (even though he knew there were no funds to do so). Compl., PageID.59 (¶¶196-197).

These allegations support that Muhammad, at the very least, took every opportunity to belittle the water crisis and plausibly allege conscious shocking behavior, even under the R&R's application of its strict *Guertin* standard. *See Guertin*, 912 F.3d at 928 (government official who "belittled" water crisis and announced the water was safe to drink acted with conscious shocking behavior).

6. Former Benton Harbor Water Plant Manager Michael O'Malley

The R&R erroneously found that allegations against O'Malley "may support a conclusion that Mr. O'Malley was negligent, and perhaps that he was guilty of malfeasance," but not conscious shocking conduct. R&R, PageID.1858.

In January 2019, O'Malley lied to Benton Harbor residents, stating that the City was delivering clean water to the tap and that the water was safe to drink. Compl., PageID. 60 (¶200). O'Malley was central to the decision to use Carus 8600, which lead to heightened lead levels and prolonged Plaintiffs' exposure to lead. Compl., PageID.61 (¶¶207-208); ECF No. 1-6, PageID.170 (Compl. Ex. 7). Even worse, he lied, expressing that Carus 8600 was working ahead of schedule, despite knowing that lead levels were worsening. Compl., PageID.68 (¶¶245-249); PageID.65-66 (¶232-240). Further, he continued to submit proposals inclusive of Carus 8600 as the sole corrosion inhibitor, Compl., PageID.74 (¶¶283-285), knowing full well it was having the opposite of its intended effect. Compl. PageID.72-73 (¶¶272- 276); ECF No. 1-16, PageID.240 (Compl. Ex. 17).

These allegations, on their own, are sufficient to find that Plaintiffs plausibly alleged conscious shocking conduct, even under the R&R's application of its strict *Guertin* yardstick standard. *See Guertin*, 912 F.3d at 927 (being central to the decision to use a plant that was not safe and telling citizens that water was safe to drink was conscious shocking); *id.* at 927 (making decisions regarding the water safety despite being aware of "significant problems" was "especially egregious").

Moreover, Plaintiffs' additional allegations go beyond what was determined to be conscious shocking in *Guertin*. Plaintiffs alleged that O'Malley obscured lead testing efforts; refused to disclose the addresses of testing sites to the EGLE;

inexplicably requested the number of sites sampled for lead contamination be reduced; and failed to provide filters or bottled water to anyone in the community––even to homes that tested over the action level. Compl., PageID. 60; 64-65 (¶200; ¶202; ¶¶228-230); *see also* ECF No. 1-4, PageID.162 (Compl. Ex. 5).[16] These allegations certainly "do not comport with traditional ideas of … decency," *Range*, 763 F.3d at 589-590, and therefore the R&R's finding that O'Malley's conduct was merely negligence should be rejected.

### 7. Benton Harbor City Manager Darwin Watson

The R&R incorrectly found that Plaintiffs' allegations against Watson warranted little analysis, because "[t]he most that can be gleaned from [them] is that [] Watson deceived the public for one month regarding the potential cause of the lead contamination." R&R, PageID.1859.

---

[16] Plaintiffs also alleged that O'Malley dishonestly responded to the EGLE's February 2020 letter, which required the City to modify its current corrosion control treatment rates and submit a new corrosion control study proposal. Specifically, Plaintiffs alleged that O'Malley falsely responded: stating they had completed the initial ACO's requirements in March 2019, before Carus 8600 was introduced into the water supply **and** that the requested modifications from the February 2020 letter had been completed. Compl., PageID. 70-71 (¶262; ¶¶265-267); ECF No. 6, PageID.333 (Compl. Ex. 16). The R&R did not accept this allegation as true, construing facts in O'Malley's favor and concluding that his statements were accurate based on a reading of his response. R&R, PageID.1857 n.33. However, this is incorrect, as is evidenced by the EGLE's response, indicating that the requested modifications to the treatment rate were not met. Compl. PageID.72-73 (¶¶272-276); ECF No. 1-16, PageID.240 (Compl. Ex. 17).

Watson outright lied to the public when he stated that Benton Harbor's infrastructure was not comprised of lead lines (knowing full well that the City had already received a grant to replace those lines). He also lied when he claimed that homeowners were responsible for replacing lines that ran from the sidewalk to the house. And in making these false statements, Watson intentionally spun the water crisis as being unrelated to public health, and that any lead problem was isolated to individual plumbing systems, when such was actually a system wide issue, which he knew. Compl., PageID.53-55 (¶¶167-169; ¶175).

