UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IESAH MITCHELL, next friend for A.M., et al.,

        Plaintiffs,

v.

CITY OF BENTON HARBOR, et al.,

        Defendants.

_____/

Case No. 1:22-cv-475

Hon. Hala Y. Jarbou

## OPINION

Plaintiffs are minors who consumed lead-contaminated water while living in Benton Harbor, Michigan.  They bring this action against the City of Benton Harbor (the "City"), some of its present and former officials, several state officials, and two private engineering firms.  The Court referred the case to Magistrate Judge Phillip J. Green.  Defendants then filed motions to dismiss the complaint.  (*See* ECF Nos. 81, 84, 86, 91, 93.)  On June 1, 2023, Magistrate Judge Green entered a report and recommendation ("R&R") which recommends that the Court grant most of the motions, deny one, and dismiss Plaintiffs' claims.  (R&R, ECF No. 120.)  Before the Court are Plaintiffs' objections to the R&R (ECF No. 121).  For the reasons herein, the Court will overrule the objections and adopt the R&R.

## I. STANDARD

Under Rule 72 of the Federal Rules of Civil Procedure,

the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

## II. ANALYSIS

### A. Objection 1:  Reliance on Exhibits

When describing the factual background of this case, the magistrate judge relied on exhibits filed in a similar case, *Braziel v. Whitmer*, No. 1:21-cv-960 (W.D. Mich.).  (*See* R&R 6.)  One of those exhibits was an affidavit prepared by Defendant Brandon Onan.  Plaintiffs argue that it was improper for the magistrate judge to rely on those exhibits, especially the Onan affidavit, because a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the Court to focus on the complaint.

Plaintiffs are correct that assessment of the complaint under Rule 12(b)(6) "must ordinarily be undertaken without resort to matters outside the pleadings"; otherwise, the motion must be treated as one for summary judgment under Rule 56.  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).  There are some exceptions to this rule.  For instance, "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Id.*  However, the Onan affidavit does not fall under any of these exceptions.

On the other hand, the magistrate judge implicitly recognized that Rule 12(b)(6) does not permit the Court to consider exhibits filed in the *Braziel* case.  The magistrate judge asserted that he provided the background information only as "useful context"; he did not consider "anything contained in the cited exhibits in making any of the recommendations contained in [the] Report and Recommendation."  (R&R 6.)  And when analyzing the complaint, the magistrate judge did not cite or discuss anything that the Court cannot consider under Rule 12(b)(6).

Plaintiffs ask the Court to reject and disregard the background section of the R&R.  The Court need not reject the magistrate judge's summary of facts and evidence to the extent it simply

provides background information.  However, the Court will disregard that section when assessing whether or not the Court should dismiss Plaintiffs' claims.

### B. Objection 2: Dismissal of Bodily Integrity Claims

Plaintiffs object to the recommendation that the Court dismiss Plaintiffs' substantive due process claims, which are premised on (1) a violation of their right to bodily integrity and (2) exposure to a state-created danger.  For a claim based on a violation of the right to bodily integrity, Plaintiffs must show "conscience-shocking conduct" by Defendants.  *Guertin v. Michigan*, 912 F.3d 907, 922 (6th Cir. 2019).  The magistrate judge concluded that Plaintiffs' allegations were not sufficient to show that the state or city defendants had engaged in such conduct.

Plaintiffs fault the magistrate judge for failing to discuss the background factors mentioned in *Guertin* for considering whether an official's conduct is unconstitutionally arbitrary, including "the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act."  *Guertin*, 912 F.3d at 924.  However, the magistrate judge implicitly recognized these factors by using *Guertin* as a yardstick to determine whether Defendants' conduct rises to the level of a constitutional violation. Like this case, that case also involved officials managing a lead-tainted water supply, so the first two factors lead to the same result.

For instance, as in *Guertin*, Defendants had extensive time to deliberate about their choices. Consequently, they cannot excuse their actions "on the basis of split-second decision making."  *Id.* Here, the magistrate judge did not excuse Defendants' conduct on that basis.

Also, as in *Guertin*, Plaintiffs' use of the City's water made their relationship to the City somewhat like the involuntary relationships that "normally occur" in case law discussing substantive due process claims involving "forced, involuntary invasions of bodily integrity."  *See*

3

*Guertin*, 912 F.3d at 307.  By examining Plaintiffs' bodily integrity claims on their merits, the magistrate judge apparently assumed that this same reasoning would also apply to Plaintiffs' claims, even though Defendants were not the ones responsible for introducing lead into the City's water supply.

Finally, the magistrate judge did not rely upon a legitimate government purpose to defeat Plaintiffs' claims.  Instead, the magistrate judge applied a deliberate indifference standard, the same standard applied in *Guertin*.  Thus, Plaintiffs have not identified any error in the magistrate's application of the standard for substantive due process claims.

### 1. Michigan Department of Environment, Great Lakes, and Energy ("EGLE") Director Liesl Clark

As to Defendant Clark, Plaintiffs allege that she was in charge of the agency responsible for implementing and enforcing state and federal drinking water standards.  Of course, that role alone does not suffice to give rise to liability under § 1983.  A claimed constitutional violation must be based upon "'active unconstitutional behavior' by the defendant,' which goes beyond 'a mere failure to act.'"  *Does v. Whitmer*, 69 F.4th 300, 306 (6th Cir. 2023) (quoting *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021)).  Moreover, she is not "liable for the unconstitutional conduct of her subordinates under a theory of *respondeat superior*."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Here, Plaintiffs fail to allege active unconstitutional behavior by Defendant Clark.

