# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Kelly L. Stephens     POTTER STEWART U.S. COURTHOUSE     Tel. (513) 564-7000
Clerk     CINCINNATI, OHIO 45202-3988     www.ca6.uscourts.gov

Filed:  May 06, 2025

Ms. Margaret Bettenhausen
Mr. Nathan A. Gambill
Ms. Rebecca M. Smith
Office of the Attorney General
of Michigan
P.O. Box 30755
Lansing, MI 48909

Mr. Douglas J. Curlew
Cummings, McClorey, Davis & Acho
17436 College Parkway, Third Floor
Livonia, MI 48152

Ms. Melanie P. Daly
Levy Konigsberg
605 Third Avenue, 33rd Floor
New York, NY 10158

Mr. Meigs M. Day
Cummings, McClorey, Davis & Acho
2851 Charlevoix Drive, S.E., Suite 203
Grand Rapids, MI 49546

Ms. Alexandra Markel
Mr. Walter George Pelton
Mr. Thomas J. Rheaume Jr.
Bodman  Litigation
1901 Saint Antoine Street, Sixth Floor
Detroit, MI 48226

Mr. Corey M. Stern
Levy Konigsberg
605 Third Avenue, 33rd Floor
New York, NY 10158

Re:  Case No. 23-1970, *Mitchell, et al v. City of Benton Harbor, MI, et al.*
Originating Case No. : 1:22-cv-00475

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk


Laurie A Weitendorf
Deputy Clerk

cc:  Ms. Ann E. Filkins

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

IESHA MITCHELL, guardian and next friend of A.M., et al.,

　　　　　　　　　*Plaintiffs-Appellants,*

　　　*v.*

CITY OF BENTON HARBOR, MICHIGAN; MARCUS MUHAMMAD; MICHAEL O'MALLEY; DARWIN WATSON; LIESL CLARK; ERIC OSWALD; ERNEST SARKIPATO; BRANDON ONAN; ELHORN ENGINEERING COMPANY,

　　　　　　　　　*Defendants-Appellees.*

No. 23-1970

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cv-00475—Hala Y. Jarbou, District Judge.

Argued: October 29, 2024

Decided and Filed: May 6, 2025

Before: MOORE, COLE, and LARSEN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Melanie P. Daly, LEVY KONIGSBERG, New York, New York, for Appellants. Thomas J. Rheaume, Jr., BODMAN PLC, Detroit, Michigan, for City of Benton Harbor Appellees. Rebecca M. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for State Defendant Appellees. Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee Elhorn Engineering Company. **ON BRIEF:** Melanie P. Daly, Corey M. Stern, LEVY KONIGSBERG, New York, New York, for Appellants. Thomas J. Rheaume, Jr., Alexandra C. Markel, Walter G. Pelton, BODMAN PLC, Detroit, Michigan, for City of Benton Harbor Appellees. Rebecca M. Smith, Margaret A. Bettenhausen, Nathan A. Gambill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for State Defendant Appellees. Douglas J. Curlew,

CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee Elhorn Engineering Company.

MOORE, J., delivered the opinion of the court in which COLE, J., joined. LARSEN, J. (pp. 30–44), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. This case concerns the claims of several hundred children in Benton Harbor, Michigan, who drank lead-contaminated water from the City's public water system for three years and now suffer from the consequences of elevated lead levels in their blood. Plaintiffs filed suit in the U.S. District Court for the Western District of Michigan against several state officials and city officials, as well as two engineering firms, whom they blame for failing to mitigate and even worsening the lead-water crisis and misleading them about the dangers of the drinking water. They brought substantive-due-process and state-created-danger claims under 42 U.S.C. § 1983 and state-law negligence claims. The district court dismissed the complaint. We **AFFIRM IN PART** and **REVERSE IN PART**. Because Plaintiffs plausibly pleaded a violation of the right to bodily integrity against the city officials, we reverse and remand as to those officials and as to the municipality but affirm as to the state officials. We also reverse the district court's declination of supplemental jurisdiction over the state-law claims and remand for reconsideration.

## I. BACKGROUND

### A. Factual Background

This factual background is drawn from the allegations in Plaintiffs' complaint and the exhibits attached thereto. Because this case comes to us on an appeal of a motion to dismiss, we accept the complaints' allegations as true. In October 2018, routine water testing revealed that Benton Harbor's municipal water supply was contaminated with dangerous quantities of lead. R. 1 (Compl. ¶ 1) (Page ID #21). Plaintiffs, hundreds of children suing by and through their guardians or next friends, allege that the City of Benton Harbor ("City"); certain officials

employed by the City of Benton Harbor, Marcus Muhammad, Darwin Watson, and Michael O'Malley ("City officials"); certain officials employed by the Michigan Department of Environment, Great Lakes, and Energy ("EGLE")[1], Liesl Clark, Eric Oswald, Brandon Onan, and Ernest Sarkipato ("State officials"); and certain private engineering firms, Elhorn Engineering Co. and F&V Operations & Resource Management, Inc., bungled the lead-water discovery, failed to remediate and worsened the problem through their actions, and encouraged Plaintiffs to drink unsafe water.

As is well known, lead is a toxic metal that is particularly hazardous to children's health. *Id.* ¶¶ 336, 343 (Page ID #82–83). Even low-level lead exposure in children can cause lifelong consequences. *Id.* ¶¶ 343–44 (Page ID #83–84). Those consequences include impairment to the nervous system, anemia, hypertension, and harm to organ systems. *Id.* "The neurological and behavioral effects of lead are believed to be irreversible." *Id.* ¶ 344 (Page ID #84) (citation omitted).

Lead contamination of public drinking-water systems, like that in Benton Harbor, is caused by older lead pipes leading from water sources to homes and businesses. *Id.* ¶ 108 (Page ID #43). While the water source itself is not contaminated with lead, the traveling water, combined with sanitary treatment chemicals, can corrode the pipe walls and cause lead to leach into the drinking water. *See id.* ¶¶ 107–09 (Page ID #43). Water must be properly treated to prevent corrosion of lead pipes. *Id.*

Benton Harbor has long struggled to maintain its water system. The city of approximately 10,000 is situated on Lake Michigan, about one hundred miles east of Chicago. *See id.* ¶ 81 (Page ID #40). Like many cities along the Rust Belt, Benton Harbor has suffered from significant economic and population decline, resulting in "segregation, inequity, disinvestment, and concentrated poverty." *Id.* ¶¶ 82–83 (Page ID #40). Most of Benton Harbor's population is Black and Latino, and more than half live below the federal poverty line. *Id.* ¶ 91 (Page ID #41). Benton Harbor has maintained a public water-distribution system for more than one hundred years. *Id.* ¶ 95 (Page ID #42). Benton Harbor pulls its water from the

---

[1]EGLE was previously known as the Michigan Department of Environmental Quality.

surface of Lake Michigan and then filters and treats the water at the Benton Harbor Water Treatment Plant, before piping the water to homes and businesses. *Id.* ¶¶ 105–06 (Page ID #43).

A recent partial inventory of the service lines indicated that 51 percent still contained (or likely contained) lead, and only 2 percent were lead-free. *Id.* ¶¶ 101–03 (Page ID #42–43). Shortly before the lead contamination was discovered, defendant Ernest Sarkipato, a surface water treatment specialist and engineer at EGLE, mailed Benton Harbor a notice of "significant deficiencies" in numerous areas, "with the potential to allow or introduce contamination to the public water supply." R. 4 (Oct. 3, 2018 Letter at 2) (Page ID #282). The letter also noted a "lack[] [of] financial and managerial capacity to meet all the requirements" of the Michigan Safe Drinking Water Act. *Id.* at 1 (Page ID #281).

In October 2018, following mandatory triennial testing, officials in Benton Harbor discovered lead concentrations exceeding the federal action level in the public drinking water. R. 1 (Compl. ¶ 162) (Page ID #53). Ten percent of sites sampled returned lead levels of 22 ppb, more than the 15-ppb threshold. *Id.* Plaintiffs claim that the City and State Defendants, as well as certain engineering firms, badly mishandled this discovery.

Plaintiffs allege that, from the beginning, City and State officials failed adequately to convey the danger posed by the lead-contaminated water. On October 24, 2018, EGLE issued an advisory that told residents that "[t]he most important thing [they] can do is run water to flush out potential lead contaminants." R. 92-4 (Notice) (Page ID #845)[2]; *see* R. 1 (Compl. ¶¶ 163–66) (Page ID #53). Although the notice did not discourage residents from drinking the water, it advised them to use "cold water tap for drinking or cooking" and to use "bottled water to prepare baby formula." R. 92-4 (Notice) (Page ID #845).

To the extent that the EGLE advisory served to warn Plaintiffs about the contaminated water, the City undermined it at a press conference the next day, Plaintiffs allege. R. 1 (Compl.

---

[2]Although this document was attached to the State officials' motion to dismiss, we may consider it. "[W]e have recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014).

¶ 173) (Page ID #55).   During the press conference, defendant Marcus Muhammad, mayor of Benton Harbor, stated that the notice was "not being . . . delivered as a high alert, emergency 911, panic frenzy.  This is FYI, and you can work with our city staff to find out ways to get tested."  *Id.* ¶ 174 (Page ID #55).   Then defendant Darwin Watson, the former city manager, falsely told the public that the City had no lead water lines, and the county medical director, Dr. Rick Johansen, "misleadingly emphasized that this was not a system-wide crisis but isolated to individual plumbing."  *Id.* ¶ 175–76 (Page ID #55).   These communications left Plaintiffs with a misleading impression that the problem was "present in isolated, individual plumbing systems" and not the result of the City's failure to implement "proper corrosion controls" to prevent lead leaching from municipal and residential plumbing.  *Id.* ¶¶ 169–72 (Page ID #54).

The City's misleading communications continued:   In early January 2019, a Benton Harbor resident notified EGLE that she received a letter from the City indicating the water was "safe to drink after a 'first flush,'" and that, when she called defendant Michael O'Malley, then the City's drinking water superintendent, he informed her that the City was "delivering 'clean water right to the tap and [she] should have no problem drinking it.'"  *Id.* ¶¶ 198–200 (Page ID #59–60).   Around the same time, a nonprofit organization Fresh Water Future informed EGLE officials that O'Malley said the City was "not prov[id]ing filters or bottles [of water] for anyone," including homes testing above the action level, because the City was "provid[ing] clean water 'right to their spout.'"  R. 1-4 (Jan. 2019 Email) (Page ID #162); *see* R. 1 (Compl. ¶¶ 202–06) (Page ID #60).

Meanwhile, City and State officials failed to effectively address the City's aging lead-pipe infrastructure.  While the lead issues were not featured in the October 2018 warning letter from EGLE that preceded the lead exceedance, the State and City officials were on notice that the system at least contained lead.  R. 1 (Compl. ¶ 149) (Page ID #50).  As evidence, Plaintiffs point to a $284,000 grant from EGLE to the City to begin replacing lead and galvanized steel lines in May 2018, five months before the testing results came in.  *Id.* ¶ 148 (Page ID #50). Despite the known presence of lead pipes, the City "was not using any form of corrosion control" until, "at the earliest, four months after the exceedance/violations."  *Id.* ¶¶ 185–86 (Page ID #57).