This conduct, even under the R&R's application of its strict *Guertin* yardstick standard, is conscious shocking. *See Guertin*, 912 F.3d at 928 (attempt to "spin [water issues] as not related to public health instead of investigating the underlying problem" was conscious shocking).

Moreover, the R&R's finding that Watson only "deceived the public for one month" is erroneous.[17] Plaintiffs did not allege that Watson ever stopped deceiving the public. Rather, Plaintiffs allege that he "backtracked" and covered up his lies by claiming the City was in the process of investigating the source of lead (still knowing

---

[17] This finding is also fails to acknowledge a devastating reality about lead exposure in children. Even brief exposure to a low dose of lead can cause devastating and permanent ailments in children. It is widely understood that there is no known safe blood lead concentration. This fact establishes that any conduct that creates, increases, or prolongs lead exposure for children **for any amount of time** can have a serious, irreversible impact on lives and livelihoods. Compl., PageID. 82-86 (¶¶ 336-356).

and not admitting that the source of the lead was the lead lines which were system wide and which he previously claimed did not exist). Compl., PageID.58 (¶194). This allegation hardly cabins Watson's dishonesty to the period of one month, and to find otherwise, impermissibly construes facts in Watson's favor. *See Fabian v. Fulmer Helmets, Inc*., 628 F.3d 278, 281 (6th Cir. 2010) ("So long as [the Court] can 'draw the reasonable inference that the defendant is liable for the misconduct alleged, a plaintiff's claims must survive a motion to dismiss.").

The R&R also ignored Plaintiffs' allegation that Watson was intimately involved in affirmative steps that created, continued, and worsened the crisis. He was central to decisions regarding the implementation of Carus 8600, allowing it to be fed into the water system prematurely (before a corrosion control treatment study was finalized or conducted, without the ability to meaningfully monitored), and despite knowing that its use and the proposals associated therewith did not comply with state or federal laws and completely disregarded EPA guidelines. *See* ECF No. 1-12, PageID.221-225 (Compl. Ex. 13). It was Watson's name, on behalf of the City, on the original permit application for Carus 8600. And the permit was ultimately issued in his name. ECF No. 1-6, PageID.167 (Compl. Ex. 7); ECF No. 1-11, PageID.219 (Compl. Ex. 12). This is conscious shocking, even under the R&R's application of its strict *Guertin* yardstick standard. *See Guertin*, 912 F.3d at 927

(being central to the decision to use a plant that was not safe was conscious shocking).

Accordingly, Plaintiffs request that the Court wholly reject the R&R's evaluation and analysis of Plaintiffs' specific allegations as to each Defendants' conduct and deny the pending motions to dismiss.

## III.   Objection No. 3: The R&R Erred in Recommending Dismissal of Plaintiffs' *Monell* Claim

The R&R erroneously found that Plaintiffs had not plausibly alleged a *Monell* claim against the City because Plaintiffs failed to plead any policy, practice or custom that purportedly caused the alleged constitutional violation. R&R, PageID.1862. In coming to this finding, the R&R again employed an impermissibly heightened pleading standard by failing to accept Plaintiffs' allegations as true.

In *Carthan v. Snyder*, the Eastern District held that government officials "were final decisionmakers for Flint with respect to the decision to provide residents with contaminated water[,]" and as such, "their actions represented official policy[,] and [the City] could be held liable for their conduct insofar as it violated plaintiffs' rights." 384 F. Supp. 3d 802, 865 (E.D. Mich. 2019).[18]

---

[18] Other parts of this decision were addressed on appeal in *Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303 (6th Cir. 2020). However, the court's *Monell* ruling was not on issue on appeal. *Id.* at 322 n.7

This reasoning equally applies here. Plaintiffs specifically alleged that each City Defendant's conduct represented an official policy, for which Benton Harbor should be held responsible. Compl., PageID.33-34 (¶¶60-62); *see also* Compl., PageID.89,94 (374; 395). This, on its own, is enough to plausibly allege a claim under a *Monell* theory of liability "**sufficient to proceed past the 12(b)(6) stage and into discovery**." *Jackson v. Corizon Health, Inc.*, No. 2:19-CV-13382-TGB, 2020 U.S. Dist. LEXIS 113536, at *10 (E.D. Mich. June 17, 2020) (emphasis added).