As noted in the R&R, Plaintiffs allege that Clark "was deliberately indifferent to suffering and injuries to Plaintiffs when she made decisions and statements that concealed and prolonged the current public health crisis."  (Compl. ¶ 70, ECF No. 1.)  The magistrate judge properly disregarded this allegation because it is conclusory.  It does not identify any particular conduct by

Defendant Clark, let alone the decisions or statements she made that are the basis for Plaintiffs' claims against her.

Plaintiffs rely on *Shively v. Green Local School District Board of Education*, 579 F. App'x 348 (6th Cir. 2014), in which the Court of Appeals concluded that facts alleged in a complaint were sufficient to state a claim against supervisory school officials who were "alleged to have had knowledge of and . . . made decisions regarding complaints of harassment" toward a student. *Id.* at 353. But there, the student and the student's parents repeatedly spoke with several of those school officials—as well as the police, medical care professionals, and a guidance counselor—and complained about the bullying and harassment the student faced. *Id.* at 354. Given the "number and variety of ways" the plaintiffs contacted school officials and considering the "procedural posture" of the case, the Court of Appeals concluded that the plaintiffs' allegations were sufficient to infer that the school officials "were involved in making decisions" about how the harassment would be addressed. *Id.*

Here, Plaintiffs make a similar allegation that Clark "made decisions" related to the City's water supply, but the Court is not persuaded that it should reach the same result as *Shively*. Given the unique nature of the school setting and the direct involvement by school officials over the wellbeing of individual students, it may be plausible to infer that a school official who spoke directly to a parent about the harassment of a student, and who received input from the police or medical professionals about that harassment, made a specific decision about how to address that harassment. But those are not the circumstances present here. Plaintiffs do not allege similar facts from which to infer that Defendant Clark made any decision or took any action that violated their constitutional rights. Simply asserting that she "made decisions" is not enough.

Plaintiffs also rely on their allegation that Clark initially "dodged" several questions at a legislative hearing about the quality of the City's water and then stated that it was not safe to drink. (Compl. ¶¶ 325-28.)  This allegation does not save their due process claim against Clark.  Plaintiffs compare this case to *Guertin*; however, dodging a few questions and then candidly admitting that the City's water is unsafe is a far cry from the conduct of the officials in *Guertin* who "falsely assured the public that [Flint's] water supply was safe and attempted to refute assertions to the contrary."  *See Guertin*, 912 F.3d at 927.  Providing false assurances of safety to the public compounds the harm from an unsafe water supply.  Evading questions and then acknowledging that the water is unsafe does not.[1]

Next, Plaintiffs ask the Court to consider evidence from the *Braziel* case to support their claim against Clark.  (*See* Pls.' Objs. 23.)  The Court will disregard that evidence.  Like the magistrate judge, the Court will focus solely on the complaint and documents that the Court can review under Rule 12(b)(6) when determining whether Plaintiffs' complaint states a claim.  The Court agrees with the magistrate judge that the complaint does not state a federal claim against Clark.

### 2.  EGLE Drinking Water Director Eric Oswald

As with Defendant Clark, Plaintiffs allege that Defendant Oswald "made decisions and statements that concealed and prolonged" the health crisis stemming from lead contamination in the City's water supply.  (Compl. ¶ 71.)  On its own, this allegation is conclusory.  It does not identify Defendant's statements or decisions that are the basis for Plaintiffs' claim.

---

[1] To be clear, the Court is not saying that the facts in *Guertin* set the bar for conduct necessary to give rise to a substantive due process claim.  Instead, the Court is comparing the facts of that case to indicate why the bar for deliberate indifference and conscious-shocking conduct has not been met here.

The magistrate judge discussed other allegations about Defendant Oswald, including the following: Oswald made a statement in May 2018 that it was "impossible to know for sure" when lead first leached into the City's water supply; in March 2019, Oswald signed an Administrative Consent Order with the mayor of Benton Harbor, directing the city to submit a proposal for corrosion treatment or a corrosion control study; and in November 2019, Oswald said that the City's water was safe due to treatment with Carus 8600.[2]  (R&R 38-39.)  The magistrate judge summarized the allegations as assertions that (1) Oswald "knew of the lead contamination . . . and failed to take sufficient action to protect and notify the public," and (2) Oswald made erroneous, and *perhaps* dishonest[] statements about the effectiveness of corrosion control treatment that was approved by EGLE."  (*Id.* at 39-40.)

Plaintiffs argue that the magistrate judge "did not acknowledge" their allegation that Oswald delayed five months after the first documented lead action level exceedance to issue the consent order allowing for the implementation of a corrosion control treatment.  (Pls.' Objs. 23.)  However, Plaintiffs did not make such an allegation.  Instead, they simply asserted that Oswald signed the consent order "five months into the crisis."  (Compl. ¶ 214.)  The complaint contains no allegation of delay by Oswald and no facts to support such an assertion.  And in any case, the passage of a few months of time between the discovery of elevated lead levels and the order for control treatment suggests potential negligence by Oswald, rather than deliberate indifference.  Negligence is not sufficient for a constitutional claim.  *See Guertin*, 912 F.3d at 916.

Plaintiffs also note their allegation that Oswald "indicated, dishonestly and publicly, that the results of internal studies indicated the [Carus 8600 corrosion] inhibitor was effectively

---

[2] Carus 8600 is a blend of orthophosphate and polyphosphate that is used to control corrosion in lead pipes.  (Compl. ¶¶ 138, 209.)  Another alternative is to use orthophosphate on its own.  (*Id.* ¶ 137.)  The use of such chemicals, when successful, "creates protective scales that coat the system pipes and prevent lead from leaching into drinking water." (*Id.* ¶ 140.)

reducing corrosion rates."  (Compl. ¶ 244.)  The magistrate judge dismissed this statement as "conclusory" because "the most that can be gleaned from the complaint" is that Defendant's statement was "erroneous" rather than "knowingly false."  (R&R 40.)