In January 2019, the City began working with EGLE's recommended consultant, as well as with officials at EGLE, to develop a corrosion-control plan. *Id.* ¶¶ 188, 207 (Page ID #57, 61). O'Malley sent EGLE a proposal, recommended by Elhorn, to dose the water supply with Carus 8600, a "generic blend" of orthophosphate and polyphosphate used to control corrosion of lead pipes. *Id.* ¶¶ 138, 208–10 (Page ID #49, 61). The plan was debated by EGLE officials, who raised concerns about the appropriate amount of chemical to use and how the optimal dosage would be determined. *Id.* ¶¶ 211–12 (Page ID #61–62). But the officials ultimately reached a consensus. R. 1-7 (Feb. 7–21, 2019 Emails) (Page ID #194–95); R. 1-8 (Feb. 22–25 2019, Emails) (Page ID #199). EGLE approved the plan by the end of February 2019, and the City implemented it "under the approval, direction, and guidance of EGLE and Defendant Elhorn" on March 27, 2019. R. 1 (Compl. ¶¶ 213, 221) (Page ID #62–63). Plaintiffs contend this was inappropriate given EPA guidance on the use of polyphosphates, the lack of a preceding corrosion-control study, the failure to consider alternative treatments, and the failure to take special precautions in using the blended phosphate. *Id.* ¶¶ 213, 220, 222–26 (Page ID #62–64).

The treatment had no immediate effect. By June 2019, lead levels had risen to 27 ppb in the worst ten percent of samples, with the highest sample reaching 59 ppb. *Id.* ¶ 233 (Page ID #65). And although EGLE issued an administrative consent order requiring the City to submit either a corrosion control treatment proposal or a corrosion-control study by the end of April 2019, the City submitted only a one-page plan for a future study of the Carus 8600 treatment by that date. *Id.* ¶¶ 214–19 (Page ID #62–63). Nonetheless, O'Malley stated publicly that the corrosion plan was working ahead of schedule, even though few lead samples had been taken by that point. *Id.* ¶¶ 247–48 (Page ID #68). Later test results proved his statement false, as lead levels continued to rise. *Id.* ¶ 249 (Page ID #68).

In early 2020, defendant Brandon Onan, Supervisor of the Lead and Copper Unit at EGLE, wrote the City a letter indicating that the Carus 8600 blend was not working fast enough and ordered the City to change the treatment rate. *Id.* ¶¶ 253, 259 (Page ID #69–70). The letter was sent despite EGLE's initial internal concerns that the letter could bias the City's corrosion-control study, and that the City should instead investigate other options. *Id.* ¶¶ 254–58 (Page ID #69–70). EGLE ordered the City to hire a third-party consultant to implement the changes and

conduct a corrosion-control study by September 30, 2020.  *Id.* ¶¶ 261–264 (Page ID #70–71).
The City once again submitted a one-page proposal for a corrosion-control study that EGLE
described as insufficient because it was "not detailed" and because the City lacked the capacity
to implement the proposal due to staffing shortages at the water treatment plant.  *Id.* ¶¶ 269–74
(Page ID #72).  Meanwhile, the Carus 8600 dosage remained unchanged, and by the end of June
2020 the worst ten percent of homes continued testing with 23 ppb of lead, with the highest
sample testing at 440 ppb.  *Id.* ¶¶ 275–77 (Page ID #73).

      In July 2020, the City finally issued an advisory encouraging residents to drink bottled
water or to use water filters.  *Id.* ¶¶ 279–80 (Page ID #73).  But to the extent residents could not
access either, the City recommended flushing the pipes for a few minutes before drinking the
tap water.  *Id.* ¶ 281 (Page ID #74).  At this point, the City still had not completed a
corrosion-control study and instead submitted another proposal, which was approved by EGLE,
despite the City's lack of capacity to carry it out.  *Id.* ¶¶ 283–88 (Page ID #74–75).

      In November 2020, EGLE revoked O'Malley's license, and the City placed him on
administrative leave and terminated his employment.  *Id.* ¶ 289 (Page ID #75).  Subsequently,
the City contracted with engineering firm F&V Operations & Resource Management, Inc., to
take over day-to-day operation of the plant.  *Id.* ¶ 290 (Page ID #75).  By the end of December
2020, the lead levels continued to rise slightly, with the top ten percent having an elevated
presence of 24 ppb with the highest sampling at 240 ppb.  *Id.* ¶ 291 (Page ID #75).  Only in early
2021 did the City begin the process of requesting proposals to develop an optimal corrosion-
control process.  *Id.* ¶ 296 (Page ID #76).

      In the fall of 2021, EPA officials visited Benton Harbor and found that the F&V
employees charged with managing the plant could not answer simple questions or conduct the
tasks and testing necessary to operate it.  *Id.* ¶¶ 309–11 (Page ID #78–79).  EPA issued a
"scathing" report indicating that City and State officials had failed to comply with relevant
regulations and that the lead issues identified three years earlier still were unresolved.
*Id.* ¶¶ 316–17 (Page ID #79).  On November 2, 2021, EPA filed a unilateral administrative order
against the City, requiring the City to distribute public educational materials and to implement
monitoring devices throughout the system to ensure the corrosion control was working.

*Id.* ¶¶ 330–32 (Page ID #81–82).  Testing results around that time remained elevated, with an elevated presence of lead at 15 ppb with the highest sample testing at 48 ppb.  *Id.* ¶ 334 (Page ID #82).

Throughout this time, "Plaintiffs regularly drank tap water at home and other locations throughout Benton Harbor."  *Id.* ¶ 360 (Page ID #87).  They have since "been diagnosed with elevated blood-lead and/or bone-lead levels, and/or have exhibited signs and symptoms of lead poisoning."  *Id.* ¶ 364 (Page ID #87).  They also "suffer from cognitive deficits; behavioral issues; difficulty focusing; difficulty completing schoolwork, chores, and/or other tasks; and have other emotional issues."  *Id.* ¶ 366 (Page ID #88).  Plaintiffs contend these issues were "proximately caused by exposure to lead from Benton Harbor's tap water during the relevant time period."  *Id.* ¶ 367 (Page ID #88).

**B.  Procedural Background**

The present complaint was filed in the U.S. District Court for the Western District of Michigan on May 27, 2022.  Based on the allegations chronicled above, Plaintiffs raised several claims.  First, Plaintiffs alleged that the City and State Defendants violated their Fourteenth Amendment rights to bodily integrity (Count II), and to be free from state-created danger (Count I).  R. 1 (Compl. ¶¶ 369–404) (Page ID #88–96).  Second, Plaintiffs alleged that the engineering firms acted under color of law and violated those same rights (Counts III–IV).  *Id.* ¶¶ 405–39 (Page ID #97–104).  Third, Plaintiffs alleged state-law claims of negligence and professional negligence against the engineering firms (Counts VII–VIII).  *Id.* ¶¶ 440–66 (Page ID #104–09).[3]

In December 2022, the City and State Defendants moved to dismiss for failure to state a claim and based on qualified immunity.  The engineering companies moved to dismiss for failure to state a claim and asked the court to decline supplemental jurisdiction over the state-law claims.  On June 1, 2023, a magistrate judge issued a report and recommendation that the complaint be dismissed in full, and that supplemental jurisdiction be declined.  *Mitchell v. City of Benton Harbor*, No. 1:22-cv-475 (PJG), 2023 WL 5016921 (W.D. Mich. June 1, 2023).

---

[3]The complaint does not identify Counts V or VI.

Plaintiffs filed objections, which the district court overruled, adopting the report and recommendation, dismissing Plaintiffs' claims with prejudice and without leave to amend, and declining to exercise supplemental jurisdiction over the state-law negligence claims. *Mitchell v. City of Benton Harbor*, No. 1:22-cv-475 (HJB), 2023 WL 6304913 (W.D. Mich. Sept. 28, 2023). Plaintiffs timely appealed the dismissal of their federal claims against the City and State officials, as well as their state-law claims against Elhorn Engineering Co.[4] We have jurisdiction to review the final decision under 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A defendant asserting qualified immunity at the motion-to-dismiss stage may argue both that the facts set out in the complaint do not plausibly allege a violation of the plaintiff's statutory or constitutional right—that the complaint fails to state a claim—and that, even if so, the right was not clearly established at the time of the challenged conduct. We review the dismissal of claims for failure to state a claim and on qualified-immunity grounds *de novo*. *In re Flint Water Cases*, 960 F.3d 303, 323 (6th Cir. 2020).

## III. SUBSTANTIVE-DUE-PROCESS CLAIMS

Plaintiffs appeal the district court's dismissal of their substantive-due-process claims against the State officials, the City officials, and the City. Plaintiffs assert that the district court erred by concluding that they had not plausibly alleged a violation of their constitutional right to bodily integrity.[5] For the following reasons, we affirm as to the State officials and reverse as to the City officials and the City itself.

---

[4]On appeal, Plaintiffs do not challenge the district court's dismissal of their federal claims against Elhorn Engineering Co. Plaintiffs have also dismissed F&V Operations & Resource Management, Inc., from this appeal.

[5]Plaintiffs do not challenge the district court's dismissal of their substantive-due-process claims premised on state-created danger.

## A. Legal Standards

The Fourteenth Amendment prohibits the state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This due-process right has substantive and procedural components. The substantive component bars the state from depriving people of certain protected rights "regardless of the fairness of the procedures used to implement them." *Guertin v. Michigan*, 912 F.3d 907, 918 (6th Cir. 2019) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Among these protected rights is the right to bodily integrity, "an indispensable right recognized at common law as the 'right to be free from . . . unjustified intrusions on personal security' and 'encompass[ing] freedom from bodily restraint and punishment.'" *Id.* (alteration in original) (quoting *Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977)).

Although many bodily integrity cases arise in the context of government-imposed punishment or restraint, we recognized in *Guertin* that "the central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body." *Id.* at 919. "[I]ndividuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest." *Id.* (quoting *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012)). "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection." *Id.* at 920–21.

To establish a constitutional violation, a plaintiff must demonstrate not only that her bodily integrity was infringed, but also that it was infringed by government officials' discretionary, "constitutionally repugnant" actions. *Id.* at 922. Actions are constitutionally repugnant in the context of a bodily integrity violation when they "shock the conscience." *Id.* (quoting *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996)). Merely negligent conduct does not shock the conscience, but unjustifiable and intentionally injurious conduct usually does. *Id.* at 923. When conduct falls somewhere between these bookends—in

the neighborhood of recklessness or gross negligence—we evaluate the conduct in context to determine if the official was deliberately indifferent to a known risk of harm, "for what may 'constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). Among these considerations are "the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act." *Id.* at 924. When, for example, a government official acts recklessly during a fast-paced car chase or amid a prison riot, we are unlikely to find that he was deliberately indifferent to a known risk of harm. *Lewis*, 523 U.S. at 852–53 (citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). But when officials have time to consider their actions, but nonetheless subject individuals to an unjustified risk of harm, their behavior is more likely to offend the Constitution. *Id.* at 851–53; *Guertin*, 912 F.3d at 924.