Moreover, contrary to the R&R's conclusion, Plaintiffs specifically allege that: "The Defendant City maintained abhorrent policies that consisted of not conducting proper drinking water testing for lead, refusing to report dangerous lead levels in drinking water, working with inept, unqualified, and dangerous contractors, failing to keep records required by federal and state law, allowing false or misleading statements to be issued to the public and to governmental authorities about the safety of the drinking water, and hiding, covering up, and otherwise obscuring the reported levels of lead in the distribution system." Compl., PageID. 93 (¶392). And Plaintiffs clearly linked these policies to the constitutional violations. Compl., PageID.32 (¶59). Accordingly, the Court should reject the R&R's finding that Plaintiffs failed to plausibly allege a *Monell* claim.

**Overall, the R&R analysis, if adopted, constitutes reversible error insofar as it creates a heightened pleading standard for constitutional claims at the**

**motion to dismiss stage.** The R&R fails to apply the appropriate standards and analysis for conscious shocking conduct; ignores crucial allegations; and goes against the well-established Sixth Circuit standard of review for evaluating complaints on a 12(b)(6) motion.

Plaintiffs' have plausibly alleged bodily integrity claims against the City and State Defendants, and at the very least, have set forth enough to "raise a reasonable expectation that discovery will reveal evidence of illegal [conduct.]" *Cates*., LLC, 874 F.3d at 534. Therefore, the Court should permit Plaintiffs' claims to proceed.

### IV. Objection No. 4: The R&R Erred in Recommending Dismissal with Prejudice and Without Leave to Amend

The R&R went against accepted practice in recommending that Plaintiffs' Complaint should be dismissed with prejudice, and without an opportunity to amend. *Brown v. Matauszak*, 415 F. App'x 608, 614 (6th Cir. 2011) ("When a motion to dismiss a complaint is granted, courts typically permit the losing party leave to amend.") (citation omitted); *id.* at 615 ("[I]f a complaint is vulnerable to a motion to dismiss, a district court must first permit the plaintiff to file a curative amendment, even if the plaintiff does not seek leave to amend.").[19] This is especially true in light of the R&R's conclusion that Plaintiffs' "allegations of constitutional harm are long on conclusions and short on specifics," R&R, PageID.1843. *Tolliver v. Noble*, 752

---

[19] Plaintiffs expressly requested the opportunity to amend at oral argument. ECF No. 119, PageID.1737.

F. App'x 254, 263 (6th Cir. 2018) ("Generally, if it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief, the court should dismiss with leave to amend.").

Therefore, even if the Court finds that the recommendation of dismissal is appropriate on the merits, it should reject the recommendation to dismiss the Complaint with prejudice, and permit Plaintiffs the opportunity to amend.

## V.   Objection No. 5: The R&R Erred in Recommending Dismissal of Plaintiffs' State-Created Danger Claims

The R&R erred in finding that Plaintiffs' state-created danger claims were facially deficient on all three elements. As to the first element, the R&R found that "there is nothing in the Complaint that so much as suggests that Plaintiffs suffered any harm from a third party." R&R, PageID.1830. But Plaintiffs plausibly alleged that Defendants' conduct— which increased the lead contamination as well as the risk of the public's continued use of contaminated water—caused the minor Plaintiffs to be harmed by private businesses (restaurants, day cares, schools, bowling alleys, museums, etc.) who served the Plaintiffs lead contaminated water. Compl., PageID. 56,87 (¶183; ¶¶360-361). And contrary to the R&R's finding, this is unlike the argument about "a loving parent, seeking only to provide their child with food or water," rejected in *In re Flint Water Cases*, 384 F. Supp. 3d 802, 864 (E.D. Mich. 2019). The R&R also ignored recent precedent from this Court, which suggests third-party harm need not be so far removed from the Plaintiff. *Kostrzewski*

*v. City of Wyo.*, No. 1:20-cv-682, 2021 U.S. Dist. LEXIS 229410, at *13 (W.D. Mich. May 6, 2021) (finding the third-party act of violence prong to be met by the Plaintiff's own suicide).

As to the second element, the R&R incorrectly found that "Plaintiffs have failed to plausibly allege that they were at a risk greater or different from the rest of the population using that water system." R&R, PageID.1830. First, Plaintiffs *specifically* pled that they were at a greater risk for danger. Indeed, Plaintiffs' Complaint is replete with allegations that lead exposure poses not only a greater danger, but *__the most significant danger__* to children. Compl., PageID.21, 46, 82-84 (¶3; ¶122; ¶338; ¶343-345). Second, the heart of the inquiry is more accurately described as whether Plaintiffs alleged that they belong to a "limited and specifically definable group." *Waller v. Trippett*, 49 Fed. Appx. 45, 50-51 (6th Cir. 2002) ("food service steward at [correctional facility], was a member of a limited and specifically definable group"). In other words, whether "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006). A "charitable reading of the complaint—which the Court is required to perform at this stage—"[20] shows that Plaintiffs have met this standard by identifying 365 minors who resided in the

---

[20] *Kostrzewski,* U.S. Dist. LEXIS 229410 at *13.