The Court agrees that, on its own, the allegation is conclusory.  It does not identify Defendant's statements and does not explain what, if anything, is false in those statements.  In their objections, Plaintiffs point to their allegation that lead levels in the City's water had increased by December 2019, at the end of the second six-month monitoring period.  (*See* Compl. ¶ 249.)  However, Plaintiffs do not point to any facts indicating that Oswald was aware of increased corrosion rates when he made his statements, or that he was being intentionally dishonest when representing that the City's "internal studies" showed effectiveness in reducing corrosion rates.  Plaintiffs allege no facts about those studies.

Plaintiffs also point to a letter from Defendant Onan to the City.  (*See* 2/13/2020 Letter to City, ECF No. 1-13.)  The letter states that "[a] review of the last three lead and copper sampling rounds collected by the City concludes the treatment is not achieving results quickly enough."  (*Id.*, PageID.228.)  In the letter, Onan recommended adjusting the corrosion treatment to a higher ratio of orthophosphate to polyphosphate in order to "speed up treatment effectiveness" and to "more efficiently lower corrosion rates[.]"  (*Id.*, PageID.229.)  This letter does not support Plaintiffs' contention that Oswald was dishonest.  It does not suggest that the corrosion treatment was wholly ineffective; instead, it suggests that the treatment was not acting quickly enough.

Importantly, Oswald's allegedly false statement is not at all like the conduct in *Guertin*, where an official told the EPA that the water treatment plan had an "optimized corrosion control program" when in fact he knew that there was no corrosion control in use at the plant.  *See Guertin*, 912 F.3d at 928.  As the magistrate judge indicated, Plaintiffs' allegations suggest, at most, a

misrepresentation about the effectiveness of the corrosion control method used by the City.  Such allegations do not amount to conscience-shocking behavior by Oswald.  He did not say anything that would have led Plaintiffs or anyone else to believe that the City's water was safe to drink. Indeed, a statement about the "effectiveness" of the City's use of Carus 8600 in "reducing corrosion rates" is a subjective and technical opinion that provides little insight into that issue. Thus, Plaintiffs do not state a substantive due process claim against Onan.

### 3. EGLE Surface Water Treatment Specialist Ernest Sarkipato

Plaintiffs allege that Defendant Sarkipato was "deliberately indifferent to Plaintiffs' suffering and injuries when he made decisions and statements that concealed and prolonged the public health crisis."  (Compl. ¶ 73.)  As discussed above, this cookie-cutter statement is vague and conclusory.

In their objections, Plaintiffs argue that Sarkipato was deliberately indifferent for approving a permit for the City to use Carus 8600 for corrosion control.  According to Plaintiffs, Carus 8600 is a "generic" blend of phosphates that is not tailored to the "unique conditions" of the City's water system.  (Compl. ¶ 210.)  EGLE engineers allegedly "warn[ed]" Sarkipato that the proposal to use Carus 8600 was "unlike other corrosion control proposals previously made and implemented for communities with known lead service lines and lead action level exceedances, such as Benton Harbor."  (*Id.* ¶ 211.)  As the basis for this warning, Plaintiffs' complaint refers to emails between Sarkipato and other officials from EGLE.  (*See id.* n.29.)  These emails are attached to the complaint and are part of the complaint for purposes of Rule 12(b)(6).

The foregoing emails provide context for the alleged "warning" to Sarkipato.  They discuss the City's permit application for the use of Carus 8600.  According to the emails, the permit application apparently proposed the use of Carus 8600 at a feed rate of "1.05 ppm PO4 as Orthophosphate," based on recommendations from Defendant Elhorn Engineering Company.  (*See*

Ex. 8 to Compl., ECF No. 1-7, PageID.194.)   One EGLE official, Brian Thurston, expressed concern that this concentration of orthophosphate was "not in line with other recent OCCT proposals of 3.1 ppm as Orthophosphate for a community with known [lead] services lines and lead exceedance levels." (*Id.*)   Thurston suggested a "higher initial dose of Orthophosphate . . . to quickly establish a protective film in the [lead] service lines." (*Id.*)   Sarkipato responded to Thurston's email by saying that he would "wait for consensus" but that the actual recommendation from Elhorn was for "1.5 mg/L as total PO4, which was discussed with them in a meeting[.]" (*Id.*, PageID.194.)   Sarkipato also relayed Elhorn's concern that the "poly portion" of Carus 8600 "may be too high and counterproductive above this amount." (*Id.*)   And  he queried whether other recent proposals used a "100% ortho[phosphate product], as opposed to a blended" one.  (*Id.*)   Finally, Sarkipato stated that a "coupon test to follow would . . . quantify lead release at different dosages, resulting in the optimal designation by [EGLE]." (*Id.*)

    In other words, the engineer who allegedly "warned" Sarkipato about the permit application did not account for the type of corrosion inhibitor that would be used.   Thurston believed the dosage should be higher than 1.05 ppm of orthophosphate but the recommended dosage was 1.5 ppm of a blend of orthophosphate and polyphosphate.   Sarkipato's response to that concern does not in any way suggest deliberate indifference to a serious risk of harm to Plaintiffs. He indicated that he had not reached a final decision about the proper dosage of Carus 8600 and that he believed additional testing would assist with identifying the optimal dosage.   Nothing in that exchange supports a claim of deliberate indifference against Sarkipato.