**B.  Application to Lead-Water Cases**

Beginning in *Guertin*, we have applied these principles in a series of cases concerning the lead contamination of drinking water supplies in Flint, Michigan, and Benton Harbor. In *Guertin* and *In re Flint Water Cases*, Flint residents alleged that city and state officials manufactured a lead-water crisis by switching the city's municipal water source from Lake Huron to the Flint River for cost-cutting reasons. *In re Flint Water Cases*, 960 F.3d at 311–15. That decision was allegedly made despite officials' knowledge that the river water had high chlorine levels that, if left untreated, would corrode the aging pipes and cause lead to leach into the drinking water, and notwithstanding the lack of precautions. *Id.* at 314–15. The results were predictable: within weeks, lead levels in the water were rising, and residents became ill with bacterial disease from the water. *Id.* at 315–16. Instead of conceding error, officials covered up the crisis, doctoring testing results and falsely assuring residents that the water was safe to drink. *Id.* at 316–20.

We allowed substantive-due-process claims to proceed against many of the municipal and state defendants in the Flint Water Crisis cases. *Guertin*, 912 F.3d at 927-30; *In re Flint Water Cases*, 960 F.3d at 324. When doing so, we reasoned that these officials infringed residents' rights to bodily integrity by "knowingly and intentionally introducing life-threatening

substances into individuals without their consent." *Guertin*, 912 F.3d at 921.  By engineering the shift to the Flint River and then covering up the crisis and offering false assurances to the public, these officials undertook affirmative acts that led individuals to consume contaminated water without their knowing consent. *Id.* at 926–29.  Their conduct was conscience shocking because it was undertaken after a lengthy period of decision making and without any legitimate government purpose. *Id.* at 925.  "[J]ealously guarding the public's purse cannot, under any circumstances, justify the yearlong contamination of an entire community." *Id.* at 926.

At the same time, we refrained from imposing liability on individuals who were aware of issues relating to the water crisis but who were not alleged to have personally made decisions regarding the water-source switch or otherwise caused Plaintiffs to drink the contaminated water. *Id.* at 929–30.  We also declined to hold liable certain officials who failed to blow the whistle, but whose inaction was not factually linked to the residents' consumption of the tainted water. *Id.* at 932.

 In sum, when officials took affirmative steps, "with deliberate and reckless indifference to the likely results," that caused residents to drink contaminated water without their consent, we determined that a constitutional violation was plausibly alleged. *Id.* at 927.  But when officials merely failed to remedy a situation of which they were aware, we did not find a constitutional violation adequately pleaded. *See In re Flint Water Cases*, 960 F.3d at 327–29 (finding deliberate indifference based on officials' alleged role in creating, failing to mitigate, and covering up the crisis).

Subsequently, in *Braziel v. Whitmer*, No. 23-1954, 2024 WL 3966238, at *5 (6th Cir. Aug. 28, 2024), we applied *Guertin*'s reasoning to a complaint against two city officials sued in relation to the Benton Harbor water crisis.  We held that the complaint did not plausibly allege that Mayor Muhammad was deliberately indifferent to the risk of lead poisoning based on general allegations that he failed to notify the public about lead levels, violated legal notice requirements, and made unspecified false statements that the tap water was safe to drink. *Braziel*, 2024 WL 3966238, at *6.  But we held that a plausible allegation of deliberate indifference was made as to the former Water Superintendent O'Malley, who "repeatedly denied, lied, and covered up [the] public health emergency" by advising residents the water was safe to

drink, despite his intimate knowledge of the municipal water system. *Id.* at *8 (alteration in original) (quotation marks omitted). Because Plaintiffs supported their general allegation with specific examples, O'Malley fell into the category of officials recognized in *Guertin* to have taken affirmative actions to persuade the public to drink the water, and to have the requisite culpability in doing so. *Id.* at *8–9.

## C. State Officials

Plaintiffs press substantive-due-process claims against four State officials involved in the Benton Harbor water crisis. Plaintiffs' allegations against the State officials can be grouped in three categories. First, the State officials allowed or encouraged the City to adopt a corrosion inhibitor, Carus 8600, without adequate vetting or a concurrent control study. Second, the State officials did not do enough to ensure that the City corrected the lead water problems. Third, the State officials misled the public about the severity of the crisis.

Because Plaintiffs do not allege that the State officials acted with any intent to injure, we must consider whether they acted with deliberate indifference. *In re Flint Water Cases*, 960 F.3d at 324. Upon consideration of the facts alleged, we conclude that Plaintiffs have not pleaded a plausible constitutional violation by the State officials because the complaint does not allege deliberately indifferent action; at most, the complaint suggests negligence and poor policy choices, motivated at times by a legitimate governmental purpose.

As explained above, our consideration of deliberate indifference requires consideration of contextual factors, including the time to deliberate, the relationship among the parties, and whether the officials acted in service of any legitimate governmental purpose. *Guertin*, 912 F.3d at 924. It is undisputed here that the State officials had time to deliberate over their actions; the conduct allegedly took place over the course of years "and did not arise out of time-is-of-the-essence necessity." *Id.* at 925. Because officials had time to consider their actions, we hold them to a higher standard than we would if they had reacted to an instantaneous emergency. *See id.*

Further, as we recognized in *Guertin*, the relationship between the parties is to some degree involuntary. Although the Plaintiffs here do not point us to ordinances, as in *Guertin*, that

mandate water uptake by residents, *see id.*,[6] we can infer that Benton Harbor's substantial portion of low-income residents have no choice but to rely on the City's tap water. *See* R. 1 (Compl. ¶ 112 n.7) (Page ID #44) (noting that Benton Harbor's residents have a median individual income of $16,000). Moreover, like the residents in *Guertin*, the residents of Benton Harbor received false assurances from at least City officials that their water was safe to drink. *See* R. 1 (Compl. ¶¶ 173–76, 198–206) (Page ID #55, 59–60). Drawing all reasonable inferences in favor of the Plaintiffs, these "assurances of the water's potability hid the risks, turning residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination." *Guertin*, 912 F.3d at 925–26.

Plaintiffs also argue that in considering the entirety of the situation, we should take account of Defendants' knowledge of the condition of the Benton Harbor water system, the risks of lead poisoning to children, and the recent experience in Flint. D. 25 (Pls.' Br. at 44). We agree that this contextual information is relevant to the constitutional analysis because an official can be held liable only if he or she is aware of the risks. *See Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014) ("[I]t is the entirety of the situation that must be assessed, including a defendant's awareness of the kind and degree of risk, and of the right threatened.").

Notwithstanding these considerations, the complaint does not allege a constitutional violation by the State officials. We start with Plaintiffs' allegations that the State officials violated their right to bodily integrity by implementing the Carus 8600 corrosion control without adequate study or precautions. This allegation does not support a deliberate indifference claim because Carus 8600 was implemented in furtherance of a legitimate public purpose.

"[T]o find deliberate indifference, . . . *we [] must make some assessment that [the officer] did not act in furtherance of a countervailing governmental purpose that justified taking that risk.*" *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 541 (6th Cir. 2008) (emphasis added). "It is in the very nature of deliberative bodies to choose between and among competing policy options, and yet a substantive-due-process violation does not arise whenever

---

[6]Plaintiffs point us to Benton Harbor, Mich., Code of Ordinances §§ 44-16 to 20. D. 25 (Pls.' Br. at 40). Contrary to Plaintiffs' contentions, those ordinances do not require Plaintiffs "by law to connect to the water supply." *Id.*

the government's choice prompts a known risk to come to pass." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005).

The Carus 8600 treatment was implemented to further the legitimate government purpose of reducing the levels of lead in Benton Harbor's water supply. *See* R. 1 (Compl. ¶¶ 207–13, 244, 253–59) (Page ID #61–62, 67, 69–70); R. 1-13 (Feb. 13, 2020 Letter) (Page ID #228–30) (urging the City to alter the corrosion-control treatment rate to "speed up treatment effectiveness" and "more efficiently lower corrosion rates"). Nothing in Plaintiffs' complaint suggests otherwise. Plaintiffs allege that Carus 8600 was a poor choice among the various corrosion-control options; according to the complaint, it was not tailored to the unique conditions of Benton Harbor's historically neglected water system and was unlike proposals made and implemented in other communities with known lead water issues. R. 1 (Compl. ¶¶ 210–11) (Page ID #61–62). But there is no suggestion in the complaint that the State officials adopted the Carus 8600 treatment "for some 'arbitrary' reason." *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 935 (6th Cir. 2020).

We have consistently recognized that poor choices made in furtherance of a legitimate government interest are not deliberately indifferent. For example, in *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002), we considered whether a police chief was deliberately indifferent to the risk of harm by his actions in an unsuccessful standoff, during which the suspect shot his son before police entered the home. *Id.* at 499, 511–16. We rejected plaintiffs' challenge to the police chief's "choice among necessarily risky alternative[s]." *Id.* at 514. We recognized that "[m]erely demonstrating that [the chief] incorrectly assessed the competing risks may demonstrate negligence on [the chief's] part, but it is not enough to show a callous disregard for the safety of [the victims]." *Id.*

Plaintiffs' challenge to EGLE's response is much the same: with the benefit of hindsight, they question the State officials' decisions and suggest they should have done more to optimize the corrosion control and halt the lead levels sooner. Even if employing Carus 8600 had an effect of elevating lead levels for some time (as Plaintiffs suggest), these claims sound in negligence, not deliberate indifference. *See, e.g.*, *Jane Doe*, 954 F.3d at 935–36 (concluding that school district did not engage in conscience-shocking behavior when it took certain precautions

with respect to dangerous student that did not prevent the ultimate harm). The choice to implement Carus 8600, rather than some other chemical or waiting to conduct a corrosion-control study, was a policy choice about the best way to remedy a known risk. *See* D. 32 (State Br. at 15) (arguing that a "pretreatment corrosion control study would have delayed treatment implementation, and lead remediation, by several months"). "[I]t is generally not for the courts to compel affirmative steps in one area at the expense of another in weighing competing policy options." *Schroder*, 412 F.3d at 730.

The State officials' implementation of Carus 8600 is wholly unlike the conduct we deemed deliberately indifferent in *Guertin* or *In re Flint Water Cases*. There, the conduct there was *not* aimed at remedying the situation. To the contrary, we noted that the Flint-related complaints plausibly alleged that the water-source switch was motivated by an unjustified pursuit of cost savings. *Guertin*, 912 F.3d at 926.[7] Any justified failure to implement corrosion control did not explain the initial switch to the Flint River or the coverup that followed. *In re Flint Water Cases*, 960 F.3d at 327. Plaintiffs have offered no competing inference that can be drawn with respect to the purpose underlying the State officials' actions.

The State officials' failure to take more vigorous action to remedy the lead-water crisis or to require a corrosion-control study also sounds in negligence, not deliberate indifference. For example, Plaintiffs cite the factual allegation that Oswald "waited *five months* after the first documented lead action level exceedance to issue an [administrative consent order]," allowing the Carus 8600 treatment to be used before a study was conducted. D. 25 (Pls.' Br. at 28) (citing R. 1 (Compl. ¶¶ 214, 222–27) (Page ID #62–63)). Similarly, they cite factual allegations that suggest Sarkipato "fail[ed] to do anything upon learning the City could not meaningfully monitor the water safety after implementing Carus." *Id.* at 31 (citing R. 1 (Compl. ¶ 221) (Page ID #63)).