4.6 square miles of Benton Harbor, during a known period of lead contamination. Compl., PageID.91 (¶382).

Finally, as to the third element, the R&R found that "Plaintiffs cannot *establish* that the defendants knew or should have known that they could be responsible for specifically endangering Plaintiffs," because "Plaintiffs have failed to plausibly allege that any of the defendants took any action to *cause* the lead contamination in Benton Harbor." R&R, PageID.1831 (emphasis added). Initially, Plaintiffs need not *establish* that Defendants *caused the risk* of harm to plausibly assert a state-created danger claim. Rather, it is sufficient to *allege* that Defendants "*increased the risk*" of harm. *Jones*, 438 F.3d at 690 (emphasis added). Second, as set forth above, and below in Section VI(B), Plaintiffs plausibly alleged that each Defendant acted in a deliberately indifferent and conscious shocking manner. This is sufficient to state a claim. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 469 (6th Cir. 2006) (As to the third element: "We have since clarified that the plaintiff must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment.").

## VI.   Objection No. 6: The R&R Erred in Recommending Dismissal of Plaintiffs' Claims Against The Engineering Defendants

### A. Plaintiffs plausibly alleged that F&V and Elhorn are state actors.

Plaintiffs object to the R&R's analysis on this issue, R&R, PageID.1834-1840, because it ignored the allegations in Plaintiff's Complaint and the arguments

41

in Plaintiffs' opposition briefs (which Plaintiffs refer to and incorporate by reference herein).  ECF No. 103, PageID.1403-1410; ECF No. 104, PageID.1432-1438. Additionally, the R&R's analysis of *O'Brien v. New Buffalo Twp.*, No. 1:01-CV-365, 2003 U.S. Dist. LEXIS 12824, (W.D. Mich. July 21, 2003) is flawed.

In *O'Brien*, this Court ruled that private engineers were considered state actors under the symbiotic relationship/nexus test when the Town and its employees: "relied almost exclusively on" the private engineers for "oversight and advice;" "adopted virtually every recommendation made by" the private engineers; and "considered [one of the private engineers] to be the Township Engineer." *Id.* at *23-24. This is directly analogous to Plaintiffs' allegations against Elhorn & F&V. For example, the City relied exclusively on Elhorn for all of its decisions related to corrosion control and accepted all of their recommendations. *See* ECF No. 1-11, PageID.219 (Compl. Ex. 12) (O'Malley: "Elhorn Engineering is our go-to Contractor for Corrosion Control. They will continue to work with us to evaluate the treatment and [adjust] as needed."). As to F&V, the City considered F&V to be its water treatment plant superintendent and ran the City's day-to-day operations.[21] Compl., PageID.34, 75, 77 (¶64; ¶290, ¶302).

---

[21] As to this allegation, the R&R's reliance on *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) is overly broad. *Rendall-Baker* narrowly held that reliance on a contract, without more, is not sufficient to transform a private entity into a state actor; not that a party is immune from being considered a state actor just because it

In distinguishing *O'Brien*, the R&R impermissibly weighed evidence in Defendants' favor. For example, it stated: "the documents between Benton Harbor and EGLE regarding the permitting process for the use of Carus 8600 indicate that the city was acting on its own behalf, with the benefit of the expertise of the private engineers." R&R, PageID.1837-38. Also, contrary to the R&R's conclusion, *O'Brien* is not an outlier. *O'Brien* applied the symbiotic relationship/nexus test, which has been expressly recognized by the Sixth Circuit. *See, e.g., Marie v. Am. Red Cross,* 771 F.3d 344, 362 (6th Cir. 2014) (citing cases including *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295 (2001)).[22]

Finally, because the inquiry into whether a defendant can qualify as a state actor "is fact-specific, and the presence of state action is determined on a case-by-case basis," *Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir. 2003), it was premature for the R&R to dismiss Plaintiffs' claims before permitting Plaintiffs to undertake discovery. *See Ky. Tax Bill Servicing v. City of Covington*, No. 19-188-DLB-CJS, 2021 U.S. Dist. LEXIS 23444, at *21 (E.D. Ky. Feb. 8, 2021) (ruling that

---

is preforming duties under a contract. *See West v. Atkins*, 487 U.S. 42, 52 n.10 (1988) ("*Rendell-Baker* provide[s] no support for respondent's argument that a physician, employed by the State ..., does not act under color of state law merely because he renders medical care in accordance with professional obligations.").