    When summarizing this email exchange, the magistrate judge stated that "initial concerns regarding dosage appear to have been resolved." (R&R 42.)   Plaintiffs take issue with this statement and contend that the magistrate judge improperly weighed the evidence and construed

10

the facts in Defendants' favor.  Plaintiffs are correct that the facts alleged in the complaint and contained in its supporting documents do not suggest that "initial concerns" about the dosage were "resolved."  But even without this statement in the R&R, the outcome does not change.  Construing the facts in Plaintiffs' favor, it is not plausible to infer deliberate indifference by Sarkipato.  He responded to the concern raised by Thurston and gave reasons for discounting it.  Plaintiffs do not allege facts from which to infer that those reasons were insufficient, or that the risks associated with the dosage identified by Sarkipato were so apparent and so significant that he would have been deliberately indifferent to ignore them.  In other words, it is not plausible to infer that he was aware that approval of the recommended dosage would pose a significant risk of serious harm to Plaintiffs.

Plaintiffs also raise other issues with the permit application approved by Sarkipato.  They allege EGLE was concerned that "calculations within the permit application were incorrect, and that the application did not actually provide any information as to how Defendant Elhorn planned to create/provide optimal corrosion control."  (Compl. ¶ 212.)  In addition, the permit application did not require a corrosion control study before implementing Carus 8600.  As discussed above, however, the emails attached to Plaintiffs' complaint indicate that EGLE considered dosage issues and discussed them directly with Elhorn, which recommended 1.5 ppm of Carus 8600.  And as to the lack of a corrosion control study, Plaintiffs' exhibits indicate that EGLE understood that the City would conduct a "coupon study . . . to identify [the] optimum dose for the [Carus 8600] product," and that "data received after the study [would] allow [EGLE] to make a determination on [an] optimized dose."  (Ex. 9 to Compl., February 2019 Onan Emails, ECF No. 1-8, PageID.199.)  In other words, EGLE expected that the City would study the effectiveness of Carus

8600 after implementing it.  There is nothing conscience-shocking about approving the permit in these circumstances.

In short, Sarkipato approved a permit to use a blended phosphate corrosion control product to address lead contamination in the City's water supply.  Even if there was disagreement or concern about the proper dosage for that product to address the unique nature of the City's water system, Plaintiffs have not alleged any facts that would suggest deliberate indifference by Sarkipato in approving that permit.  Importantly, he was attempting to fix the lead problem using a chemical that Plaintiffs themselves allege is a viable treatment for preventing lead pipes from contaminating drinking water.  (*See* Compl. ¶¶ 138-40.)  These circumstances cut against a substantive due process claim.  Sarkipato's alleged failure to require a corrosion control study or to identify the optimal dosage of Carus 8600 before approving the permit was no more than negligence, which does not state a constitutional claim.

Plaintiffs point to their allegations that "the EPA recommends state agencies require a demonstration study and increased monitoring to ensure a corrosion control technique is effective," and that the EPA "indicates special considerations must be taken into account when blended phosphates are introduced to a public water system . . . because the polyphosphates may lead to poor corrosion control."  (Compl. ¶¶ 142-43 (quotation marks omitted).)  Accepting these allegations as true, they show that there are some risks to using a blended phosphate product and that not all corrosion control techniques are effective.  But that does not mean Sarkipato was deliberately indifferent to a serious risk of prolonged or increased lead contamination in the water supply when approving the use of a blended product to abate that contamination.  The EPA's guidance for corrosion control testing does not set the standard for what officials must do to avoid

violating the Constitution.  A failure to comply with that guidance may indicate a lack of care, but it does not amount to deliberate indifference or conscious-shocking behavior.

Plaintiffs also contend that the magistrate judge did not consider their allegations that Sarkipato did not intervene when the following occurred: (1) the City's Drinking Water Superintendent, Michael O'Malley, misinformed residents in January 2019 that the City's water was "safe to drink after a 'first flush'" and that the City was "delivering 'clean water right to the tap and [the resident] should have no problem drinking it'"  (Compl. ¶¶ 199-200 (quoting 1/9/2019 Sarkipato Email)); (2) Sarkipato discovered that the City was not providing water filters or bottled water to its residents (*see id.* ¶ 202); and (3) Sarkipato learned that a 2021 RFP issued by the City to address corrosion issues was not in compliance with state or federal law and did not contain a budget sufficient to cover the costs of corrosion testing (*id.* ¶ 299).

Plaintiffs' complaint does not expressly allege that Sarkipato failed to act or intervene when these events took place, so it is understandable that the magistrate judge did not discuss this assertion when assessing the complaint.  At any rate, the foregoing allegations are like those that were insufficient in *Guertin*.  There, the Court of Appeals approved the dismissal of defendants who were aware of issues with Flint's water supply but were not personally involved in conduct that caused the plaintiffs to consume lead-contaminated water.  *See Guertin*, 912 F.3d at 930.  As that court explained, a § 1983 plaintiff is only accountable for their own conduct, not the conduct of others.  *Id.*; *see also Iqbal*, 556 U.S. at 677 ("In a § 1983 suit . . . each Government official . . . is only liable for his or her own misconduct.").  Furthermore, "the Due Process Clause is a limitation only on government action," not government inaction.  *Id.*  For similar reasons, Plaintiffs' additional allegations about Sarkipato's failure to correct the conduct of others do not

state a substantive due process claim against him.  (*See* R&R 43 ("[M]ere failure to take action is insufficient to sustain a bodily [integrity] claim.").)