---

[7]In *Guertin*, we distinguished two Second Circuit cases concerning statements by public officials about the air quality in lower Manhattan in the wake of the 9/11 terrorist attacks, because "those matters involved the balancing of competing governmental interests—restoring public services and protecting public health—during a time-sensitive environmental emergency." *Guertin*, 912 F.3d at 929 (citing *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007), and *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008)). Here, unlike in *Guertin*, facts akin to *Lombardi* and *Benzman* are present "on the face of [P]laintiffs' complaint." *Id.* As explained above, Plaintiffs' complaint demonstrates that Carus 8600 was adopted as a public-health solution in the wake of the lead-water revelations in Benton Harbor.

And, with respect to Onan, they cite his letter to the City regarding the control treatment's ineffectiveness which failed to encourage City officials to "investigate *different corrosion control options*." *Id.* at 33 (citing R. 1 (Compl. ¶¶ 253–60) (Page ID #69–70)).

Plaintiffs' allegations amount to a claim that the State officials made "bad choices" in how they responded to an existing lead-water crisis. *Guertin*, 912 F.3d at 924. "As will often be the case in retrospect," the State officials "could have done more." *Jane Doe*, 954 F.3d at 936; *see Ewolski*, 287 F.3d at 516 ("[I]mprudence and poor execution do not rise to the level of constitutionally arbitrary abuses of power."). But the State officials' allegedly inept and sluggish efforts are not conscience shocking.

Finally, Plaintiffs' claim that State officials misled the public about the risks of drinking the Benton Harbor tap water does not alter our conclusion because Plaintiffs have not plausibly alleged that the State officials made misleading statements that caused Plaintiffs to drink the water. We consider the examples on which Plaintiffs principally rely. As to Oswald, Plaintiffs charge that he misled the public in a November 2019 letter to the Great Lakes Environmental Law Center. D. 25 (Pls.' Br. at 29) (citing R. 1 (Compl. ¶¶ 243–44) (Page ID #67)). But the letter itself undermines Plaintiffs' characterization of it. *In re Flint Water Cases*, 960 F.3d at 329 ("When a document attached to the complaint contradicts the allegations, the document trumps the allegations."). Rather than "indicat[e] that everything was safe as to the water being treated and distributed" by Benton Harbor, R. 1 (Compl. ¶ 243) (Page ID #67), the letter describes the steps that EGLE was taking in partnership with the City and emphasizes the importance of continuing to filter water in Benton Harbor. R. 92-17 (Oswald Letter at 1) (Page ID #1030) ("This initial and ongoing process of mitigating exposure to lead in drinking water with filters cannot be emphasized enough . . . ."). Plaintiffs also charge that Oswald made "dishonest[]" remarks that the Carus 8600 system was working to reduce corrosion rates, R. 1 (Compl. ¶ 244) (Page ID #67), but the letter states only that "results from the initial coupon study . . . showed that the blend and the dosage currently being used by the City is effectively reducing corrosion rates," R. 92-17 (Oswald Letter at 2) (Page ID #1031). And Plaintiffs have not raised any factual allegations that the actual statement was false or misleading.

As to Sarkipato, Plaintiffs claim that he did not do enough to counteract O'Malley's alleged statement to a resident that the water was safe to drink or upon learning that residents had not received water filters.  D. 25 (Pls.' Br. at 32).  However, the only allegation concerning Sarkipato's public statements is to the contrary.  When the resident called to report O'Malley's comment that the water was safe to drink from the tap, Sarkipato talked to the resident about "ways residents can reduce their risk."  R. 1-4 (Jan. 9, 2019 Emails at 1) (Page ID #162).  This is not enough to suggest that Sarkipato was responsible for misinformation that led Benton Harbor residents to drink unsafe water.

Finally, a word about EGLE Director Liesl Clark.  Plaintiffs do not allege that Clark was specifically involved any of the decisions discussed above.  Clark is the director of EGLE, and Plaintiffs argue that she "failed to take any action to mitigate the crisis, even though her responsibilities as EGLE Director required her to do so."  D. 25 (Pls.' Br. at 26).  Plaintiffs' claims against Clark fail because they do not allege any personal action or inaction that caused the people of Benton Harbor to drink lead-contaminated water.  While the complaint alleges that she made "decisions and statements that concealed and prolonged" the Benton Harbor water crisis, R. 1 (Compl. ¶ 70) (Page ID #36), this general statement is not supported by factual allegations.  The only factual allegation set forth against Clark is that, three years into the crisis, she first avoided questions posed by a legislative committee, and then admitted the water in Benton Harbor was not safe to drink.  *Id.* ¶¶ 322–28 (Page ID #80–81).

Although it is true that Clark has a senior role in EGLE, § 1983 is not a doctrine of respondeat superior, and Plaintiffs have not plausibly alleged that Clark is personally responsible for what happened here.  *Does v. Whitmer*, 69 F.4th 300, 306–07 (6th Cir. 2023).  No specific, factual allegations in the complaint suggest that she "authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of [her] subordinates through the execution of [her] job functions."  *Id.* at 306 (quoting *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021)); *see Guertin*, 912 F.3d at 929 (reversing denial of motion to dismiss as to Daniel Wyant, director of the Michigan Department of Environmental Quality, because "while the conduct of individuals within his department was constitutionally abhorrent, we may only hold Wyant accountable for his own conduct, not the misconduct of his subordinates").

In sum, the complaint does not plausibly allege that any of the State officials violated Plaintiffs' rights to bodily integrity.  The allegations suggest, at most, that the officials were negligent in performing their duties of ensuring that Benton Harbor residents had a safe water supply.  The complaint does not support an inference that these officials acted for improper purposes, covered up their actions, or engaged in any campaign to mislead the public into drinking tainted water.  What we have here is not deliberate indifference to a known risk of harm.  Accordingly, we affirm the district court's dismissal of the claims against the State officials.

**D.  City Officials**

Plaintiffs also assert substantive-due-process claims against the City officials and the City itself.  The claims against these defendants turn primarily on the statements the City officials made to the public suggesting that the water in Benton Harbor was safe to drink and that the problem was not as widespread as it turned out to be.  Plaintiffs also allege that Watson and O'Malley were deliberately indifferent in implementing the Carus 8600 solution, while failing to conduct a full assessment of the problem and optimal solutions.

We begin by recognizing, as we did with the State officials, that the decisions here were largely undertaken with the benefit of time.  And the residents of Benton Harbor can hardly be understood to stand in a voluntary relationship with the public water supply.  So, we turn to whether any of the City officials' actions were undertaken for some legitimate governmental purpose, or whether Plaintiffs have plausibly alleged deliberate indifference here.

We begin with allegedly misleading statements.  There is rarely a justification for misleading the public about the extent of a lead-water crisis; Defendants have offered no legitimate government purpose for providing information that downplayed the extent of the danger.  *See Guertin*, 912 F.3d at 926.[8]  Accordingly, our question is whether the complaint plausibly alleges that they made false and misleading statements.  Unlike the allegations

---

[8]*But see Lombardi*, 485 F.3d at 83 (holding that EPA's false statements about the air quality in lower Manhattan after the September 11 attacks were justified by the competing governmental purposes present after the attacks).

concerning the State officials, the complaint's allegations regarding the City officials tell a plausible tale of deliberate indifference to a known risk of harm.

Beginning from when the lead-water exceedance was first discovered, the individual City officials each made statements "downplay[ing] the severity of lead in the water." R. 1 (Compl. ¶ 173) (Page ID #55). Mayor Muhammad, at an early press conference, undermined an EGLE lead advisory, stating that it was "not being . . . delivered as a high alert, emergency 911, panic frenzy" but just as an "FYI." *Id.* ¶ 174 (Page ID #55). During the same press conference, City Manager Watson falsely stated that the City itself had no lead lines, attributing the problem to isolated connection lines between certain homes and the water mains, even though the City had recently received a grant to replace lead water lines. *Id.* ¶ 175 (Page ID #55). Watson would not correct that statement for another month. *Id.* ¶ 194 (Page ID #58).

Just three months later, EGLE officials learned that former Drinking Water Superintendent O'Malley told at least one person that the City's water was clean and could be drunk directly from the tap. *Id.* ¶ 200 (Page ID #60). The EGLE officials also learned that the City had sent letters advising residents that "the water [was] safe to drink after a first flush." *Id.* ¶ 199 (Page ID #59). This came as a surprise because City officials previously "said they would" be "providing water or filters." R. 1-4 (Jan 2019 Emails) (Page ID #162). O'Malley also attempted to cover up the extent of the problem or, at least, remained willfully blind to its scale and severity. According to the complaint, O'Malley "obscur[ed] [the] City's lead testing" by "refus[ing] to disclose the addresses of the testing sites to EGLE" and attempted to reduce the number of testing sites. R. 1 (Compl. ¶¶ 228–30) (Page ID #64–65). And once the City began implementing the Carus 8600 protocol, "City officials dishonestly and publicly stated that inroads were being made regarding eliminating lead from the water," even as lead levels were rising. *Id.* ¶ 245 (Page ID #68). For example, in November 2019, O'Malley told members of a public City committee that the corrosion control was "having an impact sooner than" expected, even though he had tested only seven homes. *Id.* ¶¶ 246–48 (Page ID #68). O'Malley had to withdraw that statement two months later. *Id.* ¶ 251 (Page ID #69).

Meanwhile, as they underplayed the crisis and overplayed the effectiveness of measures taken to address it, the City officials made no serious efforts at studying the problem or its

optimal solution and failed meaningfully to respond to EGLE's demands that they do so. Although they implemented the Carus 8600 treatment for, as we have explained, a legitimate public purpose, they repeatedly failed to conduct a corrosion-control study to optimize that treatment or determine if a different approach was needed. *Id.* ¶¶ 179–80, 215–18, 263–71 (Page ID #56, 63, 71–72). Although these actions might indicate mere negligence when viewed in isolation, they further support the Plaintiffs' allegations that City officials acted with deliberate indifference.

These allegations suffice to advance the claims against the City officials past the motion to dismiss. Drawing all reasonable inferences in favor of the Plaintiffs, the City officials misled the public about the nature of the lead-water crisis from the moment the lead-level exceedance was discovered. Watson characterized the crisis as localized to individual homes, even though he knew the problem was systemic from the outset. And then City officials downplayed the scale of the emergency and advised people to drink the tap water replete with lead. Rather than working earnestly to resolve the problem, the City officials skirted recommended guidelines and sought to minimize lead-water testing. And when they began to implement a solution to the problem, the City officials provided the public with a recklessly rosy picture of the progress made, leading the public to think the problem was being resolved when, in fact, the water was still too dangerous to drink.

The City officials make various arguments in response. First, they suggest that the allegations are not sufficient as to each individual Defendant. Section 1983 liability is assessed individually, based on the affirmative acts of the individual Defendants. *Hart v. Hillsdale County*, 973 F.3d 627, 639 (6th Cir. 2020) ("[E]ach defendant's liability must be assessed individually based on his own actions.") (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). But in reviewing a complaint, we must be careful not to excessively parse statements or reduce generalized allegations to the concrete examples that support them. Here, the complaint generally alleges that the City officials "misled the public about the true extent of the Benton Harbor water crisis and the dangers of lead." R. 1 (Compl. ¶ 146) (Page ID #50); *see id.* ¶ 379 (Page ID #91) (alleging that City officials "deliberately denied, lied about, covered up, deceived, discredited, and ignored known dangers and risks of harm to which they exposed

Plaintiffs, making them more vulnerable to said dangers"). And the complaint supports that general allegation with specific instances attributed to each Defendant. We may infer at this stage based on the specific and general allegations that all three City officials contributed to that misleading impression and thereby caused Plaintiffs to drink the lead-contaminated water. *See Hart*, 973 F.3d at 640 ("Winnowing the defendants is not possible until an evidentiary record is developed."); *Moderwell v. Cuyahoga County*, 997 F.3d 653, 663–64 (6th Cir. 2021).[9] Discovery will clarify the scope of each person's responsibility, and the Defendants may renew their arguments about individual responsibility at summary judgment.