[22] The R&R cited this case for the proposition that the symbiotic relationship test applied in *O'Brie*n is an outlier.

because the State actor inquiry is specific, "discovery may be beneficial to develop additional facts to support or discredit Plaintiff's claims"); *see also Minges v. Butler Cnty. Agric. Soc'y*, 585 F. App'x 879, 881 (6th Cir. 2014) (same).

### B. Plaintiffs plausibly alleged a substantive due process violation for bodily integrity.

The R&R found "that the complaint says nothing to establish that either [engineering defendant] did anything [] that would 'shock the conscience.'" R&R, PageID.1840. This finding wholly ignores Plaintiffs' specific allegations that:

 F&V led a key component of the water crisis — the water treatment plant — into absolute and utter disarray, which contributed to an increased and prolonged the lead contamination in Benton Harbor. Compl., PageID.34; 75; 78-79; 82; 98  (¶64, ¶290, ¶¶309-317; ¶335; ¶¶412-413).[23] And Elhorn initially and continued to recommend the same unlawful and dangerous corrosion control strategy at every turn, which ultimately resulted in an increase in lead contamination.[24] Compl.,PageID.65-66; 98-99 (¶232-240; ¶¶412-413;); ECF No. 6, PageID.332

---

[23] F&V waived its right to challenge whether Plaintiffs stated a claim of bodily integrity as it did not raise that argument in its motion to dismiss. *See Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008).

[24] Even worse, every action that Elhorn took appears to have been to "justify the use of the Carus 8600 inhibitor" ECF No. 1-12, PageID.22 (Compl. Ex. 13). Thus, rather than consider a safe and compliant option for the citizens of Benton Harbor, Elhorn limited its recommendation to those that *it distributes*. *See* Elhorn Website, "*Water Purification Chemicals*" https://www.elhorn.com/chemicals.

(Compl. Ex. 16); ECF No. 1-16, PageID.240 (Compl. Ex. 17); ECF No. 1-17, PageID.243 (Compl. Ex. 18).

## VII.   Objection No. 7: The R&R Erred in Recommending that the Court Decline to Exercise Supplemental Jurisdiction

Having established that Plaintiffs' federal claims should not be dismissed, the Court should also reject the recommendation to decline to exercise supplemental jurisdiction over the state law claims.[25] Separating the federal claims from the state law claims will greatly prejudice the trial phase of this litigation. In addition, as set forth more fully in Plaintiffs prior submission, ECF No. 75, PageID.595-603,[26] it would be improper to decline to exercise jurisdiction because the principals of judicial economy, convenience, fairness, and comity strongly and fundamentally favor keeping the state and federal claims together, and with this Court.

## CONCLUSION

Considering the foregoing, Plaintiffs respectfully request that the Court reject the recommendation, deny the pending motions to dismiss, and exercise supplemental jurisdiction over Plaintiffs' state law claims.

Dated:        June 15, 2023                    Respectfully submitted,

                                **LEVY KONIGSBERG LLP**

---

[25] Plaintiffs also specifically object to the recommendation that the Court decline to exercise supplemental jurisdiction if all of the federal claims are dismissed.

[26] Plaintiffs incorporate by reference the arguments made therein.

/s/ Corey M. Stern
Corey M. Stern
605 Third Ave., 33rd Floor
New York, New York 10158
(212) 605-6298
cstern@levylaw.com

/s/ Melanie Daly
Melanie Daly
605 Third Ave., 33rd Floor
New York, New York 10158
(212) 605-6298
mdaly@levylaw.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(b)(ii), I certify that the *Mitchell* Plaintiffs' Opposition Brief complies with the 10,800 word limit set forth in Local Rule 7.3(b)(i) having a total word count of 10,649 words (including headings, footnotes, citations and quotations; excluding the case caption, cover sheets, any table of contents, any table of authorities, the signature block) as generated using version 16.66.1 of Microsoft Word software.

**LEVY KONIGSBERG LLP**

/s/ Melanie Daly
Melanie Daly

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2023 I electronically filed this document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

**LEVY KONIGSBERG LLP**

/s/ Melanie Daly
Melanie Daly