Plaintiffs compare Sarkipato to the defendants in *Guertin* who "played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant," and in doing so, "did not act" on a warning that the treatment plant lacked sufficient resources to properly monitor the water.  *Guertin*, 912 F.3d at 927.  Those defendants are distinguishable.  They were personally involved in the conscious-shocking decision to use a water treatment plant that "they knew was rife was public-health-compromising complications."  *Id.*  Because of their personal involvement in that decision, they could be liable for it under § 1983.  In contrast, Plaintiffs argue that Sarkipato is liable for not intervening to correct the conduct of others.  Such inaction generally does not give rise to any type of claim under § 1983, let alone a substantive due process claim.

### 4. EGLE Lead & Copper Unit Supervisor Brandon Onan

Plaintiffs object to the magistrate judge's statement that "it is difficult to discern what Plaintiffs believe Mr. Onan did wrong, much less that he engaged in conscious-shocking conduct." (R&R 44.)  In their objections, Plaintiffs focus on a letter Onan sent to the City in February 2020, directing it to alter the blend of its phosphate mix and to increase the treatment dosage rate in order to "speed up treatment effectiveness."  (*See* Onan Letter, Ex. 14 to Compl., ECF No. 1-13, PageID.228-229.)  According to Plaintiffs, this letter omitted concerns expressed by EGLE Surface Water Treatment Specialist Bob London.

In an email to Onan, London explained that EPA rules required consideration of several treatment options, including "pH/alkalinity adjustment [and] calcium hardness adjustment," in addition to "the use of corrosion inhibitors."  (London-Onan Emails, Ex. 15 to Compl., ECF No. 1-14, PageID.233.)  London was concerned that Onan's draft letter to the City appeared to "steer the City toward the use of phosphate-based inhibitors."  (*Id.*)  London did not want to "bias the

14

direction of the study" and cautioned that the City "does need to follow the requirements of the [EPA's] rule." (*Id.*)

Onan responded to London saying that his letter to the City focused on orthophosphate treatment for two reasons. First, the EPA "no longer consider[s] calcium hardness adjustment . . . as an effective CCT." (*Id.*, PageID.232.)  Second, considering the "current state" of the City's water treatment plant, Onan was not comfortable recommending "pH/alkalinity adjustments" because "even small shifts in pH can have very large and immediate impacts to the distribution system." (*Id.*)

Plaintiffs home in on Onan's decision to steer the City toward orthophosphate treatment instead of directing the City to consider other possible corrosion control measures, in accordance with Michigan's Lead and Copper Rule.  Plaintiffs contend that Onan ignored London's "warning" that the letter directed the City to take a path that did not follow the requirements of that rule.

The foregoing facts do not state a substantive due process claim.  In effect, Plaintiffs argue that Onan should have been more careful to advise the City to follow applicable legal requirements when considering measures to take in response to the lead-tainted water in its water supply. However, giving advice does not become a due process violation simply because it recommends a course of action that violates a state or federal law.  At the end of the day, Onan recommended that the City adjust the use of its corrosion inhibitor to tackle its lead problem.  That recommendation does not reflect deliberate indifference to Plaintiffs' risk of harm.

### 5. Benton Harbor Mayor Marcus Muhammad

The magistrate judge concluded that Plaintiffs failed to state a due process claim against the City's mayor, Marcus Muhammad.  In their objections, Plaintiffs focus on Muhammad's statements to the public.  He allegedly "downplayed" the City's lead problem, telling the public that the issue was not "a high alert, emergency 911, panic frenzy[.]" (Compl. ¶¶ 173-74.)  He also

claimed that the City had funds "to replace 40% of service lines," when the City allegedly had no such money because it was under "emergency financial management" at the time. (*Id.* ¶¶ 196-97.)

Statements by government officials that downplay the severity of public emergencies or that appear to make promises the government cannot keep are lamentable, but they are not due process violations. Indeed, Plaintiffs do not indicate how Muhammad's statements impacted them personally. Plaintiffs argue that Muhammad is like the official in *Guertin* who "announced the water was safe to drink, and demeaned, belittled, and aggressively dampened attempts by the scientific community to challenge the government's assertions that Flint did not have a problem with its drinking water." *Guertin*, 912 F.3d at 927-28. That official was one of several who "intentionally attempted to cover-up" the city's water problem. *Id.* at 928. In contrast, Plaintiffs do not allege that Muhammad created the City's lead problem or that he attempted to cover it up by lying about it. Thus, Plaintiffs do not state a federal claim against Muhammad.

### 6.   Benton Harbor Water Plant Manager Michael O'Malley

Defendant O'Malley was part of the decision to use Carus 8600. He submitted the City's permit application to EGLE at the end of January 2019. (Compl. ¶ 208.) In 2020, he continued to support the use of Carus 8600, even though testing showed that lead levels were still higher than "lead action levels." (*Id.* ¶¶ 278, 283-85.)

Plaintiffs also allege that O'Malley made several statements that were false. In January 2019, he allegedly lied to a City resident, telling her that the City was "delivering 'clean water right up to the tap and [she] should have no problem drinking it.'" (*Id.* ¶ 200.) And in November 2019, Plaintiffs allege that O'Malley "dishonestly" told a City committee that the Carus 8600 treatment was "working ahead of schedule," even though he had tested only seven of the 60 houses that he was required to test under state and federal law. (*Id.* ¶ 246-47.) When he made the statement, he apparently knew that the City's test results from its first six-month monitoring period

indicated that lead concentrations had increased slightly despite the use of Carus 8600.  Testing in July 2019 showed the presence of lead at 27 ppb in the 90th percentile of testing sites, a little higher than the results in October 2018, which showed 22 ppb in that same percentile.  (*Id.* ¶¶ 233, 235.)  Two months after his statement, O'Malley "backed off" his assertion, telling the public that it would "take up to 18 months for the treatment to sufficiently coat the [water] pipes."  (*Id.* ¶ 251-52.)