The differences between the allegations in *Braziel* and the allegations in this complaint are instructive. In *Braziel*, we held that the complaint failed to state a claim against Muhammad because the complaint did "not point to any specific statements that Muhammad himself made" "regarding the safety of the water and measures to address lead in the water." 2024 WL 3966238, at *6. Here, by contrast, the complaint specifically alleges that Muhammad told the public that a notice about water lead levels was "not being . . . delivered as a high alert, emergency 911, panic" but just as an "FYI." R. 1 (Compl. ¶ 174) (Page ID #55). Further, the complaint alleges that the City, of which Muhammad was mayor, sent letters indicating the water was safe to drink and made statements overstating progress made in eliminating the lead. Although the press conference remark could possibly be viewed as intending to prevent a public panic, and not to deliberately mislead, all inferences are drawn in the Plaintiffs' favor at this stage. These allegations lend plausibility to Plaintiffs' claim that Muhammad downplayed the crisis and misled the public to believe that the water was safe to drink. Similarly, the general allegation as to Watson is supported by the specific allegation that he lied about the presence of lead water lines in the City's system. This statement was made at the same press conference in which Muhammad downplayed the extent of the crisis. There is no indication that Watson corrected Muhammad's misstatement. "The context of statements is often telling." *City of Monroe Employees Ret. System v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005). As we

---

[9]The dissenting opinion's attempt to distinguish *Hart* and *Moderwell* is unpersuasive. There, as here, the complaint plausibly demonstrated that the officials were liable, but it was difficult at the motion-to-dismiss stage to determine who was responsible for each specific act. Similarly, here, discovery will reveal who of these high-ranking City officials is responsible for various actions and communications by the City.

have recognized in the securities fraud and defamation realms, circumstances and surrounding comments are relevant to determining whether an individual's statement is misleading or false. *See id.*; *Boulger v. Woods*, 917 F.3d 471, 481 (6th Cir. 2019). Here, too, the context of the statement heightened its effect and plausibly contributed to the false impression that the water was safe to drink.

The dissenting opinion contends that the complaint does not plausibly allege individual misconduct as to Muhammad and Watson and that our conclusion improperly imputes their "guilt-by-association" with O'Malley. Dissenting Op. at 38. We disagree. We have considered the statements of Muhammad and of Watson, in the contexts in which they were made. Considering the City officials' actions and statements together is not imposing liability on some for the actions of others, but rather recognizing that these statements were made in succession amid the context of inaction as to the lead-water crisis, and that it does violence to the complaint to consider each remark in isolation. The dissenting opinion also recognizes that context is important—but applies that lesson only to diminish the culpability of Muhammad and Watson. The dissenting opinion points out that Muhammad's statement was made contemporaneously with notices sent to the public indicating that some of the drinking water was contaminated with lead. Dissenting Op. at 33. But rather than construing Muhammad's statement as especially culpable, insofar as it diminished the effect of the notices, the dissenting opinion draws the conclusion that Muhammad intended only to reduce public panic. Likewise, the dissenting opinion insists that Watson's statement about the presence of lead service lines was innocuous because he acknowledged that connections between the water main and some home service lines might be the source of lead and admitted he was wrong weeks later. *Id.* at 36–37. Yet, drawing reasonable inferences in Plaintiffs' favor, this statement was misleading because residents may have believed their own connections were lead-free and that they were not at risk. At this stage, we must draw reasonable inferences in favor of the plaintiffs, which we have done here.

Second, the City officials argue that the claims should not move forward because the allegations are not outrageous enough. *See* D. 33 (City Defs.' Br. at 14) (contending that the claims against Mayor Muhammad fail because "they do not rise to the constitutional level of 'so inspired by malice or sadism . . . that [it] amount[ed] to a brutal and inhumane abuse of official

power'" (quoting *Lillard*, 76 F.3d at 725).  Although the shocks-the-conscience standard is highly context dependent, *Guertin*, 912 F.3d at 923, we have already recognized that it shocks the conscience when government officials lie to the public about the contamination of the public drinking water with lead.  *In re Flint Water Cases*, 960 F.3d at 327–30 (finding deliberate indifference as to multiple state officials who made false and misleading public comments about the safety of the lead and bacteria-contaminated water in Flint); *accord Braziel*, 2024 WL 3966238, at *9 (finding allegations regarding O'Malley's public statements conscience shocking).  If Plaintiffs' claims are true—that the City officials lied about the presence of lead in the Benton Harbor water supply, thereby causing residents to drink the water—that would shock the conscience.  That is all we need to find for now.

Third, the City officials argue that there can be no constitutional violation here because the claims are premised "solely on inaction, deficient remedial action, or misrepresentation." D. 33 (City Defs.' Br. at 9).  They assert that "*Guertin* is fundamentally different from this case because officials were alleged to have intentionally caused the water contamination by changing water sources despite known risks." *Id.*  But plaintiffs alleging violations of the right to bodily integrity arising from drinking lead-contaminated water do not need to set forth factual allegations identical to the extraordinary mismanagement in the Flint Water Crisis to prevail.  In any event, the City officials misread *Guertin* and entirely fail to acknowledge *In re Flint Water Cases*, both of which are binding precedent in this circuit.  In both cases, we recognized that officials in Flint independently violated residents' substantive-due-process rights by misrepresenting the safety of the water because "[m]isleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional." *Guertin*, 912 F.3d at 926 (citation omitted); *accord In re Flint Water Cases*, 960 F.3d at 327–30; *Braziel*, 2024 WL 3966238, at *5 ("Even on their own, public statements by government officials misleading and lying to the public about the safety of the water supply can suffice to establish a constitutional violation."). For example, we allowed claims to proceed against Michigan Department of Environmental Quality Director of Communications Brandon Wurfel based on allegations that he "announced the water was safe to drink, and demeaned, belittled, and aggressively dampened attempts by the

scientific community to challenge the government's assertions that Flint did not have a problem with its drinking water." *Guertin*, 912 F.3d at 928; *accord In re Flint Water Cases*, 960 F.3d at 329 (rejecting Wurfel's argument that "'mere' public statements cannot violate a person's right to bodily integrity"). Accordingly, this argument is unconvincing.

Lastly, the City officials argue that qualified immunity shields their actions because Plaintiffs have not demonstrated that the right they assert is clearly established. But we have already recognized that "government officials who play a 'role in creating, sustaining, and covering up [a water crisis]' have 'violate[d] [the victims'] right to bodily integrity,' and that this right to bodily integrity is clearly established under the Due Process Clause of the Fourteenth Amendment." *Braziel*, 2024 WL 3966238, at *5 (alteration in original) (quoting *In re Flint Water Cases*, 960 F.3d at 323); *see Guertin*, 912 F.3d at 933–35. In *Guertin* and *In re Flint Water Cases*, we recognized this as a preexisting, clearly established right. The dissenting opinion mischaracterizes *Guertin*'s "clearly established" analysis as resting exclusively on the obviousness of the constitutional violation there. *See* Dissenting Op. at 42–43. Although *Guertin* recognized that the officials' alleged conduct was so egregious that it "would alert a reasonable person to the likelihood of personal liability," 912 F.3d at 933 (quoting *Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003)), the opinion also relied on a long line of due-process case law clearly establishing that "an individual's right to bodily integrity is sacred, founded upon informed consent, and may be invaded only upon a showing of a government interest," *id.* at 934. Even though an exact factual analog had not previously arisen, "the right to bodily integrity claim there was compelled by the logic and reasonable inferences of [] prior decisions." *Id.*[10] As we recognized in *Guertin*, discovery might reveal that the City officials' actual conduct fell far outside the scope of the clearly established right recognized in our prior decisions or that the City officials were motivated by a legitimate government purpose. *See id.* at 935. The City officials are free to renew this argument at summary judgment. For now, we decline to dismiss based on qualified immunity. The district court's grant of the motion to dismiss as to the City officials will be reversed.

---

[10]It is worth noting that specific conduct attributed to O'Malley in the complaint largely post-dated the issuance of *Guertin*, and the holding of that case also would have put him on notice of the unconstitutionality of his conduct.

**E.  *Monell* Claim against the City of Benton Harbor**

Plaintiffs finally seek to hold the City liable for the violations of their right to bodily integrity.  Plaintiffs rest their *Monell* claim on the actions of the City officials who were allegedly the "final decision makers with respect to their decisions regarding treatment of the contaminated water, their decisions to conceal the crisis, and their decision to lie about the safety of the water." D. 25 (Pls.' Br. at 42).  Having concluded that the claims can go forward against the individual City officials, we allow the *Monell* claim to proceed, as well.

"[A] municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Because the claims will move forward against each of the City officials, including Mayor Muhammad, the *Monell* claim survives, as well.  *Cf. Braziel*, 2024 WL 3966238, at *10 (concluding *Monell* claim could not proceed because Plaintiffs had not plausibly alleged liability against Muhammad).  The district court's grant of the motion to dismiss as to the City of Benton Harbor will be reversed.

## IV.  LEAVE TO AMEND

Plaintiffs contend that the district court erred by dismissing their claims without leave to amend.  "When a district court denies a plaintiff's motion for leave to amend the complaint because it would have been futile, we typically review that decision de novo because it is a purely legal conclusion." *Swanigan v. FCA US LLC*, 938 F.3d 779, 789 (6th Cir. 2019).  But where the plaintiff requested to amend their complaint "without either formally moving for leave

to amend or giving grounds for amendment, we review for abuse of discretion." *Id.* (quoting *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 322 (6th Cir. 2017)).

Plaintiffs arguably sought leave to amend twice before dismissal in this case.  At oral argument on the motions to dismiss, when the magistrate judge expressed concern that Plaintiffs' claims were too conclusory to support a claim of a constitutional violation against public officials, Plaintiffs' counsel argued that, if the magistrate judge read the complaint as deficient in that way, then he should "give [Plaintiffs] a chance to amend the complaint." R. 119 (Oral Arg. Tr. at 22) (Page ID #1737).  Next, in their objections to the magistrate judge's report and recommendation of dismissal with prejudice, Plaintiffs argued that the complaint should not be dismissed without opportunity to amend. R. 121 (Objs. at 38) (Page ID #1910).  The district judge rejected Plaintiffs' argument for two reasons:  (1) Plaintiffs had not filed a proposed amended complaint as required by the local rules pertaining to a motion to amend; and (2) the court "cannot discern a path forward for their claims" because, as relevant here, Plaintiffs' substantive-due-process claim was "based on facts that suggest negligence, rather than deliberate indifference." *Mitchell*, 2023 WL 6304913, at *11.