Plaintiffs argue that the foregoing facts are sufficient to state a substantive due process claim against O'Malley.  The Court disagrees.  In sum, Plaintiffs allege that O'Malley supported the use of a corrosion inhibitor to treat a lead problem that he did not create.  Supporting a potential solution to that problem is the opposite of indifference.  Arguably, O'Malley should have acted more quickly to implement that treatment or should have recognized that the treatment was not working (or was making the problem worse) and then changed course, but those failures amount to negligence at most, not deliberate indifference.  *See Guertin*, 923 F.3d at 924 ("[S]imply making bad choices does not rise to the level of deliberate indifference.").

In addition, O'Malley's alleged misrepresentations in isolated statements to a City resident and to a City committee may have been improper, but they do not shock the conscience.  Unlike the defendants in *Guertin*, O'Malley did not create the lead problem or add to the harm by repeatedly misleading the plaintiffs and the rest of the public about the dangers they faced.  Indeed, Plaintiffs do not allege that O'Malley's statements personally impacted them in any way.

Plaintiffs further allege that O'Malley "obscured" the City's lead testing efforts, refused to disclose the testing sites to EGLE, and asked EGLE to reduce the number of testing sites.  (Compl. ¶¶ 228-30.)  None of these actions shock the conscience.  Moreover, Plaintiffs do not allege facts from which to infer that these actions harmed them.

Next, Plaintiffs allege that O'Malley failed to provide filters or bottled water to homes with lead contamination.  (*Id*. ¶ 202.)  This allegation states a mere failure to act.  It does not support a substantive due process claim.

Finally, Plaintiffs allege that O'Malley made false statements in response to a letter from EGLE.  First, O'Malley allegedly told EGLE that the City had "fulfilled the ACO's requirement of a completed corrosion control study."  (*Id*. ¶ 266 (citing 5/19/2020 Letter, Ex. 16 to Compl., ECF No. 6).)  The Court agrees with the magistrate judge that the letter does not make this representation.  (*See* R&R 50 n.33.)  In fact, the letter expressly states, "I have . . . sought out firms that may be able to provide a Corrosion Control Study."  (5/19/2020 Letter, PageID.332.)

Second, Plaintiffs contend that O'Malley misrepresented that the City had implemented EGLE's recommendation to increase the orthophosphate ratio and treatment rate.  So far as the Court can tell, Plaintiffs' complaint does not assert that O'Malley made such a misrepresentation. Instead, Plaintiffs briefly mentioned this issue in their response to O'Malley's motion to dismiss. Understandably, the magistrate judge did not address it in the R&R.

At any rate, O'Malley's letter does imply that the City made the changes recommended by EGLE.  (*See id.*, PageID.333 ("When the change from EGLE letter in February 2020 where the City was demanded to alter its treatment to a more aggressive Orthopolyphosphate and a doubling of the dose for treatment, Todd Lucks came nearly immediately to the water plant to assist us in the change out.").)  Plaintiffs rely on EGLE's follow-up letter from June 2020 to dispute O'Malley's assertion.   This letter states that, "[w]hile phosphate levels *have increased significantly*, the target of 3.0mg/L orthophosphate is not being met in the distribution system." (6/17/2020 EGLE Letter, ECF No. 1-16 (emphasis added).)   In other words, although the phosphate levels in the water supply had increased, the City had not added enough orthophosphate

to meet the amount recommended by EGLE.  Taking some actions to address the City's lead problem does not suggest deliberate indifference by O'Malley.

Even if the Court were to generously construe O'Malley's statement and EGLE's response as evidence that O'Malley told EGLE that the City had changed its treatment rate and ratio when in fact the City had made no changes at all, the outcome would be the same.  Stating a falsehood about the extent of the City's response to its lead problem in a single letter to EGLE does not shock the conscience.  It stands in stark contrast to the repeated public falsehoods and denials in *Guertin* that served to cover up the officials' actions and the known dangers in the city's water supply.

### 7. City Manager Darwin Watson

The lead level in the City's water "first exceeded the federally mandated lead action level in October 2018[.]"  (Compl. ¶ 162.)  That same month, Defendant Watson allegedly lied to the public when he stated at a press conference that the City's water system had no lead lines.  One month later, after the City received the results of additional lead testing from homes, Watson allegedly "backtracked" and indicated that the City would hire investigators to investigate the source of lead contamination.  (*Id.* ¶¶ 190-94.)

The magistrate judge concluded that "the most that can be gleaned from these allegations is that Mr. Watson deceived the public for one month regarding the potential cause of the lead contamination."  (R&R 52.)  The magistrate judge also concluded that this deception was not conscious-shocking conduct.  (*Id.*)  The Court agrees with those conclusions.  Importantly, Watson's allegedly false statement does not suggest an effort to make the City's residents believe that their water was safe to drink.  Instead, the statement improperly ruled out one possible source of the contamination.

Plaintiffs object to the magistrate judge's assertion Watson deceived the public for only a month.  Plaintiffs contend that he knew that the service lines were the source of the lead problem

but he would not admit it, causing his deception about the source of the lead contamination to extend for longer than a month.  Nevertheless, as the Court stated above, Watson's statement does not shock the conscious because, unlike the defendants in *Guertin*, he did not "falsely assure[] the public that the water was safe and attempt[] to refute assertions to the contrary." *Guertin*, 912 F.3d at 927.

Plaintiffs also note that Watson was involved in decisions regarding the implementation of Carus 8600, allowing it to be used before conducting a corrosion control study and in disregard of state and federal guidelines.  For reasons discussed above, the City's use of Carus 8600 does not reflect deliberate indifference by Defendants and does not shock the conscience.  That product was designed to address the sort of problem the City faced.  (Compl. ¶ 140.)  Plaintiffs have not alleged facts from which to infer that Defendants were aware that it would be wholly ineffective or that its use "was rife with public-health-compromising complications."  *See Guertin*, 912 F.3d at 927.