Rule 15 provides that courts "should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2).  Generally, "[i]f it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief, the court should dismiss with leave to amend." *Tolliver v. Noble*, 752 F. App'x 254, 263 (6th Cir. 2018) (alteration in original) (quoting 6 Charles A. Wright, et al., *Federal Practice and Procedure* § 1483 (3d ed. 2010)).  However, we have refrained from applying this liberal policy of amendment when plaintiffs make only a cursory request for relief and fail to attach a copy of a proposed amended complaint.  *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014); *Swanigan*, 938 F.3d at 789–90.  Plaintiffs briefly argued that leave to amend was appropriate where the magistrate judge found the complaint "long on conclusions and short on specifics," R. 121 (Objs. at 38) (Page ID #1910) (quoting R. 120 (R. & R. at 36) (Page ID #1843)), but they never explained what would be accomplished by amendment, nor did they attach an amended complaint (as required by the local rules).  Accordingly, the district court did not abuse its discretion by denying leave to amend.  We have now reinstated the claims against

the City officials and the City, and on remand we leave it to the district court to decide whether to entertain an amended complaint.

## V.  SUPPLEMENTAL JURISDICTION

Plaintiffs finally contend that the district court erred by declining to exercise supplemental jurisdiction over their state-law claims against Elhorn.  "We review a district court's decision declining to exercise supplemental jurisdiction for an abuse of discretion." *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 709 (6th Cir. 2012).

The district court declined to exercise supplemental jurisdiction because it had already "dismisse[d] all claims over which it has original jurisdiction."  *Mitchell*, 2023 WL 6304913, at *14.  Although that was a fair basis for declining supplemental jurisdiction at the time, now that we will order the reinstatement of certain federal claims, the argument no longer holds. *See Veneklase*, 670 F.3d at 716.

Elhorn insists that we should adjudicate the question of supplemental jurisdiction now, "even if the Plaintiffs-Appellants' federal claims are revived." D. 29 (Elhorn Br. at 20).  We decline to consider those arguments in the first instance because the decision to exercise supplemental jurisdiction rests in the discretion of the district court.  *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).  Instead, we reverse the dismissal of Plaintiffs' claims against Elhorn and "remand the proceedings to the district court to allow it to address the question of whether it wishes to exercise supplemental jurisdiction over the state law claims given that a federal claim remains pending." *Veneklase*, 670 F.3d at 716.

## VI.  CONCLUSION

For the foregoing reasons, we **AFFIRM IN PART** and **REVERSE IN PART**.  We **AFFIRM** the district court's dismissal of the § 1983 bodily-integrity claims against the State officials and **REVERSE** the district court's dismissal of the § 1983 bodily-integrity claims against the City officials and the *Monell* claims against the City.  We further **AFFIRM** the district court's denial of leave to amend and **REVERSE** the district court's declination of

supplemental jurisdiction over the state-law claims against Elhorn.  We **REMAND** for further proceedings consistent with this decision.

---

**CONCURRENCE/DISSENT**

---

LARSEN, Circuit Judge, concurring in part, concurring in the judgment in part, and dissenting in part.  I agree with the majority that Plaintiffs' claims against the State defendants cannot withstand a motion to dismiss.  I also agree that the district court did not abuse its discretion in denying Plaintiffs leave to amend their complaint.  I join those parts of the opinion in full.

As for City official O'Malley, if writing on a clean slate, I might have affirmed the dismissal of the claims against him.  *See Braziel v. Whitmer*, 2024 WL 3966238, at *11–13 (6th Cir. Aug. 28, 2024) (Nalbandian, J., concurring in part and dissenting in part).  But a prior panel, albeit in unpublished authority, decided to let nearly identical claims proceed against O'Malley.  *Id.* at *9.  The prior complaint alleged that the very same actions by O'Malley, taken in precisely the same circumstances, violated the same legal rule that Plaintiffs assert here.  It is a "basic principle of justice that like cases should be decided alike," *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005).  And identical complaints against the same defendant, brought in the same court, could not be more alike.  That different plaintiffs raised the claims is no ground for distinction.  For that reason, I concur in the judgment with respect to the majority's treatment of the claims against O'Malley.  And, as a result, I concur in the majority's treatment of the state-law claims against Elhorn Engineering.

I disagree with the majority, however, that Plaintiffs have plausibly alleged that City officials Muhammad and Watson violated Plaintiffs' clearly established constitutional rights.  So I would affirm the district court's dismissal of the claims against those two defendants.  Relatedly, I would also affirm the district court's denial of Plaintiffs' *Monell* claim.

I.

The complaint alleges that Mayor Marcus Muhammad and City Manager Darwin Watson violated Plaintiffs' constitutional right to bodily integrity under the Fourteenth Amendment's Due Process Clause—that is, that the officials' behavior toward Plaintiffs "shock[ed] the

conscience." *Guertin v. Michigan*, 912 F.3d 907, 922 (6th Cir. 2019) (quoting *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996)). Mere negligence by a government actor can never rise to the level of unconstitutional, conscience-shocking behavior. *Id.* at 923. Instead, the official's actions must have demonstrated at least "deliberate indifference" that "violates the decencies of civilized conduct." *Id.* at 918, 923 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

As the majority explains, this is not the court's first case about lead contamination in public drinking water. This court has considered allegations of constitutional violations by government actors in cases arising from the Flint Water Crisis. *See Guertin*, 912 F.3d at 915; *In re Flint Water Cases*, 960 F.3d 303, 310 (6th Cir. 2020). The plaintiffs in those cases alleged that government officials introduced dangerously high levels of lead into the public drinking water and then lied to cover it up. *See Guertin*, 912 F.3d at 933–34; *In re Flint Water*, 960 F.3d at 310. *Guertin* held that the officials plausibly violated the Constitution, explaining: "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit." 912 F.3d at 921. The court made clear, however, that this was not the same as recognizing "a right to live in a contaminant-free, healthy environment," which the Constitution does not guarantee. *Id.* at 921–22.

Plaintiffs rely on *Guertin* and *In re Flint Water* to allege unconstitutional conduct by Muhammad and Watson. The two officials argue that they are entitled to qualified immunity. To overcome qualified immunity, Plaintiffs must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *In re Flint Water*, 960 F.3d at 323 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Muhammad and Watson contend that Plaintiffs have failed to satisfy either prong. For the following reasons, I agree.

A.

Begin with the alleged constitutional violation. Plaintiffs cannot plausibly show that Muhammad's and Watson's conduct "shocked the conscience," as that test is properly

understood.   Plaintiffs liken this case to the Flint cases, but this case differs in a key way: Plaintiffs acknowledge that the lead contamination arose due to the natural (and foreseeable) consequences of water coursing through aged water pipes.   No government official introduced the lead into the water.   So our inquiry is whether Muhammad's and Watson's responses to naturally occurring elevated lead levels evinced deliberate indifference "shock[ing] [to] the conscience."   *Guertin*, 912 F.3d at 922 (quoting *Lillard*, 76 F.3d at 725).   The answer is plainly "no."

i.

Whether an official's conduct shocks the conscience depends largely on context.   *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008).   As the Supreme Court has cautioned, official conduct "that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."   *Id.* (quoting *Lewis*, 523 U.S. at 850).   So, before considering whether Muhammad and Watson plausibly violated the Constitution, I provide an overview of the City's response to the crisis.

Both the complaint and public records reflect that Benton Harbor officials publicly acknowledged the lead contamination and warned of its dangers.[1]   That stands in stark contrast to the situation this court confronted in *Guertin*.   *See* 912 F.3d at 922 ("Here, defendants make no contention . . . that they provided notice to Flint residents about the lead-laced water.").   Benton Harbor officials mailed advisories and public materials after every round of testing (every six months) to inform residents of the testing results.   The mailings reported that the City "found elevated levels of lead in drinking water in some homes/buildings."   R. 92-15, State Defs.' Ex. 14, PageID 1014.   They also warned that consuming too much lead "can cause serious health problems," such as "damage to the brain and kidneys, and . . . the production of red blood

---

[1]When ruling on a motion to dismiss, courts "may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein."   *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

cells." *Id.* The materials further advised residents to: "[r]un your water to flush out lead"; "[l]ook for alternative sources or treatment of water"; "[t]est your water for lead"; and "[g]et your child tested." *Id.* at 1015–16. Not all households using City water received these materials. But public records reflect that most households did, and Plaintiffs do not allege that their homes were among those that didn't. Nor do Plaintiffs allege that City officials deliberately omitted some households, or "callous[ly] disregard[ed]" a known risk that materials would not reach them. *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005).

Along with advising residents of the lead contamination, City officials worked to mitigate it. They treated the City's water with the Carus 8600 phosphate blend as a form of corrosion control treatment. Plaintiffs dispute the propriety of using Carus 8600 as corrosion control. Yet they acknowledge that the City implemented the corrosion control treatment—used to "prevent or minimize corrosion of lead pipes"—within months of discovering the elevated lead levels. R. 1, Compl., PageID 48.

With this context in mind, I turn to the specific allegations against Muhammad and Watson. *See Guertin*, 912 F.3d at 926 ("The deliberate-indifference standard requires an assessment of each defendant's alleged actions individually.").

ii.

**Mayor Marcus Muhammad**. Plaintiffs take issue with Mayor Muhammad's public response to the crisis. They fault Muhammad for making the following statement at an October 2018 press conference: "Although we want to send out a notice and make this announcement, it's not being . . . delivered as a high alert, emergency 911, panic frenzy. This is FYI, and you can work with our city staff to find out ways to get tested." R. 1, Compl., PageID 55. As the statement suggests, Muhammad made this comment contemporaneously with his notice to the public that the City had discovered that some of its drinking water had "higher-than-acceptable levels of lead." R. 92-14, State Defs.' Ex. 13, PageID 1010. Spreading public awareness of the problem, and suggesting that residents work with the City to get tested, is not conscience-shocking behavior.

Plaintiffs' briefing nonetheless frames Muhammad's disclaimer of a "high alert" or an "emergency" as a "lie[]" meant to lull them into a false sense of security. Appellant Br. at 35. But Plaintiffs do not allege that, absent these comments, they would have refrained from drinking the water. So Plaintiffs have failed to allege causation, an essential element of their claim. *See Guertin*, 912 F.3d at 930–31 (dismissing claims against certain defendants because the plaintiffs failed to set forth any facts indicating that those defendants caused them to consume lead-contaminated water). Moreover, reducing public panic in the face of a crisis serves a legitimate government purpose. *Id.* at 924 (identifying one consideration in a deliberate-indifference inquiry to be "whether a legitimate government purpose motivated the official's act"). Indeed, our sister circuit has called avoiding panic "an essential government function." *Lombardi v. Whitman*, 485 F.3d 73, 83 (2d Cir. 2007). And, as the majority opinion notes, government action "implemented in furtherance of a legitimate public purpose" does not constitute deliberate indifference. Maj. Op. at 14 (citing *Hunt*, 542 F.3d at 541). Muhammad's statement, which notified the public of lead in the water, suggested that residents work with the City to get tested, but urged them not to panic, did not plausibly violate the Constitution.