### C. Objection 3: Dismissal of *Monell* Claim

The magistrate judge concluded that Plaintiffs could not state a *Monell* claim against the City because Plaintiffs do not state a claim against any of the individual City defendants.  Plaintiffs respond that their allegations are sufficient to state a claim against the City because the conduct by each individual City defendant represents official policy by the City for which the City can be liable.  Plaintiffs contend that the individual City defendants are the final decisionmakers for the City and, as such, their conduct constitutes City policy.  *See Rieves v. Town of Smyrna*, 67 F.4th 856, 865 (6th Cir. 2023) (noting that a municipal entity "is generally liable for the acts and decisions made by [an official] in his capacity as the final decisionmaker for [the entity].").  Plaintiffs' objection is meritless because the conduct on which they rely to assert a *Monell* claim does not state a constitutional violation.  Without a constitutional violation by the final decisionmakers, there is no *Monell* claim for their conduct.

Plaintiffs also rely on their allegation in the complaint that

> Defendant City maintained abhorrent policies that consisted of not conducting proper drinking water testing for lead, refusing to report dangerous lead levels in drinking water, working with inept, unqualified, and dangerous contractors, failing to keep records required by federal and state law, allowing false or misleading statements to be issued to the public and to governmental authorities about the safety of the drinking water, and hiding, covering up, and otherwise obscuring the reported levels of lead in the distribution system.

(Compl. ¶ 392.)  On its own, this allegation is conclusory.  To the extent Plaintiffs are relying on the conduct of the city defendants that is alleged elsewhere in the complaint, Plaintiffs do not state a constitutional claim for the reasons mentioned above and in the R&R.

### D. Objection 4: Dismissal with Prejudice and without Leave to Amend

Finally, Plaintiffs object to the magistrate judge's recommendation that the Court dismiss their federal claims with prejudice.  Plaintiffs argue that they should be given leave to amend their complaint.  Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, the Court "should freely give leave [to amend] when justice so requires." *Id.*  But under the Court local rules, when a party seeks leave to file an amended complaint, that party must provide the Court with a proposed amended complaint.  W.D. Mich. LCivR 5.7(f).  Plaintiffs have not provided a proposed amended complaint, so they have not complied with the Court's rules.

Moreover, judging from Plaintiffs' complaint, their responses to the motions to dismiss, and their objections, the Court cannot discern a path forward for their claims.  Their substantive due process claim based on a theory of state-created danger is plainly meritless, for reasons discussed in the R&R and in the next section.  Their substantive due process claim arising from the right to bodily integrity is based on facts that suggest negligence, rather than deliberate indifference, by government officials.  Accordingly, the Court will not grant Plaintiffs' request for leave to amend their complaint.

### E.   Objection 5: Dismissal of State-Created Danger Claim

Plaintiffs object to the dismissal of their substantive due process claim based on a theory of state-created danger.  Such a claim requires the following:

> (1) an affirmative act by the [defendants] that create[d] or increase[d] a risk that [plaintiffs] would be exposed to private acts of violence, (2) a special danger to [plaintiffs] such that the [defendants'] acts placed the [plaintiffs] specifically at risk, as distinguished from a risk that affects the public at large, and (3) that the [defendants] knew or should have known that their actions specifically endangered the [plaintiffs].

*Jackson v. Schultz*, 429 F.3d 586, 591 (6th Cir. 2005) (internal quotation marks and citation omitted); *accord Linden v. City of Southfield*, 75 F.4th 596, 602-03 (6th Cir. 2023) (citing *Jackson*).

Here, Plaintiffs do not meet the first requirement, which is an increased risk of exposure to a private act of violence.  Plaintiffs argue that they were harmed when private businesses served them with lead-contaminated water; however, there are no allegations suggesting that, in serving Plaintiffs water, those private businesses were engaged in "acts of violence."

Also, Plaintiffs do not meet the second requirement.  They do not allege that they were subjected to a risk that is greater or different from the general public.  Plaintiffs contend that they were at greater risk of harm because they were children.  Lead impacts children more than adults. But even assuming that serving lead-contaminated water is a "private act of violence," the relevant question is whether Plaintiffs were at greater risk of *exposure* to that "violence," not whether they were at risk of greater *injury*.  *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) ("Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be *exposed* to private acts of violence." (emphasis added)).  Here, Plaintiffs do not state a claim because they shared the same risk of exposure to lead-contaminated water "that affects the public at large."  *See id.*

### F. Objection 6: Dismissal of Engineering Defendants

The magistrate judge recommends dismissal of the two engineering firm defendants, F&V Operations and Resource Management, Inc. and Elhorn Engineering Company, because they are not state actors subject to liability under 42 U.S.C. § 1983 and because Plaintiffs do not state a substantive due process claim against them.  (R&R 27-33.)  Plaintiffs object to both reasons for dismissal of the engineering firms.

#### 1. State Actors

Private entities like F&V and Elhorn are considered state actors under § 1983 only in certain circumstances.  Plaintiffs rely on the "nexus" or "symbiotic relationship" test, whereby the act of a private entity is considered state action because "there is a sufficiently close relationship between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself."  *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).  "It is not enough . . . that the parties have a contractual relationship"; instead, "Plaintiffs must show that the state 'played a role in the decision' made by the private actor that led to the deprivation of Plaintiffs' rights, either by showing, for example, that the contract necessitated the private actor's decision or that state actors were involved in the decision."  *M.S. ex rel. Covington v. Hamilton Cnty. Dep't of Educ.*, 756 F. App'x 510, 514 (6th Cir. 2018) (quoting *Wolotsky*, 960 F.2d at 1336).