The majority opinion acknowledges that Muhammad might have made his statement to prevent public panic. It nevertheless adopts Plaintiffs' allegation that Muhammad made this statement to "deliberately mislead" them. Maj. Op. at 22. The majority is correct that we must make all reasonable inferences in Plaintiffs' favor at this stage. *Guertin*, 912 F.3d at 916. But we don't need to accept "unwarranted factual inferences." *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006). Here, no facts in the complaint plausibly support the allegation that Muhammad was trying to "deliberately mislead" the public. And even if Muhammad's statement could be "consistent with" intentional deception, that alone wouldn't cut it. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also id.* (noting that the "sheer possibility" of a defendant's wrongdoing is not enough to survive a motion to dismiss). The "more likely explanation[]" for Muhammad's instruction not to treat the announcement as a "high alert, emergency 911, panic frenzy" is that he sought to quell a panicked frenzy. *Id.* at 681. Given this "obvious alternative explanation," Plaintiffs' unadorned allegation of ill-intended deception is not plausible. *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567); *see also Long v. Insight Commc'ns of Cent. Ohio, LLC*, 804 F.3d

791, 794 (6th Cir. 2015) ("[A]lthough state of mind may be alleged generally, 'the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind-allegation plausible on its face.'" (internal quotation marks and citation omitted)). This is especially so, considering that courts are to start from "the *presumption* that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) (emphasis added).

The majority opinion searches in vain for facts to support Plaintiffs' framing. It reads the complaint to allege that "the City, of which Muhammad was mayor, sent letters indicating the water was safe to drink." Maj. Op. at 22. But the complaint, citing an email exchange to which Plaintiffs were not party, alleges only that a single resident informed EGLE that "she received a letter from the Defendant City, which indicated the water was safe to drink after a 'first flush.'" R. 1, Compl., PageID 59. The allegation makes no mention of Muhammad. And attributing that statement to Muhammad here is hard to square with *Braziel*, which considered this very same email exchange and yet dismissed the complaint against him for failing to "point to any specific statements that Muhammad himself made." 2024 WL 3966238, at *3, *6. In any event, there is no allegation that any of the plaintiffs here received such a letter or the email describing it—they do not claim that they did. So they do not "factually link" this letter to their consumption of the City's water. *Guertin*, 912 F.3d at 932.

The majority opinion also attributes to Muhammad allegations that the City overstated its progress in eliminating the lead. But the complaint's only statement to that effect comes from O'Malley, who said: "[I]t appears . . . the corrosion control treatment system we installed . . . is having an impact sooner than [we expected]." R. 1, Compl., PageID 68 (alterations in original). A statement by O'Malley does not create the plausible inference that Muhammad deliberately misled Plaintiffs. In sum, Plaintiffs do "not provide any statement or action by Muhammad that would indicate that he" made his press conference statement to *deliberately* mislead them. *Braziel*, 2024 WL 3966238, at *7.

Plaintiffs identify one other statement by Muhammad, but it does nothing to advance their case. Plaintiffs find fault with Muhammad's November 2018 statement that the City had

enough money to replace portions of its service lines.  They cast this as a lie because the City seemingly lacked the necessary funds.  But this misrepresentation did not plausibly violate Plaintiffs' constitutional right to bodily integrity.  Muhammad's allegedly false portrayal of the City's ability to remedy the lead contamination in the future did not convey that the water was safe to drink in the present.  So Muhammad's statement did not plausibly turn Plaintiffs' "voluntary consumption of [water] into an involuntary and unknowing act of self-contamination."  *Guertin*, 912 F.3d at 925–26.

**City Manager Darwin Watson**.  Plaintiffs also take issue with two statements by Watson.[2]  To start, Plaintiffs fault Watson for telling homeowners that they were responsible for replacing service lines running from sidewalks to homes.  They admit this statement "may be true."  R. 1, Compl., PageID 54.  They nevertheless take issue with it because the City is responsible for providing drinking water to residents.  But the Constitution does not impose that obligation on the City.  *See Guertin*, 912 F.3d at 921 ("There is, of course, 'no fundamental right to water service.'" (quoting *In re City of Detroit*, 841 F.3d 684, 700 (6th Cir. 2016))).  So it's unclear how any misrepresentation about financial responsibility could have violated the Constitution.  Nothing in Watson's statement assured the public that the water was safe to drink: who bore the financial burden of fixing the lead problem had no bearing on whether the problem existed in the first place.  Watson did not plausibly violate Plaintiffs' right to bodily integrity by misleading them about who was responsible for replacing certain service lines.

Plaintiffs also allege that Watson knew the City's water system was composed of lead service lines, yet he told the public that it was not.  Plaintiffs suggest this statement falsely portrayed the lead as being present only "in isolated, individual plumbing systems."  R. 1, Compl., PageID 54.  They acknowledge, however, that within a month, Watson "backtracked" the statement.  *Id.* at 58.

---

[2]On appeal, Plaintiffs try to raise another allegation against Watson—that he violated their constitutional rights by being a "key decision-maker with respect to the implementation of Carus."  Appellant Br. at 37.  But Plaintiffs' complaint makes no specific allegation tying Watson to the implementation of Carus 8600.  Nor did Plaintiffs present this argument below.  So they have forfeited this allegation.  *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022).

This allegation does not plausibly indicate "egregious behavior" on Watson's part. *Guertin*, 912 F.3d at 923 (quoting *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014)). Misstating the source of lead in the water is not the same as denying its presence. In fact, Watson told residents that "the connection from the water main to the home service line" seemed to be the source of the lead. R. 92-14, State Defs.' Ex. 13, PageID 1011. Residents were still on alert, then, that their water could be contaminated with lead. So Watson's statement about lead service lines typically would not convince someone the water was safe to drink. And though the majority opinion conceives of ways in which Watson's statements *could have* caused *someone* to unwittingly consume lead-contaminated water, Plaintiffs do not allege that this statement convinced *them* of the water's safety. Thus, the statement did not plausibly violate their constitutional rights.[3]

iii.

The majority opinion reaches a contrary conclusion with respect to Muhammad's and Watson's potential liability. But in doing so, it groups all the City defendants together. This approach contravenes our caselaw.[4] Plaintiffs in § 1983 suits "must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)).

To be sure, we have at times refrained from "winnow[ing] the pool of responsible defendants" at the motion-to-dismiss stage. *Hart v. Hillsdale County*, 973 F.3d 627, 640 (6th Cir. 2020). But we have done so in factually distinct circumstances. In *Hart*, for example, the defendants alleged a "web of reliance" that was "impossible" to disentangle at the motion-to-dismiss stage. *Id.* Similarly, in *Moderwell v. Cuyahoga County*, the plaintiffs alleged

---

[3]To the extent that the majority opinion reads the complaint to allege that Muhammad and Watson violated Plaintiffs' constitutional rights by failing to earnestly "study[] the problem or its optimal solution," the opinion correctly notes that any such failures are not actionable in themselves, as they amount to "mere negligence." Maj. Op. at 20–21; *see Guertin*, 912 F.3d at 916 (noting that "mere negligence" "is categorically beneath the threshold of constitutional due process" (quoting *Lewis*, 523 U.S. at 849)).

[4]The majority opinion also groups together the claims against the State defendants and analyzes their actions accordingly. But the majority correctly determines that none of the State defendants violated the Constitution. So that error is harmless.

that the defendants "act[ed] in concert," which made it "difficult[] [to] assign[] liability at the pleading stage."  997 F.3d 653, 663–64 (6th Cir. 2021) (citing *Hart*, 973 F.3d at 640).

No analogous reason justifies relaxing the typical § 1983 pleading requirements in this case.  Plaintiffs do not allege that Muhammad and Watson acted in concert with O'Malley, and no one suggests that Muhammed and Watson acted in reliance on information provided by each other.  What's more, *Guertin* and *In re Flint Water* demonstrate that allegations of the kind Plaintiffs raise *can* be disaggregated and analyzed separately at the motion-to-dismiss stage.  In fact, *Guertin* expressly noted our obligation to assess the deliberate-indifference claims against each individual defendant.  912 F.3d at 926.  Our analysis exemplified this:  we dismissed claims against one defendant because, although "the conduct of individuals within his department was constitutionally abhorrent," we "[could] only hold [him] accountable for his own conduct." *Id.* at 929.

The majority points to one paragraph in the complaint to justify grouping the City officials together at this point.  The paragraph alleges that "at every turn, EGLE and City officials, along with their contractors, dodged the law and misled the public about the true extent of the Benton Harbor water crisis and the dangers of lead."  R. 1, Compl., PageID 50.  This cursory paragraph does not allege concerted action.  It appears, moreover, in the complaint's "Statement of Facts."  It surely does not provide grounds to ignore our directive to consider the claims against each individual defendant—especially because Plaintiffs identify the City officials by name in the "Claims for Relief."

Treating the City officials' actions as a group enables the majority opinion to find plausible constitutional violations by Muhammad and Watson where none exist.  The majority identifies one public statement by Muhammad and one by Watson—neither of which, for the reasons stated above, was egregious.  The majority then tacks those public statements onto O'Malley's arguably more troubling communications.  The combined effect of all three defendants' statements permits the majority to conclude that the claims against each defendant should proceed.  In essence, the majority opinion deploys a guilt-by-association tactic that our caselaw forbids.  *See, e.g.*, *Guertin*, 912 F.3d at 915, 929.  When properly considered,

Muhammad's and Watson's actions do not plausibly support a constitutional violation by either actor.

The majority opinion also lowers the "particularly high hurdle" that Plaintiffs must surmount to state a substantive due process claim based on conscience-shocking behavior. *Id.* at 926. Rebuffing Defendants' claim that the allegations here fall short of the extreme misconduct found actionable in *Guertin*, the majority opinion responds that "plaintiffs alleging violations of the right to bodily integrity arising from drinking lead-contaminated water do not need to set forth factual allegations identical to the extraordinary mismanagement in the Flint Water Crisis to prevail." Maj. Op. at 24. Perhaps that is so. But even if the allegations needn't replicate *Guertin*, they surely must closely resemble it. The allegations here do neither. *See infra* I.B.

Unmooring this case from *Guertin* and *In re Flint Water* impermissibly dilutes the "shocks the conscience" test. The very purpose of the test is to isolate cases of truly "egregious behavior" and to prevent us from "transforming run-of-the-mill tort claims into violations of constitutional guarantees." *Guertin*, 912 F.3d at 923 (quoting *Range*, 763 F.3d at 590). The alleged government conduct in the Flint Water Crisis survived this exacting analysis only because the government officials' purported behavior was so "extraordinary" as to be "constitutionally abhorrent." Maj. Op. at 24; *Guertin*, 912 F.3d at 929. By jettisoning the Flint Water Crisis as the standard for conscience-shocking conduct in lead-contamination cases, the majority drains the constitutional test of its essence. It is reserved for cases of "outrageous," "'brutal' and 'offensive'" misconduct that transgresses the boundaries "of fair play and decency." *Lewis*, 523 U.S. at 847 & n.8 (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957)). In sum, it is designed to be a test that few plaintiffs can meet. Plaintiffs have not met it here.

## B.

Plaintiffs also cannot show that Muhammad and Watson violated clearly established law. For a right to be clearly established, "*existing* precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (emphasis added). In other words, the state of the law "at the time of the challenged conduct" must have made it obvious to

every reasonable officer that his conduct was unconstitutional. *Id.* Timing is important because a government official is entitled to qualified immunity unless he had "fair notice that [his] conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

The burden falls on the plaintiff to identify the precedent that clearly established the law. *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025). Here, Plaintiffs point to *Guertin* and *In re Flint Water* as having clearly established the unconstitutionality of Muhammad's and Watson's actions.