In this case, the magistrate judge properly determined that, based on Plaintiffs' allegations, Elhorn acted as an advisor to both the City and EGLE regarding the use of Carus 8600.  (R&R 30.)  As Plaintiffs acknowledge, the City made the ultimate decision about whether and how to use that product.  (*See* Pls.' Objs. 42 ("[T]he City relied exclusively on Elhorn for all of its decisions related to corrosion control and accepted all of their recommendations.").)  Thus, even if the City relied

on Elhorn's advice, that advice cannot by fairly be treated as conduct of the state, let alone conduct that led to the violation of Plaintiffs' constitutional rights.

As to F&V, the magistrate judge noted that this company allegedly assumed the day-to-day operations of the City's water plant in November 2020.  (R&R 29; *see* Compl. ¶ 290.)  However, that involvement alone does not transform F&V into a state actor or make its decisions fairly attributable to the state.  Performing a public contract does not, by itself, make a private entity a state actor.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982).  There must be a closer nexus between the challenged action and the state to transform the entity's conduct into state action.  Indeed, in cases where private entities ran the day-to-day operations of a state-owned facility, courts have found that those entities were not state actors.  *See, e.g.*, *Wolotsky*, 960 F.2d at 1336; *Crowder v. Conlan*, 740 F.2d 447, 453 (6th Cir. 1984).

Plaintiffs rely on *O'Brien v. Township of New Buffalo*, No. 1:01-cv-365, 2003 WL 25426577 (W.D. Mich. July 21, 2003), in which the district court concluded that engineers providing oversight and advice to a township for construction of water and sewer systems were state actors.  *Id.* at *6.  For the reasons stated in the R&R, the Court agrees with the magistrate judge that *O'Brien* is distinguishable and is not persuasive.

### 2. Failure to State a Claim

Even if the engineering firms were state actors, the Court agrees with the magistrate judge that Plaintiffs have not alleged facts from which to infer that these defendants violated Plaintiffs' constitutional rights.

F&V allegedly provided "substandard and insufficient services" when managing the water treatment plant.  (Compl. ¶ 64.)  During an EPA inspection of the plant in September 2021, F&V employees were allegedly unable to "answer simple questions" or "demonstrate certain tasks and testing necessary for running the plant[.]"  (*Id.* ¶¶ 310-11.)  EPA discovered "vital pieces of

24

equipment that had been out of service for many years" and "a myriad of unsanitary, defectively designed, and otherwise hazardous conditions at the plant." (*Id.* ¶¶ 312-13.)  As of 2022, months after F&V assumed control over the plant, test results still showed the presence of lead in the City's water at 15 ppb, which was "in excess of lead action levels." (*Id.* ¶¶ 334-35.)  These allegations are somewhat vague in terms of F&V's actual conduct.  At most, they suggest negligence in the operation of the water treatment plant, which does not suffice to state a substantive due process claim.

Elhorn's role was to repeatedly recommend the use of Carus 8600, a known corrosion inhibitor, to treat the City's existing lead problem.  According to Plaintiffs' complaint, that treatment was ineffective at best and exacerbated the problem at worst.  It allegedly led to an increase in the presence of lead in the City's water supply by a few parts per billion for a period of time.[3]  Such conduct does not shock the conscience and does not give rise to a constitutional claim.  *See Guertin*, 912 F.3d at 924 ("[S]imply making bad choices does not rise to the level of deliberate indifference.").  Accordingly, the Court agrees that Plaintiffs do not state a federal claim against F&V or Elhorn.

### 3. Objection 7: Declining to Exercise Supplemental Jurisdiction

Finally, Plaintiffs object to the magistrate judge's recommendation to not exercise supplemental jurisdiction over Plaintiffs' state-law claims.  Plaintiffs contend that such a dismissal will prejudice the trial phase of the litigation, and that principles of judicial economy, convenience, fairness, and comity all favor keeping the state-law claims in this Court. However, comity and concerns about "needlessly deciding state law issues" weigh against the exercise of supplemental

---

[3] In October 2018, the 90th percentile of sampling sites showed 22 ppb of lead. (Compl. ¶ 162.)  In June 2019, testing showed 27 ppb of lead in the same percentile. (*Id.* ¶ 235.)  In June 2020, the result was 23 ppb. (*Id.* ¶ 277.)  In December 2020, the result was 24 ppb. (*Id.* ¶ 291.)  In June 2021, the result was 24 ppb. (*Id.* ¶ 306.)  According to "the most recent testing results" at the time of Plaintiffs' complaint, the lead level was at 15 ppb. (*Id.* ¶ 334.)

jurisdiction over Plaintiffs' state-law claims.  *See Landefeld v. Marion Gen. Hosp.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  And the other factors do not provide much weight in favor of exercising supplemental jurisdiction because the case is still at an early stage.

In short, when a court dismisses all claims over which it has original jurisdiction, it "should not ordinarily reach the plaintiff's state-law claims."  *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).  The Court will follow that course here.

## III.  CONCLUSION

In summary, on de novo review, the Court agrees with the overall analysis and disposition recommended in the R&R.  Apart from the magistrate judge's assertion that concerns about the dosage of Carus 8600 were resolved, the Court is not persuaded that there is any error in the magistrate judge's analysis.  Accordingly, the Court will adopt the R&R.

The Court will enter an order and judgment in accordance with this Opinion.


Dated: September 28, 2023                    /s/ Hala Y. Jarbou
                                             HALA Y. JARBOU
                                             CHIEF UNITED STATES DISTRICT JUDGE