The problem for Plaintiffs is that *Guertin* and *In re Flint Water* were not law at the time Muhammad and Watson allegedly violated Plaintiffs' constitutional rights. Consider Muhammad's allegedly unconstitutional statements. His first statement advised residents not to go into a "panic frenzy" over the elevated lead levels. R. 1, Compl., PageID 55. He announced this at a press conference on October 25, 2018. His second statement concerned the City's fiscal ability to replace service lines. He made this statement no later than November 23, 2018.[5] Watson, too, made his allegedly offending statements in the fall of 2018. At the October 25, 2018, press conference, Watson incorrectly told Plaintiffs the City had no lead lines. By November 2018, he had corrected this statement. Sometime in fall 2018, Watson also advised homeowners that they were responsible for replacing lead lines running between sidewalks and homes.

Thus, the only "statements or actions that are attributable to Muhammad [and Watson] specifically and that would tend to support [Plaintiffs'] claims," *Braziel*, 2024 WL 3966238, at *6, predated *Guertin* and *In re Flint Water*.[6] This court published *Guertin* on January 4, 2019.

---

[5]Plaintiffs allege that Muhammad "claimed the City would have enough money to replace 40% of service lines." R. 1, Compl., PageID 59. They cite a news article that contains no such statement. Two paragraphs earlier, however, they cite a November 2018 news article reporting: "Mayor Marcus Muhammad said it's estimated that the city will have money to replace about 40 service lines after the inventory is done." Louise Wrege, *BH homes test positive for high lead levels*, Herald-Palladium (Nov. 23, 2018), https://www.heraldpalladium.com/news/local/bh-homes-test-positive-for-high-lead-levels/article_dcce88fa-73e8-53e9-a5b1-b488a3983cc1.html. Plaintiffs' appellate brief confirms this is Muhammad's statement with which they find fault.

[6]The same is not necessarily true as to O'Malley. The emails relaying O'Malley's earliest statements were sent on January 9, postdating *Guertin* by five days. So, following *Braziel*'s lead, it is plausible the law was clearly established "at the time" O'Malley made the statements discussed in the emails. *In re Flint Water*, 960 F.3d at 323; *see Braziel*, 2024 WL 3966238, at *5, *9 (explaining that our cases had clearly established the unconstitutionality of O'Malley's actions). Additionally, Plaintiffs challenge statements that O'Malley made in November 2019. Those

912 F.3d at 907. *In re Flint Water* followed on May 22, 2020. 960 F.3d at 304. Neither case established any law in fall 2018.

Even if timing weren't an issue, the cases still don't clearly establish the unconstitutionality of Muhammad's and Watson's statements. The majority admits that this case is not "identical" to *Guertin*. Maj. Op. at 24. But that's an understatement: this case is not even closely analogous to it. *See Trozzi v. Lake County*, 29 F.4th 745, 761 (6th Cir. 2022) (noting that, to overcome qualified immunity, plaintiffs must identify "closely analogous precedent"). A look at the holding and facts in *Guertin* quickly reveals as much.

In *Guertin*, this court held that "knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit," violates an individual's constitutional right to bodily integrity. 912 F.3d at 921. It is true that the court allowed claims against one official, Bradley Wurfel, to proceed based on public statements alone. *Id.* at 928–29; *see In re Flint Water*, 960 F.3d at 329–30. But the allegations against Wurfel in the Flint Water Crisis cases were of a different character. Wurfel allegedly knew his colleagues had *poisoned* the water, yet he "announced the water was safe to drink, and [he] demeaned, belittled, and aggressively dampened attempts . . . to challenge the government's assertions that Flint did not have a problem with its drinking water." *Guertin*, 912 F.3d at 928. Simply put, Wurfel allegedly "cover[ed] up" the "knowing[] and intentional[]" poisoning of a community by denying, and hampering attempts to uncover, any problems with the water. *In re Flint Water*, 960 F.3d at 329; *Guertin*, 912 F.3d at 921.

That's a far cry from the alleged misrepresentations here. Plaintiffs do not allege that anyone introduced lead into Benton Harbor's water. Naturally, then, they do not allege that Muhammad and Watson covered that up. Instead, the allegations here are, at most, that in the course of *disclosing* the *natural* occurrence of lead in the water, Muhammad and Watson "downplayed" the risks that the elevated lead levels posed. R. 1, Compl., PageID 55. That is far less egregious than the government conduct this court found plausibly conscience shocking in the Flint Water Crisis cases.

---

statements certainly postdated *Guertin*. Thus, unlike the statements by Muhammad and Watson, at least some statements by O'Malley occurred after *Guertin*'s publication.

Plaintiffs nevertheless try to liken this case to *Guertin* by alleging that all the named officials "deliberately denied, lied about, covered up, deceived, discredited, and ignored known dangers and risks of harm to which they exposed Plaintiffs." *Id.* at 91. This conclusory allegation, and others like it, rings hollow and falls short. *Guertin* found the officials' conduct conscience-shocking because the officials allegedly "caused Flint residents to consume a toxin with no known benefit, did so without telling them, and made affirmative representations that the water was safe to drink." 912 F.3d at 934. By contrast, Muhammad and Watson held a press conference where they publicly acknowledged the discovery of elevated lead levels, indicated that the testing results were "cause for concern," and told residents they could work with the City to test their water for lead. R. 92-14, State Defs.' Ex. 13, PageID 1010.

Plaintiffs allege that Muhammad "downplayed the severity of lead in the water" by announcing it was not an emergency. R. 1, Compl., PageID 55. And Watson did the same by saying the City had no lead service lines. The two officials also made allegedly misleading statements about fiscal management of the crisis.

Making all reasonable inferences in Plaintiffs' favor, however, one cannot make out a plausible "deni[al]" or "cover[] up" of a City-made crisis by Muhammad or Watson. *Id.* at 91. Simply saying that their actions were like those of the Flint officials does not make them so. *See Braziel*, 2024 WL 3966238, at *7 (explaining that the plaintiffs needed to "assert more than mere conclusory statements against Muhammad for their Fourteenth Amendment substantive-due-process claim against him to move forward"). Neither *Guertin* nor *In re Flint Water* would have put Muhammad and Watson on notice that their statements were unconstitutional, even if those cases had been decided at the time the statements were made.

For its part, the majority acknowledges that *Guertin* and *In re Flint Water* didn't clearly establish the law in this case. Instead, the majority says that these cases "recognized . . . a preexisting, clearly established right." Maj. Op. at 25. In other words, the majority must believe that this case, like *Guertin*, is the "rare obvious case"—one that so clearly crosses constitutional boundaries that, even in the absence of a case on point, Muhammad and Watson should have known that the illegality of their actions was "beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quotation marks and citations omitted). The majority opinion does

nothing, however, to explain why this is so.  And given the conspicuous distinctions between the cases, it is not sufficient to say that if *Guertin* was the obvious case, then this one is too.

Comparing the *Guertin* allegations to the ones here makes it obvious that this case is *not* the obvious case.  This court in *Guertin* held that the "obvious cruelty inherent" in "taking *affirmative steps to systematically contaminate* a community through its public water supply" and distributing the toxic water "*without taking steps to counter its problems*," while "*assuring the public . . . it was safe*," should have alerted officials to the unlawfulness of their actions. 912 F.3d at 933 (emphasis added) (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)).  No such conduct occurred here: No one introduced lead into Benton Harbor's water—natural corrosion did.  Muhammad and Watson did not deny the presence of elevated lead levels—they notified residents of it.  And City officials did not sit on their hands while the lead levels rose—they implemented a corrosion control treatment to lower them.  Whatever the errors of Muhammad's and Watson's actions, their actions were not so abhorrent as to "obvious[ly]" violate the Constitution.  *Brosseau*, 543 U.S. at 199.  However you look at it, Muhammad and Watson did not violate Plaintiffs' clearly established rights.

## II.

I also disagree with the majority's treatment of Plaintiffs' *Monell* claim.  A municipality cannot be liable under *Monell* "without an underlying constitutional violation."  *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014).  For the reasons provided above, Muhammad and Watson did not plausibly violate the Constitution.  So their actions cannot be the basis of Plaintiffs' *Monell* claim.

As for O'Malley, the City could be liable for his conduct only if some municipal policy was the "moving force" behind it.  *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).  The majority opinion does not claim that any City policy caused O'Malley to make his allegedly unconstitutional statements.  And for good reason.  O'Malley's and the City's messaging were at odds with each other.  For instance, an email exchange revealed that O'Malley told one resident the City was providing "clean water right to the tap and [she] should have no trouble drinking it."  R. 1-4, Pls.' Ex. 5,

PageID 162.  Yet the City distributed public advisories that: warned residents the City had discovered elevated lead levels in parts of the public drinking water; alerted residents to the risks of consuming too much lead; and advised residents to consider alternative sources of water.  This indicates that O'Malley's actions did not align with the City's policy or custom.  Sure enough, the City terminated O'Malley mid-crisis, making the disconnect between the two parties plain.

To be sure, in some circumstances, a municipality may be liable for a single official's actions if the official had "final authority to establish municipal policy."  *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  And Plaintiffs make a conclusory claim that O'Malley (along with every other named government defendant) was "an employee and/or official . . . with final policymaking authority for the purposes of *Monell*."  R. 1, Compl., PageID 33.  But Plaintiffs point to no state or local law in support of O'Malley's authority, even though such laws determine whether an official has final decision-making power.  *See Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  Nor do Plaintiffs allege facts indicating that O'Malley had "final and unreviewable" discretion that was "not constrained by the official policies of superior officials."  *Waters*, 242 F.3d at 362.  All Plaintiffs offer in support of their allegation that O'Malley was more than an employee is their own "naked assertion[]," which is insufficient.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  I would thus affirm the district court's dismissal of Plaintiffs' *Monell* claim.

\* \* \*

At bottom, Plaintiffs allege that Muhammad and Watson acknowledged elevated lead levels in portions of the City's drinking water, yet downplayed the dangers residents faced.  This may have been a failure, but the Due Process Clause does not protect against it.  *See Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("[I]mprudence and poor execution do not rise to the level of constitutionally arbitrary abuses of power.").  Even if it did, no clearly established law in place at the time warned Muhammad and Watson that their actions violated the Constitution.  I respectfully disagree with the majority's conclusions to the contrary and would affirm the district court's dismissal of the claims against Muhammad, Watson, and the City.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-1970

FILED

May 06, 2025

KELLY L. STEPHENS, Clerk

IESHA MITCHELL, guardian and next friend of
A.M., et al.,

     Plaintiffs - Appellants,

v.

CITY OF BENTON HARBOR, MICHIGAN;
MARCUS MUHAMMAD; MICHAEL O'MALLEY;
DARWIN WATSON; LIESL CLARK; ERIC
OSWALD; ERNEST SARKIPATO; BRANDON
ONAN; ELHORN ENGINEERING COMPANY,

     Defendants - Appellees.

Before: MOORE, COLE, and LARSEN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is
AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent
with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Kelly L. Stephens, Clerk